IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| NORTHSTAR OFFSHORE GROUP, LLC | § | |
| | § | Case No. 16-34028 |
| Putative Debtor. | § | |

PUTATIVE DEBTOR NORTHSTAR OFFSHORE GROUP, LLC'S
MOTION FOR ABSTENTION UNDER 11 U.S.C. § 305(A), AND, IN THE
ALTERNATIVE, ANSWER, AFFIRMATIVE DEFENSES, AND
REQUEST FOR DISCOVERY
(Relates to Docket No. 1)

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE U.S. BANKRUPTCY COURT:

COMES NOW, Northstar Offshore Group, LLC ("Northstar"), Putative Debtor in the

above-captioned case, and, in opposition to the Involuntary Petition (Dkt. No. 1), files this Motion

for Abstention Under 11 U.S.C. § 305(a) and, In the Alternative, Answer, Affirmative Defenses, and Request for Discovery (the "Motion"), and respectfully represents:

## I.      OVERVIEW

1.      On August 12, 2016 (the "Involuntary Petition Date"), Alliance Offshore, LLC ("Alliance Offshore"), Alliance Energy Services, LLC ("Alliance Energy"), and Montco Oilfield Contractors, LLC ("Montco," and together with Alliance Offshore and Alliance Energy, the "Petitioning Creditors") filed an involuntary chapter 11 petition (Dkt. No. 1) (the "Involuntary Petition") against Northstar. Northstar requests that the Court deny entry of an order for relief and abstain from hearing the case pursuant to section 305 of title 11 of the U.S. Code (the "Bankruptcy Code").[1] For the reasons explained herein, the interests of creditors and the putative debtor would be better served by abstention.

2.      Northstar is an independent exploration and production ("E&P") company that—like most E&P companies operating in the current economic environment—is experiencing financial constraints as a result of the dramatic decline in the oil and gas market. Notwithstanding this, Northstar has not sought relief pursuant to chapter 11 of the Bankruptcy Code because it does not presently believe that an in-court restructuring of its debts is the best means of addressing its financial condition. Instead, this proceeding may undermine the progress which Northstar has made in its efforts to achieve an out-of-court restructuring of its debts. These restructuring efforts have addressed governance, financial, and operating issues. Operationally, management has implemented a wide range of cost-saving measures which have reduced operating expenses by

---

[1]     The Petitioning Creditors served Northstar with the Involuntary Petition and summons on August 17, 2016. Dkt. No. 8. The Court subsequently signed the parties' stipulation extending Northstar's deadline to respond to the Involuntary Petition from September 7, 2016 until September 29, 2016. Dkt. No. 23.

almost half without materially reducing pre-existing levels of production. Financially, the company recently retained an investment banker to assist it in pursuing strategic alternatives, including procuring additional capital and negotiating settlements with Northstar's creditors. In addition, the joint liquidators and professionals who are overseeing the wind-up of a Cayman Islands-based hedge fund which owns interests in Northstar have represented that they are finalizing the liquidation of assets and a portion of the proceeds from such liquidation are earmarked for use by Northstar. *See* Ex. B to Northstar's Mot. for Abstention, Decl. of M. J. Wright, at ¶¶ 9–10 (noting that much of the funds are currently in escrow, pending approval by the court overseeing the liquidation). From a governance standpoint, Northstar has recently constituted a Board of Managers comprised of two independent managers and one manager associated with Platinum Partners ("Platinum"), Northstar's indirect majority shareholder.

3.      Other than the operational undertakings mentioned above, which have been ongoing, the foregoing developments are recent. If these measures are successful in alleviating Northstar's financial concerns, creditors will not only avoid the cost and delay associated with any chapter 11 case, they will likely realize a more robust recovery as significant administrative costs will be avoided. If, on the other hand, these efforts fail to address Northstar's financial constraints, creditors will not be harmed as the suspension requested by this Motion may promptly be abated, and Northstar may proceed with this chapter 11 case. Absent the requested suspension, the progress made by Northstar and its advisors may be undermined, and resources that would otherwise be devoted to this endeavor will be diverted to the administrative requirements of chapter 11. Accordingly, Northstar submits that a temporary suspension of these proceedings pursuant to section 305(a)(1) of the Bankruptcy Code is warranted so as to permit it sufficient time to attempt to forge an out-of-court resolution of its liquidity constraints.

4.      Subject to, and without waiving its request for abstention, Northstar concurrently files its answer and affirmative defenses to the Involuntary Petition. In connection therewith, Northstar requests an opportunity to conduct limited discovery aimed at understanding the circumstances surrounding the filing of the Involuntary Petition.

## II.      FACTUAL BACKGROUND

### A.      Overview of Northstar and its Operations

5.      Northstar is an independent E&P company headquartered in Houston, Texas. Northstar's business focuses on acquisitions, production enhancements, development drilling, workovers, and low-risk exploration in the shallow waters of the Gulf of Mexico.

6.      Northstar's producing properties are located primarily on the Outer Continental Shelf of the Gulf of Mexico. The company leases these properties from the U.S. Bureau of Ocean Energy Management pursuant to the Outer Continental Shelf Lands Act and also from the State of Louisiana.

7.      Northstar's predecessor entities entered the E&P business in approximately 2001. These predecessor entities were sold to independent third parties in 2008 and 2011. The current Northstar entity was formed in early 2012 and constitutes the third generation of the company and its management team, most of whom have been with the company or its predecessors for the past five to ten years.

8.      Northstar GOM Holdings Group LLC ("Northstar GOM") purchased Northstar in September 2014. Northstar GOM is owned by PPVA Oil and Gas, LLC, an entity which is controlled by Platinum.[2] Three other entities controlled by Platinum, including Platinum Partners

---

[2]    Platinum is a New York-based investment management group that manages multiple funds in a variety of sectors. *See* "Platinum Partners Hedge Fund," http://www.platinumlp.com/About.

Value Arbitrage Fund LP ("PPVA LP"), also purchased equity interests in Northstar. Thus, all of Northstar's equity interests are currently owned, either directly or indirectly, by Platinum entities. Platinum also holds a significant amount of Northstar's secured and unsecured debt.

**B.     PPVA LP and the Cayman Islands Liquidation Proceeding**

9.     On July 28, 2016, an involuntary winding up petition (the "PPVA International Petition") was filed against Platinum Partners Value Arbitrage Fund (International) Limited ("PPVA International") in the Grand Court of the Cayman Islands (the "Cayman Islands Court"). On August 23, 2016, that court entered a Winding Up Order. The Winding Up Order provides for PPVA International to be wound up and appoints Matthew James Wright and Christopher Barnett Kennedy of RHSW (Cayman) Limited as joint official liquidators.

10.     PPVA International invests its investable capital in Platinum Partners Arbitrage Intermediate Fund, Limited, which, in turn, invests its investable capital in PPVA LP. On August 23, 2016, PPVA LP voluntarily filed a winding up petition (the "PPVA LP Petition") in the Cayman Islands Court, along with a request for the appointment of joint provisional liquidators ("JPLs"). On August 25, 2016, the Cayman Islands Court issued a provisional liquidation order (the "Provisional Order"), and appointed Matthew James Wright and Christopher Barnett Kennedy of RHSW (Cayman) Limited as JPLs. *See* Ex. 1 to Decl. of M. J. Wright at ¶ 1.

11.     The Provisional Order authorizes the JPLs to "take such steps as, in their discretion, may be necessary or expedient for the purpose of presenting a compromise or arrangement to the creditors" of PPVA LP in order to maximize the value of PPVA LP's assets. *Id.* at ¶ 3; *see also id.* at ¶ 4(b)(iii) (authorizing JPLs to "enter into discussions and negotiations for and on behalf of" PPVA LP for the purpose of "making any compromise or arrangement with [alleged] creditors" of PPVA LP). Moreover, the Provisional Order grants the JPLs "the power to sell any of [PPVA LP's] property by public auction or private contract," subject to the consent of a liquidation

committee or, alternatively, the Cayman Islands Court. *Id.* at ¶ 4(c). In addition, the Provisional Order grants the JPLs the power to take such other action in relation to PPVA LP's subsidiaries as the JPLs see fit "for the purpose of protecting the assets of [PPVA LP] and managing the affairs of [PPVA LP]." *Id.* at ¶ 4(g)(iii).[3]

12.     Like Northstar's involuntary proceeding, PPVA LP's liquidation proceeding is still in its preliminary stages. As discussed below, however, given the significant potential of Northstar's assets, PPVA LP remains committed to the success of Northstar and is actively working to provide financial support for Northstar through the liquidation of assets in the Cayman Islands Court. Proceeds from PPVA LP's sale of assets that are earmarked for use by Northstar have already been realized by the liquidators and some are currently in escrow. Decl. of M. J. Wright at ¶ 10.

13.     Platinum believes that its significant investment in Northstar will be maximized by providing ongoing financial support to Northstar. This financial support would be used by Northstar to develop properties which Platinum believes have the potential to generate significant future revenues and to resolve the claims of Northstar's creditors. Platinum believes that all stakeholders will benefit from these dual undertakings. While creditor claims may be resolved in and outside of chapter 11, it is not clear whether debtor-in-possession financing would be available to Northstar for purposes of investing in its undeveloped properties.

---

[3]     The Cayman Islands Court will conduct a further hearing on the PPVA LP Petition on October 27, 2016. At this hearing, PPVA LP's creditors will have the opportunity to object to the appointment of the JPLs and other aspects of the Provisional Order.

C.     **The Black Elk Bankruptcy**

14.     On August 11, 2015, certain creditors of Black Elk Energy Offshore Operations, LLC ("Black Elk") filed an involuntary bankruptcy petition in this Court under chapter 7 of the Bankruptcy Code. Case No. 15-34287, Dkt. No. 1. Shortly thereafter, Black Elk consented to the entry of an order for relief, and the case was converted to chapter 11 (the "Black Elk Bankruptcy"). Case No. 15-34287, Dkt. Nos. 68, 75. On July 13, 2016, the Court confirmed the Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC under Chapter 11 of the Bankruptcy Code. Case No. 15-34287, Dkt. No. 1204.

15.     Platinum-related entities owned the majority of the equity interests in Black Elk. *See* Case No. 15-34287, Dkt. No. 115. The Black Elk Bankruptcy is relevant to this case due to the existence of a pre-bankruptcy agreement involving Northstar's purchase of certain assets from Black Elk.[4]

(i)     *Northstar's Purchase of Select Black Elk Assets*

16.     In early 2015, before the commencement of the Black Elk Bankruptcy, Northstar and Black Elk entered into, and subsequently amended, the Original Purchase Agreement,[5] wherein Northstar agreed to purchase Black Elk's rights in various oil and gas properties (as defined in the Original Purchase Agreement, the "Northstar Assets").[6] Case No. 15-34287, Dkt.

---

[4]     As discussed in more detail below, the Petitioning Creditors actively participated in the Black Elk Bankruptcy.

[5]     These agreements include the Purchase and Sale Agreement by and between Black Elk Energy Offshore Operations, LLC, as Seller, and Northstar Offshore Group, LLC, as Purchaser, dated as of January 9, 2015, as amended by the First Amendment to Purchase and Sale Agreement, dated as of April 9, 2015, and as further amended by the Second Amendment to Purchase and Sale Agreement dated as of June 1, 2015 (collectively, the "Original Purchase Agreement").

[6]     A full list of the Northstar Assets was attached to the Original Purchase Agreement. Case No. 15-34287, Dkt. No. 961-4 at Ex. A.

No. 797, at ¶¶ 1–2. The sale closed on April 13, 2015, but title to seven of the Northstar Assets (the "Untransferred Northstar Assets")[7] did not transfer to Northstar. *Id.* at ¶ 5. While the Black Elk Bankruptcy was ongoing, Northstar and Black Elk negotiated the Third Amendment to the Purchase and Sale Agreement (together with the Original Purchase Agreement, the "Amended Purchase Agreement") providing for Northstar to purchase and receive title to the Untransferred Northstar Assets. Case No. 15-34287, Dkt. No. 961-2. On June 2, 2016, Black Elk filed a motion (the "Sale Motion") seeking this Court's approval of the sale to Northstar pursuant to the terms of the Amended Purchase Agreement. Case No. 15-34287, Dkt. No. 961.

(ii)  *Alliance Energy's Competing Bid on the Untransferred Northstar Assets*

17.  Certain creditors, including Grand Isle Shipyards, Inc. ("Grand Isle"),[8] an alleged lienholder on five of the seven Untransferred Northstar Assets,[9] objected to the Sale Motion. Case No. 15-34287, Dkt. Nos. 1008, 1050, 1065. After hearing argument, the Court imposed a deadline of July 27, 2016 for entities that held liens on the Untransferred Northstar Assets to submit competing bids—either directly or through a designee—to purchase the Untransferred Northstar Assets. Case No. 15-34287, Dkt. No 1206, at ¶¶ 28–30. As the Court acknowledged, Northstar's proposed consideration for the Untransferred Northstar assets included the assumption of plugging and abandonment ("P&A") liabilities, as well as the posting of adequate surety bonds. *Id.* at ¶ 19.

---

[7]  The Untransferred Northstar Assets are: High Island A-442, OCS G-11383; High Island A-443, OCS G-3241; South Pelto 8, OCS G-3587; South Pelto 13, OCS G-3171; South Marsh Island 41, OCS G-1192; West Cameron 20, OCS 0680; and West Cameron 269, G-13563. Case No. 15-34287, Dkt. No. 961-2 at Ex. A.

[8]  Counsel for Grand Isle has been granted admission *pro hac vice* in the instant case. Dkt. No. 28.

[9]  Grand Isle and Gulf Offshore Logistics, LLC asserted liens over the following Untransferred Northstar Assets: High Island A-442, OCS G-11383; High Island A-443, OCS G-3241; South Marsh Island 41, OCS G-1192; West Cameron 20, OCS 0680; and West Cameron 269, G-13563. *See* Case No. 15-34287, Dkt. No. 1232, at p. 6, ¶ 2.

18.     On July 27, 2016, Alliance Energy—one of the Petitioning Creditors herein—as designee of Grand Isle and Gulf Offshore Logistics, LLC ("Gulf Offshore") submitted a competing bid (the "Alliance Bid") to purchase the Untransferred Northstar Assets. Case No. 15-34287, Dkt. No. 1232, Ex. A. Alliance Energy "received by assignment from Grand Isle Shipyard, Inc. and Gulf Offshore Logistics an assignment of their . . . liens encumbering the Untransferred [Northstar] Assets" and submitted credit bids pursuant to that assignment. *Id.* The credit portion of the Alliance Bid accounted for all but $250,000 of the $3,076,145.30 total consideration that Alliance Energy offered to purchase the Untransferred Northstar Assets. *Id.* at ¶ 2. The same day, Grand Isle and Gulf Offshore asked the Court to conclude that the Alliance Bid was the highest and best offer for the Untransferred Northstar Assets. No. 15-34287, Dkt. No. 1232, at ¶ 3.

19.     Notwithstanding this request, the Alliance Bid contained a number of contingencies, including the completion of satisfactory diligence of the Untransferred Northstar Assets. *Id.*, Ex. A at ¶ 5. Prior to the submission of the Alliance Bid, Grand Isle and Gulf Offshore (both represented by the same counsel) engaged in limited diligence and did not physically inspect the Untransferred Northstar Assets.

20.     On August 3, 2016, although Grand Isle and Gulf Offshore's liens had purportedly been transferred to Alliance Energy, the attorney representing both Grand Isle and Gulf Offshore emailed Northstar's counsel asking for additional information concerning the amount of unpaid vendor invoices which Northstar had agreed to assume under the Amended Purchase Agreement. Counsel was purportedly unaware of these relatively significant amounts and, in conjunction with making the information request, counsel alleged that "Northstar is trying to raise the goal posts to prevent our clients from succeeding in their Competing Bid." *See* Ex. C to Northstar's Mot. for Abstention.  Counsel also stated that his clients "need the opportunity to inspect the assets," and

that "our clients [should be] given access." *Id.* Northstar's counsel responded the same day by providing supporting documentation for the unpaid invoices and providing the contact information for the individual at Northstar who could arrange for physical inspection of the assets. *Id.* No such physical inspection of the assets occurred.

(iii)     *Montco's Involvement in the Black Elk Bankruptcy*

21.     Montco—another Petitioning Creditor herein—also had significant involvement in the Black Elk Bankruptcy.  Specifically, Montco contracted to perform P&A work on multiple Black Elk properties, resulting in tens of millions of dollars of revenues.  Case No. 15-34287, Dkt. Nos. 682, 999, 1146.

22.     The Court approved an initial service agreement between Montco and Black Elk on March 1, 2016, which provided for payment to Montco of approximately $48.2 million for P&A work on 19 properties.  Case No. 15-34287, Dkt. No. 682-1 at ¶ 1.2.1 & Ex. A.  On June 8, 2016, the Court authorized Montco to perform P&A work for three additional properties pursuant to an amended agreement providing for the payment to Montco of approximately $27.2 million.  Case No. 15-34287, Dkt. No. 999, at ¶ 1; Case No. 15-34287, 916-3, at ¶¶ 1.2.4–1.2.5.  A few weeks later, the Court authorized Montco to perform decommissioning work on two more properties pursuant to an agreement providing for the payment to Montco of an additional $10.0 million.  Case No. 15-34287, Dkt. No. 1146, at ¶ 1; Case No. 15-34287, Dkt. No. 1043-2, at ¶¶ 1.2.6–1.2.8.  Thus, Montco will be paid approximately $85.4 million for the P&A work it has agreed to perform thus far in connection with the Black Elk Bankruptcy.

**D.**     **The Involuntary Petition and the Subsequent Withdrawal of Alliance's Competing Bid in the Black Elk Bankruptcy**

(i)     *Involuntary Petition*

23.     On August 12, 2016, Alliance Energy, Alliance Offshore,[10] and Montco filed the Involuntary Petition in the above-captioned matter. Dkt. No. 1. The Involuntary Petition names Northstar as a putative debtor and alleges that Northstar is not paying its debts as they come due.

24.     As of the Involuntary Petition Date, Northstar owed a total of approximately $451,783.10 to Alliance Energy and $226,325.02 to Alliance Offshore based on unpaid invoices issued to Northstar.

25.     As of the Involuntary Petition Date, Northstar owed Montco outstanding invoices totaling approximately $329,988.00.

(ii)     *Court's Request to Supplement the Alliance Bid*

26.     On August 22, 2016, this Court issued an Order to Supplement in the Black Elk Bankruptcy, in which it noted that the Alliance Bid had "substantial contingencies, which were proposed to be resolved by the end of August, 2016." Case No. 15-34287, Dkt. No 1255. The Court then directed Grand Isle and Gulf Offshore to supplement the Alliance Bid on or before September 6, 2016 by filing a statement either waiving all remaining contingencies in the Alliance Bid, terminating the Alliance Bid, or explaining why the Alliance Bid was superior to other offers. *Id.*

---

[10]     Alliance Offshore is a corporate affiliate of Alliance Energy. *See* Press Release, Alliance Energy, Alliance Energy Services Begins Operations (Sept. 16, 2015) (describing Alliance Energy as a "sister company" of Alliance Offshore), http://www.allianceenergyservicesllc.com/news/Alliance-Energy-Services-Begins-Operations.

(iii)     *Withdrawal of the Alliance Bid*

27.     The same day as the Court issued the Order to Supplement, and ten days after Alliance Energy filed the Involuntary Petition against Northstar, General Counsel for the Alliance Companies sent a letter to Black Elk withdrawing the Alliance Bid.[11]  Case No. 15-34287, Dkt No. 1257, Ex. A.  The letter stated that Alliance Energy's offer had been conditional and that "[u]pon review and assessment of the assets and information pertaining to the assets, [Alliance Energy] has determined that the assets are not acceptable to [Alliance Energy]." *Id.* The letter provided no further explanation.

28.     On August 23, 2016, Grand Isle and Gulf Offshore filed with the Court a notice of termination of the Alliance Bid. *Id.* Two days later, on August 25, 2016, Grand Isle and Gulf Offshore filed a response to the Order to Supplement repeating that the Alliance Bid had been terminated.  Case No. 15-34287, Dkt. No. 1265.  Grand Isle and Gulf Offshore also officially withdrew their motion for the Court's approval of the Alliance Bid.  Case No. 15-34287, Dkt. No. 1266.

**E.     Northstar's Current Status**

29.     Like most independent E&P companies, Northstar has been affected by the dramatic decline in commodity prices that began in the second half of 2014. The magnitude of this price decline, along with the ongoing uncertainty in the energy markets, has adversely impacted Northstar's operating results.  Northstar has been further challenged as a result of Black Elk's failure to pay it all of the consideration required by the Original Purchase Agreement and its

---

[11]   The letter identifies "Alliance Integrated Energy Solutions, LLC" as the purchaser, whereas the July 27, 2016 Agreement names Alliance Energy as the purchaser.

failure to satisfy liens encumbering certain of the properties transferred to Northstar subject to the Original Purchase Agreement.

30.     Nevertheless, Northstar is a viable entity.  Actions undertaken by Northstar have allowed it to withstand the challenges with which it has been faced.  In particular, management has implemented cost-saving measures which have reduced its operating expenses by nearly 50 percent, while at the same time maintaining relatively stable production levels.  As a result of these efforts, Northstar recently became cash flow positive at the field level for the first time since acquiring the Northstar Assets from Black Elk.

31.     Other actions which have improved Northstar's prospects include the retention of Imperial Capital to assist Northstar and Northstar GOM in evaluating potential avenues for resolving Northstar's outstanding payment obligations.  Northstar is also working with PPVA LP to facilitate these settlement efforts.  More specifically, the JPLs of PPVA LP, one of Northstar's equity holders, have initiated asset sales in PPVA LP's liquidation proceeding, and a portion of the proceeds of these asset sales are specifically earmarked for Northstar's use.  *See* Decl. of M. J. Wright at ¶ 9. The JPLs have already collected a portion of these funds, much of which are currently being held in escrow, subject to approval by the Cayman Islands Court and contract.  *Id.* at ¶ 10.

### III.     <u>MOTION FOR ABSTENTION UNDER 11 U.S.C. § 305(a)</u>

32.     By this Motion, Northstar requests that the Court exercise its ability to abstain from exercising jurisdiction over this chapter 11 case pursuant to section 305(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 1011 and 7012.

33.     Under Bankruptcy Code section 305(a), after notice and a hearing, the court may "dismiss a case" or "suspend all proceedings" if "the interests of creditors and the debtor would be better served" thereby.  11 U.S.C. § 305(a)(1).  Courts have recognized that section 305(a)(1)

reflects a recognition by Congress that "in certain cases it may be appropriate for a bankruptcy court to decline jurisdiction." *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996), *aff'd sub nom. Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757 (E.D. Pa. 1997). Indeed, the provision reflects the Bankruptcy Code's policy of favoring "private, negotiated adjustments of creditor-company relations" and using "refuge in bankruptcy as a last resort." *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015 (Bankr. D. Utah 1982). Ultimately, the rationale for giving parties the opportunity to resolve issues outside of court is sound: "The problems of insolvency, for the most part, are matters for extra-judicial resolution, calling for 'business not legal judgment.'" *Id.* at 1016 (citation omitted).

34.     Notwithstanding this, the determination of whether to abstain is a highly case-specific inquiry. *See In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996). Courts consider multiple factors as well as the totality of the circumstances when assessing whether the interests of the debtor and creditors would be better served by a dismissal or suspension. *In re Tex. EMC Mgmt., LLC*, Nos. 11-40008-H3-7, 11-40017-H3-7, 2012 WL 627844, at *3 (Bankr. S.D. Tex. Feb. 24, 2012). These factors include:

    (1) the economy and efficiency of administration;

    (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

    (3) whether federal proceedings are necessary to reach a just and equitable solution;

    (4) whether there is an alternative means of achieving an equitable distribution of assets;

    (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether [non-federal insolvency proceedings have progressed] so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*Id.*; *801 S. Wells St. Ltd. P'ship*, 192 B.R. at 723 (citations omitted).[12]  "[T]he exact factors and the weight to be given each of them is 'highly sensitive to the facts of each individual case.'" *Argus Grp. 1700*, 206 B.R. at 756 (citation omitted).  Moreover, these factors are used to assess abstention resulting both in dismissal and in suspension of proceedings.  *See In re Morabito*, BAP No. NV–14–1593–FBD, 2016 WL 3267406, at *5 (B.A.P. 9th Cir. June 6, 2016).  Here, several of these factors favor abstention, and therefore, the Court should either suspend this proceeding or, alternatively, dismiss the Involuntary Petition.[13]

## Northstar Has Made Progress Resolving Claims Outside of Court

35.    Authorities interpreting section 305(a) agree that the fifth factor—the possibility for the debtor and creditors to effectively resolve claims outside of bankruptcy—is especially important in deciding whether dismissal or suspension of a bankruptcy case is warranted.  For example, the legislative history of section 305 explicitly states that abstention may be particularly appropriate where "an arrangement is being worked out by creditors and the debtor out of court" and where the out-of-court arrangement does not prejudice creditors.  Sen. Rep. No. 95-989, 95th

---

[12]  *See also In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001), *aff'd*, 269 B.R. 225 (D. Colo. 2001) (noting that courts consider factors including "(1) the motivation of the parties seeking bankruptcy jurisdiction; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) the economy and efficiency of administration; [and] (4) the prejudice to the parties").

[13]  Northstar requests that the Court maintain the automatic stay during any period of suspension in order to assist the company in achieving a resolution of its claims.  *See, e.g.*, *In re Compañía de Alimentos Fargo, S.A.*, 376 B.R. 427, 441 (Bankr. S.D.N.Y. 2007) (implying that automatic stay remains in place during suspension period).

Cong., 2d Sess. (1978) 35, U.S. Code Cong. & Admin. News 1978, p. 6281. Similarly, several courts have granted requests for abstention where the debtor had made substantial progress resolving claims outside of bankruptcy. *See, e.g., In re Win-Sum Sports, Inc.*, 14 B.R. 389, 394–95 (Bankr. D. Conn. 1981) (dismissing petition under section 305 despite finding that debtor was not paying its debts as they came due, in part, because debtor had "bec[o]me current on many of its old accounts payable" since petition was filed); *In re Beacon Reef Ltd. P'ship*, 43 B.R. 644, 646 (Bankr. S.D. Fla. 1984) (finding abstention appropriate where prepetition creditors were "satisfied by subsequent payments"); *In re Rimpull Corp.*, 26 B.R. 267, 272 (Bankr. W.D. Mo. 1982) (determining case was "paradigm" for abstention where debtor had reached agreement with majority of creditors, resulting in realistic proposal to pay outstanding debt); *In re Luftek, Inc.*, 6 B.R. 539, 547 (Bankr. E.D.N.Y. 1980) (finding abstention appropriate under section 305, despite finding substantial evidence that debtors were generally not paying debts as they came due, where debtors had entered into out-of-court loan commitment for payment of creditors).

36.     In the instant case, both Northstar's professionals and the professionals managing the PPVA LP liquidation proceeding have only recently been retained and are working to effectuate an out-of-court settlement of Northstar's past-due claims. While these efforts were undertaken in response to the filing of the Involuntary Petition and are therefore newly underway, the JPLs for PPVA LP have already sold assets and some proceeds from these asset sales are currently in escrow. *See* Decl. of M. J. Wright at ¶¶ 9–10.

37.     Moreover, while Northstar is optimistic about its settlement prospects, in the event these efforts fail, creditors will not be prejudiced thereby as the suspended Involuntary Petition can be readily reinstated. While some brief delay may result from Northstar's efforts to forge an out-of-court restructuring, these efforts will likely benefit the estate if a voluntary petition later

results, as Northstar will be that much further along in its creditor negotiations. In addition, to assure the Court and creditors that any delay occasioned by Northstar's request for abstention is neither undue nor excessive, Northstar will agree to file progress reports concerning the status of its out-of-court settlement efforts. *See, e.g.*, *In re Mazzocone*, 183 B.R. 402, 422 (Bankr. E.D. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (requiring written status report after six-month suspension); *see also In re Duratech Indus., Inc.*, 241 B.R. 291, 300 (Bankr. E.D.N.Y. 1999) (providing that certain reporting requirements, such as filing monthly operating statements, may apply during suspension). Given the fact that "an arrangement is being worked out by creditors and the debtor out of court," *801 S. Wells St. Ltd. P'ship*, 192 B.R. at 723 (citation omitted), and that creditors will not be prejudiced by such efforts, the fifth factor considered by courts weighs in favor of abstention.

38. Similarly, the first factor considered by courts—economy and efficiency of administration—favors abstention. Out-of-court settlements tend to be more "expeditious" and "economic" because they are "unbridled by bankruptcy [and] enjoy a flexibility conducive to speed." *See Colonial Ford*, 24 B.R. at 1016. Thus, postponing this proceeding for a short period to allow Northstar to pursue out-of-court settlement efforts may ultimately be more expeditious and less expensive than the alternative of pursuing a resolution of creditor claims in chapter 11. *See, e.g.*, *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981) (abstaining from involuntary chapter 7 petitions where "efficient and equitable distribution" was occurring outside of bankruptcy, since "efficiency and economy of administration are prime considerations" in assessing the best interests of the debtor and creditors); *In re Short Hills Caterers, Inc.*, No. 08-18604 DHS, 2008 WL 2357860, at *5 (Bankr. D.N.J. June 4, 2008) (finding that abstention was more efficient than allowing bankruptcy to proceed where debtor had arranged for satisfaction of

creditors' claims via assignment of assets for their benefit); *see also Argus Grp. 1700*, 206 B.R. at 756 (listing cost of bankruptcy as salient abstention consideration and recognizing that bankruptcy proceedings would cause the debtors to "incur needless additional expenses").

39.     Similarly, the third and fourth factors considered by courts—whether federal proceedings are necessary to reach a just and equitable solution, and whether there is an alternative means of achieving an equitable distribution of assets—both recognize that the existence of alternatives to bankruptcy may render such proceedings unnecessary.  While Northstar does not intend to pursue a receivership or other state court proceeding, it is actively pursuing an out-of-court claims resolution process which, if successful, will eliminate the need for federal bankruptcy protection.  Moreover, any out-of-court resolution will necessarily be "just and equitable" in the eyes of creditors as they will not be required by any coercive Bankruptcy Code provision or other law to agree to such settlement unless they perceive it to be fair.  Further, if an individual creditor rejects a consensual settlement and instead elects to pursue its claims outside of this bankruptcy forum, it will be free to do so.  Accordingly, there are alternatives to this federal bankruptcy case which may allow Northstar to reach a just and equitable solution of its creditor claims, while simultaneously requiring less expense and administrative burden.  *See, e.g.*, *Terry Oilfield Supply Co. v. Am. Sec. Bank, N.A.*, 195 B.R. 66, 73 (S.D. Tex. 1996) (characterizing bankruptcy as "drastic" and "expensive").

40.     Taken together, factors one, three, four, and five recognize that because chapter 11 is an expensive process, a putative debtor should be permitted a reasonable opportunity to resolve its disputes outside of bankruptcy where such a resolution is sufficiently viable.  Given the realistic probability of obtaining funding for an out-of-court settlement, and the retention of professionals to prosecute the settlement, Northstar has a viable strategy to address creditor claims.

41.     The second factor considered by courts—the availability of another forum to protect the interests of creditors—similarly favors abstention. Namely, state court proceedings are available to protect the interests of creditors, particularly creditors who may have lien rights which permit them to foreclose on Northstar's properties. *See, e.g., Beacon Reef*, 43 B.R. at 646–47 (granting abstention, in part, due to the availability of state law foreclosure proceedings, and the absence of any showing reflecting "[t]he inadequacy of state law to deal with the relationships between the parties"). Here, state foreclosure proceedings could potentially allow creditors, including the Petitioning Creditors, to enforce their lien rights against Northstar's properties in a more rapid and less expensive manner than bankruptcy proceedings permit. In light of the availability of these proceedings, abstention is warranted. *See In re Kass*, 114 B.R. 308, 309 (Bankr. S.D. Fla. 1990) ("Dismissal should be granted where the Court finds that the petitioning creditors have adequate State law remedies."); *see also Duratech*, 241 B.R. at 299–300 (suspending bankruptcy pending resolution of related litigation).

42.     The seventh factor considered by courts—the purpose for which bankruptcy jurisdiction has been sought—requires further investigation. An involuntary proceeding may be appropriate where the petitioning creditor seeks to prevent "preferential payments to favored creditors, or to stop 'the race to the courthouse' by creditors who wish to advantage themselves by levying on the debtor's assets." *See 801 S. Wells St. Ltd. P'ship*, 192 B.R. at 725. "However, use of an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage is improper." *Id.* at 725–26 (citing *In re Better Care, Ltd.*, 97 B.R. 405, 410 (Bankr. N.D. Ill. 1989)); *see also In re Glob. Energies, LLC*, 763 F.3d 1341, 1349 n.5 (11th Cir. 2014) (noting that filing an involuntary petition to gain control over a debtor's assets constitutes an "improper

purpose").   Northstar submits that further factual investigation is required to determine the rationale and motivation underlying the Petitioning Creditors' actions.  As outlined in the Factual Background section of this Motion, there are certain unusual facts surrounding the filing of the Involuntary Petition, and Northstar does not presently have sufficient information to evaluate the propriety of the filing.  Notwithstanding this need, the Petitioning Creditors' interests will not be harmed by temporarily suspending the Involuntary Petition and maintaining the status quo while Northstar seeks to consummate an out-of-court settlement.   Pending such settlement, the Petitioning Creditors' claims will be preserved in all respects and, as such, they will suffer no prejudice.

43.     Based on the foregoing, Northstar requests that the Court suspend all proceedings in this involuntary chapter 11 case under section 305(a) of the Bankruptcy Code or alternatively abstain from exercising its jurisdiction over the proceedings altogether.

## IV.     ANSWER, AFFIRMATIVE DEFENSES, AND REQUEST FOR DISCOVERY

44.     In the alternative to its Motion for Abstention Under 11 U.S.C. § 305(a) and not in waiver of same, Northstar hereby answers the Involuntary Petition.

### A.  ANSWER

45.     The allegations set forth in numbered paragraph 1 of the Involuntary Petition call for a legal conclusion and therefore no response is required.[14]  To the extent that a response is required, the allegations are denied.

---

[14]  All references to numbered paragraphs in the Involuntary Petition refer to the numbered sections contained in Official Form 205, the form which the Petitioning Creditors used to initiate this proceeding.

46.     In response to numbered paragraph 2 of the Involuntary Petition, Northstar admits that its correct name is Northstar Offshore Group, LLC, but denies any remaining allegations contained in that paragraph.

47.     In response to numbered paragraph 5 of the Involuntary Petition, Northstar admits that its principal place of business is 11 Greenway Plaza, Suite 2800, Houston, Texas, 77046 in Harris County, Texas, but denies any remaining allegations contained in that paragraph.

48.     In response to numbered paragraph 6 of the Involuntary Petition, Northstar admits that its website URL is http://nstaroffshore.com/ but denies any remaining allegations contained in that paragraph.

49.     In response to numbered paragraph 7 of the Involuntary Petition, Northstar admits that it is an LLC, but denies any remaining allegations contained in that paragraph.

50.     In response to numbered paragraph 8 of the Involuntary Petition, Northstar admits that it is none of the business types listed, but denies any remaining allegations contained in that paragraph.

51.     In response to numbered paragraph 9 of the Involuntary Petition, Northstar denies the allegations contained in that paragraph. A liquidation proceeding is currently pending in the Cayman Islands against PPVA LP, an affiliate of Northstar as that term is defined by the Bankruptcy Code.

52.     The allegations set forth in numbered paragraph 10 of the Involuntary Petition call for a legal conclusion and therefore no response is required. To the extent that a response is required, Northstar admits that its principal place of business is located in Houston, Texas, but denies any remaining allegations in that paragraph.

53.     The allegations set forth in numbered paragraph 11 of the Involuntary Petition call for a legal conclusion and therefore no response is required.  To the extent that a response is required, the allegations are denied.

54.     Northstar is without sufficient information to admit or deny the allegations set forth in numbered paragraph 12 of the Involuntary Petition.  To the extent that a response is required, the allegations are denied.

55.     In response to the allegations contained in numbered paragraph 13 of the Involuntary Petition, Northstar admits that the three entities listed are petitioning creditors seeking recovery of allegedly unpaid invoices, but denies that it owes Alliance Offshore and Alliance Energy the amounts alleged.  Northstar admits that $329,988.00 accurately reflects the amount of unpaid invoices owed to Montco as of the Involuntary Petition Date. Northstar is without sufficient information or knowledge to admit or deny the allegations in numbered paragraph 13 regarding the value of any liens, and to the extent that a response is required, the allegations are denied.  To the extent that a response is required to any remaining allegations in numbered paragraph 13, the allegations are denied.

56.     The allegations set forth in Part 4 of the Involuntary Petition, entitled "Part 4: Request for Relief," call for a legal conclusion and therefore no response is required.  To the extent that the allegations set forth in Part 4 of the Involuntary Petition, entitled "Part 4: Request for Relief," do not call for a legal conclusion, Northstar is without sufficient information to admit or deny the allegations, and therefore the allegations are denied.

57.     Northstar denies the allegations set forth in any other portion of the Involuntary Petition to which a response may be required.

## B. <u>FIRST AFFIRMATIVE DEFENSE</u>

58.     Pursuant to section 305(a)(1) of the Bankruptcy Code, the interests of the creditors and the putative debtor would be better served by a dismissal of the above-captioned case or a suspension of all proceedings in such case.

## C. <u>SECOND AFFIRMATIVE DEFENSE</u>

59.     No order for relief can be entered against Northstar because the petitioning creditors' claims are barred in whole or in part by bad faith and/or the lack of good faith.   An involuntary bankruptcy petition filed in bad faith should be dismissed upon equitable grounds regardless of whether the putative debtor otherwise meets the eligibility requirements in sections 303(b) and 303(h) of the Bankruptcy Code.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 330 (3d Cir. 2015).  A creditor acts in bad faith when it files an involuntary petition in order to gain an advantage in a business dispute with the putative debtor, or to gain control over the putative debtor or its assets.  *See Glob. Energies*, 763 F.3d at 1349 n.5; *see also 801 S. Wells St. Ltd. P'ship*, 192 B.R. at 725.  Similarly, where a creditor files an involuntary bankruptcy petition to gain a disproportionate advantage for itself over the other creditors—as opposed to filing in order to prevent a disproportionate advantage from accruing to other creditors—that also constitutes a bad faith filing, particularly where the creditor could have raised its claims in a different forum.  *In re Bicoastal Holding Co.*, 402 B.R. 916, 919 (Bankr. M.D. Fla. 2009) (citing *In re K.P. Enter.*, 135 B.R. 174, 179 (Bankr. D. Me. 1992)); *see also In re St. Marie Dev. Corp. of Mont., Inc.*, 334 B.R. 663, 672 (Bankr. D. Mont. 2005).

60.     Northstar reserves the right to request that the Court require the Petitioning Creditors to post a bond for Northstar's reasonable protection under section 303(e) of the Bankruptcy Code.

### D. THIRD AFFIRMATIVE DEFENSE

61.     No order for relief can be entered against Northstar because the petitioning creditors' claims are barred in whole or in part by the doctrine of unclean hands.

### E. FOURTH AFFIRMATIVE DEFENSE

62.     No order for relief can be entered against Northstar because the petitioning creditors' claims are barred in whole or in part by failure to mitigate damages.

### F. FIFTH AFFIRMATIVE DEFENSE

63.      No order for relief can be entered against Northstar because the petitioning creditors' claims are barred in whole or in part by offset, recoupment, and/or payment.

### G. SIXTH AFFIRMATIVE DEFENSE

64.     No order for relief can be entered against Northstar because, pursuant to section 303(b) of the Bankruptcy Code, one or more of the petitioning creditors is not eligible to file the Involuntary Petition, because its claims are subject to a bona fide dispute as to liability or amount.

### H. REQUEST FOR ATTORNEYS' FEES, COSTS, AND DAMAGES UNDER 11 U.S.C. § 303(i)

65.     Northstar hereby requests reasonable attorneys' fees, costs, and actual and punitive damages under section 303(i) of the Bankruptcy Code. Section 303(i)(1) allows a bankruptcy court to award costs and reasonable attorneys' fees in favor of the putative debtor in the event that an involuntary petition is dismissed, other than on the consent of all petitioning creditors and the debtor, and if the debtor does not waive the right to judgment under section 303(i)(1). Northstar has not waived, and in fact specifically reserves, its right to judgment under section 303(i) of the Bankruptcy Code. *See In re Meltzer*, 516 B.R. 504, 514 (Bankr. N.D. Ill. 2014) (debtor did not waive fees where he "first asserted [right to fees] in his dismissal motion" and subsequently continued to pursue it).

66.     Furthermore, section 303(i)(2) of the Bankruptcy Code provides for the award of actual and punitive damages if an involuntary petition is filed in bad faith. 11 U.S.C. § 303(i)(2); *see Better Care*, 97 B.R. at 410. Northstar has not waived, and in fact specifically reserves, its right to judgment under section 303(i) of the Bankruptcy Code, including for (i) actual damages proximately caused by the filing of the Involuntary Petition, and (ii) punitive damages.

## I.  <u>REQUEST FOR DISCOVERY</u>

67.     If the Court does not grant Northstar's Motion for Abstention Under 11 U.S.C. § 305(a), Northstar requests sufficient time to conduct discovery on its affirmative defenses to the Involuntary Petition before a trial on the merits.  Under Federal Rule of Bankruptcy Procedure 1018, which adopts Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 for contested involuntary proceedings, the parties are permitted to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," unless the Court orders otherwise.  FED. R. CIV. P. 26(b)(1); *see also* FED. R. BANKR. P. 1018 (stating that Federal Rules of Bankruptcy Procedure 7028 to 7037, which adopt Federal Rules of Civil Procedure 28 to 37, apply to proceedings contesting involuntary bankruptcy petitions).    Thus, Northstar is entitled to obtain discovery from the Petitioning Creditors on nonprivileged matters that are relevant to its defenses.  *See, e.g.*, *In re Henry S. Miller Commercial, LLC*, 418 B.R. 912, 919–20 (Bankr. N.D. Tex. 2009) (permitting discovery on factual issue contested by involuntary putative debtor); *In re Stewart*, No. 07-11414-RGM, 2008 WL 4526130, at \*4 (Bankr. E.D. Va. Sept. 30, 2008) (indicating that discovery was conducted on involuntary petition after putative debtor asserted section 303(i) claim). Accordingly, Northstar requests that the Court allow sufficient time for Northstar to pursue discovery on the multiple defenses it has asserted to the Involuntary Petition before a trial on the merits is scheduled.

## V.    PRAYER

WHEREFORE, Northstar respectfully requests that the Court: (i) grant the relief requested herein; and (ii) award Northstar such other and further relief at law and equity to which it is justly entitled.

Dated:  September 29, 2016

Respectfully  submitted,
*/s/ Lydia T. Protopapas*
Lydia T. Protopapas
Texas Bar No. 00797267
Southern  Dist. of Texas Bar No. 21378
Jason W. Billeck
Texas Bar No. 24001740
Southern  Dist. of Texas Bar No. 23802

**WINSTON & STRAWN LLP**
1111 Louisiana,  25th Floor
Houston,  TX 77002
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700

*Counsel for Northstar Offshore Group, LLC*

### CERTIFICATE  OF SERVICE

I, Lydia Protopapas, hereby certify that, on September 29, 2016: (A) all counsel of record who are deemed to have consented to electronic  service were served with a copy of the *Motion for Abstention Under 11 U.S.C. § 305(a), and, in the Alternative, Answer, Affirmative Defenses, and Request for Discovery* via the Court's CM/ECF system; and (B) the parties named in the attached **Exhibit A** were served with a copy of the *Motion for Abstention Under 11 U.S.C. § 305(a), and, in the Alternative, Answer, Affirmative Defenses, and Request for Discovery* in the manner set forth in Exhibit A.

*/s/ Lydia T. Protopapas*
Lydia T. Protopapas