UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **NORTHSTAR OFFSHORE** | § | Case No. 16-34028 |
| **GROUP, LLC,** | § | |
| | § | (Chapter 11) |
| | § | |
| DEBTOR. | § | |

**DEBTOR'S MOTION FOR AN ORDER AUTHORIZING IT TO SETTLE CONTROVERSIES RELATED TO, AND TO CLOSE, A PRE-PETITION TRANSACTION RELATED TO THE CASTEX PREFERENCE RIGHT**

A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 18, 2017 AT 1:30 P.M (CT). IN COURTROOM 404, 4TH FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK, HOUSTON, TX 77002.

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

Northstar Offshore Group, LLC (the "Debtor"), respectfully submits this Motion for Entry of an Order Authorizing it to Settle Controversies Related to, and to Close, a Pre-Petition Transaction Related to the Castex Preference Right ("Motion").

**SUMMARY**

1. In 2015, the Debtor acquired a portfolio of assets from Black Elk Energy Offshore Operations, LLC ("Black Elk"). One of those assets, Black Elk's interest in WC 77/96 Unit (defined more fully below), is subject to a preferential right of purchase ("Preferential Right") in favor of Walter Oil & Gas Corporation ("Walter") and Castex Offshore, Inc. ("Castex" and,

together with Walter, the "Preference Right Parties"). The Preference Right Parties attempted to exercise their Preferential Right, but the transaction failed to close because Black Elk was forced into an involuntary bankruptcy on August 11, 2015.

2. Since then the Debtor has continued to hold nominal title to WC 77/96 Unit, but Castex has continued to operate the WC 77/96 Unit lease and keep revenues from it.

3. The Preference Right Parties and the Debtor are parties to a series of disputes and controversies between them related to the rights and obligations of each party in connection with the exercise of the Preferential Right and the closing of the transaction, including the Preference Right Parties' rights to acquire title to WC 77/96 Unit and the Debtor's right to receive payment.

4. After months of trying to close a transaction to resolve these disputes, the Debtor and the Preference Right Parties have now entered into a Purchase and Sale Agreement ("PSA") that will transfer title of WC 77/96 Unit to the Preference Right Parties in exchange for payment by the Preference Right Parties to the Debtor of $1,402,535, plus $42,000 in interest for the delay in closing the transaction (together, the "Purchase Price"). A copy of the PSA is attached hereto at Exhibit A.

5. The Debtor believes that consummation of this transaction is an appropriate settlement of controversies between the Debtor and the Preference Right Parties, which settlement inures to the benefit of the Debtor's estate and its creditors.

6. In contemplation of the closing the PSA, the Preference Rights Parties have funded the Purchase Price into the Debtor's counsel's trust account to be held in escrow pending court approval of the PSA and closing.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory bases for the relief requested in this Motion are §§ 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2014 and 9019(a).

## BACKGROUND

10. The Debtor is an independent oil and gas exploration and production ("E&P") company that focuses on acquisitions, workovers and recompletions, development drilling, and low-risk exploration in the shallow waters of the Gulf of Mexico. A detailed discussion of the Debtor's operations and current financial condition can be found in the *Declaration of Avery C. Alcorn in Support of First Day Pleadings* [Dkt. No. 106] (as supplemented, the "Alcorn Declaration").

### A. Procedural History

11. On August 12, 2016 ("Involuntary Petition Date"), certain parties filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") against the Debtor thereby commencing the above-captioned case.

12. On December 2, 2016 ("Voluntary Petition Date"), the Debtor consented to an order for relief by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code [Dkt. No. 88] ("Voluntary Petition").

13. During the time period between the Involuntary Petition Date and the Voluntary Petition Date ("Gap Period"), the Debtor continued to operate its business under § 303(f) of the Bankruptcy Code.

14. On December 19, 2016, the U.S. Trustee filed a notice of appointment of an official committee of unsecured creditors [Dkt. No. 186] ("Committee"). The U.S. Trustee filed an amended notice of appointment on December 22, 2016 [Dkt. No. 192].

15. Since the Voluntary Petition Date, the Debtor has continued to operate its business as a debtor-in-possession.

B. **Nature of the Pre-Petition Transaction**

16. On January 9, 2015, the Debtor entered into an agreement with Black Elk to acquire a portfolio of oil and gas leases and other assets owned by them in the Gulf of Mexico (as amended on April 9, 2015, June 1, 2015, and July 2016, the "Black Elk Sale Agreement").

17. The assets to be sold under the Black Elk Sale Agreement included Unit #754307017 known as the West Cameron Block 96 Unit, covering the SW/4SW/4 and W/2SE/4SW/4 of WC 77 and the NW/4NW/4 and the NW/4NE/4NW/4 of WC 96, as to all depths below the stratigraphic equivalent of 16,400 feet SSTVD (subsea true vertical depth) as seen on the Newfield OCS-G 9987 Well No. 1 ("WC 77/96 Unit").

18. The effective date of the sale under the Black Elk Sale Agreement was December 31, 2014.

19. The Black Elk Sale Agreement included a schedule allocating the purchase price to be paid among the assets to be conveyed. The amount of the purchase price allocated to WC 77/96 Unit was $1,402,535.

20. The WC 77/96 Unit is subject to an Operating Agreement. Such Operating Agreement provides a preference right in favor of the Preference Right Parties:

> Within twenty (20) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties.

§ 26.2.2 Exercise of Preferential Right to Purchase, Offshore Operating Agreement dated April 14, 2004 between Newfield Exploration Co. and BHP Billington Petroleum (Americas) Inc., The Houston Exploration Co., and Ridgewood Energy Corp.

21. Both Walter and Castex held preferential rights to purchase Black Elk's right, title, and interest in the assets that were transferred pursuant to the Black Elk Sale Agreement, including WC 77/96 Unit.

22. Black Elk failed to immediately notify the Preference Right Parties of the sale to the Debtor as required by the Black Elk Sale Agreement. Nevertheless, after receiving notice on or after April 8, 2015, the Preference Right Parties exercised their preference rights with respect to WC 77/96 Unit on April 28, 2015.[1]

23. On August 11, 2015, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against Black Elk under case number 15-34287 in the United States Bankruptcy Court for the Southern District of Texas ("Black Elk Case"). The Black Elk Case was later converted to a case under chapter 11. Black Elk's bankruptcy and the failure of the Bureau of Ocean Energy Management ("BOEM") to approve immediately the assignment of certain assets to the Debtor, also delayed the closing of the Black Elk Sale Agreement.

24. On June 2, 2016, Black Elk filed an *Emergency Motion for Order (A) Approving Sale of Untransferred Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, Subject to Higher and Better Offers, (B) Approving Purchase Agreement for Sale of Untransferred Assets, (C) Approving Assumption of Northstar Sale Agreements and Setting Cure Costs and (D) Granting Related Relief* (the "Sale Motion") seeking court approval of the sale to

---

[1] McMoRan Oil & Gas LLC also had a preferential right to purchase such Assets but chose to waive it.

the Debtor pursuant to the terms of the Black Elk Sale Agreement. Case No. 15-34287, Dkt. No. 961.

25. On July 13, 2016, this Court in the Black Elk Case entered the *Order (A) Approving Sale of Untransferred Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, Subject to Higher and Better Offers, (B) Approving Purchase Agreement for Sale of Untransferred Assets, (C) Approving Assumption of Contracts and Setting Cure Costs, and (D) Granting Related Relief and Sustaining Objections in Part* ("Sale Order"). Among other things, the Sale Order approved Black Elk's assumption of the Black Elk Sale Agreement pursuant to §§ 105(a), 363, and 365 of the Bankruptcy Code, and approved the consideration for the sale as reasonably equivalent value and fair consideration under the Bankruptcy Code, other federal law, and state law. Case No. 15-34287, Dkt. No. 1206, at ¶ 17, ¶ 19.

26. After the Bankruptcy Court confirmed Black Elk's chapter 11 plan and entered the Sale Order, the Preference Right Parties again tried to close the underlying transaction regarding WC 77/96. The Preference Right Parties to WC 77/96 Unit agreed to pay the amount of the purchase price allocated to such asset. However, the closing was delayed yet again by the filing of the Debtor's Involuntary Petition.

    **C.**    **Controversies between the Debtor and the Preference Right Parties**

27. Ordinarily, when a third-party exercises a preferential right to purchase, that third party steps into the shoes of the purchaser and, at closing, pays the same price the purchaser previously agreed to pay and takes title to the property. Here, however, the original transaction partially closed prior to the preference right being exercised. The Debtor paid the consideration as purchaser and the title passed to the Debtor.

28. Once the Debtor became aware of the Preference Right Parties' desire to exercise their Preference Right, negotiations began in order to implement the transfer of WC 77/96 Unit

RELATED TO THE CASTEX PREFERENCE RIGHT    Page 6 of 15

to the Preference Right Parties in exchange for cash to the Debtor. The amount to be paid was based on the amount of the total consideration paid by the Debtor to Black Elk under the PSA as allocated to WC 77/96 Unit. Those negotiations were delayed during the pendency of the Black Elk Case and then further delayed during the pendency of the Debtor's own bankruptcy case.

29. Since the Debtor filed its Voluntary Petition, the Debtor and the Preference Right Parties have engaged in arms-length negotiations to document and close the transaction. During these negotiations, the Preference Rights Parties raised a concern over a lien filed by EnVen Energy Ventures, LLC ("EnVen"). The EnVen lien is asserted in connection with the same lease where the WC 77/96 Unit is located; however the lien is asserted in connection with a different unit on such lease. The Debtor tried to negotiate a lien release with EnVen to give the Preference Rights Parties comfort to close the transaction; however, the Debtor could not reach a business solution with EnVen.

30. On March 15, 2017, Arena Limited DIP I, LLC (the "DIP Agent") sent Northstar the Limited Termination Notice. In the Limited Termination Notice, the DIP Agent asserted that an Event of Default occurred under Section 7.12(b) of the Credit Agreement. This Event of Default is based on the DIP Agent's assertion that the Debtor's not having received the payment in connection with the Preference Right.

31. On March 22, 2017, the Debtor field the *Emergency Motion For Entry Of Order Amending Final Order (I) Approving Postpetition Financing, (II) Granting Liens And Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, And (IV) Modifying Automatic Stay* (the "Motion to Amend the DIP Financing"). Pursuant to the Motion to Amend the DIP Financing, the Debtor seeks to enter into an amendment (the "Third Amendment") of the post-petition financing with the DIP Agent. Under the Third Amendment, a

condition to receiving additional advances under the post-petition financing is to commence a lawsuit against the Preference Rights Parties to recover the withheld revenue in connection with the WC 77/96 Unit.

32. After the Debtor filed the Motion to Amend the DIP Financing, the Preferential Rights Parties contacted the Debtor to indicate their willingness to enter into the PSA without any condition relating to the release of the EnVen lien.

33. On March 24, 2017, the Debtor and the Right Parties entered into the PSA which is conditioned on court approval. On the same day, the Preference Rights Parties transferred the Purchase Price under the PSA to the Debtor's counsel's trust account to be held in escrow until court approval and closing of the PSA. The DIP Agent has confirmed that this arrangement satisfies the condition in the Third Amendment to commence a lawsuit against the Preference Right Parties.

34. Negotiating at arm's length and through counsel, the PSA has the following principal terms:

   a. The Debtor will transfer its rights in WC 77/96 Unit to the Preference Right Parties as further specified in § 1.2 of the PSA;

   b. The Preference Right Parties will pay the Debtor $1,402,535 in cash consideration upon closing;

   c. The Preference Right Parties will pay the Debtor an additional $42,000 in interest upon closing for the delay in closing;

   d. No condition on the Debtor to obtain any kind of lien release from EnVen lien; and

   e. The Debtor and the Preference Right Parties will release each other from all claims related to the Assets (as defined in the PSA), except for claims based on willful or intentional misconduct as further specified in § 10.7 of the PSA. This release by the Debtor will include without limitation the release of any claim for production proceeds related to the Assets.

35. The Debtor believes this settlement is well within its sound business judgment and would immediately provide value to creditors in the form of a substantial cash payment and the resolution of all potential disputes and claims between the parties relating to the transaction.

## BASIS FOR RELIEF

### A. The Proposed Settlement is in the Debtor's Best Interest

36. The Debtor seeks approval of the PSA as a compromise of controversy under Bankruptcy Rule 9019. Rule 9019(a) authorizes settlements. "One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves." *In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005). "Compromises are favored in bankruptcy" because they minimize litigation costs and further the parties' interest in expediting the administration of a bankruptcy case. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. Rev. 1993)).

37. Bankruptcy Rule 9019 sets forth the procedural requirements that must be followed before a settlement may be approved. Rule 9019(a) states that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." FED. R. BANKR. P. 9019(a). This rule empowers a bankruptcy court to approve compromises and settlements if they are "fair and equitable and in the best interest of the estate." *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). Moreover, Bankruptcy Code § 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

38. Approval of a proposed settlement is within the discretion of the court. *See, e.g., In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (noting that courts should exercise their discretion "in light of the general public policy favoring settlements"). The

burden of establishing the fairness of a compromise rests on the proponent(s) of the compromise; however, a debtor is not required to present a full mini-trial or evidentiary hearing to adjudicate the issues being settled. Rather, when determining whether to approve a compromise, the court "is not to decide the numerous questions of law and fact raised" by the compromise, but is "to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citations omitted); *In re Mirant Corp.*, 348 B.R. 725, 743 (Bankr. N.D. Tex. 2006).

39. A bankruptcy court should approve a settlement under Rule 9019 if the settlement is within a range of reasonableness, fair and equitable, and in the best interests of the bankruptcy estate. "In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, comparing the terms of the compromise with the likely rewards of litigation." *In re Cajun Elec.*, 119 F.3d at 356 (citations omitted); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferr, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293 (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Moreover, a bankruptcy court need not be convinced that the proposed settlement is the best possible, but "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008).

40. The Fifth Circuit has directed that, in determining whether to approve a proposed settlement, a Bankruptcy Court must evaluate the following factors: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) all other factors bearing on the wisdom of the compromise. *In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *In re Jackson Brewing Co.*, 624 F.2d at 602.

41.     Under the third, catch-all provision, the Fifth Circuit has specified two additional factors. First, the court should consider the best interests of the creditors, "with proper deference to their reasonable views." *In re Foster Mortg. Corp.*, 68 F.3d at 917. Second, the court should consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 918 (internal citations omitted).

42.     The Debtor believes that the proposed settlement satisfies the requirements established by the Supreme Court in *TMT Trailer* and further defined by the Fifth Circuit.

### i.    The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law.

43.     The Debtor and the Preference Right Parties have agreed to settle without the need for litigation. The likelihood of success on potential claims for breach of contract, specific performance, or unjust enrichment is uncertain. Alternatively, the Preference Right Parties could initiate litigation on their behalf to protect their rights. This settlement obtains the benefits of litigation and a favorable result to the Debtor in such litigation without incurring the legal fees and costs attendant to such litigation. Finally, it is not at all certain that litigation would result in recovery of 100% of the amounts the Debtor would otherwise get under the PSA.

### ii.   The Complexity and likely Duration of the Litigation and any Attendant Expense, Inconvenience and Delay.

44.     Compared to the PSA, the attendant expenses, inconvenience, and delays of litigating the issue of preference rights would be a needless waste. The legal issues at issue are not complex. However, the history of the parties' attempts to close the preference rights transaction is lengthy, and litigating and establishing the factual predicate for relief may take

some time. Even if the litigation reached an early and favorable resolution, that resolution would likely be no better than that provided in the PSA. Such a course would, in any event, cost more in legal fees than approval of the settlement now by the Bankruptcy Court.

45. The Debtor's ultimate recovery is in all likelihood limited to the recovery of the allocated purchase price for WC 77/96 Unit. The Debtor is not aware of any facts suggesting a basis for bringing any tort or other claims against the Preference Right Parties to recover in excess of attorneys' fees and other costs over the allocated purchase price. Thus, the amount that the Debtor could recover in litigation would be the same, or less than, the amount it will receive under the PSA. Thus, the PSA is superior to the results that could be obtained in litigation.

46. The attendant costs of any litigation against the Preference Right Parties would be significant in comparison to the immediate cash infusion that would result from entry into the PSA. Resolving the preference rights issue now allows the Debtor to obtain a tangible, immediate benefit for its estate without the delay or expense of litigation.

### iii.    All Other Factors Bearing on the Wisdom of the Compromise.

47. The Debtor has considered the reasonableness factors for purposes of Rule 9019 and believes that the PSA is reasonable. Under the PSA, the Debtor will receive over $1.4 million in cash consideration in exchange for transferring title to WC 77/96 Unit to the Preference Right Parties. The PSA will also avoid any further expenses of negotiating or litigating a closing process that has already been drawn out by the bankruptcy filings of Black Elk and the Debtor. This is appropriate consideration for the asset because it was the value assigned to the asset during the negotiation of the original sale from Black Elk to the Debtor, and was the value approved as reasonably equivalent value and fair consideration in the Sale Order

approving Black Elk's assumption of the Black Elk Sale Agreement with the Debtor.[2]  In addition, the Debtor is receiving $42,000 in interest for the delay in closing.

48.     In sum, entry into the PSA at this time is in the best interests of the estate and falls well within the considered business judgment of the Debtor.

### D.     The Proposed Settlement is also Appropriate under Section 363(b)

49.     The Debtor submits that the transaction should also be approved as a sale under § 363, which states that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

50.     The use of estate property should be authorized under § 363(b) so long as a sound business purpose exists for the transaction.  *See, e.g.*, *In re Oaktree Imaging, L.P.*, No. 06-80348-G3-7, 2007 WL 2667979, at *2 (Bankr. S.D. Tex. Sept. 6, 2007).  In determining whether to authorize the sale of a debtor's property under § 363(b), courts in the Fifth Circuit look to whether the debtor in possession has articulated a valid business justification for its decision.  *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).  Generally, "[u]nless the manner in which an estate representative arrives at a decision is seriously flawed, the court will defer to the estate representative."  *In re Broughton Ltd. P'ship*, 474 B.R. 206, 218 (Bankr. N.D. Tex. 2012) (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) *and In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426, 427 (Bankr. N.D. Tex. 2009)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under § 363(b) of the Bankruptcy Code.

51.     Sound business justification exists to support the approval of the PSA as a transaction outside of the ordinary course of business.  The amount that the Debtor will receive

---

[2] *See* Paragraph 25, *supra*.

in exchange for WC 77/96 Unit is reasonable. The price is based on the allocation provided for in the Black Elk Sale Agreement which was approved by the Court as reasonably equivalent value and fair consideration in the Black Elk bankruptcy case. A portion of the total purchase price of all assets sold pursuant to the Agreement was allocated to WC 77/96 Unit. That allocation is the amount that the Preference Right Parties will pay the Debtor for the asset. In addition, the Preference Right Parties agree to pay an additional $42,000 in interest for the delay.

52.     No auction or market test of WC 77/96 Unit is possible or feasible because of the Preference Right held by the Preference Right Parties. Other parties are not in a position to exercise that right. Moreover, any sale process would delay considerably the timing of the Debtor's receipt of the cash proceeds. The Debtor does not believe a market sale process could realistically yield a better outcome than the PSA, especially considering the costs of delay, the costs of conducting the sale process, and the fact that such a sale process would not – and could not – resolve potential claims that the Preference Right Parties may assert against the Debtor.

53.     The Debtor believes that the cash consideration it will receive for WC 77/96 Unit is fair and adequate. Once the PSA closes, the Debtor will receive $1,402,535 from the Preference Right Parties in addition to $42,000 in interest to account for the delay in closing. This cash infusion will greatly benefit the Debtor's estate and preserve value for the benefit of all creditors. For these reasons, entering into the PSA is justified by the Debtor's business judgment.

**NO PRIOR REQUEST**

54.     No prior motion for the relief requested herein has been made.

## CONCLUSION

WHEREFORE the Debtor respectfully requests that this Court enter an order substantially in the form of the proposed order attached hereto and grant any other appropriate relief.

Dated: March 26, 2017

Respectfully submitted,

DIAMOND McCARTHY LLP

*/s/ Charles M. Rubio*
Kyung S. Lee
TBA No. 12128400
klee@diamondmccarthy.com
Charles M. Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
Christopher R. Murray
TBA No. 24081057
cmurray@diamondmccarthy.com
Two Houston Center
909 Fannin, 15th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199

*Counsel for Northstar Offshore Group, LLC, Debtor and Debtor-in-Possession*