# **EXHIBIT C**

**Execution Copy**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN NORTHSTAR OFFSHORE GROUP, LLC**

**AS SELLER**

**AND**

**NORTHSTAR OFFSHORE VENTURES LLC**

**AS BUYER**

**Dated as of July 14, 2017**

## TABLE OF CONTENTS

**Page No.**

**ARTICLE I PURCHASE AND SALE**.................................................................. 1

   **Section 1.1**    Purchase and Sale. ...................................................... 1

   **Section 1.2**    Assets. ....................................................................... 2

   **Section 1.3**    Excluded Assets. .......................................................... 4

   **Section 1.4**    Assumed Liabilities. ...................................................... 5

   **Section 1.5**    Excluded Liabilities. ...................................................... 6

   **Section 1.6**    Revenues and Expenses .................................................. 8

**ARTICLE II PURCHASE PRICE** ................................................................... 8

   **Section 2.1**    Purchase Price. ............................................................ 8

   **Section 2.2**    Allocation of Purchase Price........................................... 8

**ARTICLE III CLOSING AND DELIVERIES** ................................................ 9

   **Section 3.1**    Closing. ...................................................................... 9

   **Section 3.2**    Obligations of Seller at Closing...................................... 9

   **Section 3.3**    Obligations of Buyer at Closing. .................................. 10

   **Section 3.4**    Closing Statement; Adjustments to Purchase Price at Closing...................... 11

   **Section 3.5**    Title Defects.............................................................. 12

   **Section 3.6**    Environmental Review and Environmental Defects..................................... 14

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** ........................ 17

   **Section 4.1**    Generally................................................................... 17

   **Section 4.2**    Organization and Good Standing..................................... 17

   **Section 4.3**    Power. ...................................................................... 17

   **Section 4.4**    Approvals, Authorization and Enforceability. ................................... 17

   **Section 4.5**    No Conflicts. ............................................................. 18

   **Section 4.6**    No Brokers or Finders.................................................. 18

   **Section 4.7**    Litigation.................................................................. 18

   **Section 4.8**    Taxes and Assessments. ............................................... 19

   **Section 4.9**    Condemnation. ........................................................... 19

   **Section 4.10**      Contracts. ......................................................... 19

   **Section 4.11**      Payments for Hydrocarbon Production............................... 19

   **Section 4.12**      Governmental Authorizations........................................ 19

**Section 4.13**    Outstanding Capital Commitments. ............................................... 20

**Section 4.14**    Imbalances. ................................................................................... 20

**Section 4.15**    Preference Rights. ......................................................................... 20

**Section 4.16**    Transfer Requirements and Other Consents. ............................... 20

**Section 4.17**    No Violation of Laws. ................................................................... 21

**Section 4.18**    Environmental. .............................................................................. 21

**Section 4.19**    Suspended Funds. .......................................................................... 21

**Section 4.20**    BOEM or BSEE Incidents of Non-Compliance and Suspensions. ............ 21

**Section 4.21**    Casualty. ........................................................................................ 21

**Section 4.22**    [Reserved]. ..................................................................................... 21

**Section 4.23**    Insurance and Bonds. .................................................................... 21

**Section 4.24**    Intentionally Omitted. ................................................................... 21

**Section 4.25**    Payout Status. ................................................................................ 22

**Section 4.26**    Non-Consent Operations. .............................................................. 22

**Section 4.27**    Wells. ............................................................................................. 22

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER** .............................. 22

**Section 5.1**    Existence and Qualification. ............................................................. 22

**Section 5.2**    Power. ................................................................................................ 22

**Section 5.3**    Authorization and Enforceability. ..................................................... 22

**Section 5.4**    No Conflicts. ...................................................................................... 23

**Section 5.5**    Liability for Brokers' Fees. ............................................................... 23

**Section 5.6**    Litigation. .......................................................................................... 23

**Section 5.7**    Qualification. ..................................................................................... 23

**Section 5.8**    Consents. ........................................................................................... 23

**Section 5.9**    Independent Evaluation. .................................................................... 23

**Section 5.10**    NORM, Wastes and Other Substances. ........................................... 24

**ARTICLE VI COVENANTS OF THE PARTIES** ............................................................... 24

**Section 6.1**    Access to Information Prior to Closing. ............................................ 25

**Section 6.2**    Operations Pending the Closing. ....................................................... 25

**Section 6.3**    Government Reviews. ......................................................................... 27

**Section 6.4**    Letters-in-Lieu; Assignments; Operatorship. .................................... 27

**Section 6.5**    Preference Rights and Transfer Requirements. ................................. 28

**Section 6.6**    Tax Matters. ....................................................................................... 29

**Section 6.7** Further Assurances......................................................................... 30

**Section 6.8** Insurance. ...................................................................................... 30

**Section 6.9** Record Retention. .......................................................................... 31

**Section 6.10** Bonds, Letters of Credit and Guarantees. .................................. 31

**Section 6.11** Plugging, Abandonment, Decommissioning and Other Costs.................. 31

**Section 6.12** Employees. .................................................................................. 32

**Section 6.13** Transition Services Agreement.................................................... 32

**ARTICLE VII CONDITIONS TO CLOSING** ........................................................ **32**

**Section 7.1** Conditions of Seller to Closing. .................................................. 32

**Section 7.2** Conditions of Buyer to Closing. .................................................. 33

**ARTICLE VIII POST-CLOSING OBLIGATIONS; INDEMNIFICATION;
LIMITATIONS; DISCLAIMERS AND WAIVERS** ........................................ **35**

**Section 8.1** Survival. ........................................................................................ 35

**Section 8.2** Indemnification by Seller............................................................. 35

**Section 8.3** Indemnification by Buyer. ........................................................... 35

**Section 8.4** Limitations on Indemnities. ......................................................... 36

**Section 8.5** Release. ......................................................................................... 36

**Section 8.6** Disclaimers. .................................................................................. 36

**Section 8.7** Waiver of Trade Practices Acts. .................................................. 38

**Section 8.8** Redhibition Waiver. ..................................................................... 38

**Section 8.9** Recording. .................................................................................... 38

**Section 8.10** Non-Compensatory Damages. ..................................................... 39

**Section 8.11** Disclaimer of Application of Anti-Indemnity Statutes............................ 39

**Section 8.12** Casualty........................................................................................ 39

**ARTICLE IX TITLE  MATTERS** ............................................................................ **40**

**Section 9.1** Seller's Title.................................................................................. 40

**Section 9.2** Definition of Defensible Title....................................................... 41

**Section 9.3** Definition of Permitted Encumbrances......................................... 41

**Section 9.4** Cooperation with Regulatory Approval......................................... 42

**ARTICLE X *BANKRUPTCY COURT MATTERS*** ............................................... **44**

**Section 10.1** Bid Procedures. ........................................................................... 44

**Section 10.2** Sale Order. ................................................................................... 44

**Section 10.3** Bankruptcy Court Approval.......................................................... 45

**ARTICLE XI TERMINATION AND EFFECT OF TERMINATION**.................................. **46**

    **Section 11.1**    Right of Termination............................................................... 46

    **Section 11.2**    Termination Rights. ................................................................. 46

    **Section 11.3**    Effect of Termination............................................................... 47

    **Section 11.4**    Specific Performance. .............................................................. 47

**ARTICLE XII MISCELLANEOUS** .......................................................................... **48**

    **Section 12.1**    Counterparts. ............................................................................ 48

    **Section 12.2**    Notices. .................................................................................... 48

    **Section 12.3**    [Reserved] ................................................................................ 49

    **Section 12.4**    Expenses. ................................................................................. 49

    **Section 12.5**    Governing Law and Venue. ..................................................... 49

    **Section 12.6**    Captions. .................................................................................. 50

    **Section 12.7**    Waivers. ................................................................................... 50

    **Section 12.8**    Assignment. ............................................................................. 50

    **Section 12.9**    Entire Agreement. .................................................................... 50

    **Section 12.10**    Amendment. ............................................................................ 51

    **Section 12.11**    No Third-Party Beneficiaries. ................................................. 51

    **Section 12.12**    References. ............................................................................... 51

    **Section 12.13**    Construction. ........................................................................... 51

    **Section 12.14**    Conspicuousness. .................................................................... 52

    **Section 12.15**    Severability. ............................................................................. 52

    **Section 12.16**    Time of Essence. ..................................................................... 52

## EXHIBITS

**Exhibit A**      Leases
**Exhibit A-1**    Wells and Units
**Exhibit A-2**    Contracts
**Exhibit A-3**    Easements
**Exhibit A-4**    Equipment
**Exhibit A-5**    Pipelines
**Exhibit B-1**    Form of Assignment, Conveyance and Bill of Sale
**Exhibit B-2**    Form of Assignment of Operating Rights Interests in Oil and Gas Lease
**Exhibit B-3**    Form of Assignment of Record Title Interests in Oil and Gas Lease
**Exhibit B-4**    Form of Assignment of Pipeline Right-of-Way Grant
**Exhibit B-5**    Form of State of Louisiana Assignment of Right of Way
**Exhibit C**      Form of Certificate of Non-Foreign Status

## SCHEDULES

**Schedule 1.2(k)**    Geological Data
**Schedule 1.3(f)**    Excluded Contracts
**Schedule 1.3(h)**    Excluded Computer and Communication Equipment
**Schedule 1.3(n)**    Certain Excluded Assets
**Schedule 1.4(a)**    Assumed and Assigned Contracts
**Schedule 1.4(b)**    Assumed M&M Lien Claims
**Schedule 2.2**       Allocated Values
**Schedule 4.7**       Litigation
**Schedule 4.8**       Taxes and Assessments
**Schedule 4.10**      Contracts
**Schedule 4.11**      Hydrocarbon Production Payments
**Schedule 4.12**      Governmental Authorizations
**Schedule 4.13**      Outstanding Capital Commitments
**Schedule 4.14**      Imbalances
**Schedule 4.17**      Violation of Laws
**Schedule 4.18**      Environmental
**Schedule 4.19**      Suspended Funds
**Schedule 4.20**      BOEM or BSEE Incidents of Non-Compliance and Suspensions
**Schedule 4.23**      Insurance, Bonds, Letters of Credit, Escrows, Guarantees and Other Securities
**Schedule 4.25**      Payout Status
**Schedule 4.26**      Non-Consent Operations
**Schedule 4.27**      Wells
**Schedule 6.5**       Preference Rights and Transfer Requirements
**Schedule 6.8**       Insurance
**Schedule 6.10**      Replacement Bonds
**Schedule 9.3(m)**    Permitted Encumbrances

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") dated as of July 14, 2017 (the "Execution Date"), is executed by and between Northstar Offshore Group, LLC, a Delaware limited liability company ("Seller"), and Northstar Offshore Ventures LLC ("Buyer"), a Delaware limited liability company. Seller and Buyer are each referred to herein as a "*Party*" and collectively as the "*Parties*." Capitalized terms used in this Agreement are defined in the **Definition Appendix** attached hereto.

## RECITALS

A.      Seller is engaged in the business of offshore oil and natural gas exploration, development and production in the United States of America (the "*Business*"), and owns, in varying proportions, certain oil and gas leases and associated assets.

B.      On August 12, 2016, Montco Oilfield Contractors, LLC, Alliance Offshore, LLC, and Alliance Energy Services, LLC filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code against the Seller thereby commencing a bankruptcy case (the "*Bankruptcy Case*").

C.      On December 2, 2016, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the U.S.  Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*").

D.      Seller desires to sell to Buyer all of the Assets, and Buyer desires to purchase from Seller all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth.

E.      The Parties hereto intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105, 363 and 365 of title 11 of the United States Code (the "*Bankruptcy Code*").

F.      The Parties' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound by the terms hereof, agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.1**      Purchase and Sale.

Upon the terms and subject to the conditions of this Agreement, on the Closing Date and effective as of the Effective Time, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase

from Seller, the Assets, free and clear of all Liens and Claims (other than the Assumed Liabilities and Permitted Encumbrances).

  **Section 1.2**  Assets.

  As used herein, the term "***Assets***" means, subject to the terms and conditions of this Agreement, all of Seller's right, obligation, title, interest and estate, real or personal, recorded or unrecorded, movable or immovable, tangible or intangible, used in or related to the Business, including without limitation the following (but excluding the Excluded Assets):

  (a)  All of the oil and gas leases; subleases and other leaseholds; net profits interests; carried interests; farmout rights; options; contractual rights; and other properties and interests described on **Exhibit A** (collectively, the "***Leases***"), together with each and every kind and character of right, title, claim, and interest that Seller has in and to the lands covered by the Leases or the lands currently pooled, unitized, communitized or consolidated therewith (collectively, the "***Lands***");

  (b)  All oil, gas, water, disposal or injection wells shown on **Exhibit A-1** whether producing, shut-in, or temporarily or permanently abandoned, and any other oil, gas, water, disposal or injection wells located on or associated with the Lands, even if not shown on **Exhibit A-1**, whether producing, shut-in, or temporarily or permanently abandoned (collectively, the "***Wells***");

  (c)  All pools and units shown on **Exhibit A-1**, and all pools and units which include any Lands or all or a part of any Leases or include any Wells (the "***Units***"; the Units, together with the Leases, Lands and Wells, being hereinafter referred to as the "***Properties***"), and including all interest of Seller derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease, and all tenements, hereditaments and appurtenances belonging to the Leases and Units;

  (d)  All contracts, agreements, and instruments by which the Properties are bound, or that relate to or are otherwise applicable to the Properties, only to the extent such contracts are valid and existing and applicable to the Properties rather than Seller's other properties, including but not limited to, operating agreements, unitization, pooling and communitization agreements, declarations and orders, joint venture agreements, farmin and farmout agreements, exploration agreements, participation agreements, exchange agreements, transportation or gathering agreements, agreements for the sale and purchase of oil, gas, casinghead gas or processing agreements to the extent applicable to the Properties or the Hydrocarbons produced from the Properties, including but not limited to those identified on **Exhibit A-2** (collectively, the "***Contracts***"), but excluding any master service agreements and any contracts, agreements and instruments to the extent transfer is restricted by third-party agreement or applicable Law and the necessary consents to transfer are not obtained pursuant to **Section 6.5** and provided that "***Contracts***" shall not include the instruments constituting the Leases or Easements;

(e)     All easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights and all contracts, agreements, and instruments by which they are bound (collectively, the "***Easements***") appurtenant to, and used or held for use in connection with the Properties (including those identified on **Exhibit A-3**), but excluding any permits and other rights to the extent transfer is restricted by third-party agreement or applicable Law and the necessary consents to transfer are not obtained pursuant to **Section 6.5**;

(f)     All platforms, equipment, machinery, fixtures and other tangible personal property and improvements set forth on **Exhibit A-4** and all other platforms, equipment, machinery, fixtures and other tangible personal property and improvements located on the Properties or used, or held for use, in connection with the operation of the Business, including all furniture, equipment and other personal property located in Seller's office located at 11 Greenway Plaza, Suite 2800, Houston, Texas, 77046 (collectively, "***Equipment***");

(g)     All flow lines, pipelines, gathering systems and appurtenances thereto set forth on **Exhibit A-5** and all flow lines, pipelines, gathering systems and appurtenances thereto located on the Properties or used, or held for use, in connection with the operation of the Business (collectively, "***Pipelines***" and, together with the Equipment and Wells, "***Personal Property***");

(h)     All Hydrocarbons produced from, located on or otherwise attributable to, the Leases, Lands, and Wells from and after the Effective Time;

(i)     All Imbalances as set forth on **Schedule 4.14**;

(j)     All lease files; land files; well files; gas and oil sales contract files; gas processing files; division order files; abstracts; title opinions; land surveys; environmental surveys, inspections, assessments, and reports; logs; maps; engineering data and reports; interpretive data, technical evaluations and technical outputs; reserve studies and evaluations, to the extent delivered to Buyer prior to the date hereof; and other books, records, data, files, and accounting records, in each case to the extent related to the Business, the Assumed Liabilities or Assets, or used or held for use in connection with the maintenance or operation thereof, but excluding (i) any books, records, data, files, logs, maps, evaluations, outputs, and accounting records to the extent disclosure or transfer would result in a violation of applicable Law or is restricted by any Transfer Requirement that is not satisfied pursuant to **Section 6.5**, (ii) computer or communications software or intellectual property (including tapes, codes, data and program documentation and all tangible manifestations and technical information relating thereto), (iii) attorney-client privileged communications and work product of Seller's or any of its Affiliates' legal counsel (other than title opinions), (iv) reserve studies and evaluations other than any that have been delivered to Buyer prior to the date hereof, and (v) records relating to the negotiation and consummation of the sale of the Assets (subject to such exclusions, the "***Records***"); provided, however, that Seller may retain the originals of such Records as Seller has reasonably determined may be required for existing litigation, tax, accounting, and auditing purposes;

3

(k)      All Geological Data (provided it is not subject to a Transfer Requirement that is not satisfied pursuant to **Section 6.5**), including without limitation the Geological Data listed on **Schedule 1.2(k)**, and all reserve estimates and economic estimates related to the Properties prepared by Seller or its Affiliates;

(l)      All computers, software (provided it is transferable), specialty tools, SCADA systems, peripherals, radio equipment, and telephone equipment, except as listed in **Schedule 1.3(h)**;

(m)      all proprietary and other computer software to the extent transferrable;

(n)      To the extent transferrable pursuant to applicable Law, all Governmental Authorizations;

(o)      All trade credits, account receivables, note receivables, take-or-pay amounts receivable, and other receivables, attributable to the Assets with respect to (i) any period prior to the Effective Time, solely to the extent that any such receivables are owed to Seller by a party entitled to a payment under a Senior Statutory Liens, a Cure Amount or other Assumed Liability, up to the amount of the Assumed Liability payable to such party and, (ii) any period of time on or after the Effective Time;

(p)      Subject to **Section 8.12**, all right, title, and interest in and to all causes of action, including claims under directors and officers insurance policies and any rights of insurance in connection therewith, whether or not related to the Properties;

(q)      The tradename "***Northstar***" and all registered or unregistered logos, trademarks, symbols, service marks, copyrights, trade names, or other intellectual property associated with the Business (including applications or pending applications thereof); and

(r)      All premium payments, premium advances, collateral and escrowed funds provided in connection with any of the Seller's bonds that relate to the Assets, including all Replacement Bonds and all rights, but not obligations of Seller in all collateral, funds or credit support (including letters of credit) provided in connection with any such bond.

**Section 1.3**      <u>Excluded Assets.</u>

Notwithstanding the foregoing, the Assets shall not include any assets of the Seller that are listed in this **Section 1.3** (collectively, the "***Excluded Assets***"), and these are excepted, reserved and excluded from the purchase and sale contemplated herein.  The Excluded Assets are:

(a)      all corporate, partnership, limited liability company, financial, income and franchise tax and legal records of Seller that relate to Seller's business generally (whether or not relating to the Assets), and all books, records and files that relate to the Excluded Assets and those records retained by Seller pursuant to **Section 1.2(j)** and copies of any other Records retained by Seller pursuant to **Section 1.5**;

4

(b)      all rights to any refund of Taxes and, until the expiration of 24 months from the Closing Date, all rights to any refunds of costs or expenses, other than Taxes, borne by Seller or Seller's predecessors in interest and title attributable to periods prior to the Effective Time;

(c)      Seller's area-wide bonds, supplemental bonds, bonds delivered by Seller to any third person in connection with acquisition of the Assets or any other properties, permits and licenses or other permits, licenses or authorizations used in the conduct of Seller's business;

(d)      subject to **Section 8.12**, all claims and causes of action related to any claims for relief under chapter 5 of the Bankruptcy Code that exist as of the Closing Date;

(e)      all trade credits, account receivables, note receivables, take-or-pay amounts receivable, and other receivables attributable to the Assets with respect to any period of time prior to the Effective Time, except to the extent set forth in Section 1.02(o)(i);

(f)      the Contracts listed in **Schedule 1.3(f)** and any employee contracts or benefit plans;

(g)      all rights, titles, claims and interests of Seller or any Affiliate of Seller (i) to or under any policy or agreement of insurance or any insurance proceeds with respect to the Excluded Liabilities, except (A) with regard to directors and officers insurance policies or (B) as set forth in **Section 8.12**, and (ii) to or under any bond or bond proceeds;

(h)      the computers, software, specialty tools, SCADA systems, peripherals, radio equipment, and telephone equipment located on the properties listed in **Schedule 1.3(h)**;

(i)      all documents and instruments of Seller that may be protected by an attorney-client privilege;

(j)      the Settlement Agreement dated April 30, 2015, between Fieldwood Energy Offshore LLC, Black Elk Energy Offshore Operations, LLC and Seller;

(k)      all Geological Data subject to a Transfer Requirement that is not satisfied pursuant to **Section 6.5**;

(l)      any Asset deemed an Excluded Asset pursuant to **Section 6.5**;

(m)      all of Seller's cash on hand at Closing; and

(n)      all wells, leases, Easements and real, personal and mixed property located on, or used exclusively in the operation of, the properties listed in **Schedule 1.3(n)**.

    **Section 1.4**      Assumed Liabilities.

Subject to the terms and conditions of this Agreement, as of the Closing, Buyer shall assume and agree to pay, perform and discharge, or cause to be paid, performed, and discharged, only the following obligations and Liabilities of Seller related to the Business (the "***Assumed Liabilities***"):

(a)     all Liabilities of Seller under all Contracts listed in **Schedule 1.4(a)** (the "***Assumed and Assigned Contracts***");

(b)     all Liabilities relating to the statutory lien claims listed in **Schedule 1.4(b)** (the "***Assumed M&M Lien Claims***");

(c)     all Liabilities arising in connection with the ownership, use or operation of the Assets from and after the Effective Time;

(d)     the payment of any and all Property Costs (other than any Excluded Liabilities) due for periods commencing, on or after the Effective Time;

(e)     all Liabilities with respect to Cure Amounts of Assumed and Assigned Contracts;

(f)     all Environmental Liabilities and any and all other Liabilities arising under Environmental Laws or any other Law in connection with any environmental, health, or safety matters relating to the operation of the Assets from and after the Effective Time;

(g)     all Taxes related to the Assets attributable to taxable periods, or portions thereof, beginning on or after the Effective Time, including Liabilities for Taxes attributable to the ownership of the Assets from and after the Effective Time;

(h)     the P&A Obligations, whether incurred prior to, on or after the Effective Time; and

(i)     any Liabilities related to COBRA continuation coverage allocated to Buyer under **Section 6.12**.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.  For the avoidance of doubt, all Liabilities arising out of or related to the Assets or the operations thereof prior to the Effective Time shall not be Assumed Liabilities unless specifically provided in this Agreement.

**Section 1.5**     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller other than the Assumed Liabilities, and Seller shall be solely and exclusively liable with respect to all Liabilities of Seller (including all Liabilities arising out of or relating to the Assets or the operation thereof prior to the Effective Time unless specifically provided in this Agreement) (such Liabilities, collectively, the "***Excluded Liabilities***").  For purposes of clarity,

and without limitation of the generality of the foregoing, the Excluded Liabilities shall include, without limitation, each of the following Liabilities:

(a)    any and all Liabilities for Taxes arising from or with respect to the Assets for any taxable periods, or portions thereof, ending prior to the Effective Time;

(b)    any and all Liabilities arising under Environmental Laws or other any other Law in connection with any environmental, health, or safety matters relating to the operation of the Assets on or before the Effective Time;

(c)    any fines or penalties imposed or assessed related to or arising out of or relating to the ownership or operation of the Assets prior to the Effective Time (including fines and penalties imposed or assessed in connection with Seller's pre-Closing violation of Legal Requirements, including Environmental Laws), except to the extent such fines or penalties are imposed or assessed with respect to, or arise out of, the actions of Buyer or its Affiliates after the Closing Date;

(d)    all obligations arising out of or relating to the accounting for, failure to pay or the incorrect payment to or from any royalty owner, overriding royalty owner, working interest owner or other interest holder under the Assets and escheat obligations, in each case, insofar as the same are attributable to periods, and Hydrocarbons produced and marketed with respect to the Assets, prior to the Effective Time;

(e)    any and all Liability for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Seller, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under this Agreement;

(f)    all Excluded Employee Liabilities;

(g)    the Settlement Agreement dated April 30, 2015, between Fieldwood Energy Offshore LLC, Black Elk Energy Offshore Operations, LLC and Seller;

(h)    all Liabilities arising under any indebtedness of Seller or any obligations or Liabilities to preferred or common equity holders or debtholders of Seller;

(i)    all Liabilities: (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case, other than Cure Amounts; and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Case and prior to the Effective Date;

(j)    all Liabilities and obligations of Seller under this Agreement or any of the Conveyances, and each other instrument executed in connection with this Agreement; and

(k)     other than the Assumed Liabilities, all liability, warranty and similar claims for damages or injury to person or property and all other Liabilities, regardless of when made or asserted, to the extent arising out of or incurred in connection with the ownership, use, maintenance or operation of any of the Assets, on or before the Closing Date.

**Section 1.6**     Revenues and Expenses

Subject to the provisions hereof, including **Section 3.4**, Seller shall remain entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds) and shall remain responsible for all Operating Expenses (in each case) attributable to the Assets for the period of time prior to the Effective Time.   Subject to the provisions hereof, from and after Closing, Buyer shall be entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds) and shall be responsible for all Operating Expenses (in each case) attributable to the Assets for the period of time from and after the Effective Time.   All Operating Expenses attributable to the Assets (in each case) that are: (a) incurred with respect to operations conducted or Hydrocarbons produced prior to the Effective Time shall be paid by or allocated to Seller and (b) incurred with respect to operations conducted or Hydrocarbons produced from and after the Effective Time shall be paid by or allocated to Buyer.   Seller shall, upon receipt of any amounts owed to Buyer that are not accounted for in the Final Accounting Statement, promptly deliver any such amounts to Buyer. Buyer shall, upon its receipt of any amounts owed to Seller under this section that are not accounted for in the Final Accounting Statement, promptly deliver any such amounts to Seller.

**ARTICLE II**
**PURCHASE PRICE**

**Section 2.1**     Purchase Price.

The aggregate consideration for the sale and transfer of the Assets (the "***Purchase Price***") is: (i) Thirteen Million Two Hundred Fifty Thousand and No/100 Dollars ($13,250,000.00) plus (ii) assumption of the Assumed Liabilities, including the P&A Obligations and the payment and satisfaction of all Cure Amounts in accordance with the terms of the Sale Order, (iii) the funding of Buyer with a working capital facility of $19,000,000.00 for the satisfaction of the Assumed Liabilities, (iv) the replacement of Seller's outstanding bonds (other than bonds issued by Argonaut Insurance Company (the "***Argonaut Bonds***")) and a commitment by Buyer to obtain further bonds as required by applicable Law to operate the Business; and (v) Buyer's written and binding commitment to assist Seller in settling its bankruptcy estate pursuant to a plan acceptable to the Bankruptcy Court, in part, with the funding of a litigation trust in an amount not to exceed $150,000.   As required by the terms of the Bid Procedures Order, Buyer has submitted to the Seller a cash deposit (the "***Good Faith Deposit***") in the amount of $1,325,000.00.   The Good Faith Deposit shall be held and disbursed in a segregated escrow account to be maintained by American Escrow Company in accordance with the terms of this Agreement and in accordance with any requirements of the Bankruptcy Court.

**Section 2.2**     Allocation of Purchase Price.

Schedule 2.2 contains the Allocated Value of the Assets.  For the purposes hereof, the "***Allocated Value***" of an Asset shall mean the portion of the Purchase Price that has been allocated to a particular block, or portions thereof, as listed in **Schedule 2.2**.  The allocations may be relied upon for all purposes hereunder, including all of the following:

(a)     To notify holders of preference rights of Buyer's offer;

(b)     Buyer and Seller shall use the Allocated Values as the basis for reporting asset values and other items for purposes of all federal, state, and local Tax Returns, including without limitation Internal Revenue Service Form 8594, if required, or any similar statement of such allocation that may be required; and

(c)     As otherwise provided in this Agreement.

## ARTICLE III
## CLOSING AND DELIVERIES

**Section 3.1**     Closing.

The consummation of the transactions contemplated hereby (the "***Closing***") shall take place at the offices of Pillsbury Winthrop Shaw Pittman LLP at Two Houston Center 909 Fannin, Suite 2000, Houston, TX 77010, on or before the third Business Day following the date on which the conditions contained in **Article 7** have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions) or on such other date or at such other place and time as may be mutually agreed to by the Parties in writing (the date on which the Closing occurs, hereinafter, the "***Closing Date***").  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title, and interest of Seller to be acquired by Buyer hereunder shall be considered to have passed to Buyer as of the Effective Time.

**Section 3.2**     Obligations of Seller at Closing.

At the Closing, upon the terms and subject to the conditions of this Agreement, Seller shall deliver or cause to be executed and delivered to Buyer, or perform or cause to be performed, the following:

(a)     assignment, conveyance and bill of sale in substantially the same form as **Exhibit B-1**;

(b)     assignment of oil and gas lease operating rights in substantially the same form **as Exhibit B-2**;

(c)     assignment of record title interests in oil and gas lease in substantially the same form as **Exhibit B-3**;

(d)     assignment of pipeline right-of-way grant in substantially the same form as **Exhibit B-4**;

(e)    Louisiana assignment of right of way in substantially the same form as **Exhibit B-5**;

(f)    a certificate duly executed by an authorized corporate officer of Seller, dated as of Closing, certifying on behalf of Seller that the conditions set forth in **Section 7.2(a)** and **Section 7.2(b)** have been fulfilled;

(g)    a certificate of non-foreign status, with an executed statement described in Treasury Regulation 1.1445-2(b)(2), in substantially the same form as **Exhibit C** certifying that Seller is not a foreign person within the meaning of the Internal Revenue Code;

(h)    letters-in-lieu of transfer orders covering the Assets, prepared by Buyer and signed by Seller to the extent necessary;

(i)    an executed Transition Services Agreement (unless such requirement is waived by Buyer); and

(j)    any other agreements, instruments and documents which are required by other terms of this Agreement to be executed and/or delivered by Seller at Closing.

**Section 3.3**    <u>Obligations of Buyer at Closing.</u>

At the Closing, upon the terms and subject to the conditions of this Agreement, Buyer shall deliver or cause to be executed and delivered to Seller, or perform or caused to be performed, the following:

(a)    a wire transfer of the cash portion of the Purchase Price (adjusted in accordance with the terms of this Agreement), less the amount of the Good Faith Deposit, in accordance with instructions from Seller;

(b)    the Conveyances in sufficient multiple originals to allow recording in all appropriate jurisdictions and offices, duly executed by Buyer, together with such other governmental forms as may be required by any Governmental Body in order to approve the transfer of the ownership of the Assets and the transfer of the operatorship of the Seller Operated Assets from Seller to Buyer, including (i) assignment, conveyance and bill of sale in substantially the same form as **Exhibit B-1**; (ii) assignment of operating rights interests in oil and gas lease in substantially the same form as **Exhibit B-2**; (iii) assignment of record title interests in oil and gas lease in substantially the same form as **Exhibit B-3**; (iv) assignment of pipeline right-of-way grant in substantially the same form as **Exhibit B-4**; and (v) Louisiana assignment of right of way in substantially the same form as **Exhibit B-5**;

(c)    evidence reasonably satisfactory to Seller that Buyer has complied with all BOEM/BSEE requirements for holding title to leases, rights-of-way, and other interests in the outer continental shelf, and has complied with BOEM/BSEE bonding (including surety bonds for the plugging and abandonment of wells) or other financial security requirements;

(d)    a certificate by an authorized officer of Buyer, dated as of Closing, certifying on behalf of Buyer that the conditions set forth in **Section 7.1(a)** and **Section 7.1(b)** have been fulfilled;

(e)    certificates of insurance in amounts equal to the amounts set forth in **Schedule 6.8**;

(f)    obligations under **Section 6.10**;

(g)    documents, insurance, and other security for demonstration of Buyer's Oil Spill Financial Responsibility, including Forms BOEM-1016, BOEM-1017, BOEM-1018, BOEM-1019, BOEM-1020, BOEM-1023 and/or BOEM-1025, as may be appropriate, to replace Seller's existing proof of Oil Spill Financial Responsibility with that of Buyer's own sufficient Oil Spill Financial Responsibility insurance or security; and

(h)    an executed Transition Services Agreement (unless such requirement is waived by Buyer); and

(i)    any other agreements, instruments and documents which are required by other terms of this Agreement to be executed and/or delivered by Buyer at Closing.

Section 3.4    Closing Statement; Adjustments to Purchase Price at Closing.

Seller shall prepare and deliver to Buyer, no later than three (3) Business Days prior to Closing, a statement which sets forth Seller's good-faith estimate of the adjustments to the Purchase Price (accompanied by supporting documentation) made in accordance with the following provision ("**Closing Statement**"):

(a)    At Closing, the Purchase Price shall be increased, as set forth in the Closing Statement, in the following amounts:

(i)    All Property Costs paid by Seller that are attributable to any period of time from and after the Effective Time; and

(ii)    Any other amount provided for in this Agreement or agreed upon by Seller and Buyer.

(b)    At the Closing, the Purchase Price shall be decreased, as set forth in the Closing Statement, in the following amounts:

(i)    Except for any Excluded Assets, the amount of all proceeds received by Seller with respect to the Assets that are attributable to the period of time from and after the Effective Time (but in no event including Hydrocarbons produced prior to the Effective Time);

(ii)    The Allocated Value of any Assets that are excluded from Closing pursuant to **Section 3.5(c)(iv)**, **Sections 3.6(e)(ii)** or **(iv)**, **Section 6.5(a)**, and **Section 6.5(d)** and Buyer shall have no obligation with respect to any liabilities or bonds associated with any such Assets that become Excluded Assets; and

(iii)    Any other amount provided for in this Agreement or agreed upon by Seller and Buyer.

(c)    Buyer shall prepare within sixty (60) days after the Closing Date and furnish to Seller a final accounting statement setting forth the adjustments and pro-rating of any amounts provided for in this Article III or elsewhere in this Agreement (the "***Final Accounting Statement***") together with reasonable supporting documentation.  Seller shall within five (5) days after receipt of the Final Accounting Statement deliver to Buyer a written report (together with reasonable supporting documentation) containing any changes that Seller proposes be made to such Final Account Statement (the "***Dispute Notice***").  The Parties shall undertake to agree on the final adjustment amounts and such final adjustment amount shall be paid by Buyer or Seller, as appropriate, not later than five (5) days after such agreement.

(d)    If Seller and Buyer are unable to resolve the matters addressed in the Dispute Notice, each of Buyer and Seller shall, within ten (10) Business Days after the delivery of such Dispute Notice, summarize its position with regard to such dispute in a written document of ten pages or less and submit such summaries to the Bankruptcy Court, together with the Dispute Notice, the Final Accounting Statement and any other documentation such Party may desire to submit.  Any decision rendered by the Bankruptcy Court pursuant hereto shall be final, conclusive and binding on Seller and Buyer and will be enforceable against any of the Parties in any a court of competent jurisdiction, and such final adjustment amounts shall be paid by Buyer or Seller, as appropriate, not later than five (5) days after such decision.

**Section 3.5**    Title Defects.

(a)    By written notice delivered to Seller prior to the expiration of the Examination Period (each such timely notice, a "***Title Defect Notice***"), Buyer may notify Seller of the existence of any matter that it reasonably believes constitutes a Title Defect. To constitute a proper and effective Title Defect Notice, such notice must be received by Seller prior to the expiration of the Examination Period and must include with respect to each asserted Title Defect (i) the nature, and a reasonably detailed description, of such Title Defect, (ii) a description of each Asset affected, (iii) the Allocated Value of each such Asset, (iv) the amount attributable to the Title Defect (the "***Title Defect Amount***") that Buyer claims for such Title Defect, (v) the computations and information upon which Buyer relies for such Title Defect Amount and (vi) all supporting documentation not in Seller's or its Affiliates' possession reasonably necessary for Seller to verify Buyer's computations, the existence of such Title Defect and the amount of such Title Defect Amount.

12

(b)     To give Seller an opportunity to begin reviewing (and curing, if appropriate in Seller's discretion) Title Defects, Buyer agrees to use reasonable efforts to give Seller, on or before the end of each calendar week prior to the expiration of the Examination Period, written notice of all Title Defects discovered by Buyer during the preceding calendar week, which notice may be preliminary in nature and supplemented prior to the expiration of the Examination Period.

(c)     As to each Asset for which Buyer asserts an alleged Title Defect in an effective Title Defect Notice, the following provisions shall apply:

(i)     Seller may elect to cure such Title Defect at or before the Closing.  A Title Defect shall be deemed cured if Seller delivers to Buyer curative material that, in Buyer's reasonable judgment, is sufficient to cure the Title Defect.  Such material delivered more than three (3) Business Days before the Closing shall be deemed sufficient and acceptable to Buyer unless, within two (2) Business Days after Buyer receives such material, Seller receives from Buyer written notice that the curative is not acceptable.

(ii)     If any Title Defects are described in one or more proper Title Defect Notices but are not cured at or before the Closing by Seller, the Purchase Price shall be reduced at Closing by all Title Defect Amounts attributable to such Title Defects; provided that the Title Defect Amount of each uncured individual Title Defect exceeds US$50,000 and the cumulative total of all Title Defect Amounts attributable to such Title Defects that exceed such threshold exceeds US$200,000 (which latter amount shall be an aggregate deductible and not a threshold).

(iii)     If the Parties disagree on the validity of an asserted Title Defect, its cure, or its Title Defect Amount, then Seller and Buyer shall attempt to agree upon a reduction (if any) in the Allocated Value of such Asset based upon the (alleged) Title Defect and upon the amount, if any, by which the Purchase Price should be reduced.  If the Parties so agree, the Purchase Price shall be reduced by the agreed upon amount and such Asset shall be conveyed hereunder subject to such (alleged) Title Defect.

(iv)     If, at the Closing, the Parties remain in dispute over the validity of an asserted Title Defect, its cure or its Title Defect Amount, then (1) such dispute shall be resolved by the Bankruptcy Court, (2) the Property affected by such disputed Title Defect shall be excluded from the Closing, (3) the Purchase Price paid at Closing shall be reduced by the Allocated Value of that Asset and (4) upon resolution of such dispute, the Asset will be conveyed to Buyer and Buyer shall pay to Seller the Allocated Value, as it may be adjusted by the Title Defect Amount, if any, found to be attributable to such Title Defect by the resolution.

(v)     Notwithstanding anything herein to the contrary, the Purchase Price shall not be reduced for a Title Defect (1) unless the Title Defect Amount for such Title Defect exceeds a threshold of US$50,000 and (2) unless and until the aggregate of all such amounts that exceed US$50,000 exceeds US$200,000 (which latter amount shall be an aggregate deductible, not a threshold).  As to any Title Defect for which no reduction of the unadjusted Purchase Price is required by virtue of the preceding sentence, (A) Seller

13

shall have no further obligation with respect to such Title Defect, (B) Buyer shall be deemed to have waived such Title Defect and (C) subject to the other provisions of this Agreement which may result in such Asset becoming an Excluded Asset, the Asset shall be conveyed hereunder subject to such Title Defect.

(d)     Any matters that may otherwise constitute Title Defects, but do not exceed the deductible or threshold in **Section 3.5(c)(ii)** or of which Seller has not timely received an effective Title Defect Notice, shall not entitle Buyer to any adjustment of the Purchase Price, but shall not void any special warranty of title, and remain subject to **Section 9.1(b)**.

   **Section 3.6**     Environmental Review and Environmental Defects

(a)     Buyer shall have the right to conduct or cause a consultant ("***Buyer's Environmental Consultant***") to conduct an environmental review of the Assets prior to the expiration of the Examination Period, including a Phase I environmental property assessment with respect to the Assets ("***Buyer's Environmental Review***"") subject to the Confidentiality Agreement and the following provisions.     As part of Buyer's Environmental Review, Buyer shall be entitled to perform underwater inspections of the platforms and pipelines comprising the Assets.   The cost, risk and expense of Buyer's Environmental Review shall be borne solely by Buyer.   In the event that Buyer's Phase I environmental property assessment(s) identify actual or potential "recognized environmental concerns," then Buyer may request Seller's permission (which permission may be withheld for any reason or no reason) to conduct additional environmental property assessments ("***Additional Assessments***").   Any sampling, boring, drilling or other invasive investigation activities shall be considered Additional Assessments.   The additional environmental property assessment procedures relating to any Additional Assessment shall be submitted to Seller in an environmental property assessment plan. Thereafter, Seller may approve (which approval may be withheld for any reason or no reason) said environmental property assessment plan, in whole or in part, and Buyer shall not have the right to conduct any activities set forth in such plan until such time that Seller has approved such plan in writing, if at all; provided, however, that if Buyer identifies during Phase I actual or potential "recognized environmental concerns," but Seller does not permit Buyer to conduct Additional Assessments with respect to such concerns, either Party may elect to remove the affected Assets from the transaction as Environmental Defect Properties and the Purchase Price will be adjusted accordingly. Buyer shall (and shall cause Buyer's Environmental Consultant to) (i) perform all environmental review work so as to not unreasonably interfere with the operations of Seller (or other operator of the affected Asset), (ii) comply with all applicable Laws and (iii) for any Asset operated by a third party under any applicable operating agreement or other agreement, conduct Buyer's Environmental Review within the scope or limitations of Seller's rights under such operating agreement or other agreement.   Seller shall use its commercially reasonable efforts to obtain all consents of third parties necessary in order for Buyer to conduct Buyer's Environmental Review.   Seller shall have the right to have one or more representatives accompany Buyer and Buyer's Environmental Consultant at all times during Buyer's Environmental Review.   For any samples taken in connection

with Buyer's Environmental Review, Buyer shall take split samples and provide Seller with one of each such sample, properly labeled and identified.

(b)      Buyer shall release, protect, defend, indemnify and hold harmless Seller and its Related Persons from and against all Losses of any kind or character to the extent caused or contributed to by Buyer or its Related Persons arising out of, in connection with or relating to Buyer's Environmental Review, but excluding any such Losses to the extent caused or contributed to by Seller or its Related Persons.

(c)      Unless otherwise required by applicable Law or any Contract, Buyer shall (and shall cause Buyer's Environmental Consultant to) treat confidentially any matters revealed by Buyer's Environmental Review and any reports or data generated from such review (the "***Environmental Information***") and not disclose any Environmental Information to any Governmental Body or other third party without the prior written consent of Seller unless required by applicable Law (include the policies of any Governmental Body including without limitation any state environmental authority), in which case Buyer will provide written notice to Seller as soon as practicable under the circumstances in order to permit Seller to seek protective measures.  Unless otherwise required by applicable Law or any Contract, Buyer may use the Environmental Information only in connection with the transactions contemplated by this Agreement.  If Buyer or Buyer's Environmental Consultant become legally compelled to disclose any of the Environmental Information, Buyer shall provide Seller with prompt notice sufficiently before any such disclosure so as to allow Seller a reasonable opportunity to seek any protective order, or any other remedy, as it deems appropriate under the circumstances.  If this Agreement is terminated at or before the Closing, Buyer shall deliver the Environmental Information to Seller, which Environmental Information shall become the sole property of Seller.

(d)      If Buyer obtains knowledge of any environmental defect affecting any Asset prior to the expiration of the Examination Period (an "***Environmental Defect***"), Buyer shall promptly (and in all events before the end of the Examination Period) notify Seller of such alleged Environmental Defect (each such timely notice, an "***Environmental Defect Notice***").  To constitute a proper and effective Environmental Defect Notice, such notice must (1) be in writing; (2) be received by Seller before the end of the Examination Period; (3) describe the Environmental Defect in reasonable detail, substantiated by the factual data gathered in Buyer's Environmental Review; (4) identify the specific Assets affected by such Environmental Defect and the Allocated Value attributable to such Assets; (5) specify the procedures recommended to correct the Environmental Defect, together with any related recommendations from Buyer's Environmental Consultant; and (6) specify the amount claimed by Buyer for such Environmental Defect and Buyer's computations for such amount ("***Environmental Defect Amount***").

(e)      As to each Property for which Buyer asserts an alleged Environmental Defect in an effective Environmental Defect Notice, the following provisions shall apply:

15

(i)     Seller may elect to cure such Environmental Defect at or before the Closing.  An Environmental Defect shall be deemed cured if Seller delivers to Buyer curative material that, in Buyer's reasonable judgment, is sufficient to cure the Environmental Defect.  Such material delivered more than three (3) Business Days before the Closing shall be deemed sufficient and acceptable to Buyer unless, within two (2) Business Days after Buyer receives such material, Seller receives from Buyer written notice that the curative is not acceptable.

(ii)    If any Environmental Defects are described in one or more proper Environmental Defect Notices but are not cured at or before the Closing, the Purchase Price shall be reduced by all Environmental Defect Amounts attributable to such Environmental Defects; provided that the Environmental Defect Amount of each uncured Environmental Defect exceeds US$50,000 and the cumulative total of all Environmental Defect Amounts attributable to such Environmental Defects that exceed such threshold exceeds US$200,000 (which latter amount shall be an aggregate deductible (and not a threshold)); and provided further, that if the Environmental Defect Amount attributable to any such uncured Environmental Defect equals or exceeds fifty percent (50%) of the Allocated Value attributable to such Asset, then either Party shall have the right to elect to exclude such Asset from the Closing, at which point the Purchase Price paid at Closing shall be reduced by the Allocated Value of such Asset and such Asset shall be deemed an "***Excluded Asset***" under this Agreement.

(iii)   If the Parties disagree on the validity of an asserted Environmental Defect, its cure or its Environmental Defect Amount, then Seller and Buyer shall attempt to agree upon a reduction (if any) in the Allocated Value of such Property based upon the (alleged) Environmental Defect and upon the amount, if any, by which the Purchase Price should be reduced.  If the Parties so agree, the Purchase Price shall be reduced by the agreed upon amount and such Property shall be conveyed hereunder subject to such (alleged) Environmental Defect.

(iv)    If, at the Closing, the Parties remain in dispute over the validity of an asserted Environmental Defect, its cure or its Environmental Defect Amount, (1) such dispute shall be resolved by the Bankruptcy Court; (2) the Property affected by such disputed Environmental Defect shall be excluded from the Closing, (3) the Purchase Price paid at Closing shall be reduced by the Allocated Value of that Asset and (4) upon resolution of such dispute, the Property will be conveyed to Buyer and Buyer shall pay to Seller the Allocated Value, as it may be adjusted by the Environmental Defect Amount, if any, found to be attributable to such Environmental Defect by the resolution.

(v)     Notwithstanding anything herein to the contrary, the Purchase Price shall not be reduced for an Environmental Defect (and a Property shall not be deemed to constitute an Excluded Asset) (1) unless the Environmental Defect Amount for such uncured Environmental Defect exceeds a threshold of US$50,000 and (2) only to the extent that the aggregate of all such amounts that exceed US$50,000 exceeds US$200,000 (which amount shall be an aggregate deductible, not a threshold).  As to any Environmental Defect for which no reduction of the Purchase Price is required by virtue of the preceding sentence, (A) Seller shall have no further obligation with respect to such

Environmental Defect, (B) Buyer shall be deemed to have waived such Environmental Defect and (C) subject to the other provisions of this Agreement which may result in such Asset becoming an Excluded Asset, the Property shall be conveyed hereunder subject to such Environmental Defect.

(f)      Any matters that may otherwise constitute Environmental Defects, but do not exceed the deductible or threshold in **Section 3.6(e)(ii)** or of which Seller has not timely received an effective Environmental Defect Notice, shall be deemed to have been waived by Buyer for all purposes and constitute an Assumed Liability.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Section 4.1      Generally.

(a)      Any representation or warranty qualified "to the knowledge of Seller" or "to Seller's knowledge" or with any similar knowledge qualification is limited to matters within the actual knowledge of David Dean, Avery Alcorn, Brian Macmillan, Keith Kreneck, and Roger Souders, as officers of Seller. "***Actual Knowledge***" for purposes of this Agreement means information actually personally known by such Persons.

(b)      Inclusion of a matter on a Schedule in relation to a representation or warranty which addresses matters having a Material Adverse Effect shall not be deemed an indication that such matter does, or may, have a Material Adverse Effect.  Likewise, the inclusion of a matter on a Schedule in relation to a representation or warranty shall not be deemed an indication that such matter necessarily would, or may, breach such representation or warranty absent its inclusion on such Schedule.  Matters may be disclosed on a Schedule to this Agreement for purposes of information only.

(c)      Subject to the foregoing provisions of this **Section 4.1**, the disclaimers and waivers contained in **Section 8.6**, **Section 8.7**, and **Section 8.8** and the other terms and conditions of this Agreement, Seller represents and warrants to Buyer the matters set out in the remainder of this **Article IV**.

Section 4.2      Organization and Good Standing.

Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation where the Assets are located, except where the failure to so qualify would not have a Material Adverse Effect.

Section 4.3      Power.

Seller has, subject to entry of the Sale Order, the power and authority to enter into and perform this Agreement and consummate the transactions contemplated by this Agreement.

Section 4.4      Approvals, Authorization and Enforceability.

Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement, and the performance of the transactions contemplated hereby, have been duly and validly authorized by all necessary limited liability company action on the part of Seller. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents to which Seller is a party constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. Except for (a) entry of the Sale Order, (b) notices, filings and consents required in connection with the Bankruptcy Case, (c) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation or other Legal Requirements, and (d) the Customary Post-Closing Consents, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party or the consummation or performance of any of the transactions contemplated hereby and thereby except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.5    No Conflicts.

Subject to the giving of the notices to third parties and the receipt of all consents, approvals and waivers from third parties in connection with the transactions contemplated hereby, including entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated herein will not (i) conflict with or result in a breach of any provisions of the organizational documents of Seller, (ii) result in a default or the creation of any encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Lease, Contract, note, bond, mortgage, indenture, license or other material agreement to which Seller is a party or by which Seller or the Assets may be bound or (iii) to Seller's knowledge, violate any material Laws applicable to Seller or any of the Assets.

Section 4.6    No Brokers or Finders.

Other than Parkman Whaling LLC, the fees and expenses of which shall be paid by Seller out of the cash portion of the Purchase Price, no agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

Section 4.7    Litigation.

With respect to the Assets and Seller's ownership, operation, development, maintenance, or use of any of the Assets, except as set forth in **Schedule 4.7**: (i) no proceeding, arbitration, action, suit, pending settlement, or other legal proceeding of any kind or nature before or by any Governmental Body (each, a "***Proceeding,***" and collectively "***Proceedings***") (including any take-

18

or-pay claims) to which Seller is a party and which relates to the Assets is pending or, to Seller's knowledge, threatened against Seller; (ii) to Seller's knowledge, no Proceeding or investigation to which Seller is not a party which relates to the Assets is pending or threatened in writing; and (iii) no notice in writing from any third party (including any Governmental Body) has been received by Seller threatening any Proceeding relating to the Assets which could have a Material Adverse Effect (excluding any notices relating to any Environmental Liabilities or Environmental Law, which are addressed in **Section 4.18**).

Section 4.8    <u>Taxes and Assessments.</u>

For all periods prior to Effective Time, except as disclosed in **Schedule 4.8**, Seller has filed all Tax Returns required to be filed by any Governmental Body and all *ad valorem*, property, production, severance and similar taxes and assessments (including penalties and interest) based on or measured by the ownership of the Assets, the production of Hydrocarbons or the receipt of proceeds therefrom that have become due and payable before the Effective Time have been properly paid, other than taxes which are being contested in good faith.

Section 4.9    <u>Condemnation.</u>

There is no actual or, to Seller's knowledge, threatened, taking (whether permanent, temporary, whole or partial) of any part of the Properties by reason of condemnation or the written threat of condemnation.

Section 4.10    <u>Contracts.</u>

Seller is in compliance and, to Seller's knowledge, all counterparties are in compliance under all material Contracts, except (i) as disclosed on **Schedule 4.10**, (ii) the Assumed and Assigned Contracts, and (iii) for such non-compliance as would not, individually or in the aggregate, exceed the sum of $25,000.00.  **Schedule 4.10** sets forth all agreement(s) or contracts (i) for the sale, exchange, or other disposition of Hydrocarbons produced from or attributable to Seller's interest in the Assets that are not cancelable without penalty or other material payment without first providing more than 60 days prior written notice and (ii) that could reasonably be expected to result in aggregate payments by Seller or aggregate revenues to Seller, of more than $25,000.00 (net to the interest of Seller) during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues).

Section 4.11    <u>Payments for Hydrocarbon Production.</u>

As of the Closing Date, except as set forth on **Schedule 4.11**, Seller is not obligated under any contract or agreement for the sale of gas from the Assets containing a take-or-pay, advance payment, prepayment, or similar provision, or under any gathering, transmission, or any other contract or agreement with respect to any of the Assets to gather, deliver, process, or transport any gas without then or thereafter receiving full payment therefor.

Section 4.12    <u>Governmental Authorizations.</u>

Except as disclosed on **Schedule 4.12**, to Seller's knowledge, Seller has obtained and is maintaining all material federal, state and local governmental licenses, permits, franchises,

19

orders, exemptions, variances, waivers, authorizations, certificates, consents, rights, privileges and applications therefor (the "Governmental Authorizations") that are presently necessary or required for the ownership and operation of the Seller Operated Assets as currently owned and operated (including Governmental Authorizations required by Environmental Law).  Except as disclosed in **Schedule 4.7** or **Schedule 4.12**, (i) Seller has obtained and maintained all material Governmental Authorizations and has operated the Seller Operated Assets in all material respects in accordance with the conditions and provisions of such Governmental Authorizations, and (ii) no written notices of material violation have been received by Seller, and no Proceedings are pending or, threatened in writing that might result in any material modification, revocation, termination or suspension of any such Governmental Authorizations or which would require any material corrective or remediation action by Seller.

**Section 4.13**   Outstanding Capital Commitments.

As of the Closing Date, there are no outstanding AFEs or other commitments to make capital expenditures which are binding on the Seller Operated Assets or, the other Assets, and which Seller reasonably anticipates will individually require expenditures by the owner of the Assets after the Closing Date in excess of $25,000 (net to Seller's interest excluding non-consent interests) other than those shown on **Schedule 4.13**.

**Section 4.14**   Imbalances.

To Seller's knowledge, **Schedule 4.14** accurately sets forth in all material respects all of Seller's Imbalances as of the respective dates set forth therein, arising with respect to the Assets and, except as disclosed in **Schedule 4.14**, (i) no Person is entitled to receive any material portion of Seller's Hydrocarbons produced from the Assets or to receive material cash or other payments to "balance" any disproportionate allocation of Hydrocarbons produced from the Assets under any operating agreement, gas balancing or storage agreement, gas processing or dehydration agreement, gas transportation agreement, gas purchase agreement, or other agreement, whether similar or dissimilar, and (ii) Seller is not obligated to deliver any material quantities of gas or to pay any material penalties or other material amounts, in connection with the violation of any of the terms of any gas contract or other agreement with shippers with respect to the Assets.

**Section 4.15**   Preference Rights.

None of the Assets, or any portion thereof, is subject to any Preference Right which may be applicable to the transactions contemplated by this Agreement, except for Preference Rights as are set forth on **Schedule 6.5**.

**Section 4.16**   Transfer Requirements and Other Consents.

Except for (a) Transfer Requirements set forth in **Schedule 6.5**, (b) Customary Post-Closing Consents, (c) consents under Contracts that are terminable upon not greater than 90 days' notice without payment of any fee or are otherwise not material, (d) compliance with any applicable requirements of the BOEM and Buyer's obligations under **Section 6.10**, and (e) compliance with any applicable requirements of the HSR Act, there are no other consents

20

required in connection with the transfer of the Assets or the consummation of the transactions contemplated by this Agreement.

**Section 4.17** No Violation of Laws.

Except as set forth on **Schedule 4.17**, Seller has not violated applicable Laws with respect to the ownership or operation of any Assets of which Seller is the operator, except where such violation would not have a Material Adverse Effect. This **Section 4.17** does not include any matters with respect to Environmental Laws.

**Section 4.18** Environmental.

To Seller's knowledge, there are no written Claims relating to the existence of any Environmental Liabilities affecting the Assets or arising out of Seller's ownership and operation of the Seller Operated Assets, which could reasonably be expected to have a Material Adverse Effect.

**Section 4.19** Suspended Funds.

**Schedule 4.19** sets forth a list of all third party funds held in suspense or escrow by Seller as of the date set forth therein that are attributable to production from the Assets.

**Section 4.20** BOEM or BSEE Incidents of Non-Compliance and Suspensions.

To Seller's knowledge, as of the date of this Agreement, there are no outstanding suspensions of operations or suspensions of production pertaining to the Assets that are awaiting approval by a Governmental Body other than those set forth on **Schedule 4.20**, and there are no outstanding unresolved INCs issued by any Governmental Body with respect to any Asset except to the extent set forth on **Schedule 4.20**.

**Section 4.21** Casualty.

Since January 1, 2017, there has been no condemnation, seizure, damage, destruction or other Casualty (whether or not covered by insurance) affecting any material portion of the Assets which has not subsequently been repaired, replaced or restored.

**Section 4.22** [Reserved].

**Section 4.23** Insurance and Bonds.

**Schedule 4.23** sets forth all insurance, bonds, letters of credit, escrows, guarantees or other security pertaining to the Assets, except as to any general or area-wide bonding posted with the BOEM, that have been posted by Seller and/or any of its Affiliates or by a third Person on its behalf for which, upon Closing, Buyer must replace (other than the Argonaut Bonds) or to which Buyer will be bound or to which the Assets will be subject (unless replacement is not required by BOEM due to the financial condition of Buyer).

**Section 4.24** Intentionally Omitted.

21

Section 4.25   <u>Payout Status.</u>

Except as described on **Schedule 4.25**, none of the Leases or Wells are subject to a payout balance that will cause Seller's interest to differ from interests shown on **Exhibit A-1**.

Section 4.26   <u>Non-Consent Operations.</u>

Except as set forth on **Schedule 4.26**, there are no operations or proposed operations with respect to the Assets as to which Seller has become a non-consenting party under the terms of the applicable operating agreement.

Section 4.27   <u>Wells.</u>

As of the date of this Agreement, all Wells that currently are required (or under the applicable Law, must be plugged and abandoned within twelve (12) months after the Effective Date) to be permanently plugged and abandoned pursuant to applicable Laws and regulations are set forth on **Schedule 4.27**.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 5.1   <u>Existence and Qualification.</u>

Buyer is duly organized, validly existing and in good standing under the laws of the state of its formation; and Buyer is duly qualified to do business as a foreign limited liability company in every jurisdiction in which it is required to qualify in order to conduct its business, except where the failure to so qualify would not have a material adverse effect on Buyer; and Buyer is or will be as of the Closing Date duly qualified to do business in the respective jurisdictions where the Assets are located.

Section 5.2   <u>Power.</u>

Buyer has the power and authority to enter into and perform this Agreement and consummate the transactions contemplated by this Agreement.

Section 5.3   <u>Authorization and Enforceability.</u>

The execution, delivery and performance of this Agreement, and the performance of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer (and all documents required hereunder to be executed and delivered by Buyer at Closing will be duly executed and delivered by Buyer) and this Agreement constitutes, and at the Closing such documents will constitute, the valid and binding obligations of Buyer, enforceable against such Buyer in accordance with their terms except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally as well

as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

> **Section 5.4**    No Conflicts.

The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated herein will not conflict with or result in a breach of any provisions of the organizational or other governing documents of Buyer nor will it violate any Laws applicable to Buyer or any of its property.

> **Section 5.5**    Liability for Brokers' Fees.

Seller shall not directly or indirectly have any responsibility, liability or expense, as a result of undertakings or agreements of the Buyer for brokerage fees, finder's fees, agent's commissions or other similar forms of compensation in connection with this Agreement or any agreement or transaction contemplated hereby.

> **Section 5.6**    Litigation.

There are no Proceedings pending, or to the actual knowledge of Buyer, threatened in writing before any Governmental Body against Buyer or any Affiliate of Buyer which are reasonably likely to materially impair Buyer's ability to perform its obligations under this Agreement.

> **Section 5.7**    Qualification.

On or prior to the Closing Date, Buyer shall be qualified to own and assume operatorship of federal and state oil, gas and mineral leases, rights-of-way and easements, and any other interests in all jurisdictions where the Assets to be transferred to it are located, and the consummation of the transactions contemplated in this Agreement will not cause Buyer to be disqualified as such an owner or operator.  To the extent required by the applicable Law, as of the Closing, Buyer shall maintain, lease bonds, area-wide bonds or any other surety bonds as may be required by, and in accordance with, such state or federal regulations governing the ownership and operation of such Assets.

> **Section 5.8**    Consents.

Except for Customary Post-Closing Consents, the entry of the Sale Order and compliance with any applicable requirements under the HSR Act, there are no consents or other restrictions on assignment that Buyer is obligated to obtain or furnish, including, but not limited to, requirements for consents from third parties to any assignment (in each case) that would be applicable in connection with the consummation of the transactions contemplated by this Agreement by Buyer.

> **Section 5.9**    Independent Evaluation.

In making its decision to enter into this Agreement and to consummate the transactions contemplated herein, except for the representations and warranties expressly made by Seller in

Article 4 of this Agreement, in the Conveyances or confirmed in any certificate furnished or to be furnished to Buyer pursuant to this Agreement, Buyer (a) has relied or shall rely solely on its own independent investigation and evaluation of the Assets and the advice of its own legal, tax, economic, insurance, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by Seller or any representatives or consultants or advisors engaged by Seller and (b) has satisfied or shall satisfy itself through its own due diligence as to the environmental and physical condition and state of repair of and contractual arrangements and other matters affecting the Assets.  Buyer has no knowledge of any fact that results in the breach of any representation, warranty or covenant of Seller given hereunder.

Buyer is purchasing the Assets on an "AS IS, WHERE IS" and "WITH ALL FAULTS" basis solely on Buyer's own investigation of the Assets and acknowledges that: (i) except as set forth in **Article IV** hereof, neither Seller nor anyone on Seller's behalf has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Assets or any part thereof, and (ii) neither Seller nor anyone on Seller's behalf has made any warranties, representations or guarantees, express, implied or statutory, written or oral respecting the performance or physical condition of the Assets.  Except as set forth in **Article IV** hereof, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and Buyer assumes all risks with respect thereto.  BUYER ACKNOWLEDGES THAT EXCEPT AS SET FORTH IN **Article IV** OF THIS AGREEMENT, SELLER MAKES NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER (EXCEPT THE SPECIAL WARRANTY OF TITLE AS SET FORTH IN THE CONVEYANCES) WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ASSETS.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN Article IV OF THIS AGREEMENT, BUYER DISCLAIMS RELIANCE ON ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, BY OR ON BEHALF OF SELLER.

Section 5.10    NORM, Wastes and Other Substances.

Buyer acknowledges that the Assets have been used for exploration, development and production of oil and gas and that there may be petroleum, produced water, wastes or other substances or materials located in, on or under the Assets or associated with the Assets. Equipment and sites included in the Assets may contain asbestos, NORM or other Hazardous Substances.  NORM may affix or attach itself to the inside of wells, materials and equipment as scale or in other forms.  The wells, materials and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Substances.  NORM containing material and/or other wastes or Hazardous Substances may have come in contact with various environmental media, including without limitation, water, soils or sediment.  Special procedures may be required for the assessment, remediation, removal, transportation or disposal of environmental media, wastes, asbestos, NORM and Hazardous Substances from the Assets.

**ARTICLE VI**
**COVENANTS OF THE PARTIES**

**Section 6.1**     Access to Information Prior to Closing.

Seller agrees that, prior to the Closing Date (or the earlier termination of this Agreement), Buyer shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the Assets of Seller and such examination of the books and records of Seller relating to the Assets as it reasonably requests and to make copies of such books and records, all at Buyer's sole expense.  Any such investigation and examination shall be conducted during regular business hours and under reasonable circumstances, and Seller shall reasonably cooperate therein.  No investigation by Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller contained in this Agreement. Each Party shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate fully with the representatives of the other Party in connection with such review and examination.   Seller shall promptly deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by Seller in the Bankruptcy Case.  Seller shall cooperate with Buyer, to the extent reasonably necessary in connection with Buyer's preparation for or participation in any part of the Bankruptcy Case in which Buyer's participation is necessary, required or reasonably appropriate.

**Section 6.2**     Operations Pending the Closing.

(a)     Except as otherwise expressly contemplated by this Agreement (including the prosecution of the Bankruptcy Case) or with the prior written consent of Buyer, and subject to and in accordance with the orders of the Bankruptcy Court under the Bankruptcy Case, between the date of this Agreement and the Closing (or earlier termination of this Agreement) Seller shall use reasonable efforts to:

(i)     taking into account Seller's status as debtor in possession, maintain and operate the Assets operated by Seller as a reasonably prudent operator and cause such Assets to be operated as a reasonably prudent operator in the ordinary course of business;

(ii)     maintain (A) all of the Assets of Seller in their current condition, ordinary wear and tear excepted, and (B) insurance upon all of such Assets in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

(iii)     comply in all material respects with applicable Laws, including, without limitation, Environmental Laws;

(iv)     not take any action which would adversely affect the operations of the Seller or the ability of the Parties to consummate the transactions contemplated by this Agreement;

(v)     pay post-petition expenses including Property Costs of the Seller under the normal course of business;

(vi)     pay or cause to be paid all bonuses and rentals, royalties, overriding royalties, shut-in royalties, and minimum royalties and development and Property Costs, and other payments incurred with respect to the Seller Operated Assets except (A) royalties held in suspense as a result of title issues and that do not give any third party a right to cancel an interest in any Seller Operated Assets, and (B) expenses or royalties being contested in good faith, unless the nonpayment of such contested expenses or royalties could result in the termination of a Lease, in which case Seller will notify Buyer and obtain Buyer's approval prior to withholding such payment;

(vii)    maintain its books, accounts and records in the ordinary course of business;

(viii)   use commercially reasonable efforts to file all material Tax Returns and pay or deposit all material Taxes on a timely basis;

(ix)     maintain all Governmental Authorizations, approvals, bonds and guaranties, in each case, to the extent material, affecting the Assets, and make all filings that Seller is required to make under applicable Law with respect to the Assets;

(x)      give written notice to Buyer as soon as practicable, but in any event within two (2) Business Days of Seller acquiring knowledge, of (A) the receipt or delivery by Seller of any written notice with respect to any material breach of any material Contract, Lease, Governmental Authorization or any applicable Law, (B) receipt or delivery by Seller of any written claim for damages or any Proceeding initiated by or against Seller with respect to the Assets, (C) receipt by Seller of any refusal or rejection to grant a consent or exercise of a Preferential Right, or (D) any material election that Seller is required to make under any material Contract or with respect to any Property, specifying the nature and time period associated with such election;

(xi)     not abandon any Properties (except any abandonment of Leases to the extent any such Leases terminate pursuant to their terms);

(xii)    not commence, propose, or agree to participate in any single operation with respect to the Properties with an anticipated cost for which Seller shall be responsible in excess of $50,000, except for emergency operations, operations scheduled on **Schedule 4.13**, or operations required by any Governmental Body or the Bankruptcy Court;

26

(xiii) not (1) terminate, cancel, or materially amend or modify any Governmental Authorization, material Contract or Lease, (2) enter into any Contract that, if such agreement, contract or commitment had been entered into prior to the date of this Agreement, would be required to be listed in Exhibit A-2; (3) relinquish voluntarily its position as operator with respect to any Property; (4) become a non-consenting party to any operation with respect to the Properties; or (5) waive, compromise or settle any material claim or right involving the Assets;

(xiv) not sell, lease, encumber, or otherwise dispose of all or any portion of any Assets, except sales of Hydrocarbons in the ordinary course of business; or

(xv) not enter into any agreement or commitment to take, or otherwise permit or consent to, any action prohibited by this Section 6.2(a).

(b)     Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Buyer, subject to and in accordance with the orders of the Bankruptcy Court under the Bankruptcy Case, and only to the extent that such action would affect the Assets or Assumed Liabilities, between the date of this Agreement and the Closing (or earlier termination of this Agreement) Seller shall not (i) effect, or agree to effect, any material change in the operation of the Seller's business as conducted on the date of this Agreement, (ii) modify or renew any material Assumed and Assigned Contracts, or (iii) take any action that would render any of the representations or warranties of Seller in this Agreement untrue or incorrect in any material respect.

Section 6.3     Government Reviews.

(a)     Each Party shall in a timely manner (a) make all required filings, if any, with and prepare applications to and conduct negotiations with, each Governmental Body as to which such filings, applications or negotiations are necessary or appropriate in the consummation of the transactions contemplated hereby and (b) provide such information as each may reasonably request to make such filings, prepare such applications and conduct such negotiations.  Each Party shall cooperate with and use all commercially reasonable efforts to assist the other Party with respect to such filings, applications and negotiations.

Section 6.4     Letters-in-Lieu; Assignments; Operatorship.

(a)     Seller will execute on the Closing Date letters in lieu of division and transfer orders relating to the Assets, on forms prepared by Buyer and reasonably satisfactory to Seller, to reflect the transaction contemplated hereby.

(b)     Seller will prepare and execute on the Closing Date all assignments necessary to convey to Buyer all of the Leases and other Assets in the form(s) as prescribed by the applicable Governmental Body and otherwise acceptable to Buyer and Seller.

(c)    Seller makes no representations or warranties to Buyer as to transferability or assignability of operatorship of any Seller Operated Assets. Rights and obligations associated with operatorship of such Assets are governed by operating and similar agreements covering the Assets and will be determined in accordance with the terms of such agreements. However, Seller will assist Buyer in Buyer's efforts to succeed Seller as operator of any Wells and Units included in the Assets including by voting for Buyer to succeed Seller. Buyer shall, promptly following Closing, file all appropriate forms and declarations or bonds with federal and state agencies relative to its assumption of operatorship of the Seller Operated Assets. For all Seller Operated Assets, Seller shall execute and deliver to Buyer, and Buyer shall promptly file the appropriate forms with the applicable regulatory agency transferring operatorship of such Assets to Buyer.

Section 6.5    Preference Rights and Transfer Requirements.

Subject to the terms of the Bid Procedures Order and only to the extent that a holder of a Preference Right files a Rights Notice in accordance with the Bid Procedures Order, Seller shall promptly (and, in all events, within five (5) Business Days following the Auction) send to the holder of each Preference Right written notice offering to sell to such holder, in accordance with the contractual provisions applicable to such Preference Right, such Asset on the terms of this Agreement (including the requirement for such holder to deliver to Seller a deposit equal to ten percent (10%) of the Allocated Value for such Asset) and for the total Allocated Value for such Asset. In addition, Seller shall promptly (and, in all events, within five (5) Business Days following the Auction) send to each holder of a Transfer Requirement pertaining to the Assets and the transactions contemplated hereby a notice seeking such party's consent to the transaction contemplated hereby.

(a)    If, at or before the Closing, a holder of a Preference Right timely notifies Seller that it intends to exercise its Preference Right with respect to an Asset to which the Preference Right applies (as determined in accordance with the agreement under which the Preference Right arises), or if the election period for a Preference Right has not expired at or before the Closing, then, subject to **Section 7.2(i)**, (i) the Asset covered by the Preference Right shall be deemed to constitute an Excluded Asset and shall be excluded from the Assets to be conveyed to Buyer at Closing; (ii) any Liabilities associated with such Asset shall be Excluded Liabilities; and (iii) the Purchase Price shall be reduced by the Allocated Value of such Asset.

(b)    If, following the Closing, the holder of a Preference Right fails to exercise its Preference Right with respect to an Asset within the election period thereunder, or fails to purchase the Asset subject to the Preference Right, Seller shall promptly notify Buyer. Within five (5) Business Days after Buyer's receipt of such notice, Seller shall sell to Buyer, and Buyer shall purchase from Seller, such Asset under the terms of this Agreement for a price equal to the Allocated Value thereof subject to any applicable adjustments hereunder (and such Asset shall no longer constitute an Excluded Asset hereunder and shall constitute an Asset for all purposes).

(c)    Prior to Closing, Seller shall use commercially reasonable efforts to obtain all consents that are required to permit the assignment of the Assets by Seller to Buyer

and the consummation by Seller of the transactions contemplated hereby; provided, however, neither Party shall be required to incur any liability or pay any money in order to be in compliance with the foregoing covenant.  As set forth in **Section 10.2**, and as a condition to Closing, the Sale Order shall make factual findings that the holders of applicable Preference Rights have been provided adequate notice and that they have failed to exercise those rights, except as specifically noted in the Sale Order.

(d)     If Seller fails to obtain a consent prior to Closing and the failure to obtain such consent would cause the assignment of such Asset to Buyer to be void, cause the terms of the underlying Lease or Contract to terminate or be terminable, or cause the Buyer to incur any material liability, then, unless Buyer waives the obligation to obtain such consent, then, subject to **Section 7.2(i)**, (i) the Asset subject to such unattained consent shall be deemed to constitute an Excluded Asset and shall be excluded from the Assets to be conveyed to Buyer at Closing; (ii) any Liabilities associated with such Asset shall be Excluded Liabilities and (iii) the Purchase Price shall be reduced by the Allocated Value of such Asset.  For a period of sixty (60) days following Closing, Seller and Buyer shall use their commercially reasonable efforts to attempt to obtain any such consent.  If such consent is obtained within such period, then Seller shall promptly sell to Buyer, and Buyer shall purchase from Seller, such Asset under the terms of this Agreement for a price equal to the Allocated Value thereof subject to any applicable adjustments hereunder (and such Asset shall no longer constitute an Excluded Asset hereunder and shall constitute an Asset for all purposes and such previously deemed Excluded Liabilities shall constitute Assumed Liabilities).

**Section 6.6**     Tax Matters.

(a)     Proration of Real and Personal Property Taxes.  All real and personal property taxes and assessments on the Assets for any taxable period commencing on or prior to the Effective Time (the "Adjustment Date") and ending on or after the Adjustment Date (a "Straddle Period") shall be prorated between Buyer and Seller as of the close of business on the Adjustment Date based on the best information then available, with (a) Seller being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Adjustment Date and (b) Buyer being liable for such Taxes attributable to any portion of a Straddle Period on or after the Adjustment Date.  All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Adjustment Date shall be allocated to Seller based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period on and after the Adjustment Date shall be allocated to Buyer based upon the number of days in the Straddle Period from and after the Adjustment Date; provided, however, that the Parties shall allocate any real property Tax in accordance with section 164(d) of the Internal Revenue Code.  The amount of all such prorations that must be paid in order to convey the Assets to Buyer free and clear of all Liens other than Permitted Encumbrances and Assumed Liabilities shall be calculated (or, if not subject to calculation, estimated) and either paid on the Closing Date or, if not subject to payment on such date, Buyer shall withhold from the Purchase Price Seller's portion, or estimated portion, of such amounts and shall thereafter be responsible for paying such amounts.

29

(b)     Taxes Related to Purchase of Acquired Assets.  Buyer shall bear any sales, use, excise, real property transfer, gross receipts, goods and services, registration, capital, documentary, stamp or transfer taxes, recording fees and similar taxes and fees other than such fees and taxes in connection with any title curative materials delivered by Seller (collectively "Transfer Taxes") incurred and imposed upon, or with respect to, the transactions contemplated by this Agreement.  Seller will determine, and Buyer will cooperate with Seller in determining the amount of any Transfer Taxes, if any, that are due in connection with the transactions contemplated by this Agreement and Buyer agrees to pay any such Transfer Tax to Seller or to the appropriate Governmental Body. If any of the transactions contemplated by this Agreement are exempt from any such Transfer Taxes upon the filing of an appropriate certificate or other evidence of exemption, Buyer will timely furnish to Seller such certificate or evidence.

(c)     Cooperation on Tax Matters.  Each Party shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of any Tax Return and any audit, litigation or other Proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon such other Party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Each Party agrees (a) to retain all books and records with respect to Tax matters, and the allocation of the Purchase Price provided for in **Section 2.2**, pertinent to the Assets relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by any other Party, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Taxing Authority, and (b) to give the other Parties reasonable written notice prior to transferring, destroying or discarding any such books and records and, if any other Party so requests, each Party shall allow the other Parties the option of taking possession of such books and records prior to their disposal.  Each Party further agrees, upon request, to use its commercially reasonable efforts to obtain any certificate or other document from any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated.  Nothing herein shall require Seller to continue in existence or to continue to operate, manage or control its remaining assets and property after the Closing for any specified period of time, and failure of Seller to do so will not constitute a breach of this Agreement.

Section 6.7    Further Assurances.

Following issuance of the Sale Order, each Party agrees to take such actions and to execute, acknowledge and deliver all such further documents as are reasonably requested by the other Party for carrying out the purposes of this Agreement or of any document delivered pursuant to this Agreement.  If any Party receives monies belonging to the other Party, such amount shall immediately be paid over to the proper Party.

Section 6.8    Insurance.

30

Effective as of the Closing Date, Buyer shall cause any insurance required by Law or pursuant to an Assumed and Assigned Contracts to be carried and maintained with respect to the Assets in the amounts set forth on **Schedule 6.8**.

Section 6.9    Record Retention.

For five (5) years after the Closing Date (or such longer period as may be required by any Governmental Authority or an ongoing claim), (a) Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer shall allow Seller (including, for clarity, any trust established under a Chapter 11 plan of Seller or any other successors of Seller) and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Seller's sole expense and upon reasonable advance notice, to any Records included in the Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller or any such trusts or successors and Seller (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such Records for such purposes. Until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estate, Seller may keep a copy of the Records and, at Buyer's sole expense, shall make all records, and Seller's personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Proceedings or tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document. In the event any Party desires to destroy any such Records prior to the time during which they must be maintained pursuant to this **Section 6.9**, such Party shall first give ninety (90) days prior written notice to the other Party and such other Party shall have the right at their option and expense, upon prior written notice given within such ninety (90) day period to the Party desiring to destroy such Records or records, to take possession of the Records within one hundred and eighty (180) days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estate shall permit.

Section 6.10    Bonds, Letters of Credit and Guarantees.

Buyer acknowledges that none of the bonds, letters of credit, escrow agreements, guarantees, and other financial assurance, if any, posted by Seller with Governmental Bodies or third parties and relating to the Assets are transferable to Buyer without express approval of the issuer thereof. Buyer shall furnish, at Closing, evidence that Buyer has complied with all general or area-wide bonds in favor of a Governmental Body as required. In addition, except to the extent that Buyer will, as of Closing, be covered by the supplemental financial assurance of the operators of the applicable Assets (evidence of which to be presented at Closing to Seller's satisfaction), then on or before the Closing Date, Buyer shall obtain, or cause to be obtained in the name of Buyer, to the extent necessary, replacements for all bonds in the amounts and in favor of the obligees reflected on **Schedule 6.10** hereto ("***Replacement Bonds***"), except for the Argonaut Bonds, which shall stay in place. Notwithstanding the foregoing, in no event shall Buyer's obligation with respect to Replacement Bonds exceed $46,000,000.

Section 6.11    Plugging, Abandonment, Decommissioning and Other Costs.

31

In addition to its other obligations under this Agreement, Buyer shall comply with all Laws, Leases, Easements, Contracts (including all joint and unit operating agreements) and prevailing industry standards relating to (i) the plugging, abandonment and/or replugging of all Wells, including inactive Wells or temporarily abandoned Wells, included in the Assets, (ii) the dismantling or decommissioning and removal of any Personal Property and other Assets of whatever kind related to or associated with operations and activities conducted by whomever on the Properties, Personal Properties, or otherwise, pursuant to the Leases, Easements, or Contracts and (iii) the clean-up, restoration and/or remediation of the property covered by the Leases, Easements, or related to the Assets (collectively, the "***P&A Obligations***").

Section 6.12    Employees.

Seller acknowledges and agrees that Buyer shall have the right (but not the obligation) to make offers of employment to certain of the Seller's employees, officers with such offers of employment to be on such terms as Buyer or Buyer's Affiliate (as applicable) may determine in its sole and absolute discretion.   Seller shall provide Buyer and Buyer's Affiliates with reasonable access to Seller's employees and records regarding each employee's terms of employment with Seller for purposes of this **Section 6.12** and shall not take any action to interfere with any offers of employment that Buyer or Buyer's Affiliates may make to any of Seller's employees or impede or in any way hinder Buyer's or Buyer's Affiliates' hiring of any of Seller's employees provided that Buyer shall not make an offer of employment or hire any of Seller's employees if such action will unreasonably interfere with the administration of the Seller's Bankruptcy Case.  Buyer and Seller agree that the responsibility and obligation to make COBRA continuation coverage (within the meaning of section 4980B of the Code and the Treasury Regulations thereunder) available following the Closing Date to all "***M&A qualified beneficiaries***" (within the meaning of Treasury Regulations §54.4980B-9, Q&A-4) with respect to the transactions contemplated hereby shall be allocated in accordance with Treasury Regulations §54.4980B-9, Q&A-8.

Section 6.13    Transition Services Agreement.

Unless the requirement is waived by Buyer (in its sole discretion), the Parties agree to use their commercially reasonable efforts to agree to (a) a Transition Services Agreement to be executed at Closing or (b) if the Parties mutually agree that no Transition Services Agreement is necessary, a mutually acceptable data sharing agreement with respect to the Excluded Assets.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.1    Conditions of Seller to Closing.

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject, at the option of Seller, to the satisfaction or waiver by Seller on or prior to Closing of each of the following conditions:

(a)    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (other than those representations and warranties of Buyer that are qualified by materiality, which shall be

true and correct in all respects) as of the Closing Date as though made on and as of the Closing Date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects (other than those representations and warranties of Buyer that are qualified by materiality, which shall be true and correct in all respects) as of such specified date;

(b)     Buyer shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by it under this Agreement prior to or on the Closing Date;

(c)     No Proceeding by a third party (including any Governmental Body) seeking to restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement shall be pending before any Governmental Body and no order, writ, injunction or decree shall have been entered and be in effect by any court or any Governmental Body of competent jurisdiction, and no statute, rule, regulation or other requirement shall have been promulgated or enacted and be in effect, that on a temporary or permanent basis restrains, enjoins or invalidates the transactions contemplated hereby;

(d)     Buyer shall have delivered (or be ready, willing and able to immediately deliver) to Seller duly executed counterparts of the Conveyances and all other documents and certificates to be delivered by Buyer under this Agreement and shall have performed (or be ready, willing and able to immediately perform) the other obligations required to be performed by it under **Section 3.3** (including, without limitation, delivery of any payment due to Seller from Buyer);

(e)     Buyer shall have obtained, or caused to be obtained, in the name of Buyer, all general or area-wide bonds in favor of a Governmental Body as required, and all replacements for Seller's bonds, letters of credit, guaranties, and other financial assurance, if any, to Governmental Bodies and other obligees as reflected on **Schedule 6.10** hereto, to the extent required by **Section 6.10**;

(f)     Buyer shall have furnished (or be ready, willing, and able to immediately furnish) Seller with certificates of insurance in amounts equal to the amounts set forth in **Schedule 6.8**;

(g)     If applicable, the waiting period under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired, notice of early termination shall have been received or a consent order issued by or from applicable Governmental Bodies; and

(h)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order.

**Section 7.2**     Conditions of Buyer to Closing.

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject, at the option of Buyer, to the satisfaction or waiver by Buyer on or prior to Closing of each of the following conditions:

(a)    Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects (other than those representations and warranties of Seller that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the Closing Date as though made on and as of the Closing Date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects (other than those representations and warranties of Seller that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of such specified date;

(b)    Seller shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by it under this Agreement prior to or on the Closing Date;

(c)    No Proceeding by a third party (including any Governmental Body) seeking to restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement shall be pending before any Governmental Body and no order, writ, injunction or decree shall have been entered and be in effect by any court or any Governmental Body of competent jurisdiction, and no statute, rule, regulation or other requirement shall have been promulgated or enacted and be in effect, that on a temporary or permanent basis restrains, enjoins or invalidates the transactions contemplated hereby;

(d)    Seller shall have delivered (or be ready, willing and able to immediately deliver) to Buyers duly executed counterparts of the Conveyances, and all other documents and certificates to be delivered by Seller under **Section 7.1** and shall have performed (or be ready, willing and able to immediately perform) the other obligations required to be performed by it under **Section 7.1**;

(e)    If applicable, the waiting period under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired, notice of early termination shall have been received or a consent order issued by or from applicable Governmental Bodies;

(f)    Buyer has not received any information that reasonably suggests that any of the Closing documents that require the approval of a Governmental Body may not be readily approved due to reasons beyond the control of Buyer;

(g)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order;

(h)    No Material Adverse Effect shall have occurred and be continuing; and

(i)     The aggregate Allocated Value of Assets that become Excluded Assets pursuant to the operation of **Section 3.5(c)(iv)**, **Sections 3.6(e)(ii) or (iv)**, **Section 6.5(a)** or **Section 6.5(d)** shall not be in excess of $500,000, unless waived by Buyer.

**ARTICLE VIII**
**POST-CLOSING OBLIGATIONS; INDEMNIFICATION;**
**LIMITATIONS; DISCLAIMERS AND WAIVERS**

**Section 8.1**     Survival.

All representations and warranties of Seller and Buyer contained herein shall expire on the Closing Date.  The covenants and other agreements of Seller and Buyer set forth in this Agreement shall survive the Closing Date until fully performed; provided, however, that nothing herein shall require Seller to remain in existence.

**Section 8.2**     Indemnification by Seller.

From and after the Closing, subject to the terms and conditions of this **Article VIII** (including, without limitation, the survival and the timing requirement in **Section 8.1**), Seller shall indemnify, defend and hold harmless Buyer and its directors, officers, employees, stockholders, members, agents, consultants, advisors and other representatives (including legal counsel, accountants and financial advisors) and Affiliates and the successors and permitted assigns of this Agreement of Buyer (collectively, the "***Buyer Indemnified Persons***") from and against any and all Losses asserted against, resulting from, imposed upon, or incurred or suffered by any Buyer Indemnified Person to the extent resulting from, arising out of or relating to:

(a)     any breach or nonfulfillment of or failure to perform any covenant or agreement of Seller contained in this Agreement or confirmed in any certificate furnished by or on behalf of Seller in connection with this Agreement; and

(b)     any Excluded Liabilities.

**Section 8.3**     Indemnification by Buyer.

From and after the Closing, subject to the terms and conditions of this **Article VIII** (including, without limitation, the survival and timing requirements of **Section 8.1**), Buyer shall indemnify, defend and hold harmless Seller, Seller's Affiliates, and each of their respective managers, general partners, directors, officers, employees, agents, consultants, equity owners, stockholders, advisors and other representatives (including legal counsel, accountants and financial advisors), and Seller's predecessors-in-interest (all such persons referred to collectively as the "***Seller Indemnified Persons***") from and against any and all Losses, asserted against, resulting from, imposed upon, or incurred or suffered by any Seller Indemnified Person, directly or indirectly, to the extent resulting from, arising out of, or relating to:

(a)     any breach or nonfulfillment of or failure to perform any covenant or agreement of Buyer contained in this Agreement or confirmed in any certificate furnished by or on behalf of Buyer to Seller in connection with this Agreement;

35

(b)     the Assumed Liabilities; and

(c)     Any other indemnity obligations of Buyer contained herein.

Section 8.4     Limitations on Indemnities.

Notwithstanding anything to the contrary in this **Article VIII** or otherwise, and excluding any matter with respect to (a) Excluded Liabilities, and (b) Seller's obligations for post-closing adjustments to the Purchase Price (the matters addressed in (a) and (b) are collectively referred to as "***Seller's Obligations***"), Seller's maximum liability for Losses associated with all matters for which indemnification may be sought shall be ten (10%) of the cash portion of the Purchase Price; provided, however, none of such monetary limitations shall apply to Seller's indemnification obligations with respect to the Seller's Obligations which are not subject to any indemnification limitation.

Section 8.5     Release.

**EXCEPT AS OTHERWISE SET FORTH HEREIN, AT THE CLOSING BUYER HEREBY RELEASES, REMISES AND FOREVER DISCHARGES THE SELLER INDEMNIFIED PERSONS FROM ANY AND ALL CLAIMS, KNOWN OR UNKNOWN, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, CONTINGENT OR OTHERWISE, WHICH BUYER MIGHT NOW OR SUBSEQUENTLY MAY HAVE AGAINST THE SELLER INDEMNIFIED PERSONS, RELATING DIRECTLY OR INDIRECTLY TO THE CLAIMS ARISING OUT OF OR INCIDENT TO ENVIRONMENTAL LAWS, ENVIRONMENTAL LIABILITIES, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, INCLUDING, WITHOUT LIMITATION, RIGHTS TO CONTRIBUTION UNDER CERCLA, REGARDLESS OF FAULT, ALL TO THE EXTENT SAME RELATE TO THE ASSETS, BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL OR INTENTIONAL MISCONDUCT.**

Section 8.6     Disclaimers.

(a)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, OR IN THE CONVEYANCES, (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED (EXCEPT FOR THE SPECIAL WARRANTY OF TITLE SET FORTH IN THE CONVEYANCES), AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING, WITHOUT LIMITATION, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF SELLER OR ANY OF ITS AFFILIATES).

36

(b)    EXCEPT AS EXPRESSLY REPRESENTED OTHERWISE IN THIS AGREEMENT, OR IN THE TRANSACTION DOCUMENTS (INCLUDING SELLER'S SPECIAL WARRANTY OF TITLE IN THE CONVEYANCES), AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF PETROLEUM SUBSTANCES IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM REDHIBITORY VICES OR DEFECTS (INCLUDING THOSE CONTEMPLATED IN LOUISIANA CIVIL CODE ARTICLES 2475, AND 2520 THROUGH 2548), FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY EQUIPMENT, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT BUYER SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS EXCEPT AS EXPRESSLY REPRESENTED OTHERWISE IN THIS AGREEMENT AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE, OR (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.

(c)    EXCEPT AS REPRESENTED IN **Section 4.7** AND **Section 4.18**, SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, ENVIRONMENTAL LIABILITIES, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND BUYER SHALL BE DEEMED TO BE

TAKING THE ASSETS "AS IS" AND "WHERE IS" FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION EXCEPT AS REPRESENTED IN **Section 4.7** AND **Section 4.18**.

      **Section 8.7**    Waiver of Trade Practices Acts.

      (a)    It is the intention of the Parties that Buyer's rights and remedies with respect to this transaction and with respect to all acts or practices of Seller, past, present or future, in connection with this transaction shall be governed by legal principles other than the Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41 et seq. (the "***DTPA***") or the Louisiana unfair trade practices and consumer protection law, La. R.S. 51:1402, *et seq.* (the "***UTPCPL***").  As such, Buyer hereby waives the applicability of the DTPA and the UTPCPL to this transaction and any and all duties, rights or remedies that might be imposed by the DTPA and/or the UTPCPL, whether such duties, rights and remedies are applied directly by the DTPA or the UTPCPL itself or indirectly in connection with other statutes.  Buyer acknowledges, represents and warrants that it is purchasing the goods and/or services covered by this Agreement for commercial or business use; that it has assets of $5,000,000.00 or more according to its most recent financial statement prepared in accordance with GAAP; that it has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of a transaction such as this; that it is not in a significantly disparate bargaining position with Seller; that Buyer understands that the DTPA is a law that gives consumers special rights and protections; and that Buyer, after consultation with an attorney of its own selection, it voluntarily consents to this waiver.

      (b)    Buyer expressly recognizes that the price for which Seller has agreed to perform its obligations under this Agreement has been predicated upon the inapplicability of the DTPA and this waiver of the DTPA.  Buyer further recognizes that Seller, in determining to proceed with the entering into of this Agreement, has expressly relied on this waiver and the inapplicability of the DTPA.

      **Section 8.8**    Redhibition Waiver.

Buyer waives all rights in redhibition pursuant to Louisiana Civil Code Articles 2475 and 2520 through 2548, and acknowledges that this express waiver shall be considered a material and integral part of this transaction and the consideration thereof.  Buyer acknowledges that this waiver has been brought to its attention and has been explained in detail and that Buyer has voluntarily and knowingly consented to this waiver of warranty of fitness and warranty against redhibitory vices and defects for the Assets.

      **Section 8.9**    Recording.

No later than fifteen (15) days after Closing, Buyer shall record the Conveyances in the appropriate counties and/or parishes and file the Conveyances with appropriate Governmental Bodies and provide Seller with copies of all recorded or approved instruments.  The Conveyances are intended to convey all of the Assets, as applicable, being conveyed pursuant to this Agreement.  Certain Assets or specific portions of the Assets that are leased from, or require

the approval to transfer by, a Governmental Body are conveyed under the Conveyances and also are described and covered by other separate assignments made by Seller to Buyer on officially approved forms, or forms acceptable to such entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements.   The interests conveyed by such separate assignments are the same, and not in addition to, the interests conveyed in the Conveyances attached as **Exhibit B-1** through **Exhibit B-5**.  Further, such assignments shall be deemed to contain the special warranty of title of Seller and all of the exceptions, reservations, rights, titles, power and privileges set forth herein and in the Conveyances as fully and only to the extent as though they were set forth in each such separate assignment.

Section 8.10   Non-Compensatory Damages.

Buyer and Seller waive any right to recover punitive, special, exemplary and consequential damages, including damages for lost profits, arising in connection with or with respect to this Agreement or the transactions contemplated hereby, REGARDLESS OF FAULT (AND, AS TO THE PUNITIVE OR EXEMPLARY DAMAGES, EVEN IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE RELEASED PERSON).

Section 8.11   Disclaimer of Application of Anti-Indemnity Statutes.

The Parties acknowledge and agree that the provisions of any anti-indemnity statute relating to oilfield services and associated activities shall not be applicable to this Agreement and/or the transactions contemplated hereby.

Section 8.12   Casualty.

(a)      If, after the Execution Date and prior to the Closing, any part of the Assets suffers a Casualty or if any part of the Assets is taken in condemnation or under the right of eminent domain or if Proceedings for such purposes are pending or threatened, Seller shall promptly give Buyer written notice of such occurrence, including reasonable particulars with respect thereto, and the provisions of this **Section 8.12** shall apply.

(b)      [Reserved]

(c)      With regard to a Casualty or condemnation occurring after the Execution Date and prior to the Closing that exceeds $500,000 in replacement value (or if a combination of Casualties or condemnations, in the aggregate, exceeds $500,000 in replacement value) (a "***Termination Event Casualty***"), Buyer shall have the right to terminate this Agreement by providing Seller with written notice prior to Closing.

(d)      With regard to a Casualty or condemnation occurring after the Execution Date and prior to the Closing that is not a Termination Event Casualty (or if in the event of a Termination Event Casualty, Buyer does not elect to terminate this Agreement): (i) at the Closing, the Assets affected by a Casualty or condemnation shall be included in the Closing, and (ii) Buyer's recourse with respect to a condemnation or Casualty shall be limited to the proceeds of Seller's applicable insurance coverage actually recovered by Seller in respect thereof or other sums paid to Seller by third parties (or an assignment of claims related thereto), including any condemnation awards, which proceeds or other

sums shall be payable to Buyer only upon or after the Closing of the transactions contemplated hereby. Seller shall have no other liability or responsibility to Buyer with respect to a condemnation or Casualty EVEN IF SUCH CASUALTY SHALL HAVE RESULTED FROM OR SHALL HAVE ARISEN OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR VIOLATION OF AN APPLICABLE LAW (BUT NOT THE WILLFUL MISCONDUCT OF SELLER OR ANY SELLER INDEMNIFIED PERSONS) and there shall be no adjustment to the Purchase Price.

(e)     With respect to any such Casualty or condemnation, (i) no insurance or condemnation proceeds shall be committed or applied by Seller to repair, restore or replace a lost, damaged, destroyed or taken portion of the Assets if the cost to repair, restore or replace a lost, damaged, destroyed or taken portion of the Assets is projected to exceed $25,000, (ii) to the extent such proceeds are not committed or applied by Seller prior to the Closing Date in accordance with this subsection (e), Seller shall at the Closing pay to Buyer all sums paid to Seller by reason of such Casualty or condemnation, less any reasonable costs and expenses incurred by Seller in collecting such proceeds, (iii) in addition and to the extent such proceeds have not been committed or applied by Seller in accordance with this **Section 8.12(e)**, in such repair, restoration, or replacement, Seller shall transfer to Buyer, at the Closing, without recourse against Seller, all of the right, title, and interest of Seller in and to any unpaid insurance or condemnation proceeds arising out of such loss, damage, destruction or taking, less any reasonable costs and expenses incurred by Seller in collecting such proceeds, and (iv) any such funds that have been committed by Seller for repair, restoration or replacement as aforesaid shall be paid by Seller for such purposes or, at Seller's option, delivered to Buyer. Notwithstanding the foregoing provisions of this Section 8.12(e), in the event of an emergency or in order to protect health and safety, Seller may take all such actions as are reasonably necessary and shall notify Buyer of such action promptly thereafter.

## ARTICLE IXTITLE
## MATTERS

**Section 9.1**     Seller's Title.

(a)     Except for the special warranty of title referenced in **Section 9.1(b)**, as set forth in the Conveyances or set forth in the Sale Order, Seller makes no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's title to any of the Assets.

(b)     The conveyance covering the Assets to be delivered by Seller to Buyer shall be substantially in the forms of **Exhibit B-1** through **Exhibit B-5**, (each, a "**_Conveyance_**"). Each Conveyance shall contain a special warranty of Defensible Title by, through and under Seller and its Affiliates, but not otherwise, to the Units and Wells shown on **Exhibit A-1** as to the interests shown, subject to the Permitted Encumbrances, but shall otherwise be without warranty of title of any kind, express, implied or statutory or otherwise, except as set forth in the Sale Order. Buyer's' protection under Seller's special warranty of title in the Conveyance shall be limited to the Allocated Values as set forth on **Schedule 2.2**.

**Section 9.2**  Definition of Defensible Title.

As used in this Agreement, the term "Defensible Title'' means the title of Seller with respect to the Units and Wells shown in **Exhibit A-1** that, except for and subject to Permitted Encumbrances:

(a)  Entitles Seller to receive a share of the Hydrocarbons produced, saved and marketed from any Unit or Well shown in **Exhibit A-1** throughout the duration of the productive life of such Unit or Well (after satisfaction of all royalties, overriding royalties, net profits interests or other similar burdens on or measured by production of Hydrocarbons) (a "*Net Revenue Interest*"), of not less than the Net Revenue Interest shown in **Exhibit A-1** for such Unit or Well, except for decreases in connection with those operations in which Seller may from and after the date hereof become a non-consenting co-owner, decreases resulting from the establishment or amendment from and after the Closing Date of pools or units, decreases in connection with any payouts of non-consent penalties as reflected in **Exhibit A-1**, and decreases required to allow other working interest owners to make up past underproduction or pipelines to make up past under deliveries, all as reflected on **Schedule 4.14** and except as stated in such **Exhibit A-1**;

(b)  Obligates Seller to bear a percentage of the costs and expenses for the maintenance and development of, and operations relating to, (i) any Unit or Well shown in Exhibit A-1 not greater than the "working interest" shown in **Exhibit A-1** for such Unit or Well without increase throughout the productive life of such Unit or Well, except as stated in **Exhibit A-1** and except for increases resulting from contribution requirements with respect to non-consenting co-owners under applicable operating agreements and increases that are accompanied by at least a proportionate increase in Seller's Net Revenue Interest; and

(c)  Is free and clear of liens, encumbrances, security interests, pledges, or other defects (other than Assumed Liabilities and Permitted Encumbrances) pursuant to the Sale Order.

**Section 9.3**  Definition of Permitted Encumbrances.

As used herein, the term "Permitted Encumbrances" means any or all of the following:

(a)  Royalties and any overriding royalties, reversionary interests and other burdens on production, to the extent that any such burden does not reduce Seller's Net Revenue Interest below that shown in **Exhibit A-1** or increase Seller's working interest above that shown in **Exhibit A-1** without a proportionate increase in the Net Revenue Interest;

(b)  All Leases, Contracts, and other agreements and instruments applicable to the Assets, to the extent that they do not, individually or in the aggregate, reduce Seller's Net Revenue Interest below that shown in Exhibit A-1 or increase Seller's working interest above that shown in **Exhibit A-1** without a proportionate increase in the Net Revenue Interest;

41

(c)      Preference Rights applicable to this transaction as set forth in **Schedule 6.5**;

(d)      Transfer Requirements applicable to this transaction as set forth in **Schedule 6.5**;

(e)      Liens for current Taxes or assessments not yet delinquent or, if delinquent, are being contested in good faith in the normal course of business;

(f)      Senior Statutory Liens as set forth in **Schedule 1.4(b)**;

(g)      All rights to consent by, required notices to, filings with, or other actions by Governmental Bodies in connection with the sale or conveyance of the Assets or interests therein pursuant to this or to any future transaction if they are not required or customarily obtained prior to the sale or conveyance;

(h)      Rights of reassignment arising upon final intention to abandon or release the Assets, or any one of them to the extent reflected in one or more of the Contracts set forth on **Exhibit A-2**;

(i)      Easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations, to the extent that they do not (i) reduce Seller's Net Revenue Interest below that shown in **Exhibit A-1**, (ii) increase Seller's working interest above that shown in **Exhibit A-1** without a proportionate increase in Net Revenue Interest, or (iii) detract in any material respect from the value of, or interfere in any material respect with the use, ownership or operation of, the Assets subject thereto or affected thereby (as currently used, owned and operated) and which would be acceptable by a reasonably prudent purchaser engaged in the business of owning and operating oil and gas properties;

(j)      Calls on Hydrocarbon production under existing Contracts that are listed on **Exhibit A-2**;

(k)      All rights reserved to or vested in any Governmental Body to control or regulate any of the Assets in any manner, and all obligations and duties under all applicable Laws or under any franchise, grant, license or permit issued by any such Governmental Body;

(l)      Any matters shown on **Schedule 9.3(m)**;

(m)      Imbalances associated with the Assets; and

(n)      Liens granted under applicable joint operating agreements for amounts not yet delinquent.

**Section 9.4**      Cooperation with Regulatory Approval.

(a)      Buyer shall use its best efforts after Closing to obtain the unconditional approval by the BOEM or the DNR of the Conveyances, as applicable, in the forms attached hereto as **Exhibit B-2** through **Exhibit B-4**.  In the event Buyer or its nominated operator is elected successor operator under the operating agreements applicable to any of the Leases and/or Easements, Buyer also obligates itself to ensure that it or the successor operator makes application to the BOEM or the DNR to qualify as operator with respect to that portion of the Assets it will operate.  Buyer shall take any actions reasonably required of it by the BOEM or DNR or any other regulatory agencies to obtain all requisite regulatory approvals, including but not limited to, the purchase and posting of any and all bonds, supplemental bonds or other securities which may be required of it pursuant to OPA and Title 30 of the Code of Federal Regulations ("**C.F.R**"), Part 550, Subparts A and J; Part 556, Subpart. I. Subject to the terms and conditions of the Transition Services Agreement, until BOEM or DNR approval of the Conveyances, as applicable, is obtained, however, the following shall occur: Buyer's indemnity obligation under **Section 8.3** shall include any and all claims, expenses of any kind or character relating to the Assets accruing after the Closing Date, including but not limited to any regulatory costs incurred by Seller in connection with such BOEM or DNR approval, REGARDLESS OF FAULT, excluding, however, any civil fines and penalties incurred by Seller in connection with any violation of Laws, including any Environmental Laws, or any INCs to the extent attributable to periods prior to the Closing Date.

(b)      Prior to execution hereof, Buyer has reviewed information promulgated by the BOEM regarding the amounts and terms for the posting of supplemental bonds or pledge of securities pursuant to the provisions of 30 C.F.R §§ 556. 900 et seq.  and 550.1011, and within a reasonable time of any BOEM determination pursuant to such regulations, Buyer (directly or through its representative) shall exercise commercially reasonable efforts to satisfy the BOEM requirements concerning same, including all financial responsibility requirements under OPA and C.F.R.

(c)      The Parties acknowledge and agree that certain of the offshore Assets are in the nature of contract rights that are not recognized by the BOEM as "record title" or "operating rights," and that, accordingly, the BOEM will not approve, and Buyer and Seller do not expect the BOEM to approve, the assignment of these interests from Seller to Buyer.  Buyer shall ensure nevertheless that the assignment documents relating to such interests are appropriately filed in the "non-required filing" system of the BOEM.  Such interests shall be excluded from the scope of **Section 9.4(a)** for all purposes.  The Parties further acknowledge and agree that an Assignment, Conveyance and Bill of Sale in the form of Exhibit B-1 shall be filed in the non-required filing system of the BOEM and in various parish and county conveyance records in Louisiana and Texas, respectively.  The Parties agree that such Assignment, Conveyance and Bill of Sale shall be sufficient to effectuate the transfer of title to the Assets to Buyer, regardless of whether the record title, operating rights and right-of-way transfers filed with the BOEM are approved.

(d)      Buyer shall arrange meetings with BOEM and DNR as soon as reasonably possible following Seller's execution of this Agreement to insure that it will satisfy its obligations hereunder, including **Section 5.7** and **Section 9.4(a).**   To the extent reasonably requested by Buyer, Seller shall use commercially reasonable efforts to

participate in such meetings, or otherwise use commercially reasonable efforts to cooperate with Buyer in satisfying its obligations with respect to obtaining all required approvals from BOEM and DNR.

# ARTICLE X
## *BANKRUPTCY COURT MATTERS*

**Section 10.1**   Bid Procedures.

This Agreement is subject to consideration by Seller of higher or better competing bids from Qualified Bidders (as defined in the Bid Procedures Order) for all or substantially all of the Assets in accordance with the Bid Procedures Order (each an "***Alternative Transaction***").

**Section 10.2**   Sale Order.

Seller shall use its best efforts to cause the Bankruptcy Court to enter a Sale Order that contains the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(a)      the sale of the Assets by Seller to Buyer (A) are or will be legal, valid and effective transfers of the Assets; (B) vest or will vest Buyer with all right, title and interest of such Seller to the Assets free and clear of all Liens and Claims pursuant to Section 363(f) of the Bankruptcy Code (other than Liens created by Buyer, Permitted Encumbrances and Assumed Liabilities); (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the state in which Seller is incorporated and any other applicable non-bankruptcy Laws; and (D) be recordable in the office of any applicable Governmental Body to evidence the foregoing and county or parish clerks shall be directed to accept the Sale Order for recording;

(b)      all amounts to be paid to Buyer pursuant to this Agreement constitute administrative expenses under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and are immediately payable, if and when the obligations of Seller arise under this Agreement, without any further order of the Bankruptcy Court;

(c)      all Persons are enjoined from taking any actions against Buyer or any Affiliates of Buyer (as they existed immediately prior to the Closing) to recover any claim that such Person has solely against Seller, except with respect to Assumed Liabilities, and any sovereign immunity of a Governmental Body party to this proceeding has been waived under 11 U.S.C. §106;

(d)      obligations of Seller relating to Taxes, whether arising under Law, by this Agreement, or otherwise, shall be fulfilled by Seller;

(e)      the provisions of the Sale Order are non-severable and mutually dependent;

(f)      provide that Buyer will not have any successor or transferee liability for liabilities of Seller (whether under federal or state Law or otherwise) as a result of the sale of the Assets;

(g)      reasonably equivalent value has been given by Buyer for the Assets and Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the transactions contemplated by this Agreement are undertaken by Buyer and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such Parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(h)      all Assumed and Assigned Contracts shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code and, as required by this Agreement, Buyer shall be obligated to pay and satisfy all Cure Amounts in respect thereof;

(i)      the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement, the Bid Procedures Order and the Sale Order in all respects; provided, however, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter;

(j)      waive the stay of the Sale Order under Bankruptcy Rule 6004(h); and

(k)      a factual finding that all parties with an interest in the Properties or with Claims against the Business or Assets, including the holders of Preference Rights, have been provided adequate notice of the sale hereunder and that such parties have either failed to exercise those rights or Claims or that their rights or Claims have been denied, overruled or compromised with the consent of the Buyer.

**Section 10.3**   Bankruptcy Court Approval.

Seller shall cooperate with Buyer and its representatives in connection with the Sale Order, the Bid Procedures Order and the bankruptcy proceedings in connection therewith.  Such cooperation shall include, but not be limited to, consulting with Buyer at Buyer's reasonable request concerning the status of such proceedings and providing Buyer with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  Seller further covenants and agrees that the terms of any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, without limitation, any transaction contemplated by or approved pursuant to the Sale Order or the Bid Procedures Order.  Seller and Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed and Assigned Contracts are subject to Bankruptcy Court approval.

## ARTICLE XI
## TERMINATION AND EFFECT OF TERMINATION

Section 11.1    Right of Termination.

This Agreement may be terminated only as expressly provided for in this **Article 11**.  In the case of any such termination that is not automatic pursuant to **Section 11.2** below, the terminating Party shall give proper written notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

Section 11.2    Termination Rights.

This Agreement may be terminated at any time before Closing:

(a)    by mutual written consent of Seller and Buyer;

(b)    automatically and without any action or notice by Seller to Buyer, or Buyer to Seller:

(i)    upon the issuance of a final and non-appealable order by a Governmental Authority to restrain, enjoin, or otherwise prohibit the transfer of the Assets contemplated hereby;

(ii)    upon entry of a final and non-appealable order converting Seller's Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissing Seller's Bankruptcy Case;

(iii)    in the event Buyer's final bid is not declared the Successful Bid or the Backup Successful Bid upon completion of the Auction, provided, further, this subsection shall have no force or effect if the Buyer's final bid becomes the Successful Bid or the Backup Bid; or

(iv)    upon consummation of an Alternative Transaction with another party that has the Successful Bid for any of the Assets;

(c)    by the Buyer:

(i)    if the Buyer is not in material breach of this Agreement and there has been a material breach by Seller of any representation, warranty, or covenant contained in this Agreement as a result of which the condition referred to in **Section 7.2(a)** or **Section 7.2(b)** would not be satisfied, and (A) that breach has not been waived by the Buyer, and (B) Seller has failed to cure that breach within ten (10) calendar days following receipt of notification thereof by the Buyer;

(ii)    if the Sale Order with respect to the transactions contemplated in this Agreement has not been entered and become a final order on or before August 16, 2017; or

46

(iii)     if Closing has not within sixty (60) days following the Sale Order becoming a final order and such failure to close is not caused by or the result of Buyer's material breach of this Agreement (including the failure to satisfy the condition to closing set forth in **Section 7.2(i))**.

(d)     by the Seller:

(i)     if Seller is not in material breach of this Agreement and there has been a material breach by Buyer of any representation, warranty, or covenant contained in this Agreement as a result of which the condition referred to in **Section 7.1(a)** or **Section 7.1(b)** would not be satisfied, and (A) that breach has not been waived by Seller, and (B) Buyer has failed to cure that breach within ten (10) calendar days following receipt of notification thereof by Seller;

(ii)     if the Sale Order with respect to the transactions contemplated in this Agreement has not been entered and become a final order on or before August 16, 2017; or

(iii)     at any time after fifteen (15) days following the entry of the Sale Order by the Bankruptcy Court (as may be extended by written agreement of the Parties, the "**_Termination Date_**"), if the Closing shall not have occurred and such failure to close is not caused by or the result of Seller's material breach of this Agreement.

**Section 11.3**     Effect of Termination.

(a)     In the event this Agreement is terminated pursuant to **Sections 11.2(a)**, **(b)**, **(c)** or **(d)(ii)** above, the Good Faith Deposit shall be returned to the Buyer in accordance with the Bid Procedures Order.  This shall be the Buyer's sole and exclusive remedy for such termination.  Thereafter, both Parties shall be relieved of and released from any further liability hereunder, and they will not have any liability or obligations arising under or in connection with this Agreement, and neither Party shall be entitled to specific performance or any other remedy.

(b)     In the event the Seller terminates this Agreement pursuant to **Sections 11.2(d)(i)** or **(iii)** above, the Good Faith Deposit shall be delivered to the Seller in accordance with the Bid Procedures Order, and the Seller shall retain the Good Faith Deposit.  Thereafter, both Parties shall be relieved of and released from any further liability hereunder, and they will not have any liability or obligations arising under or in connection with this Agreement, and neither Party shall be entitled to specific performance.

**Section 11.4**     Specific Performance.

(a)     In lieu of termination under **Section 11.2(d)(i)** or **(iii)**, Seller may seek specific performance of the terms of this Agreement.

(b)     With respect to the Parties' respective covenants under this Agreement that survive the Closing, if any, and solely to the extent to be performed after the Closing,

each Party recognizes that if the other Party breaches or refuses to perform any such covenant, monetary damages alone may not be adequate to compensate the non-breaching Party for its injuries, and the non-breaching Party shall therefore be entitled to seek specific performance of the terms of such covenants, and in such case, such non-breaching Party shall not have any further cause of action for damages or other legal relief against the breaching Party with respect thereto.  Nothing herein shall require Seller to continue in existence or to continue to operate, manage or control its remaining assets and property after the Closing for any specified period of time, and failure of Seller to do so will not constitute a breach of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.1**   Counterparts.

This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute but one agreement.

**Section 12.2**   Notices.

All notices which are required or may be given pursuant to this Agreement shall be sufficient in all respects if given in writing and delivered personally, by courier, by electronic mail or by registered or certified mail, postage prepaid, as follows:

If to Seller:

Northstar Offshore Group, LLC
11 Greenway Plaza, Suite 2800
Houston, Texas 77046
Attention: Brian Macmillan
Telephone: 713-386-1046
Telecopy: 713-626-3444
Email: bmac@nstaroffshore.com

With copies to:

Lydia T. Protopapas, Esq.
Winston & Strawn LLP
1111 Louisiana Street, 25th Floor
Houston, Texas 77002-5242
Telephone: 713-651-2793
Telecopy: 713-651-2700
Email: lprotopapas@winston.com

With a copy to:

Patrick J.  Potter, Esq.
Pillsbury Winthrop Shaw Pittman LLP

|  | 1200 Seventeenth Street NW |
|  | Washington, DC 20036-3006 |
| If to Buyer: | Telephone: 202.663.8928 |
|  | Telecopy: 202.663.8007 |
|  | Email: patrick.potter@pillsburylaw.com |

Any Party may change its address for notice by notice to the others in the manner set forth above.  All notices shall be deemed to have been duly given at the time of receipt by the Party to which such notice is addressed (or in the case of electronic mail, after affirmative confirmation of receipt, including automated confirmation of receipt).

**Section 12.3**   [Reserved]

**Section 12.4**   Expenses.

Except as otherwise expressly provided elsewhere in this Agreement, (a) all expenses incurred by Seller in connection with or related to the authorization, preparation or execution of this Agreement, the Conveyance delivered hereunder and the Exhibits and Schedules hereto and thereto, and all other matters related to the Closing, including without limitation, all fees and expenses of counsel, accountants and financial advisers employed by Seller, shall be borne solely and entirely by Seller, and (b) all such expenses incurred by Buyer shall be borne solely and entirely by Buyer.

**Section 12.5**   Governing Law and Venue.

**(a)**      This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Texas in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of Laws thereof), provided that the validity and enforceability of all Conveyances or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the Laws of the jurisdiction in which such property is located.  Without limiting any Party's right to appeal any Order of the Bankruptcy Court, the Parties agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or Proceeding with respect to this Agreement and Seller.  Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that it may now or hereafter have to the bringing of any action or Proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and/or the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court sitting in Harris County, Texas.  If that court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the Texas courts located in Harris County, Texas.  In addition, the Parties irrevocably consent to service of process by delivering a copy of the process to such Person to the address provided pursuant to **Section 12.10** of this Agreement by

federal express or other overnight courier for overnight delivery or by certified mail, postage prepaid.  **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT**

**PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 12.6   Captions.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

Section 12.7   Waivers.

Any failure by any Party or Parties to comply with any of its or their obligations, agreements or conditions herein contained may be waived in writing, but not in any other manner, by the Party or Parties to whom such compliance is owed.  No waiver of, or consent to a change in, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  The rights of Seller and Buyer under this Agreement shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

Section 12.8   Assignment.

Prior to Closing, no Party shall assign all or any part of this Agreement, nor shall any Party assign or delegate any of its rights or duties hereunder, without the prior written consent of the other Party.  Subsequent to the Closing, any transfer of the Assets by Buyer, in whole or in part, may be made subject to this Agreement without Seller's consent, but such transfer shall not relieve Buyer of any liabilities or obligations set forth herein.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 12.9   Entire Agreement.

This Agreement, the Exhibits and Schedules attached hereto, and the documents to be executed hereunder, constitute the entire agreement between the Parties pertaining to the subject

matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

Section 12.10   Amendment.

(a)   This Agreement may be amended or modified only by an agreement in writing executed by the Parties hereto.

(b)   No waiver of any right under this Agreement shall be binding unless executed in writing by the Party to be bound thereby.

Section 12.11   No Third-Party Beneficiaries.

Nothing in this Agreement shall entitle any Person other than any of the Parties to any claims, remedy or right of any kind, except as to those rights expressly provided to the Seller Indemnified Persons and Buyer Indemnified Persons (provided, however, any claim for indemnity hereunder on behalf of a Seller Indemnified Person or a Buyer Indemnified Person must be made and administered by a Party to this Agreement).

Section 12.12   References.

In this Agreement:

(a)   References to any gender includes a reference to all other genders;

(b)   References to the singular includes the plural, and vice versa;

(c)   Reference to any Article or Section means an Article or Section of this Agreement;

(d)   Reference to any Exhibit or Schedule means an Exhibit or Schedule to this Agreement, all of which are incorporated into and made a part of this Agreement;

(e)   Unless expressly provided to the contrary, "hereunder", "hereof, "herein" and words of similar import are references to this Agreement as a whole and not any particular Section or other provision of this Agreement;

(f)   "Include" and "including" shall mean include or including without limiting the generality of the description preceding such term; and

(g)   Capitalized terms used herein shall have the meanings ascribed to them in this Agreement as such terms are identified and/or defined in the Definition Appendix hereof.

Section 12.13   Construction.

Buyer is a party capable of making such investigation, inspection, review and evaluation of the Assets as a prudent party would deem appropriate under the circumstances including with respect to all matters relating to the Assets, their value, operation and suitability.  Each of the

51

Parties has had substantial input into the drafting and preparation of this Agreement and has had the opportunity to exercise business discretion in relation to the negotiation of the details of the transactions contemplated hereby. This Agreement is the result of arm's-length negotiations from equal bargaining positions. In the event of a dispute over the meaning or application of this Agreement, it shall be construed fairly and reasonably and neither more strongly for nor against any Party.

### Section 12.14  Conspicuousness.

The Parties agree that provisions in this Agreement in "bold" type satisfy any requirements of the "express negligence rule" and any other requirements at law or in equity that provisions be conspicuously marked or highlighted.

### Section 12.15  Severability.

If any term or provision of this Agreement is held invalid, illegal or incapable of being enforced under applicable Laws, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a materially adverse manner with respect to either Party; provided, however, that if any such term or provision may be made enforceable by limitation thereof, then such term or provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable Laws.

### Section 12.16  Time of Essence.

Time is of the essence in this Agreement. If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day.

[SIGNATURES BEGIN ON THE FOLLOWING PAGE]

      IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties hereto on the date first above written.

**BUYER**


**NORTHSTAR OFFSHORE VENTURES LLC**


By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties hereto on the date first above written.

**SELLER**

**NORTHSTAR OFFSHORE GROUP, LLC**

By: _____

Name: _____

Title: _____

DEFINITIONS

"**Actual Knowledge**" has the meaning set forth in **Section 4.1(a)**.

"**Additional Assessment**" has the meaning set forth in **Section 3.6(a)**.

"**Adjustment Date**" has the meaning set for in **Section 6.6(a)**.

"**AFE**" means authority for expenditure.

"**Affiliates**" with respect to any Person, means any Person that directly or indirectly controls, is controlled by or is under common control with such Person.  The concept of control, controlling or controlled as used in the aforesaid context means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another, whether through the ownership of voting securities, by contract or otherwise.  No Person shall be deemed an Affiliate of any Person by reason of the exercise or existence of rights, interests or remedies under this Agreement.

"**Agreement**" has the meaning set forth in the preamble hereto.

"**Allocated Value**" has the meaning set forth in **Section 2.2**.

"**Alternative Transaction**" has the meaning set for in **Section 10.1**.

"**Argonaut Bonds**" has the meaning set forth in **Section 2.1**.

"**Assets**" has the meaning set forth in **Section 1.2**.

"**Assumed and Assigned Contracts**" has the meaning set forth in **Section 1.4(a)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.4**.

"**Auction**" means any auction held by the Seller pursuant to the Bid Procedures Order approved by the Bankruptcy Court.

"**Bankruptcy Case**" has the meaning set forth in the preamble hereto.

"**Bankruptcy Code**" has the meaning set forth in the preamble hereto.

"**Bankruptcy Court**" has the meaning set forth in the preamble hereto.

"**Bid Deadline**" means July 19, 2017.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court dated May 11, 2017 approving the bidding procedures annexed as an exhibit thereto and providing related relief.

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior.

"**BSEE**" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior.

"**Business**" has the meaning set forth in the recitals hereto.

"**Business Day**" means each calendar day except Saturdays, Sundays, and Federal holidays.

"**Buyer**" has the meaning set forth in the preamble hereto.

"**Buyer Indemnified Persons**" has the meaning set forth in **Section 8.2**.

"**Buyer's Environmental Consultant**" has the meaning set forth in **Section 3.6**.

"**Buyer's Environmental Review**" has the meaning set forth in **Section 3.6**.

"**Casualty**" means any loss, damage, or destruction of or to any Assets for any reason occurring after the Execution Date and prior to the Closing, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of Hydrocarbons through normal depletion (which exclusion shall include the watering-out of any Well, collapsed casing, sand infiltration of any Well, or other reservoir changes relating to production issues).

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in **Section 3.1**.

"**Closing Date**" has the meaning set forth in **Section 3.1**.

"**Closing Statement**" has the meaning set forth in **Section 3.4**.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" has the meaning set forth in **Section 1.2(d)**.

"**Conveyance**" has the meaning set for in **Section 9.1(b)**.

"**Cure Amounts**" means those amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to section 365(b) of the Bankruptcy Code as a condition of the assumption and/or assignment of any Assumed and Assigned Contract.

"**Customary Post-Closing Consents**" means the consents and approvals for the assignment of the Assets to Buyer that are customarily obtained after the assignment of properties similar to the Assets.

"**Defensible Title**" has the meaning set forth in **Section 9.2**.

"**Dispute Notice**" has the meaning set forth in **Section 3.4**.

"**DNR**" means the Office of Mineral Resources, Department of Natural Resources of the State of Louisiana.

"**DTPA**" has the meaning set forth in **Section 8.7(a)**.

"**Easements**" has the meaning set forth **in Section 1.2(e)**.

"**Effective Time**" means 12:01 a.m. Central Prevailing Time on August 1, 2017.

"**Environmental Defect**" has the meaning set forth in **Section 3.6**.

"**Environmental Defect Amount**" has the meaning set forth in **Section 3.6**.

"**Environmental Defect Notice**" has the meaning set forth in **Section 3.6**.

"**Environmental Information**" has the meaning set forth in **Section 3.6**.

"**Environmental Laws**" means, as the same may have been amended, superseded or replaced, any federal, state or local statute, law, regulation, ordinance, rule, order or decree including any rule of common law, relating to (i) the control of any potential pollutant or protection of the environment, including air, water or land, (ii) the generation, handling, treatment, storage, disposal or transportation of waste materials, or (iii) the regulation of or exposure to Hazardous Materials alleged to be harmful, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("**CERCLA**"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("**RCRA**"); the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.  the Hazardous Materials Transportation Act, 49 U.S.C. § 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq. ("**OPA**"); the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; the Atomic Energy Act, 42 U.S.C. § 2011 et seq.; and all applicable related law, whether local, state, territorial, or national, of any Governmental Body having jurisdiction over the property in question addressing pollution or protection of human health, safety, natural resources or the environment and all regulations implementing the foregoing.  The term "**Environmental Laws**" includes all judicial and administrative decisions, orders, directives, and decrees issued by a Governmental Body pursuant to the foregoing.

"**Environmental Liabilities**" means any and all environmental response costs (including costs of remediation), damages, natural resource damages, settlements, consulting fees, expenses, penalties, fines, orphan share, prejudgment and post-judgment interest, court costs, attorneys' fees, and other liabilities incurred or imposed (i) pursuant to any order, notice of responsibility, directive (including requirements embodied in Environmental Laws), injunction, judgment or similar act (including settlements) by any Governmental Body to the extent arising out of any violation of, or remedial obligation under, any Environmental Laws which are attributable to the ownership or operation of the Assets prior to, on or after the Closing Date or (ii) pursuant to any

claim or cause of action by a Governmental Body or other Person for personal injury, property damage, damage to natural resources, remediation or response costs to the extent arising out of any exposure to Hazardous Materials, any violation of, or any remediation or obligation under, any Environmental Laws which is attributable to the ownership or operation of the Assets prior to, on or after the Closing Date; provided, however, notwithstanding the foregoing, Buyer's liability or responsibility for any penalties or fines shall be limited to matters attributable to the ownership or operation of its proportionate share of the Assets on or after the Closing Date.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with Seller, may be treated as a single employer under section 4001 of ERISA or section 414 of the Code.

"**ERISA Affiliate Liability**" means any actual or contingent liability of Seller or its ERISA Affiliates under or in respect of any employee benefit plan pursuant to any statute or regulation that imposes Liability on a "controlled group" or similar basis as a result of being an ERISA Affiliate or successor prior to the Closing Date with respect to any other Person.

"**Equipment**" has the meaning set forth in **Section 1.2(f)**.

"**Examination Period**" means the Bid Deadline.

"**Excluded Assets**" has the meaning set forth in **Section 1.3**.

"**Execution Date**" has the meaning set forth in the preamble of this Agreement.

"**Excluded Employee Liabilities**" means except to the extent of any COBRA obligations of Buyer under Section 6.12, each of the following:

(a)      any of Seller's or any of its Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any employee benefit plan, including: (i) any arrangement that provides severance-type, stay or retention pay or change-in-control payments or benefits due to eligible terminations of employment incurred after the Closing Date); and (ii) any retention, severance or other arrangement established pursuant to section 503(c) of the Bankruptcy Code;

(b)      any and all liabilities arising out of, relating to or resulting from any legal proceeding or claim with respect to any current or former employee relating to his/her employment or services, or termination of employment or services, with Seller or any of its Affiliates;

(c)      any and all liabilities of Seller or any of its Affiliates arising out of, relating to or resulting from any defined benefit pension plans, defined contribution plans, post-employment health, welfare or death benefits (and associated Liabilities), or any ERISA Affiliate Liability;

(d)      any and all Liabilities of Seller or any of its Affiliates arising out of, relating to, or resulting from the withdrawal and/or cessation of employees or other employees from participation in any employee benefit plan, including, if applicable, pursuant to section 4062(e) of ERISA;

(e)      any and all other Contracts or other liabilities or obligations arising out of, relating to or resulting from any current, former or prospective employees with respect to their employment or termination of employment with Seller or any of its Affiliates, including: (i) payments or entitlements that Seller or any of its Affiliates may owe or have promised to pay to any current, former or prospective employee, including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, Taxes, or insurance premiums; (ii) any and all Liabilities relating to any employment agreement or contract, any current, former or negotiated collective bargaining agreement, or the employment practices of Seller or any of its Affiliates; (iii) any and all Liabilities under the WARN Act relating to actions, inactions or practices of Seller or any of its Affiliates on or prior to the Closing Date (including, for the avoidance of doubt, any reduction in force programs initiated prior to the Closing Date, even if any employment losses resulting from such reduction in force programs occur on or after the Closing Date); and (iv) any and all Liabilities relating to workers' compensation claims and occupational health claims against Seller or any of its Affiliates for accidents or injuries occurring on or prior to the Closing, if any.

"**Final Accounting Statement**" has the meaning set forth in **Section 3.4**.

"**Geological Data**" means all (i) seismic, geological, geochemical or geophysical data (including cores and other physical samples of materials from wells or tests) belonging to Seller or licensed from third parties relating to the Properties that can be transferred without additional consideration to such third parties (or including such licensed data in the event Buyer agrees to pay such additional consideration), and (ii) interpretations of seismic, geological, geochemical or geophysical data belonging to Seller or licensed from third parties that can be transferred without additional consideration to such third parties (or including such licensed data in the event Buyer agrees to pay such additional consideration).

"**Good Faith Deposit**" has the meaning set forth in **Section 2.1**.

"**Governmental Authorizations**" has the meaning set forth in **Section 4.12**.

"**Governmental Body**" or "**Governmental Bodies**" means any federal, state, local, municipal, or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority or power; and any court or governmental tribunal.

"**Hazardous Materials**" or "**Hazardous Substances**" means (i) any "hazardous substance," as defined by CERCLA, (ii) any "hazardous waste" or "solid waste," in either case as defined by RCRA, and any analogous state statutes, and any regulations promulgated thereunder, (iii) any solid, hazardous, dangerous or toxic chemical, material, waste or substance, within the meaning of and regulated by any applicable Environmental Laws, (iv) any radioactive material, including any naturally occurring radioactive material, and any source, special or byproduct material as defined in 42 U.S.C.  2011 et seq.  and any amendments or authorizations thereof, (v) any regulated asbestos-containing materials in any form or condition, (vi) any regulated polychlorinated biphenyls in any form or condition, and (vii) petroleum, petroleum hydrocarbons or any fraction or byproducts thereof.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Hydrocarbons**" means oil, gas, casinghead gas, condensate and other gaseous and liquid hydrocarbons or any combination thereof and sulphur and other minerals extracted from or produced with the foregoing.

"**Imbalance**" or "**Imbalances**" means any over-production, under-production, over-delivery, under-delivery, or similar imbalance of Hydrocarbons produced from or allocated to the Assets, regardless of whether such over-production, under-production, over-delivery, under-delivery, or similar imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"**INC**" means an incident of non-compliance issued by BOEM or BSEE with respect to any of the Assets.

"**Indemnity Deductible**" has the meaning set forth in **Section 8.4**.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Lands**" has the meaning set forth in **Section 1.2(a)**.

"**Law**" means all statutes, laws, rules, regulations, ordinances, orders, court decisions, and codes of Governmental Bodies.

"**Leases**" has the meaning set forth in **Section 1.2(a)**.

"**Liability**" mean any debt, loss, claim (including "claim" as defined in the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability, expense, commitment or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"**Lien**" means any liabilities, obligations, claims, charges, easements, encumbrances, leases, mortgages, covenants, security interests, liens, options, pledges, rights of others, or restrictions (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, Law, equity or otherwise.

"**Losses**" means any and all debts, obligations and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), diminution in value, monetary damages, fines, fees, Taxes, penalties, interest obligations, deficiencies, losses and expenses (including amounts paid in settlement, interest, court costs, costs of investigators, reasonable fees and expenses of attorneys, accountants, financial advisors and other experts, and other actual out of pocket expenses incurred in investigating and preparing for or in connection with any Proceeding).

"**Material Adverse Effect**" means any effect that is material and adverse to the ownership, operation or value of the Business or the Assets, taken as a whole, and as currently operated; provided, however, that "**Material Adverse Effect**" shall not include (i) any effect resulting from entering into this Agreement or the announcement of the transactions contemplated by this Agreement; (ii) any effect resulting from changes in general market, economic, financial or political conditions or any outbreak of hostilities or war, (iii) any effect that affects the Hydrocarbon exploration, production, development, processing, gathering and/or transportation industry generally (including changes in commodity prices or general market prices in the Hydrocarbon exploration, production, development, processing, gathering and/or transportation industry generally), and (iv) any effect resulting from a change in Laws or regulatory policies.

"**Material Indemnification Matter**" has the meaning set forth in **Section 8.4**.

"**Net Revenue Interest**" has the meaning set forth in **Section 9.2(a)**.

"**NORM**" means naturally occurring radioactive material.

"**P&A Obligations**" has the meaning set forth in **Section 6.11**.

"**Party**" and "**Parties**" have the meanings set forth in the preamble hereto.

"**Permitted Encumbrances**" has the meaning set forth in **Section 9.3**.

"**Person**" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Body or any other entity.

"**Personal Property**" has the meaning set forth in **Section 1.2(g)**.

"**Pipelines**" has the meaning set forth in **Section 1.2(g)**.

"**Preference Right**" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with (i) the sale, assignment or other transfer of any Asset or any interest therein or portion thereof or (ii) the execution or delivery of this Agreement or the consummation or performance of the terms and conditions contemplated by this Agreement.

"**Proceeding**" has the meaning set forth in **Section 4.7**.

"**Properties**" has the meaning set forth in **Section 1.2(c)**.

"**Property Costs**" means all third-party costs attributable to the ownership and operation of the Assets (including without limitation costs of insurance relating specifically to the Assets, royalties and overriding royalties payable on account of production from the Assets, and ad valorem, property, severance, Hydrocarbon production and similar Taxes based upon or measured by the ownership or operation of the Assets or the production of Hydrocarbons therefrom, but excluding Taxes imposed on or measured by income and any other Taxes) and capital expenditures incurred in the ownership and operation of the Assets in the ordinary course of business and, where applicable, in accordance with the relevant operating or unit agreement, if

any, and overhead costs charged to the Assets under the relevant operating agreement or unit agreement, if any, by unaffiliated third parties, and, but excluding without limitation liabilities, losses, costs, and expenses attributable to (i) claims for personal injury or death, property damage or violation of any Law, (ii) obligations to plug or abandon wells, (iii) obligations to decommission, dismantle, abandon and salvage platforms, pipelines, facilities, and other equipment (iv) obligations to remediate any contamination of groundwater, surface water, soil, Equipment or Pipelines under applicable Environmental Laws, (v) obligations to furnish make-up gas according to the terms of applicable gas sales, gathering or transportation contracts, (vi) gas balancing obligations and (vii) obligations to pay working interests, royalties, overriding royalties or other interests held in suspense.

"**Purchase Price**" has the meaning set forth in **Section 2.1**.

"**Records**" has the meaning set forth in **Section 1.2(j)**.

"**REGARDLESS OF FAULT**" MEANS WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY:

> OTHER THAN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE OR PASSIVE), STRICT LIABILITY, OR OTHER FAULT OF THE SELLER INDEMNIFIED PERSONS, THE BUYER INDEMNIFIED PERSONS, OR ANY OTHER PERSON OR ENTITY; AND/OR

> A PRE-EXISTING DEFECT, WHETHER PATENT OR LATENT, OF THE PREMISES OF BUYER'S PROPERTY OR SELLER'S PROPERTY (INCLUDING WITHOUT LIMITATION THE ASSETS), OR PROPERTY OF ANY OTHER PERSON OR ENTITY; AND/OR

> THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT OF A PARTY WHETHER CHARTERED, OWNED, OR PROVIDED BY THE BUYER INDEMNIFIED PERSONS, SELLER INDEMNIFIED PERSONS, OR ANY OTHER PERSON OR ENTITY.

"**Related Persons**" means with respect to an entity, its Affiliates, and each of the officers, directors, employees, agents and attorneys-in-fact of it and its Affiliates.

"**Replacement Bonds**" has the meaning set for in **Section 6.10**.

"**Sale Order**" means an order entered by the Bankruptcy Court approving the consummation of the transactions contemplated in the Agreement that incorporates the provisions set forth in Section 10.2 or is otherwise satisfactory to the Parties in their reasonable discretion.

"**Seller**" has the meaning set forth in the preamble hereto.

"**Seller Indemnified Persons**" has the meaning set forth in **Section 8.3**.

"**Seller Operated Assets**" shall mean Assets operated by Seller.

"**Seller's Obligation**" has the meaning set forth in **Section 8.4**.

"**Straddle Period**" has the meaning set for in **Section 6.6(a)**.

"**Tax Returns**" means any report, return, information statement, payee statement or other information, or any amendment thereof, required to be provided to any Governmental Body with respect to Taxes, including any return of an affiliated, combined or unitary group, and any and all work papers relating thereto.

"**Taxes**" means all state and local sales, use, ad valorem, property, severance, production, excise, stamp, documentary, real property transfer or gain, gross receipts, goods and services, registration, capital or transfer taxes or other governmental fees or charges imposed by any Taxing Authority on the Properties, the transfer of the Properties, or the production of Hydrocarbons from the Properties, including any interest, penalties or additional amounts which may be imposed with respect thereto. "**Taxes**" does not include any tax imposed on or measured by income.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Body that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such Governmental Body, including any governmental or quasi-governmental entity or agency that imposes, or is charged with collecting, social security or similar Taxes or premiums.

"**Termination Event Casualty**" has the meaning set forth in **Section 8.12(c)**.

"**Title Defect**" means any Encumbrance, charge obligation or defect that causes the Seller with respect to any of the Assets, not to have Defensible Title.

"**Title Defect Amount**" has the mean set forth in **Section 3.5**.

"**Title Defect Notice**" has the mean set forth in **Section 3.5**.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Transfer Requirement**" means any consent, approval, authorization or permit of, or filing with or notification to, any Person which is required to be obtained, made or complied with for or in connection with any sale, assignment or transfer of any Asset or any interest therein; provided, however, that "**Transfer Requirement**" shall not include any consent of, notice to, filing with, or other action by any Governmental Body in connection with the sale or conveyance of oil and/or gas leases or interests therein or Easements or interests therein, if they are not required prior to the assignment of such oil and/or gas leases, Easements or interests or they are customarily obtained subsequent to the sale or conveyance (including consents from state agencies).

"**Transfer Taxes**" has the meaning set forth in **Section 6.6(b)**.

"**Transition Services Agreement**" means a transition services agreement mutually agreed by Buyer and Seller, to be entered into at the Closing.

"**Units**" has the meaning set forth in **Section 1.2(c)**.

"**UTPCPL**" has the meaning set forth in **Section 8.7(a)**.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Legal Requirement and the rules and regulations thereunder.

"**Wells**" has the meaning set forth in **Section 1.2(b)**.

EXHIBIT "A"

LEASES

**FEDERAL AND STATE OF LOUISIANA LEASES:**

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|---------------------------|------------------|
| Eugene Island | 32 | OCS-0196 | 11/26/46 | United States of America | The Pure Oil Company | All of Block 32, Eugene Island Area, as to those depths from 13,500' to 50,000' MD. (Deep Rights only). | Operating Rights #2 |
| Eugene Island | 183 | OCS-G 17981 | 8/1/1997 | United States of America | Elf Exploration, Inc. | All of Block 183, Eugene Island Area, OCS Leasing Map, Louisiana Map No. 4. | Record Title |
| Eugene Island | 184 | OCS-G 5498 | 7/1/1983 | United States of America | Odeco Oil & Gas Company Monsanto Oil Company Murphy Oil Corporation | All of Block 184, Eugene Island Area, OCS Leasing Map No. 4. | Record Title **(Aliquot A)** S/2 |
| | | | | | | All of Block 184, Eugene Island Area, OCS Leasing Map No. 4. | Record Title **(Aliquot B)** N/2 |
| High Island | A-443 | OCS-G 3241 | 9/1/1975 | United States of America | Mobil Oil Corporation Diamond Shamrock Corporation Union Oil Company of California | All of Block A-443, High Island Area, South Addition, as shown on OCS Official Leasing Map, Texas Map No. 7B. | Record Title |
| | | | | | | E/2 NE/4 of Block A-443, High Island Area, South Addition, from surface to 99,999' TVD. | Operating Rights #1 |
| | | | | | | Contractual Obligation: Northstar is obligated to offer W&T the opportunity to participate (at 50% of our interest) should Northstar elect to perform operations to the #1 Well. See Project Summary information and specific language regarding this obligation in Section 7.09 of the PSA between W&T & Black Elk dated effective 9/14/2009. | Contractual Obligation |
| High Island | A-571 | OCS-G 2391 | 8/1/1973 | United States of America | Texas Pacific Oil Company, Inc. El Paso Natural Gas Company CNG Producing Company | All of Block A-571, High Island Area, South Addition, Official Leasing Map, Texas Map No. 7B | Record Title |
| | | | | | | S/2 SE/4 NE/4; E/2 SE/4; E/2 NW/4 SE/4; AND E/2 SW/4 SE/4 of Block A-571, High Island Area, South Addition, and then INSOFAR AND ONLY INSOFAR AS to the Glob Alt Sand Reservoir, defined as that productive zone occurring within the interval 12,519 feet TVD and 13,028 feet TVD, electric log, in well #C-22. | Operating Rights #1 |
| Main Pass | 64 | OCS-G 4909 | 12/1/1981 | United States of America | Howell Peroleum Corporation | That portion of Block 64, Main Pass Area, Louisiana Map No.10, which is more than three geographical miles seaward from the line described in the supplemental decree of the U. S. Supreme Court, June 16, 1975 (United States vs. Louisiana, 422 U.S. 13) | Record Title |

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|---------------------------|------------------|
| Main Pass | 64 | CONTINUED | | | | That portion of Block 64, Main Pass Area, from Surface to 9,000' - Less and Except as to the 7300' Sand Unit. Surface to 9,000' TVD. Includes Wells #5-ST2, #7 #10 #11 #15 #B-21 Shortstring & B-22 ST1 Wells | Title Depth #1 |
| | | | | | | That portion of Block 64, Main Pass Area, covers depths from, but not including, 9,000' to a depth 100' below the correlative point encountered at TVD 8,960' in the Howell Petroleum #1 Well. (No wells currently producing in this zone) | Title Depth #2 |
| | | | | | | That portion of Block 64, Main Pass Area, covers depths below a depth of 100% below the correlative point encountered at a TVD depth of 8,960' in the Howell Petroleum #1 Well (Less and Except as to Deep Operating Rights in the S/2 below, 11,500'). No wells currently producing in this zone | Title Depth #3 |
| | | | | | | That portion of Block 64, Main Pass Area, INSOFAR AND ONLY INSOFAR AS the lease covers the South Half (S1/2) of the block, below the stratigraphic equivalent of 11,500' subsea as seen on the electric log on the OCS-G 4909 Well #20.  Known as "Deep Operating Rights". | Operating Rights #1 |
| | | | | | | Unit covers the 7300' Sand Reservoir as that productive zone occurring within the interval from 7323 feet to 7482 feet, as in Well #11, Lease OCS-G 4909 within the Unit Area containing a total of 1879 acres.<br><br>Note: NRI in Unit can change based upon meeting various accumulations of production. | Unit Interests |
| Main Pass | 65 | OCS-G 5692 | 7/1/1983 | United States of America | Total Petroleum, Inc. | All of Block 65, Main Pass Area, OCS Leasing Map, Louisiana Map No. 10. | Record Title |
| | | | | | | All of Block 65, Main Pass Area, OCS Leasing Map, Louisiana Map No. 10. Record Titles to depths from the surface to stratigraphic equivalent of 8,600' TVD in the Total Petroleum Main Pass 64 A-2 well (Less and Except the 73,000' Sand Unit). | Title Depth #1 |
| | | | | | | All of Block 65, Main Pass Area as to depths from, but not including, the stratigraphic equivalent of 8600' TVD in the Total Petroleum A-2 well to a depth 100' below the correlative point at a TVD of 8,750' in the #2 Well. | Title Depth #2 |
| | | | | | | All of Block 65, Main Pass Area as to depths 100' below the correlative point encountered at a TVD of 8,750' in the Total Petroleum #2 Well. | Title Depth #3 |

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|---------------------------|------------------|
| Main Pass | 65 | CONTINUED | | | | Unit covers the 7300' Sand Reservoir as that productive zone occurring within the interval from 7323 feet to 7482 feet, as in Well #11, Lease OCS-G 4909 within the Unit Area containing a total of 1879 acres.<br><br>Note: NRI in Unit can change based upon meeting various accumulations of production. | Unit Interests |
| Main Pass | 256 | OCS-G 34386 | 8/1/2012 | United States of America | Northstar Offshore Group, LLC | All of Block 256, Main Pass Area, South and East Addition, OCS Leasing Map, Louisiana Map No. 10A. | Record Title |
| Main Pass | 257 | OCS-G 34387 | 8/1/2012 | United States of America | Northstar Offshore Group, LLC | All of Block 257, Main Pass Area, South and East Addition, OCS Leasing Map, Louisiana Map No. 10A. | Record Title |
| Ship Shoal | 252 | OCS-G 1529 | 7/1/1967 | United States of America | Union Oil Company of California Marathon Oil Company | Operating Rights as to the NE/4; N/2 SE/4 of Block 252, Ship Shoal Area, South Addition from 11,934 ' TVD to 13,513' TVD | Operating Rights #2 |
| South Marsh Island | 41 | OCS-G 1192 | 6/1/1962 | United States of America | CALIFORNIA OIL COMPANY | All of Block 41, South Marsh Island Area, as shown on official leasing map LA. No. 3A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations. | Record Title |
| | | | | | | E/2 of Block 41, South Marsh Island Area, limited to depths from 11,500' TVD down to a depth of 50,000'TVD – *less and except the contractual rights.* (* NOG owns no rights in the E/2 in depths from the surface to 11,500' TVD). | Operating Rights #2 |
| | | | | | | W/2 of Block 41, South Marsh Island Area, limited to depths from 15,000' TVD down to a depth of 50,000' TVD. | Operating Rights #3 |
| South Marsh Island | 41 | CONTINUED | | | | Contractual Obligation: The NE/4 NE/4 of SM 41 as to the stratigraphic equivalents of the 4 intervals as seen in the No. A-1 Well at the stratigraphic intervals:<br>1) C-1 Sands between 12,540'-12,600' TVD;<br>2) 13,700' Sands between 12,870'-13,320' TVD;<br>3) E-1 Sand between 13,460'-13,780' TVD;<br>And, as seen on the induction log of the OCS-G 1192 (SMI 41) No. A-3 Well at the stratigraphic interval:<br>4) Rob E Sand between 13,800'-14,330' TVD | Contractual Obligation |
| South Pass | 86 | OCS-G 5687 | 7/1/1983 | United States of America | Marathon Oil Company Amerada Hess Corporation The Louisiana Land and Exploration Co. | All of Block 86, South Pass Area, South and East Addition, OCS Leasing Map, Louisiana Map No. 9A. | Record Title |

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | Ownership Rights |
|---|---|---|---|---|---|---|---|
| | | | | | OKC Limited Partnership | Contractual Obligation: Northstar is obligated to offer W&T the opportunity to participate (at 50% of our interest) should Northstar elect to perform operations to the #C-13 Well (aka the #C-5 well) or the #C-8 Well. See Project Summary information and specific language regarding this obligation in Section 7.09 of the PSA between W&T & Black Elk dated effective 9/14/2009.<br><br>Northstar's WI would change to 37.5000% should W&T elect to participate in this well. | Contractual Obligation |
| South Pass | 87 | OCS-G 7799 | 9/1/1985 | United States of America | Marathon Oil Company<br>Amerada Hess Corporation<br>The Louisiana Land and Exploraiton Co.<br>OKC Limited Partnership | All of Block 87, South Pass Area, South and East Addition,  OCS Leasing Map, Louisiana Map No. 9A | Overriding Royalty Interest Only |
| South Pass | 89 | OCS-G 1618 | 7/1/1967 | United States of America | Signal Oil & Gas Company<br>The Louisiana Land and Exploration Co.<br>Marathon Oil Company<br>Amerada Petroleum Corp. | Contractual: NE/4 of Block 89, South Pass Area, South and East Addition from 14,000' SSTVD to 17500' SSTVD. Contractual  Ownership in "C" Wells.<br>Wells #C-1, C-4; C-6 & C-10 have a SP 89 BHL, with a SHL in SP 86 and holds a 50% WI. | Contractual |
| Viosca Knoll | 697 | OCS-G 34870 | 7/1/2013 | United States of America | Northstar Offshore Group, LLC | All of Block 697, Viosca Knoll, OCS Official Protraction Diagram, NH 16-07. | Record Title |
| West Cameron | 20 | OCS-0680 | 8/1/1959 | United States of America | The British-American Oil Producing Co. | Block 20, West Cameron Area. That portion in Zone 2, as that zone is defined in the agreement between the United States and the State of Louisiana, October 12, 1956, as shown on official leasing map, La. Map No. 1 Outer Continental Shelf Leasing Map (Louisiana offshore operations) | Record Title |
| | | | | | | Portion of Block 20, West Cameron Area, INSOFAR AND ONLY INSOFAR as the lease covers depths from 13,500' TVD down to a depth of 50,000' TVD. | Operating Rights #1 |
| | | | | | | Portion of Block 20, West Cameron Area, as to that portion described as contributing 210 acres in the uppermost portion of this lease - subject to a 1% Overriding Royalty Interest regardless as to whether drilling is in Record Title or Operating Rights depths. | Contractual Rights |
| West Cameron | 21 | OCS-G 23730 | 7/1/2002 | United States of America | The William G. Helis Company, L.L.C.<br>Houston Energy, L.P.<br>Duke Energy Hydrocarbons, LLC | That portion of Block 21, West Cameron Area, OCS Leasing Map, Louisiana Map No. 1, seaward of the 1975 Supreme Court Decree Line specifically described in the OCS Block Diagram. | Record Title |

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|---------------------------|------------------|
| | | | | | | Contractual area with Record Title Interest but the ORRI burden in this portion which Includes wells located in depths from the surface to base of the P3 Sand in any wellbore or future wellbore within the E/2 SE/4 NE/4; & E/2 NE/4 SE/4 in WC 21 with a BHL or perf located within 500' of the West Lease line of WC 22.  (Currently the #2 well). This Contractual "A" is less any well drilled within the "Southern Fault Block" as described below. | Contractual "A" |
| | | | | | | Contractual area with Record Title Interest but the ORRI burdens vary in this portion within the "*Southern Fault Block*" Limited to depths from the surface to the base of the P3 Sand in any wellbore drilled on WC 21 in the SE/4 SE/4; & SE/4 SW/4 SE/4; and which has a BHL or perf in the above described location of WC 21; and the BHL or per interval is located with 2,000' of the West lease line of WC 22. This "Southern Fault Block" holds a 3% ORRI burden in favor of Union Oil & Gas of California. | Contractual "B" "Southern Fault Block" |
| West Cameron | 44 | OCS-G 21532 | 7/1/2000 | United States of America | IP Petroleum Company, Inc. The William G. Helis Company, L.L.C. Houston Energy, Inc. | All of Block 44, West Cameron Area, OCS Leasing Map, Louisiana Map No. 1. | Record Title |
| | | | | | | The SE/4 NE/4; S/2 SW/4 NE/4; S/2 SE/4 NW/4; SE/4 SW/4 NW/4; E/2 NW/4 SW/4; NE/4 SW/4; N/2 SE/4; NE/4 SE/4 SW/4; N/2 SW/4 SE/4 of WC Block 44, West Cameron Area, insofar as the described portions cover those depths from the surface down to 9,476' TVD. | Operating Rights #1 |
| West Cameron | 57 | OCS-G 21534 | 7/1/2000 | United States of America | IP Petroleum Company, Inc. The William G. Helis Company, L.L.C. Houston Energy, Inc. | All of Block 57, West Cameron Area, OCS Leasing Map, | Record Title |
| | | | | | | The N/2 NW/4 SW/4; S/2 SW/4 NW/4; NE/4 SW/4 NW/4; SW/4 SE/4 NW/4; SW/4 NW/4 NE/4; S/2 SE/4 NW/4; SE/4 NW/4 NW/4; & N/2 SE/4 NW/4 of  Block 57, West Cameron Area, insofar as the described portions cover those depths from the surface down to 16,000' TVD.  Note:  Re-Assignment obligation in favor of Chevron exists pursuant to the Participation Agreement dated 9/5/07 | Operating Rights #1 |
| West Cameron | 269 | OCS-G 13563 | 8/1/1992 | United States of America | Shell Offshore Inc. | All of block 269, West Cameron Area, OCS Leasing Map No. 1. | Record Title |
| | | | | | | W/2 NE/4 NE/4; SE/4 NE/4; N/2 NE/4 SE/4 of Block 269, West Cameron Area, depths from the surface down to and including 12,805' TVD. | Operating Rights #1 |

As of 7/7/17  Orinoco

EXHIBIT "A.a"

SURFACE LEASES

**SURFACE LEASE(s):**

| Area/ Block | Surface Lease Name | Effective Date | Lessor | Lessee | Description |
|---|---|---|---|---|---|
| WC 20 OCS-0680 | Ivan Fisk Surface Lease | 3/1/60 | Barton L. Monro Barton Fisk Audra Cabral Dianne Hinch Deena Greenhaw | Northstar Offshore Group, LLC | **Surface Lease**  That certain tract of land in Sections 32, and 33 of Township 15 South, Range 13 West, more particularly described as follows: Commencing at a point 251.6 feet West and 646 feet North 0 degrees 56 feet West 1320 feet to the South Line of State Highway 292, thence East along the South line of said highway 360 feet, thence South 1320 feet, thence West 360 feet to the point of beginning. |

EXHIBIT "A.b"

P&A LIABILITY LEASES

**Terminated Leases with Associated Plugging and Abandonment Liabilty:**

| Area | Block | Lease No. | Date Expired | Operator | P&A Liability | Lease/Aliquot Description | WI |
|------|-------|-----------|--------------|----------|---------------|---------------------------|-----|
| Eugene Island | 133 | OCS-G 33092 | Expired 5/31/14 | Northstar Offshore Group, LLC | P&A Liability for Removal of #1 Caisson | All of Block 133, Eugene Island Area. | 100.00000% |
| High Island | A-442 | OCS-G 11383 | Terminated 3/27/17 | Northstar Offshore Group, LLC | P&A Liability of all Wells and Removal of Platforms A & B | All of Block A-442, High Island Area,South Addition | 45.45452% |
| Ship Shoal | 201 | OCS-G 31393 | Relinquished 1/30/15 | Northstar Offshore Group, LLC | P&A Liability for #A-6 Well (Well currently T&A) | ALL OF BLOCK 201, Ship Shoal Area. | 100.00000% |
| Ship Shoal | 202 | OCS-G 30241 | Terminated 2/28/13 | Northstar Offshore Group, LLC | P&A Liability for Removal of Platform A | ALL OF BLOCK 202, Ship Shoal Area. | 100.00000% |
| Ship Shoal | 253 | OCS-G 1031 | Producing | Northstar Offshore Group, LLC | Future P&A Liability for Removal of Platform F, but only at the time of expiration of SS 252 | ALL OF BLOCK 253, Ship Shoal Area. | 6.93750% |
| South Marsh Island | 8 | OCS-G 32155 | Relinquished 6/27/14 | Northstar Offshore Group, LLC | P&A Liability of the #1 Well (plugged but casing must be cut) | All of Block 8, South Marsh Island Area. | 100.00000% |
| West Delta | 36 | OCS-G 23956 | Terminated 10/31/2015 | Northstar Offshore Group, LLC | P&A Liability of the #G-1 Well and the Removal of Platform "G" | That portion of Block 36, West Delta Area, OCS Leasing Map, Louisiana Map No. 8, seaward of the 1975 Supreme Court Decree Line specifically described in the following OCS Block Diagram. (see XY data) and Operating Rights | 88.75000% |

**EXHIBIT A-1**
**WELLS & UNITS**

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| EI 32 | 0196 | Union Oil | No Production in Northstar ownership depths | Held by Outside Ownership Production | N/A | 5.92500% | 4.93750% |
| EI 183 | 17981 | Northstar | A004 | 17-709-41215-00 | Prod | 100.000000% | 83.333333% |
| EI 183 | 17981 | Northstar | A006 BP3 | 17-709-41469-03 | Shut-in | 100.000000% | 83.333333% |
| EI 183 | 17981 | Northstar | A007 ST 1 | 17-709-41471-01 | Shut-in | 100.000000% | 83.333333% |
| EI 183 | 17981 | Northstar | A008 | 17-709-41486-00 | Shut-in | 100.000000% | 83.333333% |
| EI 184 | 5498 | Northstar | A001 ST-1 | 17-709-40820-01 | Prod | 100.000000% | 76.666667% |
| EI 184 | 5498 | Northstar | A002 ST-1 | 17-709-40881-01 | TA | 100.000000% | 76.666667% |
| EI 184 | 5498 | Northstar | A003 BP2 | 17-709-40895-00 | Prod | 100.000000% | 76.666667% |
| EI 184 | 5498 | Northstar | A005 ST-1 | 17-709-40961-01 | TA | 100.000000% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | A001 ST-1 | 42-709-40981-01 | Shut-in | 45.45452% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | A002/A002D | 42-709-40975-00 | Shut-in | 45.45452% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | A003 ST-1 | 42-709-40981-01 | Shut-in | 45.45452% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | A004 | 42-709-40990-00 | Shut-in | 45.45452% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | A005 | 42-709-41081-00 | Shut-in | 45.45452% | P&A Liability |
| HI A-442 | 11383 Terminated 3/27/17 | Northstar | B001/B001D | 42-709-41089-00 | Shut-in | 45.45452% | P&A Liability |
| HI A-443 | 3241 | Northstar | A001 | 42-709-40313-00 | Shut-in | 84.00000% P&A ****************** 98.56000% If future operations conducted See Footnote #1 | ****************** 82.13333% If future operations conducted See Footnote #1 |
| HI A-443 | 3241 | Northstar | A003 | 42-709-40476-00 | TA | 84.00000% P&A See Footnote #1 | P&A Liability See Footnote #1 |
| HI A-443 | 3241 | Northstar | A004 | 42-709-40487-00 | Shut-in | 84.00000% P&A ****************** 98.56000% If future operations conducted See Footnote #1 | ****************** 82.13333% If future operations conducted See Footnote #1 |

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| HI A-443 | 3241 | Northstar | A005 ST-2 BP02 | 42-709-40493-04 | Lease-Saving Operations being conducted | BPO 100% APO #2 98.56000% ANKOR & SCL to forfeit ownership in lease. They will retain all P&A liability | BPO 83.33333% ************* APO #2 82.13333% |
| HI A-443 | 3241 | Northstar | A006 ST-1 | 42-709-40516-01 | Shut-in | 84.00000% P&A 98.56000% If future operations conducted See Footnote #1 | ************* 82.13333% If future operations conducted See Footnote #1 |
| HI A-443 | 3241 | Northstar | A007 | 42-709-40516-00 | Sidetracked | Never Completed | Never Completed |
| HI A-443 | 3241 | Northstar | A008 | 42-709-40533-00 | Shut-in | 84.00000% P&A ************* 98.56000% If future operations conducted See Footnote #1 | ************** 82.13333% If future operations conducted See Footnote #1 |
| HI A-443 | 3241 | Northstar | A009 | 42-709-40535-00 | Shut-in | 81.78000% P&A ************** 98.56000% If future operations conducted See Footnote #1 | ************** 82.13333% If future operations conducted See Footnote #1 |
| HI A-443 | 3241 | Northstar | A010 | 42-709-40549-00 | Shut-in | 84.00000% P&A ************** 98.56000% If future operations conducted See Footnote #1 | ************** 82.13333% If future operations conducted See Footnote #1 |
| HI A-443 | 3241 | Northstar | A011 | 42-709-40548-00 | TA | 84.00000% P&A See Footnote #1 | P&A Liability See Footnote #1 |
| HI A-443 | 3241 | Northstar | A013 BP02 | 42-709-41158-02 | TA | 91.30434% P&A See Footnote #1 | P&A Liability See Footnote #1 |
| HI A-571 | 2391 | Northstar | A001 BP01 | 42-709-40271-00 | Shut-in | 79.16500% | 65.97083% |
| HI A-571 | 2391 | Northstar | A003 ST-1 | 42-709-40459-01 | TA | 79.16500% | P&A Liability |
| HI A-571 | 2391 | Northstar | A004 | 42-709-40474-00 | TA | 79.16500% | P&A Liability |
| HI A-571 | 2391 | Northstar | A006 | 42-709-40556-00 | Shut-in | 79.16500% | 65.97083% |
| HI A-571 | 2391 | Northstar | A010 | 42-709-40723-00 | Shut-in | 79.16500% | 65.97083% |
| HI A-571 | 2391 | Northstar | A011 BP03 | 42-709-40860-00 | Prod | 79.16500% | 65.97083% |
| HI A-571 | 2391 | Northstar | A015 | 42-709-40842-00 | Shut-in | BPO 100% APO 79.16500% | BPO 83.33333% APO 65.97083% |
| HI A-571 | 2391 | Northstar | A016 ST-2 | 42-709-40941-02 | Prod | 79.16500% | 65.97083% |

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| HI A-571 | 2391 | Northstar | A017 BP01 | 42-709-40925-00 | Prod | 79.16500% | 65.97083% |
| HI A-571 | 2391 | Northstar | A018 | 42-709-41036-00 | TA | 79.16500% | P&A Liability |
| HI A-571 | 2391 | Northstar | A019 ST-3 | 42-709-41042-03 | Shut-in | 79.16500% | 65.97083% |
| MP 64 | G 4909 | Medco | 20 | 17-725-40564-00 | Shut-in | 25.00000% P&A ***************** 11.704690% for new operations within current aliquots & depths. ***************** This well is not located within the MP 64/65 Unit | 8.8369885% ***************** for new operations within current aliquots & depths |
| MP 256 | 34386 | Northstar | No Wells | Primary Term Lease | N/A | 100.00000% | 77.25000% |
| MP 257 | 34387 | Northstar | No Wells | Primary Term Lease | N/A | 100.00000% | 77.25000% |
| SM 8 | 32155 Terminated 6/27/14 | Northstar | 001 BP03 | 17-709-41514-00 | TA (plugged but casing must be cut) | 100.00000% | P&A Liability #1 Well |
| SM 41 | 1192 | Northstar | A001 | 17-707-00327-00 | TA | 100.00000% | P&A Liability |
| SM 41 | 1192 | Northstar | A009 | 17-707-40845-00 | TA | 100.00000% | P&A Liability |
| SM 41 | 1192 | Northstar | CA013 | 17-707-40477-00 | Shut-in | 100.00000% | 83.33333% |
| SM 41 | 1192 | Northstar | CA014 ST-1 | 17-707-40676-01 | Shut-in | 100.00000% | 83.33330% |
| SM 41 | 1192 | Northstar | CA015 | 17-707-40892-00 | Shut-in | 100.00000% | 83.33330% |
| SM 86 | 5687 | Northstar | C002 BP03 | 17-722-40180-00 | Prod | BPO 100% APO 75.00000% | BPO 83.33333% APO 62.50000% |
| SM 86 | 5687 | Northstar | C003 | 17-722-40184-00 | Shut-in | 75.00000% | 62.50000% |
| SP 86 | 5687 | Northstar | C005/C005A | 17-722-40213-00 | TA | 75.00000% | P&A Liability |
| SM 86 | 5687 | Northstar | C007 ST-1 | 17-722-40215-01 | Prod | 62.50000% | 62.50000% |
| SP 86 | 5687 | Northstar | C008 | 17-722-40163-00 | Shut-in | BPO 100% APO 75.00000% | BPO 83.33333% APO 62.50000% |
| SP 86 | 7799 | Fieldwood | D-2 ST-1 | 17-722-40210-01 | Shut-in | ORRI Only | 1.00000% |
| SP 87 | 7799 | Fieldwood | D-3 ST2 BP1 | 17-722-40212-02 | Shut-in | ORRI Only | 1.00000% |
| SP 87 | 7799 | Fieldwood | D-7 | 17-722-40213-00 | Prod | ORRI Only | 1.00000% |
| SP 87 | 7799 | Fieldwood | D-8 ST-2 | 17-722-40208-03 | TA | ORRI Only | 1.00000% |
| SP 87 | 7799 | Fieldwood | D-9 | 17-722-40226-00 | Prod | ORRI Only | 1.00000% |
| SP 87 | 7799 | Fieldwood | D-11 ST-1 | 17-722-40228-0 | Shut-in | 1.00000% | 1.00000% |
| SP 89 | 1618 | Northstar | C001 | 17-722-40205-00 | Shut-in | 50.00000% | 41.66667% |

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| SP 89 | 1618 | Northstar | C004 ST-1 BP1 | 17-722-40211-01 | Prod | 50.00000% | 41.66667% |
| SP 89 | 1618 | Northstar | C006 | 17-722-40214-00 | TA | 50.00000% | P&A Liability |
| SP 89 | 1618 | Northstar | C010 BP01 | 17-722-40224-00 | Prod | 50.00000% | 41.66667% |
| SS 201 | 31393 | Northstar | A006 | 17-711-41540-00 | TA | 100.00000% | P&A Liability |
| SS 252 | 1529 | Fieldwood | F004 | 17-712-40674-00 | Prod | 6.93750% | 5.41125% |
| VK 697 | 34870 | Northstar | No Wells | Primary Term Lease | N/A | 100.00000% | 77.25000% |
| WC 20 | 0680 | Northstar | 002 | 17-700-00006-00 | Prod | 100.00000% | 83.33333% |
| WC 20 | 0680 | Northstar | 010 | 17-700-00287-00 | TA | 100.00000% | P&A Liability |
| WC 20 | 0680 | Northstar | 014 | 17-700-20068-00 | Shut-In | 100.00000% | 83.33333% |
| WC 20 | 0680 | Northstar | 15 | 17-700-20071-00 | Shut-In | 100.00000% | 83.33333% |
| WC 20 | 0680 | Northstar | D001 | 17-700-41272-00 | Shut-In | 100.00000% | 83.33333% |
| WC 20 | 0680 | Northstar | D002 | 17-700-41273-00 | Shut-In | 100.00000% | 83.33333% |
| WC 20 | 0680 | Northstar | D003 | 17-700-41299-00 | Prod | 100.00000% | 83.33333% |
| WC 20 | Ivan Fisk Surface Lease | Northstar | SWD #1 | 17-023-88148-00 | SW Disposal well | 100.00000% | N/A |
| WC 21 | 23730 | Northstar | 001 | 17-700-41214-00 | Prod (But temporarily Shut-in until Stingray Contract concluded) | 56.70000% | 43.09200% |
| WC 21 | 23730 | Northstar | 002 | 17-700-41224-00 | Shut-In | 56.70000% | 43.00000% |
| WC 44 | 21532 | Northstar | 0002 ST-1 | 17-700-41176-01 | Prod (But temporarily Shut-in until Stingray Contract concluded) | 12.92324% See Footnote #2 | 10.08012% See Footnote #2 |
| WC 44 | 21532 | Northstar | B001 BP01 | 17-700-41155-01 | TA | 33.30000% | P&A Liability |
| WC 44 | 21532 | Northstar | B002 BP01 | 17-700-41203-01 | TA | 33.30000% | 83.33333% |
| WC 57 | 21534 | Northstar | 002 | 17-700-41222-00 | Shut-In | BPO 73.12500% APO 33.30000% | BPO 57.03752% APO 25.97400% |
| WC 57 | 21534 | Northstar | 003 | 17-700-41282-00 | Prod (but temporarily Shut-in until Stingray Contract concluded) | 58.49177% Oil & Gas | 45.62350% Oil 55.37216% Gas (Deep Gas Royalty Relief) |
| WC 269 | 13563 | Northstar | JA001 | 17-700-40924-00 | Shut-In | 100.00000% | 83.33333% |
| WC 269 | 13563 | Northstar | JA002 | 17-700-40931-00 | Shut-In | 100.00000% | 83.33333% |
| WC 269 | 13563 | Northstar | JA004 | 17-700-40969-00 | TA | 100.00000% | P&A Liability |

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| WC 269 | 13563 | Northstar | JA005 | 17-700-40970-00 | Shut-In | 100.000000% | 83.33333% |
| WC 269 | 13563 | Northstar | JA007 | 17-700-41159-00 | TA | 100.000000% | P&A Liability |
| WC 269 | 13563 | Northstar | JA008 ST-1 | 17-700-41303-01 | Prod (But temporarily Shut-In until Stingray Contract concluded) | 25.00000% | 20.83333% |
| WD 36 | 23956 Terminated 10/31/15 | Northstar | G-1 | 17-719-40832-00 | Shut-In | 88.7500% | P&A Liability |

## UNITS

## MAIN PASS 64 & 65 UNIT #754390004:

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| MP 64 | G 4909 | Medco | 1 ST-1 | 17-725-40294-01 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 2 | 17-725-40303-00 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 3 | 17-725-40306-00 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 4 | 17-725-40307-00 | Shut-In | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 5 ST2 | 17-725-40317-02 | Shut-In | 25.00000% | 19.03281% |
| MP 64 | G 4909 | Medco | 6 | 17-725-40320-00 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 7 | 17-725-40322-00 | TA | 25.00000% | P&A Liability |
| MP 64 | G 4909 | Medco | 8 | 17-725-40326-00 | TA | 25.00000% | P&A Liability |
| MP 64 | G 4909 | Medco | 9 | 17-725-40327-00 | TA | 25.00000% | P&A Liability |
| MP 64 | G 4909 | Medco | 10 ST-1 | 17-725-40328-01 | Prod | 25.00000% | 19.03281% |
| MP 64 | G 4909 | Medco | 11 | 17-725-40329-00 | Shut-In | 25.00000% | 19.03281% |
| MP 64 | G 4909 | Medco | 12 | 17-725-40333-00 | Shut-In | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 13 | 17-725-40360-00 | TA | 25.00000% | P&A Liability |
| MP 64 | G 4909 | Medco | 14 | 17-725-40370-00 | Shut-In | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 15 | 17-725-40446-00 | Shut-In | 25.00000% | 19.03281% |
| MP 64 | G 4909 | Medco | 17 ST-1 | 17-725-40463-01 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 18 | 17-725-40555-00 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | 19 | 17-725-40560-00 | Prod | 25.00000% | 19.18255% |
| MP 64 | G 4909 | Medco | B21 Short String | 17-725-40812-00 | Non-Prod String | 25.00000% | 19.03281% |
| MP 64 | G 4909 | Medco | B21 Long String | 17-725-40812-00 | Prod String | 25.00000% | 18.93983% |
| MP 64 | G 4909 | Medco | B22 ST-1 | 17-725-40816-01 | Shut-In | 25.00000% | 19.03281% |

| AREA / BLOCK | LEASE # | OPERATOR | WELL NAME | API | STATUS | WI | NRI |
|---|---|---|---|---|---|---|---|
| MP 65 | G 5692 | Medco | A002 | 17-725-40353-00 | Shut-In | 25.00000% | 19.18255% |
| MP 65 | G 5692 | Medco | A003 | 17-725-40356-00 | Shut-In | 25.00000% | 19.18255% |
| MP 65 | G 5692 | Medco | A004 | 17-725-40362-00 | Dump Flood | 25.00000% | 19.18255% |
| MP 65 | G 5692 | Medco | A005 | 17-725-40384-00 | Shut-In | 25.00000% | 19.18255% |
| MP 65 | G 5692 | Medco | A006 ST-1 | 17-725-40406-01 | Shut-In | 25.00000% | 19.18255% |

(1)  HI A-443:  Northstar proposed a Lease-Saving Operation to be conducted on the #A-5 Well.  ANKOR E&P Holdings and SCL Resources non-consented the proposed operation and as a result must forfeit their ownership within this Lease.  Assignments are being processed at this time to transfer the forfeit interest into Northstar.  ANKOR & SCL will retain future P&A liability for any wells in which they historically participated within this lease. Northstar's interests reflect P&A liability as to historical wells and an increased WI/NRI in any future well operations based on the additional interest to be assigned. The #A-13 Well increased P&A liability is based on Northstar's predecessor's acceptance of a historical non-consent interest.

(2)  West Cameron 44 Well #2:  Persuant to notice dated April 20, 2017, Shoreline Energy LLC was dissolved under Bankruptcy proceedings effective March 7, 2017 and therefore are no longer owners in the WC 44 Lease.  Shoreline's ownership in this Operating Rights portion of the lease consisted of the #2 Well and the #2 Caisson.  Northstar and other remaining working interest partners have each had to accept their pro-rata share of Shoreline's surrendered 22.62000% participating interest.

**EXHIBIT A-2**
**CONTRACTS**

**Eugene Island 32**

1.   Participation Agreement dated effective February 3, 2003, between Northstar Gulfsands LLC and Union Oil Company of California.

2.   Joint Operating Agreement dated effective 9-01-02 between Unocal and Northstar Gulfsands, LLC, insofar as the Lease covers rights from 13,500' to 50,000'.

**Eugene Island 133 (Abandonment of the #1 Caisson only)**
1.   None.

**Eugene Island 183**
1.   None.

**Eugene Island 184 (S/2)**
1.   None.

**Eugene Island 184 (N/2)**

1.   Offshore Operating Agreement effective June 1, 2007 by and between Newfield Exploration Company, as Operator, and Darcy Energy, LLC, as Non-Operator, covering the N/2 of Eugene Island Block 184.

2.   Declaration of Operating Agreement effective June 1, 2007, by and between Newfield Exploration Company, as Operator, and Darcy Energy, LLC, as Non-Operators, covering the N/2 of Eugene Island Block 184.

3.   First Amendment to and Ratification of First Amended and Restated Offshore Operating Agreement dated effective November 18, 2009, by and between Leed Petroleum LLC, Byron Energy Inc., and Leni Oil and Gas US Inc.

4.   Amended and Restated Offshore Operating Agreement dated effective July 18, 2008, by and between McMoran Oil & Gas LLC, as Operator (successor in interest to Newfield Exploration Company) and Leed Petroleum LLC and Byron Energy Inc., as Non-Operators, covering the N/2 of Eugene Island Block 184.

5.   Ratification and Amendment of Declaration of Offshore Operating Agreement effective July 18, 2008 by and between McMoran Oil & Gas LLC, as Operator (successor in interest to Newfield Exploration Company) and Leed Petroleum LLC and Byron Energy Inc., as Non-Operators, covering the N/2 of Eugene Island Block 184, recorded in St. Mary Parish, LA in CB 182, Page 312, under File # 303275 and in Iberia Parish, LA in CB 1423, Page 800, under File # 2009-00001722.

As of 7/27/17  Orinoco

**High Island A-442  (Lease Expired 3/27/17 - Abandonment Obligations Remain)**

1.  Operating Agreement dated August 15, 1991 by and between Hall-Houston Oil Company, and Edisto Exploration & Production Company, Ridgewood Energy Equity Income, LP and Santa Fe Energy Resources, Inc.

**High Island A-443**

1.  Gas Balancing Agreement dated effective May 19, 1981 by and between Union Oil Company of California, Diamond Shamrock Corporation, and Mobil Producing Texas and New Mexico, Inc.

2.  Operating Agreement dated effective September 1, 1975 by and between Union Oil Company of California, Mobil Oil Corporation, and Diamond Shamrock Corporation.

3.  Amendment (1-1-87) to Operating Agreement dated September 1, 1975 between Diamond Shamrock, Mobil, Unocal.

4.  Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**High Island A-571**

1.  Amendment to Operating Agreement dated effective February 1, 1989 by and between CNG Producing Company, Sun Operating Limited Partnership et al, Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company.

2.  Amendment to Operating Agreement dated effective March 1, 1986 by and between CNG Producing Company, Sun Exploration and Production, Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company.

3.  Amendment to Operating Agreement dated effective July 21, 1975 by and between CNG Producing Company, Texas Pacific Oil Company, Inc., El Paso Natural Gas Company, and American Petroleum Company of Texas.

4.  Offshore Operating Agreement dated effective February 13, 1974 by and between CNG Producing Company, El Paso Natural Gas Company, and American Petrofina Company of Texas.

5.  Operating Agreement, High Island Lateral Line A-571 dated 3-14-80, between Michigan-Wisconsin Pipe Line Co., Northern Natural Gas Co., Consolidated Gas Supply.

6.  Ratification and Adoption Agreement, 11-1-02 between Offshore Energy I LLC, Gulfterra Operating Co. LLC, Dominion E&P Inc.

7.  Production Handling Agreement, 5-24-95 between CNG, Sun Operating, Petrofina, Fina, Meridian, El Paso Production, Oryx.

8.  Operating Agreement, 5-27-97, between Texaco, CNG, Fina, Sun, Burlington, Domain, Union Pacific, American Exploration.

9.  Platform Facilities Usage Agreement, 1-22-86 between CNG, Sun, El Paso, Fina, Meridian, Mobil, Union Exploration, Amoco, NW Mutual Life, Total Minatome.

10. Gas Balancing Agreement, 10-8-81 between El Paso, American Petrofina, Sun Gas, CNG Producing.

11. Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

## Main Pass 64 & 65

1.  Unit Operating Agreement for the 7300' Sand Unit, Main Pass Blocks 64 and 65, made effective March 1, 1990.

2.  Declaration of Operating Agreement by and between Medco Energi US LLC and Leed Petroleum LLC effective April 1, 2008.

3.  First Amendment and Restated Offshore Operating Agreement dated April 1, 2008 between Medco Energi US, LLC and Leed Petroleum, created to "amend, restate, and replace the old Operating Agreements dated May 17, 1982 (MP 64) and November 15, 1983 (MP 65) in their entirety with this single Agreement."

4.  First Amendment to and Ratification of First Amended and Restated Offshore Operating Agreement dated effective May 17, 2011, by and between Medco Energi US LLC and Marlin GOM I, L.L.C.

5.  recorded in Plaquemines Parish under File Number 2011-00003275, Book 1252, Page 167 of the Conveyance Records.

6.  Production Handling Agreement dated effective September 20, 2013 by and between: 1) "Facility Owners", who is Medco Energi US LLC ("Medco") and Northstar Offshore Group, LLC ("Northstar"), and 2) "Well Owner" who is W&T Offshore, Inc. ("W&T").

7.  Assignment and Assumption of ROW interests dated August 14, 2013. Harvest Marks

8.  Bill of Sale, Chevron to Medco, August 14, 2013. Harvest Marks.

9.  Commitment of Production dated May 11, 2013.  Harvest Marks.

10. Connection Agreement dated May 11, 2013 with Medco and Northstar Offshore Group, LLC. Harvest Marks.

As of 7/27/17  Orinoco

11.  Main Pass 55 Lease Agreement, dated May 11, 2013 with Medco, Northstar Offshore Group, LLC, and Harvest Marks.

12.  Master Agreement, Medco, Northstar Offshore Group, LLC, and Harvest Marks dated May 11, 2013.

13.  Pipeline Agreement, Asset PSA dated May 15, 2013 between Chevron, Medco, and Northstar Offshore Group, LLC.

14.  Romero Pipeline Letter Agreement dated July 10, 2013 between Medco and Northstar Offshore Group, LLC.

**Main Pass 256 & 257**

1.  Agreement for Conversion and Partial Re-Assignment of Net Profits Interest, and Simultaneous Assignment and Grant of Overriding Royalty Interest, by and between Northstar Offshore Group, LLC and NOG Royalty Holdings, LP made effective as of 7-1-2017.

2.  Offshore Daywork Drilling Contract between Northstar Offshore Group, LLC and ENSCO Offshore Company dated June 6, 2017, covering MP 256 and VK 697.

**Ship Shoal 201 & 202 (SS 201 Relinquished 1/30/15  Abandonment Obligations Remain)**
1.  None.

**Ship Shoal 252 (and SS 253 Platform "F" Future Abandonment Liability)**

1.  Farmout Agreement dated February 15, 2009, between SPN Resources, LLC and Moreno Offshore Resources, as Farmors, and Houston Energy, L.P., as Farmee, as amended.

2.  Participation Agreement dated March 30, 2009, between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., CLF Resources LP, Challenger Minerals Inc., Marlin coastal, L.L.C. and Badger Oil Corporation. Schedule 4.02 (j) Page 9 of 17

3.  Offshore Operating Agreement dated March 30, 2009 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., et al, as Non-Operators.

4.  Memorandum of Offshore Operating Agreement and Financing Statement effective March 30, 2009 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., as Non-Operators, being recorded in COB 2154, Page 572, File #1324296 and in MTG Book 28\187, Page 781, File #1324296 all of the Records of Terrebonne Parish, Louisiana. UCC-1 Fixture Mineral being recorded under File Number Suffix 55, File Number 1324295 of the Records of Terrebonne Parish, Louisiana.

5.  Ratification and Amendment of Operating Agreement dated March 16, 2012 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Badger Oil Corporation, CL&F Resources LP, Challenger Minerals Inc., Dynamic Offshore Resources, L.L.C., Marlin Coastal, L.L.C. and SPN Resources, LLC.

6. Production Handling Agreement dated August 1, 2009 between SPN Resources, LLC and Moreno Offshore Resources L.L.C., as Owner, and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., CL&F Resources, LP, Badger Oil Corporation, challenger Minerals Inc. and Marlin Coastal, L.L.C., as Producer.

7. Amendment of Production Handling Agreement dated April 27, 2012, between Helis Oil & Gas Company, L.L.C., individually and on behalf of all parties Producer, pursuant to the authorization contained in the Ratification, Dynamic Offshore Resources, LLC and SPN Resources, LLC.

**South Marsh Island 8  (Abandonment Obligations Remain (well plugged but casing must be cut)**
1. None.

**South Marsh Island 41**

1. Production Handling Agreement dated effective September 1, 2004 by and between Hunt Petroleum (AEC), Inc. and Devon Energy Production Company.

2. Operating Agreement dated effective June 1, 2003 by and between Hunt Petroleum (AEC), Inc. LLOG Exploration Offshore, Inc. and Devon Energy Production Company.

3. Ratification and Amendment of PHA dated April 1, 2008 between Hunt Petroleum (AEC), Inc. Nippon Oil Exploration USA Limited.

**South Pass 86**

1. Joint Operating Agreement dated effective January 1, 1972   by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company.

2. Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**South Pass 87**

1. Assignment of Overriding Royalty Interest only. Assignment, Conveyance and Bill of Sale made and entered this 13 Date of April 15, 2015 but effective as of December 31, 2014 from Black Elk Energy Offshore Operations, LLC in favor of Northstar Offshore Group, LLC.

**South Pass 89**

1. Joint Operating Agreement dated effective January 1, 1972 by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company.

**Viosca Knoll 697**

As of 7/27/17  Orinoco

1. Agreement for Conversion and Partial Re-Assignment of Net Profits Interest, and Simultaneous Assignment and Grant of Overriding Royalty Interest, by and between Northstar Offshore Group, LLC and NOG Royalty Holdings, LP made effective as of 7-1-2017.

2. Offshore Daywork Drilling Contract between Northstar Offshore Group, LLC and ENSCO Offshore Company dated June 6, 2017, covering MP 256 and VK 697.

## West Cameron 20

1. Ivan Fisk Surface Lease dated effective March 1, 1960 by and between Ivan Fisk Sr. Et. Al. and British American Producing, and its Amendments: First Amendment dated 3/1/1971; Second Amendment dated 3/1/1991; Third Amendment dated 11/22/1994; Forth Amendment dated 1/9/2006; and the Fifth Amendment dated 3/1/2016.

## West Cameron 21

1. Joint Operating Agreement dated July 1, 2002 between The William G. Helis Company, L.L.C., as Operator, and Houston Energy, L.P., et al, as Non-Operators.

2. Letter Agreement dated July 11, 2005 from Helis Oil & Gas Company, L.L.C. to Houston Energy, L.P., CL&F Resources LP, Red Willow Offshore, LLC and Chevron U.S.A. Inc., "WC 21 State Group", regarding the acquisition by Helis and Houston of certain rights and interests from Union Oil Company of California in OCS-G 24700 West Cameron Block 22 and the WC 21 State Group pursuant to the reciprocal AMI Agreement between Helis, Houston and the WC 21 State Group in the Participation Agreement dated December 16, 2003, as ratified and amended, as to part of the rights and interest acquired by Helis and Houston.

3. Letter Agreement dated March 10, 2006 from Helis Oil & Gas Company, L.L.C. to Marlin Coastal, L.L.C., McMoRan Oil & Gas LLC, Palace Exploration Company, Kerr-McGee Oil & Gas Corporation and Red Willow Offshore, LLC.

4. Amendment to Joint Operating Agreement dated August 8, 2006 between Helis Oil & Gas Company, L.L.C., Marlin Coastal, L.L.C., Houston Energy, L.P. and Louisiana Offshore Ventures II, L.P.

5. Marlin Coastal, LLC to the William G. Helis Oil & Gas Company, LLC JOA Amendment Letter dated May 23, 2007.

6. Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.LC., HE&D Offshore, LP,  Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

As of 7/27/17  Orinoco

7.  Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC

8.  Amendment of Joint Operating Agreement, WC 21, OCS-G 23730 dated July 24, 2012, between Helis Oil & Gas Company, L.L.C., Marlin Coastal, L.L.C., Houston Energy, L.P. and Louisiana Offshore Ventures II, L.P.

9.  Third Amendment and Ratification of Joint Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP and HE&D Offshore, LP.

## <u>West Cameron 44</u>

1.  Joint Operating Agreement dated July 1, 2000 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators.

2.  Amendment and Agreement dated May 30, 2001 between Pure Resources, L.P., Houston Energy, Inc., Pure Partners, L.P., The William G. Helis Company, L.L.C., Texas 3D Ventures, L.P., Louisiana Offshore Ventures II, and Duke Energy Hydrocarbons, LLC.

3.  Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP,  Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

4.  Ratification and Amendment of Operating Agreement effective June 10, 2008 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P. and Manti Godzilla, Ltd.

5.  Participation Agreement, West Cameron 44 NE Prospect (Corvette), Offshore Louisiana effective June 10, 2008, between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

6.  First Amendment to Participation Agreement, West Cameron 44 NE Prospect (Corvette) Offshore, Louisiana effective August 8, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

7.  Second Amendment to Participation Agreement, West Cameron 44 NE Prospect (Corvette) Offshore, Louisiana, effective September 14, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

8.    Ratification and Amendment of Operating Agreement effective March 1, 2009 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P., Manti Godzilla, Ltd., BTA Oil Producers, LLC.

9.    Participation Agreement, West Cameron 44 Z-28 Prospect, Offshore, Louisiana effective March 1, 2009 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzila, Ltd. and BTA Oil Producers, LLC.

10.   Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC.

11.   Ratification and Amendment to the Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP, HE&D Offshore, LP, EPL Oil & Gas, Inc., Manti Operating Company and BTA Oil Producers, LLC

## West Cameron 57

1.    Joint Operating Agreement dated July 1, 2000 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators.

2.    Amendment and Agreement dated May 30, 2001 between Pure Resources, L.P., Pure Partners, L.P., Houston Energy, Inc., The William G. Helis Company, L.L.C., Texas 3D Ventures, L.P., Duke Energy Hydrocarbons, LLC and Louisiana Offshore Ventures II.

3.    Amendment to Joint Operating Agreement, Outer Continental Shelf – Gulf of Mexico effective December 17, 2004 between Houston Energy, L.P., Helis Oil & Gas Company, L.L.C., Marlin Energy Offshore, LLC, HE&D Offshore, L.P. and Pure Resources, L.P.

4.    Participation Agreement dated September 5, 2007 between Chevron Midcontinent, L.P. (formerly named Pure Resources, L.P.), Marlin Coastal, L.L.C., Helis Oil and Gas Company, LLC, Houston Energy, L.P. and Ridgewood Energy Corporation. (El Toro Prospect).

5.    Ratification and Amendment of Operating Agreement effective January 27, 2008 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P. and Ridgewood Energy Corporation.

6.    Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP,  Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

7.   Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC.

8.   Ratification and Amendment to the Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP, HE&D Offshore, LP and EPL Oil & Gas, Inc.

## West Cameron 269

1.   Offshore Operating Agreement dated 12-1-11 by and between Black Elk Energy Offshore Operations, LLC; Peregrine Oil & Gas II, LLC, Apache Corporation and Castex Offshore, Inc.

## West Delta 36  (Lease Expired 10/31/15 -Abandonment Obligations Remain)

1.   Offshore Operating Agreement effective February 1, 2006 between Marlin Coastal, L.L.C., as Operator, and Peregrine Oil & Gas, LP, Challenger Minerals Inc., Dynamic Offshore Resources NS, LLC and Republic Exploration LLC, as Non-Operators.


*See Marketing Contracts on Following Page....*

As of 7/27/17  Orinoco

# MARKETING CONTRACTS

Marketing Contracts by Block

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|------|-------|------------------------|----------------------|----------------|
| Eugene Island | 183/184 | EI 183 EI 184 | Dehydration Service Agreement between WFS-Liquids Company and Darcy Energy, LLC | 5/1/2007 |
| Eugene Island | 183/184 | EI 183 EI 184 | Agreement for Processing Gas Delivered by Transcontinental Gas Pipe Line Corporation to the North Terrebonne Gas Processing Plant. (Exhibit F to the C&O Agreement dated July 25, 2007. | 6/25/2007 |
| Eugene Island | 183/184 | EI 183 EI 184 | First Amendment to Gas Processing, Fractionation & Product Purchase Agreement dated Effective March 1, 2013, between Northstar Offshore Group, LLC and Enterprise Gas Processing, LLC. | 7/18/2008 |
| Eugene Island | 183/184 | EI 183 EI 184 | Injected and Retrograde Condensate Transportation and BTU Reduction Make-up Agreement - Southeast Lateral dated effective 10-1-2012 between Transcontinental Gas Pipe Line Company and Northstar Offshore Group, LLC | 10/1/2012 |
| Eugene Island | 183/184 | EI 183 EI 184 | Raw Make Purchase Letter Agreement for the North Terrebonne Gas Plant | 12/20/2012 |
| Eugene Island | 183/184 | EI 183 EI 184 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| Eugene Island | 183/184 | EI 183 EI 184 | C & O Agreement Ratification and Joinder Agreement between Marlin GOM I, L.L.C, and Enterprise Gas Processing, LLC as Operator of the North Terrebonne Gas Processing Plant and the Tebone Fractionation Plant. | No date provided |
| High Island | A-442 Expired 3/27/17 | HI A-442 | Platform Connection Agreement by and between Santa Fe Energy Products and the Operator of the High Island Pipeline System | 3/28/1997 |
| High Island | A-442 Expired 3/27/17 | HI A-442 | Lateral Line Operating Agreement dated July 3, 2002 between Ocean Energy and HIOS. | 7/3/2002 |
| High Island | A-442 Expired 3/27/17 | HI A-442 | NGL Bank Agreement dated May 5, 2004, between SPL, Inc., et al and High Island Offshore System – This works with the gas transportation agreement with HIOS which is being assigned K#GM-300-0502. | 5/5/2004 |
| High Island | A-442 Expired 3/27/17 | HI A-442 HI A-443 HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-442 Expired 3/27/17 | HIOS 442 HIOS 443 HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |

As of 7/27/17  Orinoco

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|------|-------|----------------------|---------------------|----------------|
| High Island | A-442 Expired 3/27/17 | HI A-442 | Lateral Line Operating Agreement dated December 1, 2012 between Enterprise GTM Offshore Operating Company and Black Elk Energy Offshore Operations. | 12/1/2012 |
| High Island | A-442 Expired 3/27/17 | **HIOS 442** HIOS 443 HIOS 571 | Assignment of Lateral Line Agreements between Enterprise GTM Offshore Operating and High Island Offshore  Services dated June 21, 2013 | 6/12/2013 |
| High Island | A-442 Expired 3/27/17 | **HI A-442** HI A-443 HI A-571 | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-442 Expired 3/27/17 | **HI A-442** HI A-443 HI A-571 | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HI A-442 **HI A-443** HI A-571 | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HI A-442 **HI A-443** HI A-571 | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HIOS 442 HIOS 443 HIOS 571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-443 | HI A-443 HI A-571 | Reserve Commitment Agreement dated December 1, 2009 between HIOS and Black Elk Energy Operations LLC | 12/1/2009 |
| High Island | A-443 | HI A-442 HI A-443 HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-443 | HIOS 442 HIOS 443 HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |
| High Island | A-443 | HI A-443 | Lateral Line Operating Agreement,  February 4, 2013 between Enterprise GTM Offshore Operating Company and Black Elk Energy Offshore Operations. | 241/2013 |
| High Island | A-443 | HI A-443 | Buy Back Operating Agreement between High Island Offshore System, LL.C. and Black Elk Energy Offshore Operations, LLC dated August 29, 2013 | 8/23/2013 |
| High Island | A-443 | HI A-443 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| High Island | A-571 | HI A-442<br>HI A-443<br>**HI A-571** | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-571 | HI A-442<br>HI A-443<br>**HI A-571** | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS). | 6/1/2009 |
| High Island | A-571 | HI A-443<br>HI A-571 | Reserve Commitment Agreement dated December 1, 2009 between HIOS and Black Elk Energy Operations LLC | 12/1/2009 |
| High Island | A-571 | HI A-442<br>HI A-443<br>HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-571 | HIOS 442<br>HIOS 443<br>HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |
| High Island | A-571 | HI A-571 | Amendment to Reserve Commitment Agreement date April 1, 2010 between High Island Offshore System L.L.C. and Black Elk Energy Offshore Operations LLC | 4/1/2010 |
| High Island | A-571 | HI A-571 | Lateral Line Operating Agreement, entered into as of December 1, 2012 ~~12-1-12~~ by and between Enterprise GTM Offshore Operating Co. LLC, Black Elk Energy Offshore Operations, Pisces Energy LLC | 12/1/2012 |
| High Island | A-571 | HIOS 442<br>HIOS 443<br>HIOS 571 | Assignment of Lateral Line Agreements between Enterprise GTM Offshore Operating and High Island Offshore  Services dated June 21, 2013 | 6/12/2013 |
| High Island | A-571 | HI A-571 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| Ship Shoal | 252 | SS 252 | Gas Processing, Fractionation & Products Purchase Agreement (#L1109) dated March 1, 2010 (Transco and/or Gulf South) between Marlin Coastal, L.L.C. and Enterprise Gas Processing, LLC, North Terrebonne Gas Processing Plant, Tebone Fractionation Plant | 3/1/2010 |
| South Marsh Island | 41 | SM 41 | Gathering System Agreement dated September 24, 1973 between Exxon Pipeline Company and Chevron Oil Company | 9/24/1973 |
| South Marsh Island | 41 | SM 41 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |

As of 7/27/17  Orinoco

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| South Pass | 86 | SP 86 | Owners Agreement South Pass, West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Marathon Pipe Line LLC, Apache Corporation, CKB Petroleum Inc., SPN Resources LLC, and W&T Offshore, Inc. as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of April 28, 2015 | 10/1/1981 |
| South Pass | 86 | SP 86 | Operating Agreement South Pass – West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Hess Pipeline Company, Marathon Pipe Line Company, The Largo Company and The Louisiana Land and Exploration Company, their successors and assigns, as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of November 30, 2011 | 10/1/1981 |
| South Pass | 86 | SP 86 | Facilities Interconnect & Reimbursement Agreement dated 5-21-13, between Texas Eastern Transmission, LP & BEEOO. | 5/21/2013 |
| South Pass | 89 | SP 89 | Owners Agreement South Pass, West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Marathon Pipe Line LLC, Apache Corporation, CKB Petroleum Inc., SPN Resources LLC, and W&T Offshore, Inc. as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of April 28, 2015. | 10/1/1981 |
| South Pass | 89 | SP 89 | Operating Agreement South Pass – West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Hess Pipeline Company, Marathon Pipe Line Company, The Largo Company and The Louisiana Land and Exploration Company, their successors and assigns, as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of November 30, 2011. | 10/1/1981 |
| South Pass | 89 | SP 89 (SP 86/87) | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| SP/WD SP 86 & 89 | SP 86 & 89 | SP/WD SP 86 & 89 | In-Line Inspection Project | 6/30/2005 |
| All Properties | | All Properties | NAESB dated November 1,2012 as amended, between Southwest Energy and Northstar Offshore Group, LLC | 11/1/2012 |

As of 7/27/17  Orinoco

As of 7-14-17 Orinoco

**EXHIBIT A.3**
**Easements**

None.

Rights of Way listed on Exhibit A-5

Surface Leases listed on Exhibit A

As of 7/11/17  Orinoco

**EXHIBIT A-4**
**EQUIPMENT**

| Area | Block | OCS Lease | Structure Name | Structure # | Status | Operator | Ownership Interest |
|---|---|---|---|---|---|---|---|
| EI | 133 | G33092 | #1 Caisson | 2562 | Expired P&A Liability | Northstar | 100.00000% |
| EI | 184 | G05498 | Platform A | 23932 | PROD | Northstar | 100.00000% |
| EI | 184 | G05498 | Offshore Compressor (EI 184 A) | N/A | PROD | Northstar | 100.00000% |
| HI | A 442 | G11383 | Platform A | 28020 | Terminated P&A Liability | Northstar | 45.45452% |
| HI | A 442 | G11383 | Platform B | 783 | Terminated P&A Liability | Northstar | 45.45452% |
| HI | A 443 | G03241 | Platform A | 10128 | PROD | Northstar | 98.56000% *********** Future Platform Abandonment 84.0000% *********** See Footnote #1 |
| HI | A 571 | G02391 | Platform A | 10116 | PROD | Northstar | 79.16500% |
| HI | A 571 | G02391 | Platform B-Aux | 10116 | PROD | Northstar | 79.16500% |
| MP | 64 | G04909 | Platform A | 22798 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | Platform AQ | 22798 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | Platform B | 22913 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #2 Caisson | 22798 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #1 Caisson | 22910 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #3 Caisson | 22912 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #5 Caisson | 22914 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #6 Caisson | 22915 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #7 Caisson | 22916 | PROD | Medco Energi | 25.00000% |

| Area | Block | OCS Lease | Structure Name | Structure # | Status | Operator | Ownership Interest |
|---|---|---|---|---|---|---|---|
| MP | 64 | G04909 | #8 Caisson | 22917 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #9 Caisson | 22918 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #10 Caisson | 22919 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #11 Caisson | 22920 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #12 Caisson | 22921 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #13 Caisson | 22922 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #14 Caisson | 23130 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #15 Caisson | 23403 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #17 Caisson | 23404 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #18 Caisson | 24114 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #19 Caisson | 23877 | PROD | Medco Energi | 25.00000% |
| MP | 64 | G04909 | #20 Caisson | 24121 | PROD | Medco Energi | 25.00000% |
| MP | 65 | G05692 | Platform A | 23057 | PROD | Medco Energi | 25.00000% |
| SM | 41 | G01192 | Platform A | 20713 | PROD | Northstar | 100.00000% |
| SM | 41 | G01192 | Platform CA | 23208 | PROD | Northstar | 100.00000% |
| SP | 86 | G05687 | Platform C | 24103 | PROD | Northstar | 63.88889% |
| SS | 202 | G31394 | Platform A | 23560 | PROD | Northstar | 100.00000% |
| SS | 253 | G01031 | Platform F | 26072 | Expired P&A Liability | Northstar | 6.93750% |
| WC | 20 | 680 | Platform A | 20891 | PROD | Northstar | 100.00000% |
| WC | 20 | 680 | Platform D | 2038 | PROD | Northstar | 100.00000% |
| WC | 20 | 680 | Platform D-Aux 1 | 2038 | PROD | Northstar | 100.00000% |

| Area | Block | OCS Lease | Structure Name | Structure # | Status | Operator | Ownership Interest |
|---|---|---|---|---|---|---|---|
| WC | 20 | 680 | #2 Caisson | 20881 | PROD | Nothstar | 100.00000% |
| WC | 20 | 680 | #10 Caisson | 20890 | PROD | Nothstar | 100.00000% |
| WC | 20 | 680 | #14 Caisson | 21011 | PROD | Nothstar | 100.00000% |
| WC | 20 | N/A | Onshore Compressor (WC 20) | N/A | PROD | Nothstar | 100.00000% |
| WC | 20 | Located on Ivan Fisk Surface Lease | Ivan Fisk WC 20 Tank Battery | N/A | PROD | Nothstar | 100.00000% |
| WC | 21 | G23730 | Platform G | 1641 | PROD | Nothstar | 56.70000% |
| WC | 21 | G23730 | #1 Caisson | 1641 | PROD | Nothstar | 56.70000% |
| WC | 21 | G23730 | #2 Caisson | 1653 | PROD | Nothstar | 56.70000% |
| WC | 21 | G23730 | Offshore Compressor (WC 21 G) | N/A | PROD | Nothstar | 56.70000% |
| WC | 44 | G21532 | Platform B | 1252 | PROD | Nothstar | 33.00000% |
| WC | 44 | G21532 | #2 WP | 1398 | PROD | Nothstar | 12.923424% ********** See Footnote #2 |
| WC | 57 | G21534 | #2 Caisson | 1639 | PROD | Nothstar | 33.30000% |
| WC | 57 | G21534 | #3 Caisson | 2119 | PROD | Nothstar | 58.49170% |
| WC | 269 | G13563 | Platform JA | 29040 | PROD | Nothstar | 100.00000% |
| WD | 36 | G23956 | Platform G | 1948 | Terminated P&A Liability | Nothstar | 88.75000% |

**Rental Compressors**

| Area | Block | OCS Lease | Structure Name | Structure # | Status | Operator | Ownership Interest |
|---|---|---|---|---|---|---|---|
| HI | A-571 | G02391 | Rental Compressor (HI A-571 Platform A) | N/A | PROD | Nothstar | 79.16500% |
| SM | 41 | G01192 | Rental Compressor (SM 41 Platform A) | N/A | PROD | Nothstar | 100.00000% |
| WC | 269 | G13563 | Rental Compressor (WC 269 Platform JA) | N/A | PROD | Nothstar | 100.00000% |

| Area | Block | OCS Lease | Structure Name | Structure # | Status | Operator | Ownership Interest |
|------|-------|-----------|----------------|-------------|--------|----------|--------------------|

All furniture and fixtures located at 11 Greenway Plaza, Suite 2800, Houston, Texas 77046

(1)  HI A-443:  Northstar proposed a Lease-Saving Operation to be conducted on the #A-5 Well.  ANKOR E&P Holdings and SCL Resources non-consented the proposed operation and as a result must forfeit their ownership within this Lease.  Assignments are being processed at this time to transfer the forfeit interest into Northstar.  ANKOR & SCL will retain future P&A liability for any wells in which they historically participated within this lease.  Northstar's interests reflect P&A liability as to historical wells and an increased WI/NRI in any future well operations based on the additional interest to be assigned.

(2)  West Cameron 44 Well #2:  Persuant to notice dated April 20, 2017, Shoreline Energy LLC was dissolved under Bankruptcy proceedings effective March 7, 2017 and therefore are no longer owners in the WC 44 Lease.  Shoreline's ownership in this Operating Rights portion of the lease consisted of the #2 Well and the #2 Caisson.  Northstar and other remaining working interest partners have each had to accept their pro-rata share of Shoreline's surrendered 22.62000% participating interest.

EXHIBIT A-5

PIPELINE RIGHTS-OF-WAY

| FEDERAL RIGHTS-OF-WAY OPERATED | | |
|---|---|---|
| Originating Area/Block | Right-of-Way # | Right-of-Way Description |
| Eugene Island 184 | OCS-G 15015 Segment #9266 | Pipeline Right-of-Way OCS-G 15015 is a 200-foot wide and approximately 1.21 miles (6,393 feet) long corridor associated with the bi-directional 6-inch Pipeline Segment #9266. The purpose of the pipeline R-O-W OCS-G 15015 is to maintain and operate Pipeline Segment #9266 and to transport Gas originating at Platform A in Block 184, terminating at a 10-inch SSTI in Block 195, all in the Eugene Island Area. |
| High Island A-442 | OCS-G 15676 Segment #10773 | Pipeline Right-of-Way OCS-G 15676 is a 200-foot wide and approximately 3.03 miles (15,975 feet) long corridor associated with the 6-inch Pipeline Segment #10773. The purpose of the pipeline R-O-W OCS-G 15676 is to maintain and operate Pipeline Segment #10773 and to transport Oil originating at Platform A in Block A-442, terminating at a 6-inch SSTI in Block A-443, all in the High Island Area, South Addition. |
| High Island A-442 | OCS-G 15677 Segment #10774 | Pipeline Right-of-Way OCS-G 15677 is a 200-foot wide and approximately 4.30 miles (22,690 feet) long corridor associated with the 6-inch Pipeline Segment #10774. The purpose of the pipeline R-O-W OCS-G 15677 is to maintain and operate Pipeline Segment #10774 and to transport Gas originating at Platform A in High Island Area, South Addition, Block A-442, terminating at a 30-inch SSTI in High Island Area, East Addition, South Extension, Block A-283. |
| High Island A-443 | OCS-G 29187 Segment #18829 | Pipeline Right-of.Way OCS-G 29187 is a 200-fom wide and approximately 10.50 miles (55.442 feet) long corridor associated with the bidirectional 10-inch Pipeline Segment #18829. The purpose of the pipeline R-O-W OCS-G 29187 is to maintain and operate Pipeline Segment #18829 and to transport gas originating at Platform A in High Island Area. South Addition, Block A-443. ihrough High Island Area. East Addition, South Extension. Block A-284 terminating at a 30-inch SSTI in High Island Area, East Addition, South Extension, Block A-283. |
| High Island A-571 | OCS-G 4356 Segment #5913 | Pipeline Right-of-Way OCS-G 4356 is a 200-foot wide and approximately 7.27 miles (38,364 feet) long corridor associated with the 20-inch Pipeline Segment #5913. The purpose of the pipeline R-O-W OCS-G 4356 is to maintain and operate Pipeline Segment #5913 and to transport Gas originating at Platform A in Block A-571, through Blocks A-548 and A-547, terminating at a 30-inch SSTI in Block A-546, all in the High Island Area, South Addition. |
| South Marsh Island 41 | OCS-G 25396 Segment #14649 | Pipeline Right-of-Way OCS-G 25396 is a 200-foot wide and approximately .87 miles (4,589 feet) long corridor associated with the 4-inch Pipeline Segment # I4649. The purpose of the pipeline R-O-W OCS-G 25396 is to maintain and operate PSN 14649 and to transport Gas originating at Platform A in Block 41, terminating at Platform JA in Block 40, all in the South Marsh Island Area. |

As of 7/25/17  Orinoco

| Originating Area/Block | Right-of-Way # | Right-of-Way Description |
|---|---|---|
| South Pass 89 | OCS-G 28557<br>Segment #10458 | Pipeline Right-of-Way OCS-G 28557 is a 200-foot wide and approximately 4.56 miles (24,079 feet) long corridor associated with 6 inch Pipeline Segment #10458. The purpose of the pipeline R-O-W OCS-G 28557 is to maintain and operate Pipeline Segment #10458 aid to transport supply Gas originating at Platform B in Block 89, terminating at Platform C in Block 86, all in the South Pass Area, South and East Addition. |
| Ship Shoal 202 | OCS-G 28971<br>Segment #17998<br>*Pending Abandonment* | Pipeline Right-of-Way (ROW) OCS-G 28971 is a 200-foot wide and approximately 3.37 miles (17,815 feet) long corridor associated with the 4-inch Pipeline Segment No. (PSN) 17998. The purpose of the pipeline ROW OCS-G 28971 is to maintain and operate PSN 17998 and to transport gas/condensate originating at Platform A in Block 202, through Block 197, terminating at a 26-inch SSTI in Block 198, all in the Ship Shoal Area.  ***Note: This ROW is pending abandonment and under BSEE restrictions can not be transferred under and Assignment of Pipeline ROW Grant.*** |
| Ship Shoal 202 | OCS-G 28972<br>Segment #17999<br>Pending Abandonment | Pipeline Right-of-way (ROW) OCS-G28972 is a 200-foot wide and approximately 3.76 miles (19,870 feet) long corridor associated with the 4-inch Pipeline Segment No. (PSN) 17999. The purpose of the pipeline ROW OCS-G28972 is to maintain and operate PSN 17999 and to transport oil originating at Platform A in Block 202, through Block 197, terminating at Platform J in Block 198, all in the Ship Shoal Area. ***Note: This ROW is pending abandonment and under BSEE restrictions can not be transferred under and Assignment of Pipeline ROW Grant.*** |
| West Cameron 20 | OCS-G 25492<br>Segment #3501 | Pipeline Right-of-Way OCS-G 25492 is a 200-foot wide and approximately 4.26 miles (22,491 feet) long corridor associated with the 6-inch Pipeline Segment #3501. The purpose of the pipeline R-O-W OCS-G 25492 is to maintain and operate Pipeline Segment #3501 and to transport Gas/Condensate originating at Platform A. and terminating at the Federal/State Boundary all in West Cameron Area, Block 20. |
| West Cameron 20 | OCS-G 29347<br>Segment #19613 | Pipeline Right-of-Way OCS 29347 is a 200-foot wide and approximately .76 miles (4,000 feet) long corridor associated with the 8-inch Pipeline Segment #19613. The purpose of the pipeline R-O-W OCS 29347 is to maintain and operate Pipeline Segment #19613 and to transport Gas originating at Platform A and terminating at the Fed/State Boundary all located in West Cameron Area Block 20. (Replaced Terminated OCS 0877 Segment #3503). |
| West Cameron 21 | OCS-G 26859<br>Segment #15155 | Pipeline Right-of-Way OCS-G 26859 is a 200-foot wide and approximately 3.09 miles (16,309 feet) long corridor associated with the 8-inch Pipeline Segment #15155. The purpose of the pipeline R-O-W OCS-G26859 is to maintain and operate Pipeline Segment #15155 and to transport Gas/Condensate originating at Platform G in Block 21, terminating at a 36-inch SSTI in Block 44, all in the West Cameron Area. |
| West Delta 36 | OCS-G 29323<br>Segment #19433<br>*Pending Abandonment* | Pipeline Right-of-Way OCS-G 29323 is a 200-foot wide and approximately 2.48 miles (13,109 feet) long corridor associated with the 6-inch Pipeline Segment #19433. The purpose of the pipeline R-O-W OCS-G 29323 is to maintain and operate Pipeline Segment #19433 and to transport bulk Gas originating at Platform G in Block 36, terminating at Platform A-Aux, all in the West Delta Area.  *Note: This ROW is pending abandonment and under BSEE restrictions can not be transferred under and Assignment of Pipeline ROW Grant.* |

As of 7/25/17  Orinoco

| STATE OF LOUISIANA RIGHTS-OF-WAY OPERATED | | |
|---|---|---|
| **Originating Area/Block** | **Right-of-Way #** | **Right-of-Way Description** |
| West Cameron 20 | State Lease R-O-W #643 | Right-of-Way #643 for certain rights through and under State Lands located in Cameron Parish, Louisiana and extending southward into the Gulf of Mexico, traversing under water bottoms in the offshore waters known as West Cameron Area, Offshore Louisiana, Block No. 20, situated in the Parish of Cameron, State of Louisiana. *This Right-of-Way is associated with Federal Lease West Cameron 2 OCS-0680.* |

| RIGHTS-OF-WAY ASSOCIATED WITH NORTHSTAR LEASES OUTSIDE OPERATED | | |
|---|---|---|
| **Originating Area/Block** | **Right-of-Way #** | **Right-of-Way Description** |
| Main Pass 55 | OCS-G 7541 Pig-Trap Accessory | Platform Pig-Trap: An accessory platform to R-O-W OCS-G 7541 in Main Pass Area Block 55. *Northstar holds a 25% interest and Medco Energi US LLC holds a 75% interest in this Pipeline R-O-W Grant.* |
| Main Pass 65 | OCS-G 7541 Segment 1 #7294 | Segment #7294: A 200 foot R-O-W to operate and maintain a 4-1/2 inch pipeline. 3.60 miles in length to transport oil from Platform A in block 65, through block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area. *Northstar holds a 25% interest and Medco Energi US LLC holds a 75% interest in this Pipeline R-O-W Grant.* |
| Main Pass 65 | OCS-G 7541 Segment 2 #11963 | Segment #11963: A 200 foot R-O-W to operate and maintain a 4-1/2 inch pipeine, 0.012 miles in length, to transport oil from Platform PIG-TRAP in Block 55, to a subsea tie-in Block 55, all located in Main Pass Area. *Northstar holds a 25% interest and Medco Energi US LLC holds a 75% interest in this Pipeline R-O-W Grant.* |
| Main Pass 55 | OCS-G 1380 Segment #4892 | Main Pass 55 ROW: Pipeline ROW OCS-G 1380, Segment #4892, a 200 foot wide right-of-way to operate and maintain a 12-3/4-inch O D pipeline, 0.39 miles in length, to transport oil from Sub Sea Tie-in (SSTI) in Block 55, to Federal/Stae Boundary in Block 55, all located in Main Pass Area. |
| Main Pass 64 | OCS-G 8051 Segment #7640 | OCS-G 08051, Segment Number 7640: A 200-foot wide right-of-way to operate and maintain an 8 5/8-inch pipeline, 3.66 miles in length, to transport gas from Platform A in Block 64 to a 26-inch subsea tie-in in Block 57, all located in Main Pass Area. |
| Main Pass 64 | OCS-G 28612 Segment #16240 | Maintain an 8 5/8-inch pipeline, 3.66 miles in length, to transport gas from Platform A |
| Main Pass 64 | OCS-G 28613 Segment #16241 | Block 64 to a 26-inch subsea tie-in in BlocK 57, all located in Main Pass Area. |
| Main Pass 64 | OCS-G 29198 Segment #18895 | Pipeline Right-of-Way OCS-G29198 is a 200-foot wide and approximately 1.40 miles (25,108 feet) long corridor associated with the 6.0-inch Pipeline Segment No. 18895. The purpose of pipeline ROW OCS-G29198 is to install, operate and maintain pipeline segment PSN 18895 and to transport bulk oil from Block 64, Platform "AQ" t o the Fed/State Boundary, Block 65, all located in Main Pass Area. |
| Main Pass 64 | OCS-G 29044 Segment #18181 | Pipeline Right-of-Way bearing Serial Number OCS-G 29044, Segment No. 18181 being a 200 foot-wide right-of-way to operate and maintain a 4 ½-inch pipeline, 3.60 miles in length, to transport oil from Platform A in Block 65, through Block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area. |
| Main Pass 65 | OCS-G 28585 Segment #16199 | Pipeline Right-of-Way bearing Serial Number OCS-G 28585 Segment No. 16199 being a 200 foot-wide right-of-way to operate and maintain a 3-inch pipeline, 1.08 miles in length, to transport Supply Gas from Federal/State Main Pass Block 68 to Platform A in Main Pass Block 64, all located in Main Pass Area, South and East Addition. |

As of 7/25/17  Orinoco

| Originating Area/Block | Right-of-Way # | Right-of-Way Description |
|---|---|---|
| South Pass 86 | OCS-G 13415 Segment #9550 | OCS-G 13415. Segment No. 9550. Right-of-Way two hundred feet (200')'in width for the construction. maintenance and operation of an 8.625-inch pipeline to transport crude oil, 1.98 miles in length, beginning at Platform C located in Block 86, South Pass Area. South and East Addition and terminating at a 12-inch subsea tie-in located in Block 89. South Pass Area. South and East Addition.  Northstar uses this one. for Oil to the SSTI. |
| South Pass 86 | OCS-G 13428 Segment #9597 | OCS-G 13428 Segment No. 9597. Right-of-Way two hundred feet (200')'in width for the construction. maintenance and operation of a 12-inch pipeline to transport crude Gas, 2.71 miles in length, beginning at Platform C located in Block 86, South Pass Area. South and East Addition and terminating at a 20-inch subsea tie-in located in Block 88. South Pass Area. South and East Addition.  Northtsar uses this one for Gas. |

| SEA ROBIN GAS PLANT Includes Coverage of South Marsh Island 41 | |
|---|---|
| | Northstar WI (%) * |
| Sea Robin Gas Plant - Main Deck | 48.0950% |
| * Interest represents multiple leases (SM 39, 41 & 142) | |

| SOUTH PASS / WEST DELTA PIPELINE SYSTEM Covering South Pass 86 & South Pass 89 | |
|---|---|
| The interests below reflect Northstar Offshore Group's ownership in this pipeline system based on the "South Pass/West Delta Owner's Agreement" originally dated effective October 1, 1981; its Amendment 12 dated effective December 1, 2011; and Amendment 12 last updated December 2016. | |
| SOUTH PASS 89 / WEST DELTA* | Northstar Owership (%) |
| SP 89 System Wide | 21.2961% |
| SP 89 SEG 1 {SP 89/WD 79 PL} | 25.0000% |
| SP 89 SEG 2 {SP WD 79 A Lateral PL} | No Ownership |
| SP 89 SEG 3 {WD 79 - WDRS) | 26.6000% |
| SP 89 SEG 4 (WD 86 A LAT) | No Ownership |
| SP 89 SEG 5 (SP 86 C LAT) | 25.0000% |
| * Northstar holds no pipeline interest in any of the West Delta leases within this pipeline system. | |

| HIGH ISLAND PIPELINE SYSTEM   (HIPS) | |
|---|---|
| The interests below reflect Northstar Offshore Group's ownership in this pipeline system based on the 'High Island Pipeline System Operating Agreement {HIPS}' and the 'High Island Pipeline System Owner's Agreement, both dated effective June 1, 2009. | |
| HIPS Representing Segments within High Island A-442*, A-443 & A-571 | Northstar WI (%) |
| Segment III-8 | 100.0000% |
| Segment III-10 | 80.1090% |
| Segment III-18 | 100.0000% |

*  HI A-442 is a terminated lease as of 3/27/17

**Exhibit B-1**

**FORM OF ASSIGNMENT, CONVEYANCE AND BILL OF SALE**

STATE OF [_____]          §

COUNTY OF [_____]         §

THIS ASSIGNMENT, CONVEYANCE AND BILL OF SALE (this "***Assignment***"), dated effective as of [August 1], 2017 at 12:01 a.m. Central Daylight Time (the "***Effective Time***"), is made by NORTHSTAR OFFSHORE GROUP, LLC, a Delaware limited liability company, whose address is _____ ("***Assignor***") to [_____], a [_____] whose address is _____ ("***Assignee***"). This Assignment is executed and delivered in connection with and pursuant to the terms of that certain Asset Purchase Agreement by and between Assignor and Assignee dated _____, 2017 (the "***Asset Purchase Agreement***"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Asset Purchase Agreement.

1.    Assignment.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby **SELL, ASSIGN, CONVEY AND TRANSFER** unto Assignee, all of Assignor's right, title, and interest in and to the following (collectively, the "***Assets***"):

(a)    All of the oil and gas leases; subleases and other leaseholds; net profits interests; carried interests; farmout rights; options; contractual rights; and other properties and interests described on **Exhibit A** (collectively, the "***Leases***"), together with each and every kind and character of right, title, claim, and interest that Assignor has in and to the lands covered by the Leases or the lands currently pooled, unitized, communitized or consolidated therewith (collectively, the "***Lands***");

(b)    All oil, gas, water, disposal or injection wells shown on **Exhibit A-1** whether producing, shut-in, or temporarily or permanently abandoned, and any other oil, gas, water, disposal or injection wells located on or associated with the Lands, even if not shown on **Exhibit A-1**, whether producing, shut-in, or temporarily or permanently abandoned (collectively, the "***Wells***");

(c)    All pools and units shown on **Exhibit A-1**, and all pools and units which include any Lands or all or a part of any Leases or include any Wells (the "***Units***"; the Units, together with the Leases, Lands and Wells, being hereinafter referred to as the "***Properties***"), and including all interest of Assignor derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease, and all tenements, hereditaments and appurtenances belonging to the Leases and Units;

(d)    All contracts, agreements, and instruments by which the Properties are bound, or that relate to or are otherwise applicable to the Properties, only to the extent such

contracts are valid and existing and applicable to the Properties rather than Assignor's other properties, including but not limited to, operating agreements, unitization, pooling and communitization agreements, declarations and orders, joint venture agreements, farmin and farmout agreements, exploration agreements, participation agreements, exchange agreements, transportation or gathering agreements, agreements for the sale and purchase of oil, gas, casinghead gas or processing agreements attributable to the Properties or the Hydrocarbons produced from the Properties, including but not limited to those identified on **Exhibit A-2** (collectively, the "***Contracts***"), but excluding any master service agreements and any contracts, agreements and instruments to the extent transfer is restricted by third-party agreement or applicable Law and the necessary consents to transfer are not obtained pursuant to Section 6.5 of the Asset Purchase Agreement and provided that "***Contracts***" shall not include the instruments constituting the Leases or Easements;

(e)   All easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights and all contracts, agreements, and instruments by which they are bound (collectively, the "***Easements***") appurtenant to, and used or held for use in connection with the Properties (including those identified on **Exhibit A-3**), but excluding any permits and other rights to the extent transfer is restricted by third-party agreement or applicable Law and the necessary consents to transfer are not obtained pursuant to Section 6.5 of the Asset Purchase Agreement;

(f)   All platforms, equipment, machinery, fixtures and other tangible personal property and improvements set forth on **Exhibit A-4** and all other platforms, equipment, machinery, fixtures and other tangible personal property and improvements located on the Properties or used, or held for use, in connection with the operation of the Business, including all furniture, equipment and other personal property located in Assignor's office located at 11 Greenway Plaza, Suite 2800, Houston, Texas, 77046 (collectively, "***Equipment***");

(g)   All flow lines, pipelines, gathering systems and appurtenances thereto set forth on **Exhibit A-5** and all flow lines, pipelines, gathering systems and appurtenances thereto located on the Properties or used, or held for use, in connection with the operation of the Business (collectively, "***Pipelines***" and, together with the Equipment and Wells, "***Personal Property***");

(h)   All Hydrocarbons produced from, located on or otherwise attributable to, the Leases, Lands, and Wells from and after the Effective Time;

(i)   All Imbalances as set forth on Schedule 4.14 of the Asset Purchase Agreement;

(j)   All lease files; land files; well files; gas and oil sales contract files; gas processing files; division order files; abstracts; title opinions; land surveys; environmental surveys, inspections, assessments, and reports; logs; maps; engineering data and reports; interpretive data, technical evaluations and technical outputs; reserve studies and evaluations, to the extent delivered to Buyer prior to the date hereof; and

other books, records, data, files, and accounting records, in each case to the extent related to the Business, the Assumed Liabilities or Assets, or used or held for use in connection with the maintenance or operation thereof, but excluding (i) any books, records, data, files, logs, maps, evaluations, outputs, and accounting records to the extent disclosure or transfer would result in a violation of applicable Law or is restricted by any Transfer Requirement that is not satisfied pursuant to Section 6.5 of the Asset Purchase Agreement, (ii) computer or communications software or intellectual property (including tapes, codes, data and program documentation and all tangible manifestations and technical information relating thereto), (iii) attorney-client privileged communications and work product of Assignor's or any of its Affiliates' legal counsel (other than title opinions,) (iv) reserve studies and evaluations other than any that have been delivered to Buyer prior to the date hereof, and (v) records relating to the negotiation and consummation of the sale of the Assets (subject to such exclusions, the "***Records***"); provided, however, that Assignor may retain the originals of such Records as Assignor has reasonably determined may be required for existing litigation, tax, accounting, and auditing purposes;

(k)     All Geological Data (provided it is not subject to a Transfer Requirement that is not satisfied pursuant to Section 6.5 of the Asset Purchase Agreement), including without limitation the Geological Data listed on Schedule 1.2(k) to the Asset Purchase Agreement, and all reserve estimates and economic estimates related to the Properties prepared by Assignor or its Affiliates;

(l)     All computers, software (provided it is transferable), specialty tools, SCADA systems, peripherals, radio equipment, and telephone equipment, except as listed in Schedule 1.3(h) to the Asset Purchase Agreement;

(m)     All proprietary and other computer software to the extent transferrable;

(n)     To the extent transferrable pursuant to applicable Law, all Governmental Authorizations;

(o)     All trade credits, account receivables, note receivables, take-or-pay amounts receivable, and other receivables, attributable to the Assets with respect to any period of time on or after the Effective Time;

(p)     Subject to Section 8.12 of the Asset Purchase Agreement, all right, title, and interest in and to all causes of action, including claims under directors and officers insurance policies and any rights of insurance in connection therewith, whether or not related to the Properties; and

(q)     The tradename "Northstar" and all registered or unregistered logos, trademarks, symbols, service marks, copyrights, trade names, or other intellectual property associated with the Business (including applications or pending applications thereof).

Notwithstanding anything contained herein to the contrary, the Assets do not include and specifically exclude any and all of the Excluded Assets. It is the intent of Assignor to convey and this Assignment hereby conveys to the Assignee, subject to the terms of the Asset Purchase Agreement and to the reservations and conditions herein contained, from and after the Effective Time, Assignor's interests in the Assets, subject to Permitted Liens, regardless of any incorrect description, any incorrect or misspelled names, or any mis-transcribed or incorrect recording references.

2.      Excluded Assets.  Assignor specifically excepts from this Assignment and reserves unto itself, as applicable, the Excluded Assets, which are identified on **Exhibit B** attached hereto and made a part hereof.

3.      Special Warranty of Title.  Assignor represents and warrants that (i) this Assignment is made and the Assets are being conveyed, in each case free and clear of all Liens and Claims (other than the Assumed Liabilities and the Permitted Encumbrances); and (ii) this Assignment is made by Assignor unto Assignee with a special warranty of Defensible Title for any person claiming by through and/or under Assignor or its Affiliates, but not otherwise, to the Units and Wells shown on **Exhibit A-1** as to the interests shown thereon, subject to the Permitted Encumbrances ("*Special Warranty*"). Except as set forth above, this assignment is otherwise without any warranty of title of any kind, express implied or statutory or otherwise. Assignee's protection under the Special Warranty is limited as to the Allocated Values, as set forth in the Asset Purchase Agreement.

4.      Asset Purchase Agreement.  This Assignment is subject to the Asset Purchase Agreement, and nothing in this Assignment shall operate to limit, release or impair any of Assignor's or Assignee's respective rights, obligations, remedies, or indemnities in the Asset Purchase Agreement.   To the extent the terms and provisions of this Assignment are in conflict or inconsistent with the terms and provisions of the Asset Purchase Agreement, the terms and provisions of the Asset Purchase Agreement shall control.

5.      Successors and Permitted Assigns.  This Assignment shall be binding upon and inure to the benefit of Assignee and Assignor and their respective successors and permitted assigns.

**[SIGNATURE PAGES FOLLOW.]**

Exhibit B-1 - Page 4

4818-6542-2667.v1

IN WITNESS WHEREOF, the authorized representatives of the parties hereto have executed this instrument before the undersigned competent witnesses on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNOR**:

**WITNESSES:**

Print name:_____

Print name:_____

NORTHSTAR OFFSHORE GROUP, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**ASSIGNEE**:

**WITNESSES:**

Print name:_____

Print name:_____

[_____
a [_____ ],

By:_____
Name:_____
Title:_____

STATE OF _____                §
                                 §
COUNTY OF _____               §

        BE IT KNOWN, that on this _____ day of _____, 2017, before me, the undersigned authority, and in the presence of the undersigned competent witnesses, personally came and appeared [_____] appearing herein in his capacity as [_____] of NORTHSTAR OFFSHORE GROUP, LLC, to me personally known to be the identical person whose name is subscribed to the foregoing instrument as the said officer of said limited liability company, and declared and acknowledged to me, Notary, that he executed the same on behalf of said limited liability company with full authority of said limited liability company, and that the said instrument is the free act and deed of the said limited liability company and was executed for the uses, purposes and benefits therein expressed.

WITNESSES:

_____                                    _____
Print Name:                                 [Appearer]

_____
Print Name:

                                            _____
                                            Notary Public

                                            Print name: _____
                                            My Commission Expires: _____
                                            Commission Number: _____

                                                    [SEAL]

Exhibit B-1 - Page 6

4818-6542-2667.v1

STATE OF _____  §
                     §
COUNTY OF _____ §

BE IT KNOWN, that on this _____ day of _____, 2017, before me, the undersigned authority, and in the presence of the undersigned competent witnesses, personally came and appeared [_____] appearing herein in his capacity as [_____] of [_____], to me personally known to be the identical person whose name is subscribed to the foregoing instrument as the said officer of said [limited liability company], and declared and acknowledged to me, Notary, that he executed the same on behalf of said [limited liability company] with full authority of said [limited liability company], and that the said instrument is the free act and deed of the said [liability company] and was executed for the uses, purposes and benefits therein expressed.

WITNESSES:

_____                    _____
Print Name:                                [Appearer]

_____
Print Name:

                        _____
                        Notary Public

                        Print name: _____
                        My Commission Expires: _____
                        Commission Number: _____

                        [SEAL]

Exhibit B-1 - Page 6

4818-6542-2667.v1

Form of Assignment of Operating Rights

**U.S. Department of the Interior**
**Bureau of Ocean Energy Management**

Exhibit B-2

OMB Control No.: 1010-0006
Expiration Date:   6/30/2019

**ASSIGNMENT OF OPERATING RIGHTS INTEREST IN FEDERAL OCS OIL AND GAS LEASE**

**Part A: Assignment**

Lease No.

Lease Effective Date

Legal description of the Operating Rights being assigned:

**Assignor(s):**

Assignor(s) does (do) hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest (insert name and qualification number of each Assignor and Assignee below):

**Percentage Interest Conveyed**

**Assignee(s):**

**Percentage Interest Received**

**The approval of this assignment is restricted to operating rights only.  This assignment does not affect record title interest.**

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment

This Assignment of Operating Rights Interest has been filed as of the date stamped on this document and is hereby approved by the Bureau of Ocean Energy Management on the date shown below.

**For BOEM use only**

By
Authorized Official for BOEM                Title                BOEM Approval Date

**Paperwork Reduction Act of 1995 (PRA) Statement:** The PRA (44 U.S.C. 3501 *et seq.*) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations.  The BOEM uses the information to track ownership of leases in the Federal OCS.  Responses are required to obtain or retain a benefit.  Proprietary data are covered under Section 26 of the OCSLA, 30 CFR 556.10, and in accordance with regulations in 30 CFR parts 550, 551, and 552.  An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number.  Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form.  Comments on the burden estimate or any other aspect of this form should be directed to the Information Collection Clearance Office, Bureau of Ocean Energy Management, 45600 Woodland Road, Sterling, VA 20166.

## Part B – Certification and Acceptance

1. Each Assignor certifies it is the owner of the operating rights interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE:** Each Assignor and Assignee certifies its compliance with the Department of the Interior's nonprocurement debarment and suspension regulations at 2 CFR Subtitle B, Part 1400, and agrees to communicate the requirement to comply with these regulations to persons with whom it does business related to this operating rights interest assignment by including the terms of the regulations in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION:** Each Assignor and Assignee certifies that it is in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-01 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs.

4. **QUALIFICATIONS of ASSIGNOR(S) and ASSIGNEE(S):** Each Assignor and Assignee certifies that it: is established and officially recognized by the Bureau of Ocean Energy Management as qualified and authorized to bid on, acquire interests in, and hold OCS oil and gas leases; is exercising and meeting due diligence requirements on any other OCS lease in accordance with section 8 of the OCSLA, as amended (43 U.S.C. 1337(d)); is in good standing with acceptable operating performance as required by 30 CFR §§ 550 and 556; is not disqualified by BOEM from acquiring any new OCS leases or assigned interest(s) in existing leases because of unacceptable operating performance on any other OCS lease; is not failing to meet or exercise due diligence (as determined by BOEM after notice and opportunity for a hearing under 30 CFR part 590, subpart A); and is not restricted from bidding or acquiring interests in the lease or officially designated subdivision, therein, or grouped with any other entities on the restricted joint bidders list.

5. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR §§ 550 and 556. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462, 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is (are) subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Ocean Energy Management is governed by 30 CFR §§ 550 through 556.

This Assignment of Operating Rights Interest will be made effective between the parties hereto as of _____, upon approval by the Bureau of Ocean Energy Management, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together will constitute but one and the same instrument provided. However, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Ocean Energy Management unless all counterparts are filed simultaneously.

By signing this document, you certify that your statements made herein are true, complete and correct to the best of your knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**Assignor Name:**

**Assignor Qualification No:**

By:
Signatory Name:
Signatory Title:

Execution Date

**Assignee Name:**

**Assignee Qualification No:**

By:
Signatory Name:
Signatory Title:

Execution Date

**Assignor Name:**

**Assignor Qualification No:**

By:
Signatory Name:
Signatory Title:

Execution Date

**Assignee Name:**

**Assignee Qualification No:**

By:
Signatory Name:
Signatory Title:

Execution Date

Exhibit B-3

**U.S. Department of the Interior**

Form of Assignment of Record Title

**Bureau of Ocean Energy Management**

OMB Control No.: 1010-0006

**Expiration Date:  06/30/2019**

**ASSIGNMENT OF RECORD TITLE INTEREST IN**
**FEDERAL OCS OIL AND GAS LEASE**

Lease No. _____

Lease Effective Date _____

New Lease No. (BOEM Use Only) _____

**Part A: Assignment**

**Legal description of the OCS oil and gas lease or the officially designated subdivision of the lease being assigned:**

Assignor(s) does (do) hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest (insert name and qualification number of each Assignor and Assignee below):

**Assignor(s):**

**Percentage Interest Conveyed**

**Assignee(s):**

**Percentage Interest Received**

**The approval of this assignment is restricted to record title interest only.**

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

**For BOEM use only**

This Assignment of Record Title Interest has been filed as of the date stamped on this document and is hereby approved by the Bureau of Ocean Energy Management on the date shown below.

By _____

Authorized Official for BOEM          Title          BOEM Approval Date
_____     _____     _____

**Paperwork Reduction Act of 1995 (PRA) Statement:** The PRA (44 U.S.C. 3501 *et seq.*) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations.  BOEM uses the information to track ownership of leases in the Federal OCS.  Responses are required to obtain or retain a benefit.  Proprietary data are covered under section 26 of the OCSLA, 30 CFR 556.10, and in accordance with regulations in 30 CFR parts 550, 551, and 552.  An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number.  Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form.  Comments on the burden estimate or any other aspect of this form should be directed to the Information Collection Clearance Office, Bureau of Ocean Energy Management, 45600 Woodland Road, Sterling, VA 20166.

## Part B: Certification and Acceptance

1. Each Assignor certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE:** Each Assignor and Assignee certifies its compliance with the Department of the Interior's nonprocurement debarment and suspension regulations at 2 CFR Subtitle B, Part 1400, and agree to communicate the requirement to comply with these regulations to persons with whom it does business related to this record title interest assignment by including the terms of the regulations in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION:** Each Assignor and Assignee certifies that it is in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-1 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs.

4. **QUALIFICATIONS of ASSIGNOR(S) and ASSIGNEE(S):** Each Assignor and Assignee certifies that it: is established and officially recognized by the Bureau of Ocean Energy Management as qualified and authorized to bid on, acquire interests in, and hold OCS oil and gas leases; is exercising and meeting due diligence requirements on any other OCS lease in accordance with section 8 of the OCSLA, as amended (43 U.S.C. 1337(d)); is in good standing with acceptable operating performance as required by 30 CFR §§ 550 and 556; is not disqualified by BOEM from acquiring any new OCS leases or assigned interest(s) in existing leases because of unacceptable operating performance on any other OCS lease; is not failing to meet or exercise the due diligence (as determined by BOEM after notice and opportunity for a hearing under 30 CFR part 590, subpart A); and is not restricted from bidding or acquiring interests in the lease or officially designated subdivision, therein, or grouped with any other entities on the restricted joint bidders list.

Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR §§ 550 and 556. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is (are) subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Ocean Energy Management is governed by 30 CFR §§ 550 through 556.

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____ upon approval by the Bureau of Ocean Energy Management, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Ocean Energy Management unless all counterparts are filed simultaneously.

By signing this document, you certify that your statements made herein are true, complete and correct to the best of your knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**Assignor Name:** _____

**Assignor Qualification No.** _____

By: _____

Signatory Name: _____
Signatory Title: _____

Execution Date _____

**Assignee Name:** _____

**Assignee Qualification No.** _____

By: _____

Signatory Name: _____
Signatory Title: _____

Execution Date _____

**Assignor Name:** _____

**Assignor Qualification No.** _____

By: _____

Signatory Name: _____
Signatory Title: _____

Execution Date _____

**Assignee Name:** _____

**Assignee Qualification No.** _____

By: _____

Signatory Name: _____
Signatory Title: _____

Execution Date _____

Exhibit B-4

Form of Assignment of Pipeline Right-of-Way

**U. S. Department of the Interior**
**Bureau of Safety and Environmental Enforcement (BSEE)**

OMB Control Number: 1014-0016
OMB Approval Expires: August 31, 2018

## ASSIGNMENT OF FEDERAL OCS PIPELINE RIGHT-OF-WAY GRANT

Part A: Assignment

**Legal description of the Pipeline Right-of-Way Grant being assigned (Please include Segment Number and any accessory information):**

**Assignor(s) does hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest:**

**Insert name and Company number of each Assignor and Assignee.**

**Assignor(s):** **Percentage Interest Conveyed**

**Assignee(s):** **Percentage Interest Received**

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

**For BSEE Use only – Do Not Type Below This Line**
UNITED STATES OF AMERICA

This Assignment of Federal OCS Pipeline Right-of-Way Grant has been filed as of the date stamped on this document and hereby approved by the Bureau of Safety and Environmental Enforcement on the date below.

By

Authorized Official for BSEE          Title          Approval Date

**Paperwork Reduction Act of 1995 (PRA) Statement:** The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. BSEE uses the information to track ownership of leases in the Federal OCS. Responses are required to obtain or retain a benefit (43 U.S.C. 1334). Proprietary data are covered under 30 CFR 250.197. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate, or any other aspect of this form, to the BSEE Information Collection Clearance Officer, 381 Elden Street, Herndon, VA 20170.

**Part B – Certification and Acceptance**

1. Assignor(s) certifies it is the owner of the interest in the above-described Federal OCS Pipeline Right-of-Way Grant that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE:** Assignee shall comply with the Department of the Interior's nonprocurement debarment and suspension regulations as required by Subpart B of 2 CFR Part 1400 and shall communicate the requirement to comply with these regulations to persons with whom it does business related to this record title interest assignment by including this term in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION:** Assignor(s) and Assignee(s) certify that they are in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-01 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs.  These requirements are for the purpose of preventing discrimination against persons on the basis of race, color, religion, sex, or national origin.  These regulations have specific performance requirements.

4. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the right-of-way grant described herein.  Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations in accordance with 30 CFR 250 and 550, Subpart J and to furnish and maintain such bond(s) as may be required by the Lessor pursuant to regulations at 30 CFR 556.  This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 *et seq.*, as amended (the "Act"), and Assignee(s) is subject to, and must fully comply with, all applicable regulations now or to be issued under the Act.  Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Safety and Environmental Enforcement is governed by 30 CFR 250.

This Assignment of Federal OCS Pipeline Right-of-Way Grant will be made effective between the parties hereto as of _____ upon approval by the Bureau of Safety and Environmental Enforcement, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together will constitute but one and the same instrument provided.  However, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Safety and Environmental Enforcement unless all counterparts are filed simultaneously.

I certify that the statements made herein by the undersigned are true, complete, correct to the best of my knowledge and belief, and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**ASSIGNOR**

By: _____
Name:
Title:

_____
Execution Date

**ASSIGNEE**

By: _____
Name:
Title:

_____
Execution Date

**ASSIGNOR**

By: _____
Name:
Title:

_____
Execution Date

**ASSIGNEE**

By: _____
Name:
Title:

_____
Execution Date

Attach Notary Acknowledgement (not mandatory)

BSEE **FORM BSEE-0149**   (August 2015 – Supersedes all previous versions of this form which may not be used).   Page 2 of 2

Exhibit B-5
State of Louisiana Form of Assignment of Right-of-Way
**STATE OF LOUISIANA**

## STATE OF LOUISIANA

## ASSIGNMENT OF RIGHT-OF-WAY

KNOW ALL MEN BY THESE PRESENTS, THAT

WHEREAS, by instrument dated _____ by and between the State of Louisiana represented by

the Honorable _____, Governor, and _____ was granted to _____

Register/Secretary/Commissioner/Administrator, State Right-of-Way No. _____ for certain rights through and under State lands located in

_____, situated in the Parish of

_____ State of Louisiana; and

WHEREAS, said instrument dated _____ prohibited

_____ from assigning in whole or in part any rights accrued by virtue of said agreement unless the

State of Louisiana granted consent and approval thereto; and

WHEREAS, _____ has now requested the consent and approval

of the State of Louisiana to assign all the rights of _____

aforementioned State Right-of-Way No. _____ to _____ under the

WHEREAS, it is to the mutual benefit and advantage of the parties that said agreement be approved; and

WHEREAS, all other stipulations and obligations in the original contract dated _____ are to be

assumed by assigns and are to be maintained in force and effect.

NOW, THEREFORE, the State of Louisiana, represented by _Jonathan Robillard_, Administrator, State Land Office, approves the

assignment of State Right-of-Way No. _____ by _____

_____ to said

IN WITNESS WHEREOF, the State of Louisiana, has executed this conveyance on this _____ day of _____,

_____

WITNESSES to the signature of the
Administrator of the State Land Office:

_____

Printed Name:   Adam Cox

_____                                    ADMINISTRATOR, STATE LAND OFFICE
Printed Name:                                        Printed Name:   Jonathan Robillard

_____
Printed Name: _____

ACKNOWLEDGMENT FOR THE ADMINISTRATOR OF THE STATE LAND OFFICE

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned authority, personally came and appeared _Adam Cox_, who by me being first duly sworn,

deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw _Jonathan Robillard_ sign said

instrument as Administrator of the State Land Office, in the presence of appearer and the other subscribing witness.

Sworn to and subscribed before me on this the

_____ day of _____,

_____

_____
Signature of Witness
Printed Name:  Adam Cox

IN WITNESS WHEREOF, _____ has executed this conveyance on this _____ day
of _____.

WITNESSES:

Printed Name: _____

Printed Name: _____                    BY _____ (ASSIGNOR)
                                                   Printed Name: _____

ACKNOWLEDGMENT FOR CORPORATE ASSIGNOR

STATE OF _____
OF _____

BEFORE ME, the undersigned authority, personally came and appeared _____ who
by me being first duly sworn, deposed and said:

That he/she is one of the witnesses to the execution of the foregoing instrument and that he/she saw
execute said instrument as _____ of _____ as the free act and deed of
said corporation in the presence of appearer and the other subscribing witness.

Sworn to and subscribed before me on this the
_____ day of _____,

_____                                   _____
Notary Public                                      Signature of Witness
Printed Name: _____                     Printed Name: _____

************************************************************

IN WITNESS WHEREOF, _____ has executed this conveyance on this _____ day
of _____.

WITNESSES:

Printed Name: _____

Printed Name: _____                    BY _____ (ASSIGNEE)
                                                   Printed Name: _____

ACKNOWLEDGMENT FOR CORPORATE ASSIGNEE

STATE OF _____
OF _____

BEFORE ME, the undersigned authority, personally came and appeared _____ who
by me being first duly sworn, deposed and said:

That he/she is one of the witnesses to the execution of the foregoing instrument and that he/she saw
execute said instrument as _____ of _____ as the free act and deed of said

corporation in the presence of appearer and the other subscribing witness.

Sworn to and subscribed before me on this the

_____ day of _____, _____.

_____

Notary Public

Printed Name:_____

_____

Signature of Witness

Printed Name:_____

**EXHIBIT C**

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code of 1986 (the *"Code"*) provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. For U.S. federal income tax purposes (including section 1445 of the Code), the owner of a disregarded entity (which has legal title to a United States real property interest under local law), and not the disregarded entity, is treated as the transferor of the property. To inform **[NEWCO]**, a **[STATE]** limited liability company (the *"Transferee"*), that withholding of tax is not required upon the disposition of a United States real property interest by **Northstar Offshore Group, LLC**, a Delaware limited liability company (the *"Transferor"*), the undersigned hereby certifies the following on behalf of the Transferor:

1. The Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. The Transferor is not a disregarded entity as defined in Treas. Reg. § 1.1445-2(b)(2)(iii);

3. The Transferor's U.S. employer identification number is 45-4196688; and

4. The Transferor's office address is:

> 11 Greenway Plaza, Suite 2800
> Houston, Texas 77046

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

**NORTHSTAR OFFSHORE GROUP, LLC**

By: _____
Name: Brian H. Macmillan
Title: Senior Vice President Land & Business
Development

Date: _____

## Schedule 1.2(k)

### Geological Data

1. Master Geophysical Data-Use License dated effective January 5, 2006, between Seismic Exchange, Inc. and Northstar Interests, LC.

2. Master License Agreement dated November 12, 2014, between FairfieldNodal and Northstar GOM Holdings Group, LLC.

3. Master License Agreement for Multiclient Seismic Data dated effective November 3, 2014, between WesternGeco L.L.C. and Northstar GOM Holding Group LLC.

**Schedule 1.3(f)**

**Excluded Contracts**

**East Cameron 317 & 318 (Lease Expired 2/27/17- Abandonment Obligations Remain)**

1. First Amended and Restated Offshore Operating Agreement between Medco Energi US LLC and Leed Petroleum LLC dated effective April 1, 2008.

2. First Amendment to and Ratification of Memorandum of Operating Agreement and Financing Statement dated effective May 17, 2011 by and between Medco Energi US LLC and Marlin GOM I, L.L.C. recorded in Cameron Parish under File No. 323030 in the Conveyance and Mortgage Books.

**South Marsh Island 39**

1. Platform and Facilities Throughput Agreement dated effective October 5, 2001 by and between Remington Oil and Gas Corporation and Magnum Hunter Production, Inc. (producers) and Westport Resources Corporation and Chieftain International (US) Inc. (Platform Owners) and Westport as Platform Operator.

2. Offshore Operating Agreement dated effective July 1, 1996 by and between Equitable Resource Energy Company and Chieftain International (US) Inc.

3. Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**South Marsh Island 142 (and SM 143 Future P&A Liability)**

1. Unit Operating Agreement dated effective March 17, 1976 between Forest Oil Corporation, Columbia Gas Development Corporation, Texas Gas Exploration Corporation, CNG Producing Company, KERR-McGee Corporation, Cabot Corporation, Sun Oil Company (Delaware) and Felmont Oil Corporation.

2. Unit Agreement dated March 19, 1976, by and between Forest Oil Corp and Kerr-McGee Corp et al. (Box 26).

3. Revision of Exhibit B of Unit Operating Agreement (3/17/76) dated April 22, 1979 by Forest Oil Corporation.

4. Addendum to Unit Operating Agreement (3/19/76) dated January 22, 1979 by Forest Oil Corporation.

5. Amendment to Exhibit B of Joint Interest Operating Agreement dated effective January 1, 1975 by Forest Oil Corporation.

6. Continuation of Exhibit A to Joint Interest Operating Agreement following termination of Geophysical Exploration Agreement (5/17/61) dated September 23, 1971 between Forest Oil Corporation, Columbia Gas Development Corporation, Consolidated Gas Supply Corporation, and Texas Gas Exploration Corporation.

7. Operating Agreement attached to Exploration Agreement dated 5/17/61, between Forest Oil Corporation, Hope Natural Gas Company, Texas Gas Exploration Corporation and The Preston Oil Company.

8. Amendment to Operating Agreement dated May 23, 1997 between CNG Producing Company, Total Minatome Corporation, and Aviara Energy Corporation.

9. Amendment to Operating Agreement dated May 23, 1997 between CNG Producing Company, Total Minatome Corporation, and Columbia Gas Development Corporation.

10. Production Handling Agreement dated January 1, 2007 between Hunt Petroleum, Dominion Exploration, Northstar Gulfsands, Offshore Shelf as Platform Owners Hunt Petroleum and Energy Partners as Producers.

11. Amendatory Agreement (Gas Balancing Agreement) dated 1/22/79, effective 4/22/78, between Forest Oil Corp, as Operator and Columbia Gas Development Corp, Texas Gas Exploration Corp, CNG Producing Company, Kerr-McGee Corp, Cabot Corp, Sun Oil Co and Felmont Oil Corp.

12. Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**South Pelto 8**

1. Operating Agreement dated effective August 1, 1977 by and between Mesa Petroleum and American Natural Gas.

**South Pelto 13**

1. Operating Agreement dated effective May 1, 1996 by and between Zilkha Energy Company and Santa Fe Energy Company.

2. Gas Balancing Agreement dated effective March 23, 1979 by and between Mesa Petroleum Company and Santa Fe Energy Company.

3. Operating Agreement dated effective July 1, 1975 by and between Mesa Petroleum Company and American Natural Gas Production Co.

4. Pipeline Crossing Agreement dated December 16, 1993, between Mesa Operating LTD., Partnership and Zilkha Energy Company.

**Vermilion 196 (and VR 207 P&A Liability)**

1. Offshore Operating Agreement dated effective February 9, 1999 by and between Ocean Energy Inc. and Shell Offshore, Inc.

2. Production Handling Agreement dated 7-1-12, between McMoRan, Piquant, Dynamic Offshore, Bandon, Black Elk, Halliburton.

**West Cameron 2 (Creole) State Leases: #18423, 18521, #18524, #19031, #19190, #19192 and #20473**

1. Voluntary Unit Agreement entered into and effective May 14, 2008, between the State Mineral Board for and on behalf of the State of Louisiana and Bamboo Investments, LLC; J & S Oil & Gas, LLC; Lewiston Atlas, Ltd.; Madison, LLC; Stokes & Spiehler Properties, Inc. and Xplor Energy SPV-1, Inc. and subsequent Amendments.

2. First Amendment to Voluntary Unit Agreement dated February 18, 2009, by and between the State Mineral Board for and on behalf of the State of Louisiana and Bamboo Investments, LLC, J & S Oil & Gas, LLC, Lewiston Atlas, Ltd., Madison, LLC, Stokes & Spiehler Properties, Inc. and XPLOR Energy SPV-1, Inc.

3. Second Amendment to Voluntary Unit Agreement dated December 14, 2011, between the State Mineral Board, Deep South, J&S Oil and Gas, J&S 2008, J&S 2006, Wilkinson Family Ltd Partnership, Lewiston Atlas, Madison, Stokes & Spiehler, Propel Energy.

4. Troy Bailey Agreement for Surface Lease and Saltwater Injection dated June 13, 2006 (Surface Lease "A").

5. Troy Bailey Surface Lease Act of Correction dated January 1, 2008 (Surface Lease "A").

6. Troy Bailey Surface Lease dated April 4, 2013, by and between Troy E. Bailey & Cyndie Bailey, Grantors and Northstar Offshore Group, LLC, Grantee. (Surface Lease "B")

7. Assignment, Conveyance and Bill of Sale dated effective December 1, 2012, from Jeffrey & Andrea Wilkinson Family Limited Partnership (Assignor) and Northstar Offshore Group, LLC as (Assignee)

8. Wilma Picou Agreement for Surface Lease and Saltwater Injection, dated June 14th, 2006.

9. Wilma Picou Amendment to Agreement for Surface Lease and Saltwater Injection, dated June 14, 2008.

10. Wilma Picou Amendment and Ratification of Agreement for Surface Lease and Saltwater Injection, dated June 14, 2014.

<u>West Cameron 60</u>

1. Offshore Operating Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

2. Joint Development Agreement dated effective June 27, 1991 by and between Brooklyn Union and JCF.

3. Exploration Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

4. Farmout Agreement dated September 12, 1996, between The Houston Exploration Company and Smith Offshore.

5. Unit Agreement for OCS Exploration & Development (MMS Approved 5-26-93), between BHP, CNG, Ridgewood, Brooklyn Union, Smith Offshore, WEXCO, Contract No. 754393010.

**West Cameron 61**

1. Offshore Operating Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

2. Joint Development Agreement dated effective June 27, 1991 by and between Brooklyn Union and JCF.

3. Exploration Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

4. Unit Agreement for OCS Exploration & Development (MMS Approved 5-26-93), between BHP, CNG, Ridgewood, Brooklyn Union, Smith Offshore, WEXCO, Contract No. 754393010.

**West Cameron 75 (and WC 62 P&A Liability only)**

1. Participation Agreement dated effective August 20, 2004 by and between El Paso, THEC, and Chevron.

2. Offshore Operating Agreement dated effective August 20, 2004 by and between El Paso, THEC, and Chevron.

**West Cameron 76**

1. Joint Development Agreement dated effective June 27, 1991 by and between Brooklyn Union and JCF.

2. Exploration Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

3. Offshore Operating Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

4. Unit Agreement for OCS Exploration & Development (MMS Approved 5-26-93), between BHP, CNG, Ridgewood, Brooklyn Union, Smith Offshore, WEXCO, Contract No. 754393010.

**West Cameron 77**

1. Joint Development Agreement dated effective September 1, 2004 by and between BHP, Dominion, THEC, and Ridgewood.

2. Offshore Operating Agreement dated effective September 1, 2004 by and between BHP, Dominion, THEC, and Ridgewood.

3. Exploration Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

4. Offshore Operating Agreement dated effective May 15, 1991 by and between BHP, Brooklyn Union, EP CNG and Nerco.

5.   Joint Development Agreement dated effective June 27, 1991 by and between Brooklyn Union and JCF.

6.   Unit Agreement for OCS Exploration & Development (MMS Approved 5-26-93), between BHP, CNG, Ridgewood, Brooklyn Union, Smith Offshore, WEXCO, Contract No. 754393010.

**Marketing Contracts**

Marketing Contracts by Block

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|------|-------|------------------------|----------------------|----------------|
| None |       |                        |                      |                |

**Schedule 1.3(h)**

**Excluded Computer and Communication Equipment**

All computers, software, specialty tools, SCADA systems, peripherals, radio equipment, and telephone equipment located on:

| Area | Block | Lease No. |
|---|---|---|
| East Cameron | 317 | OCS-G 5392 |
| East Cameron | 318 | OCS-G 5393 |
| South Marsh Island | 39 | OCS-G 16320 |
| South Marsh Island | 142 | OCS-G 1216 |
| South Marsh Island | 143 | OCS-G 1217 |
| South Pelto | 8 | OCS-G 3587 |
| South Pelto | 13 | OCS-G 3171 |
| Vermilion | 196 | OCS-G 19760 |
| Vermilion | 207 | OCS-G 19761 |
| West Cameron | 2 | #18423 |
| West Cameron | 2 | #18521 |
| West Cameron | 2 | #18524 |
| West Cameron | 2 | #19031 |
| West Cameron | 2 | #19190 |
| West Cameron | 2 | #19192 |
| West Cameron | 2 | #20473 |
| West Cameron | 60 | OCS-G 9383 |
| West Cameron | 61 | OCS-G 9384 |
| West Cameron | 62 | OCS-G 25872 |
| West Cameron | 75 | OCS-G 22505 |
| West Cameron | 76 | OCS-G 9386 |
| West Cameron | 77 | OCS-G 9387 |
| West Cameron 2 | | Troy Bailey Surface Lease "A" |
| West Cameron 2 | | Troy Bailey Surface Lease "B" |
| West Cameron 2 | | Wilma Picou, et al Surface Lease |

**Schedule 1.3(n)**
**Certain Excluded Assets**

| Area | Block | Lease No. |
|------|-------|-----------|
| East Cameron | 317 | OCS-G 5392 |
| East Cameron | 318 | OCS-G 5393 |
| South Marsh Island | 39 | OCS-G 16320 |
| South Marsh Island | 142 | OCS-G 1216 |
| South Marsh Island | 143 | OCS-G 1217 |
| South Pelto | 8 | OCS-G 3587 |
| South Pelto | 13 | OCS-G 3171 |
| Vermilion | 196 | OCS-G 19760 |
| Vermilion | 207 | OCS-G 19761 |
| West Cameron | 2 | #18423 |
| West Cameron | 2 | #18521 |
| West Cameron | 2 | #18524 |
| West Cameron | 2 | #19031 |
| West Cameron | 2 | #19190 |
| West Cameron | 2 | #19192 |
| West Cameron | 2 | #20473 |
| West Cameron | 60 | OCS-G 9383 |
| West Cameron | 61 | OCS-G 9384 |
| West Cameron | 62 | OCS-G 25872 |
| West Cameron | 75 | OCS-G 22505 |
| West Cameron | 76 | OCS-G 9386 |
| West Cameron | 77 | OCS-G 9387 |

| West Cameron 2 | Troy Bailey Surface Lease "A" |
|----------------|-------------------------------|
| West Cameron 2 | Troy Bailey Surface Lease "B" |
| West Cameron 2 | Wilma Picou, et al Surface Lease |

## Schedule 1.4(a)
## Assumed and Assigned Contracts

**Eugene Island 32**

1.   Participation Agreement dated effective February 3, 2003, between Northstar Gulfsands LLC and Union Oil Company of California.

2.   Joint Operating Agreement dated effective 9-01-02 between Unocal and Northstar Gulfsands, LLC, insofar as the Lease covers rights from 13,500' to 50,000'.

**Eugene Island 133 (Abandonment of the #1 Caisson only)**
1.   None.

**Eugene Island 183**
1.   None.

**Eugene Island 184 (S/2)**
1.   None.

**Eugene Island 184 (N/2)**

1.   Offshore Operating Agreement effective June 1, 2007 by and between Newfield Exploration Company, as Operator, and Darcy Energy, LLC, as Non-Operator, covering the N/2 of Eugene Island Block 184.

2.   Declaration of Operating Agreement effective June 1, 2007, by and between Newfield Exploration Company, as Operator, and Darcy Energy, LLC, as Non-Operators, covering the N/2 of Eugene Island Block 184.

3.   First Amendment to and Ratification of First Amended and Restated Offshore Operating Agreement dated effective November 18, 2009, by and between Leed Petroleum LLC, Byron Energy Inc., and Leni Oil and Gas US Inc.

4.   Amended and Restated Offshore Operating Agreement dated effective July 18, 2008, by and between McMoran Oil & Gas LLC, as Operator (successor in interest to Newfield Exploration Company) and Leed Petroleum LLC and Byron Energy Inc., as Non-Operators, covering the N/2 of Eugene Island Block 184.

5.   Ratification and Amendment of Declaration of Offshore Operating Agreement effective July 18, 2008 by and between McMoran Oil & Gas LLC, as Operator (successor in interest to Newfield Exploration Company) and Leed Petroleum LLC and Byron Energy Inc., as Non-Operators, covering the N/2 of Eugene Island Block 184, recorded in St. Mary Parish, LA in CB 182, Page 312, under File # 303275 and in Iberia Parish, LA in CB 1423, Page 800, under File # 2009-00001722.

As of  7/27/17  Orinoco

**High Island A-442  (Lease Expired 3/27/17 - Abandonment Obligations Remain)**

1.  Operating Agreement dated August 15, 1991 by and between Hall-Houston Oil Company, and Edisto Exploration & Production Company, Ridgewood Energy Equity Income, LP and Santa Fe Energy Resources, Inc.

**High Island A-443**

1.  Gas Balancing Agreement dated effective May 19, 1981 by and between Union Oil Company of California, Diamond Shamrock Corporation, and Mobil Producing Texas and New Mexico, Inc.

2.  Operating Agreement dated effective September 1, 1975 by and between Union Oil Company of California, Mobil Oil Corporation, and Diamond Shamrock Corporation.

3.  Amendment (1-1-87) to Operating Agreement dated September 1, 1975 between Diamond Shamrock, Mobil, Unocal.

4.  Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**High Island A-571**

1.  Amendment to Operating Agreement dated effective February 1, 1989 by and between CNG Producing Company, Sun Operating Limited Partnership et al, Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company.

2.  Amendment to Operating Agreement dated effective March 1, 1986 by and between CNG Producing Company, Sun Exploration and Production, Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company.

3.  Amendment to Operating Agreement dated effective July 21, 1975 by and between CNG Producing Company, Texas Pacific Oil Company, Inc., El Paso Natural Gas Company, and American Petroleum Company of Texas.

4.  Offshore Operating Agreement dated effective February 13, 1974 by and between CNG Producing Company, El Paso Natural Gas Company, and American Petrofina Company of Texas.

5.  Operating Agreement, High Island Lateral Line A-571 dated 3-14-80, between Michigan-Wisconsin Pipe Line Co., Northern Natural Gas Co., Consolidated Gas Supply.

6.  Ratification and Adoption Agreement, 11-1-02 between Offshore Energy I LLC, Gulfterra Operating Co. LLC, Dominion E&P Inc.

7.  Production Handling Agreement, 5-24-95 between CNG, Sun Operating, Petrofina, Fina, Meridian, El Paso Production, Oryx.

8.   Operating Agreement, 5-27-97, between Texaco, CNG, Fina, Sun, Burlington, Domain, Union Pacific, American Exploration.

9.   Platform Facilities Usage Agreement, 1-22-86 between CNG, Sun, El Paso, Fina, Meridian, Mobil, Union Exploration, Amoco, NW Mutual Life, Total Minatome.

10.  Gas Balancing Agreement, 10-8-81 between El Paso, American Petrofina, Sun Gas, CNG Producing.

11.  Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**Main Pass 64 & 65**

1.   Unit Operating Agreement for the 7300' Sand Unit, Main Pass Blocks 64 and 65, made effective March 1, 1990.

2.   Declaration of Operating Agreement by and between Medco Energi US LLC and Leed Petroleum LLC effective April 1, 2008.

3.   First Amendment and Restated Offshore Operating Agreement dated April 1, 2008 between Medco Energi US, LLC and Leed Petroleum, created to "amend, restate, and replace the old Operating Agreements dated May 17, 1982 (MP 64) and November 15, 1983 (MP 65) in their entirety with this single Agreement."

4.   First Amendment to and Ratification of First Amended and Restated Offshore Operating Agreement dated effective May 17, 2011, by and between Medco Energi US LLC and Marlin GOM I, L.L.C.

5.   recorded in Plaquemines Parish under File Number 2011-00003275, Book 1252, Page 167 of the Conveyance Records.

6.   Production Handling Agreement dated effective September 20, 2013 by and between: 1) "Facility Owners", who is Medco Energi US LLC ("Medco") and Northstar Offshore Group, LLC ("Northstar"), and 2) "Well Owner" who is W&T Offshore, Inc. ("W&T").

7.   Assignment and Assumption of ROW interests dated August 14, 2013. Harvest Marks

8.   Bill of Sale, Chevron to Medco, August 14, 2013. Harvest Marks.

9.   Commitment of Production dated May 11, 2013.  Harvest Marks.

10.  Connection Agreement dated May 11, 2013 with Medco and Northstar Offshore Group, LLC. Harvest Marks.

As of  7/27/17  Orinoco

11. Main Pass 55 Lease Agreement, dated May 11, 2013 with Medco, Northstar Offshore Group, LLC, and Harvest Marks.

12. Master Agreement, Medco, Northstar Offshore Group, LLC, and Harvest Marks dated May 11, 2013.

13. Pipeline Agreement, Asset PSA dated May 15, 2013 between Chevron, Medco, and Northstar Offshore Group, LLC.

14. Romero Pipeline Letter Agreement dated July 10, 2013 between Medco and Northstar Offshore Group, LLC.

**Main Pass 256 & 257**

1. Agreement for Conversion and Partial Re-Assignment of Net Profits Interest, and Simultaneous Assignment and Grant of Overriding Royalty Interest, by and between Northstar Offshore Group, LLC and NOG Royalty Holdings, LP made effective as of 7-1-2017.

1. Offshore Daywork Drilling Contract between Northstar Offshore Group, LLC and ENSCO Offshore Company dated June 6, 2017, covering MP 256 and VK 697.

**Ship Shoal 201 & 202 (SS 201 Relinquished 1/30/15  Abandonment Obligations Remain)**
1. None.

**Ship Shoal 252 (and SS 253 Platform "F" Future Abandonment Liability)**

1. Farmout Agreement dated February 15, 2009, between SPN Resources, LLC and Moreno Offshore Resources, as Farmors, and Houston Energy, L.P., as Farmee, as amended.

2. Participation Agreement dated March 30, 2009, between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., CLF Resources LP, Challenger Minerals Inc., Marlin coastal, L.L.C. and Badger Oil Corporation. Schedule 4.02 (j) Page 9 of 17

3. Offshore Operating Agreement dated March 30, 2009 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., et al, as Non-Operators.

4. Memorandum of Offshore Operating Agreement and Financing Statement effective March 30, 2009 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., as Non-Operators, being recorded in COB 2154, Page 572, File #1324296 and in MTG Book 28\187, Page 781, File #1324296 all of the Records of Terrebonne Parish, Louisiana. UCC-1 Fixture Mineral being recorded under File Number Suffix 55, File Number 1324295 of the Records of Terrebonne Parish, Louisiana.

5. Ratification and Amendment of Operating Agreement dated March 16, 2012 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Badger Oil Corporation, CL&F Resources LP, Challenger Minerals Inc., Dynamic Offshore Resources, L.L.C., Marlin Coastal, L.L.C. and SPN Resources, LLC.

As of  7/27/17  Orinoco

6. Production Handling Agreement dated August 1, 2009 between SPN Resources, LLC and Moreno Offshore Resources L.L.C., as Owner, and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., CL&F Resources, LP, Badger Oil Corporation, challenger Minerals Inc. and Marlin Coastal, L.L.C., as Producer.

7. Amendment of Production Handling Agreement dated April 27, 2012, between Helis Oil & Gas Company, L.L.C., individually and on behalf of all parties Producer, pursuant to the authorization contained in the Ratification, Dynamic Offshore Resources, LLC and SPN Resources, LLC.

**South Marsh Island 8  (Abandonment Obligations Remain (well plugged but casing must be cut)**
1. None.

**South Marsh Island 41**

1. Production Handling Agreement dated effective September 1, 2004 by and between Hunt Petroleum (AEC), Inc. and Devon Energy Production Company.

2. Operating Agreement dated effective June 1, 2003 by and between Hunt Petroleum (AEC), Inc. LLOG Exploration Offshore, Inc. and Devon Energy Production Company.

3. Ratification and Amendment of PHA dated April 1, 2008 between Hunt Petroleum (AEC), Inc. Nippon Oil Exploration USA Limited.

**South Pass 86**

1. Joint Operating Agreement dated effective January 1, 1972   by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company.

2. Participation option in favor of W&T within the Purchase and Sale Agreement dated September 14, 2009, effective August 1, 2009, between W&T Offshore, Inc., as Seller and Black Elk Energy Offshore Operations, LLC, as Buyer.

**South Pass 87**

1. Assignment of Overriding Royalty Interest only. Assignment, Conveyance and Bill of Sale made and entered this 13 Date of April 15, 2015 but effective as of December 31, 2014 from Black Elk Energy Offshore Operations, LLC in favor of Northstar Offshore Group, LLC.

**South Pass 89**

1. Joint Operating Agreement dated effective January 1, 1972 by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company.

**Viosca Knoll 697**

1. Agreement for Conversion and Partial Re-Assignment of Net Profits Interest, and Simultaneous Assignment and Grant of Overriding Royalty Interest, by and between Northstar Offshore Group, LLC and NOG Royalty Holdings, LP made effective as of 7-1-2017.

2. Offshore Daywork Drilling Contract between Northstar Offshore Group, LLC and ENSCO Offshore Company dated June 6, 2017, covering MP 256 and VK 697.

**West Cameron 20**

1. Ivan Fisk Surface Lease dated effective March 1, 1960 by and between Ivan Fisk Sr. Et. Al. and British American Producing, and its Amendments: First Amendment dated 3/1/1971; Second Amendment dated 3/1/1991; Third Amendment dated 11/22/1994; Forth Amendment dated 1/9/2006; and the Fifth Amendment dated 3/1/2016.

**West Cameron 21**

1. Joint Operating Agreement dated July 1, 2002 between The William G. Helis Company, L.L.C., as Operator, and Houston Energy, L.P., et al, as Non-Operators.

2. Letter Agreement dated July 11, 2005 from Helis Oil & Gas Company, L.L.C. to Houston Energy, L.P., CL&F Resources LP, Red Willow Offshore, LLC and Chevron U.S.A. Inc., "WC 21 State Group", regarding the acquisition by Helis and Houston of certain rights and interests from Union Oil Company of California in OCS-G 24700 West Cameron Block 22 and the WC 21 State Group pursuant to the reciprocal AMI Agreement between Helis, Houston and the WC 21 State Group in the Participation Agreement dated December 16, 2003, as ratified and amended, as to part of the rights and interest acquired by Helis and Houston.

3. Letter Agreement dated March 10, 2006 from Helis Oil & Gas Company, L.L.C. to Marlin Coastal, L.L.C., McMoRan Oil & Gas LLC, Palace Exploration Company, Kerr-McGee Oil & Gas Corporation and Red Willow Offshore, LLC.

4. Amendment to Joint Operating Agreement dated August 8, 2006 between Helis Oil & Gas Company, L.L.C., Marlin Coastal, L.L.C., Houston Energy, L.P. and Louisiana Offshore Ventures II, L.P.

5. Marlin Coastal, LLC to the William G. Helis Oil & Gas Company, LLC JOA Amendment Letter dated May 23, 2007.

6. Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP, Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

As of  7/27/17  Orinoco

7.   Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC

8.   Amendment of Joint Operating Agreement, WC 21, OCS-G 23730 dated July 24, 2012, between Helis Oil & Gas Company, L.L.C., Marlin Coastal, L.L.C., Houston Energy, L.P. and Louisiana Offshore Ventures II, L.P.

9.   Third Amendment and Ratification of Joint Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP and HE&D Offshore, LP.

## West Cameron 44

1.   Joint Operating Agreement dated July 1, 2000 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators.

2.   Amendment and Agreement dated May 30, 2001 between Pure Resources, L.P., Houston Energy, Inc., Pure Partners, L.P., The William G. Helis Company, L.L.C., Texas 3D Ventures, L.P., Louisiana Offshore Ventures II, and Duke Energy Hydrocarbons, LLC.

3.   Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP,  Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

4.   Ratification and Amendment of Operating Agreement effective June 10, 2008 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P. and Manti Godzilla, Ltd.

5.   Participation Agreement, West Cameron 44 NE Prospect (Corvette), Offshore Louisiana effective June 10, 2008, between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

6.   First Amendment to Participation Agreement, West Cameron 44 NE Prospect (Corvette) Offshore, Louisiana effective August 8, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

7.   Second Amendment to Participation Agreement, West Cameron 44 NE Prospect (Corvette) Offshore, Louisiana, effective September 14, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd.

As of 7/27/17 Orinoco

8.    Ratification and Amendment of Operating Agreement effective March 1, 2009 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P., Manti Godzilla, Ltd., BTA Oil Producers, LLC.

9.    Participation Agreement, West Cameron 44 Z-28 Prospect, Offshore, Louisiana effective March 1, 2009 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd. and BTA Oil Producers, LLC.

10.   Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC.

11.   Ratification and Amendment to the Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP, HE&D Offshore, LP, EPL Oil & Gas, Inc., Manti Operating Company and BTA Oil Producers, LLC

## West Cameron 57

1.    Joint Operating Agreement dated July 1, 2000 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators.

2.    Amendment and Agreement dated May 30, 2001 between Pure Resources, L.P., Pure Partners, L.P., Houston Energy, Inc., The William G. Helis Company, L.L.C., Texas 3D Ventures, L.P., Duke Energy Hydrocarbons, LLC and Louisiana Offshore Ventures II.

3.    Amendment to Joint Operating Agreement, Outer Continental Shelf – Gulf of Mexico effective December 17, 2004 between Houston Energy, L.P., Helis Oil & Gas Company, L.L.C., Marlin Energy Offshore, LLC, HE&D Offshore, L.P. and Pure Resources, L.P.

4.    Participation Agreement dated September 5, 2007 between Chevron Midcontinent, L.P. (formerly named Pure Resources, L.P.), Marlin Coastal, L.L.C., Helis Oil and Gas Company, LLC, Houston Energy, L.P. and Ridgewood Energy Corporation. (El Toro Prospect).

5.    Ratification and Amendment of Operating Agreement effective January 27, 2008 between Hilcorp Energy GOM, LLC, Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, L.P. and Ridgewood Energy Corporation.

6.    Production Handling Agreement dated April 1, 2008 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., and Marlin Coastal, L.L.C., as Owner of West Cameron Block 21 "G" Facility, Lease OCS-G 23730 ("Owner") and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP, Ridgewood Energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy GOM, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534 and Lease OCS-G 25132 ("Producer").

7.  Ratification of Production Handling Agreement dated June 19, 2009, by and between Helis Oil & Gas Company, LLC, Houston Energy, LP, Marlin Coastal, LLC, HE&D Offshore, LP, Hilcorp Energy GOM, LLC, Manti Godzilla Ltd. and BTA Oil Producers, LLC.

8.  Ratification and Amendment to the Operating Agreement dated July 23, 2013, by and between Northstar Offshore Group, LLC, Helis Oil & Gas Company, LLC, Houston Energy, LP, HE&D Offshore, LP and EPL Oil & Gas, Inc.

## West Cameron 269

1.  Offshore Operating Agreement dated 12-1-11 by and between Black Elk Energy Offshore Operations, LLC; Peregrine Oil & Gas II, LLC, Apache Corporation and Castex Offshore, Inc.

## West Delta 36  (Lease Expired 10/31/15 -Abandonment Obligations Remain)

1.  Offshore Operating Agreement effective February 1, 2006 between Marlin Coastal, L.L.C., as Operator, and Peregrine Oil & Gas, LP, Challenger Minerals Inc., Dynamic Offshore Resources NS, LLC and Republic Exploration LLC, as Non-Operators.

*See Marketing Contracts on Following Page....*

**MARKETING CONTRACTS**

Marketing Contracts by Block

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| Eugene Island | 183/184 | EI 183 EI 184 | Dehydration Service Agreement between WFS-Liquids Company and Darcy Energy, LLC | 5/1/2007 |
| Eugene Island | 183/184 | EI 183 EI 184 | Agreement for Processing Gas Delivered by Transcontinental Gas Pipe Line Corporation to the North Terrebonne Gas Processing Plant. (Exhibit F to the C&O Agreement dated July 25, 2007. | 6/25/2007 |
| Eugene Island | 183/184 | EI 183 EI 184 | First Amendment to Gas Processing, Fractionation & Product Purchase Agreement dated Effective March 1, 2013, between Northstar Offshore Group, LLC and Enterprise Gas Processing, LLC. | 7/18/2008 |
| Eugene Island | 183/184 | EI 183 EI 184 | Injected and Retrograde Condensate Transportation and BTU Reduction Make-up Agreement - Southeast Lateral dated effective 10-1-2012 between Transcontinental Gas Pipe Line Company and Northstar Offshore Group, LLC | 10/1/2012 |
| Eugene Island | 183/184 | EI 183 EI 184 | Raw Make Purchase Letter Agreement for the North Terrebonne Gas Plant | 12/20/2012 |
| Eugene Island | 183/184 | EI 183 EI 184 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| Eugene Island | 183/184 | EI 183 EI 184 | C & O Agreement Ratification and Joinder Agreement between Marlin GOM I, L.L.C, and Enterprise Gas Processing, LLC as Operator of the North Terrebonne Gas Processing Plant and the Tebone Fractionation Plant. | No date provided |
| High Island | A-442 Expired 3/27/17 | HI A-442 | Platform Connection Agreement by and between Santa Fe Energy Products and the Operator of the High Island Pipeline System | 3/28/1997 |
| High Island | A-442 Expired 3/27/17 | HI A-442 | Lateral Line Operating Agreement dated July 3, 2002 between Ocean Energy and HIOS. | 7/3/2002 |
| High Island | A-442 Expired 3/27/17 | HI A-442 | NGL Bank Agreement dated May 5, 2004, between SPL, Inc., et al and High Island Offshore System – This works with the gas transportation agreement with HIOS which is being assigned K#GM-300-0502. | 5/5/2004 |
| High Island | A-442 Expired 3/27/17 | HI A-442 HI A-443 HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-442 Expired 3/27/17 | HIOS 442 HIOS 443 HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |

As of  7/27/17  Orinoco

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| High Island | A-442 Expired 3/27/17 | HI A-442 | Lateral Line Operating Agreement dated December 1, 2012 between Enterprise GTM Offshore Operating Company and Black Elk Energy Offshore Operations. | 12/1/2012 |
| High Island | A-442 Expired 3/27/17 | **HIOS 442** HIOS 443 HIOS 571 | Assignment of Lateral Line Agreements between Enterprise GTM Offshore Operating and High Island Offshore Services dated June 21, 2013 | 6/12/2013 |
| High Island | A-442 Expired 3/27/17 | **HI A-442** HI A-443 HI A-571 | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-442 Expired 3/27/17 | **HI A-442** HI A-443 HI A-571 | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HI A-442 **HI A-443** HI A-571 | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HI A-442 **HI A-443** HI A-571 | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-443 | HIOS 442 HIOS 443 HIOS 571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-443 | HI A-443 HI A-571 | Reserve Commitment Agreement dated December 1, 2009 between HIOS and Black Elk Energy Operations LLC | 12/1/2009 |
| High Island | A-443 | HI A-442 HI A-443 HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-443 | HIOS 442 HIOS 443 HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |
| High Island | A-443 | HI A-443 | Lateral Line Operating Agreement, entered into as of February 4, 2013, by and between Enterprise GTM Offshore Operating Company and Black Elk Energy Offshore Operations. | 2/4/2013 |
| High Island | A-443 | HI A-443 | Buy Back Operating Agreement between High Island Offshore System, LL.C. and Black Elk Energy Offshore Operations, LLC dated August 29, 2013 | 8/23/2013 |
| High Island | A-443 | HI A-443 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |

As of  7/27/17  Orinoco

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| High Island | A-571 | HI A-442<br>HI A-443<br>**HI A-571** | High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS) | 6/1/2009 |
| High Island | A-571 | HI A-442<br>HI A-443<br>**HI A-571** | High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS). | 6/1/2009 |
| High Island | A-571 | HI A-443<br>HI A-571 | Reserve Commitment Agreement dated December 1, 2009 between HIOS and Black Elk Energy Operations LLC | 12/1/2009 |
| High Island | A-571 | HI A-442<br>HI A-443<br>HI A-571 | IT Agreement between High Island Offshore System LLC and Black Elk Energy Offshore operations LLC date 12/1/2009 | 12/1/2009 |
| High Island | A-571 | HIOS 442<br>HIOS 443<br>HIOS 571 | NGL Bank Agreement dated December 1, 2009 between SPL, Black Elk and HIOS. | 12/1/2009 |
| High Island | A-571 | HI A-571 | Amendment to Reserve Commitment Agreement date April 1, 2010 between High Island Offshore System L.L.C. and Black Elk Energy Offshore Operations LLC | 4/1/2010 |
| High Island | A-571 | HI A-571 | Lateral Line Operating Agreement, entered into as of December 1, 2012 ~~12-1-12~~ by and between Enterprise GTM Offshore Operating Co. LLC, Black Elk Energy Offshore Operations, Pisces Energy LLC | 12/1/2012 |
| High Island | A-571 | HIOS 442<br>HIOS 443<br>HIOS 571 | Assignment of Lateral Line Agreements between Enterprise GTM Offshore Operating and High Island Offshore Services dated June 21, 2013 | 6/12/2013 |
| High Island | A-571 | HI A-571 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| Ship Shoal | 252 | SS 252 | Gas Processing, Fractionation & Products Purchase Agreement (#L1109) dated March 1, 2010 (Transco and/or Gulf South) between Marlin Coastal, L.L.C. and Enterprise Gas Processing, LLC, North Terrebonne Gas Processing Plant, Tebone Fractionation Plant | 3/1/2010 |
| South Marsh Island | 41 | SM 41 | Gathering System Agreement dated September 24, 1973 between Exxon Pipeline Company and Chevron Oil Company | 9/24/1973 |
| South Marsh Island | 41 | SM 41 | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |

As of  7/27/17  Orinoco

| Area | Block | Affected Area Block(s) | Contract Description | Effective Date |
|---|---|---|---|---|
| South Pass | 86 | SP 86 | Owners Agreement South Pass, West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Marathon Pipe Line LLC, Apache Corporation, CKB Petroleum Inc., SPN Resources LLC, and W&T Offshore, Inc. as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of April 28, 2015 | 10/1/1981 |
| South Pass | 86 | SP 86 | Operating Agreement South Pass – West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Hess Pipeline Company, Marathon Pipe Line Company, The Largo Company and The Louisiana Land and Exploration Company, their successors and assigns, as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of November 30, 2011 | 10/1/1981 |
| South Pass | 86 | SP 86 | Facilities Interconnect & Reimbursement Agreement dated 5-21-13, between Texas Eastern Transmission, LP & BEEOO. | 5/21/2013 |
| South Pass | 89 | SP 89 | Owners Agreement South Pass, West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Marathon Pipe Line LLC, Apache Corporation, CKB Petroleum Inc., SPN Resources LLC, and W&T Offshore, Inc. as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of April 28, 2015. | 10/1/1981 |
| South Pass | 89 | SP 89 | Operating Agreement South Pass – West Delta Pipeline Gathering System dated effective October 1, 1981 by and between Hess Pipeline Company, Marathon Pipe Line Company, The Largo Company and The Louisiana Land and Exploration Company, their successors and assigns, as amended July 1, 1982; March 1, 1985; May 1, 1992; May 1, 1995; January 1, 1999; June 1, 2000; January 1, 2002; April 1, 2003; July 1, 2003; October 1, 2004; November 1, 2004; and currently as of November 30, 2011. | 10/1/1981 |
| South Pass | 89 | SP 89 (SP 86/87) | Crude Contract between Shell Trading and Northstar Offshore Group, LLC dated 12/5/2016 | 1/1/2017 |
| SP/WD SP 86 & 89 | SP 86 & 89 | SP/WD SP 86 & 89 | In-Line Inspection Project | 6/30/2005 |
| All Properties | | All Properties | NAESB  dated November 1,2012 as amended, between Southwest Energy and Northstar Offshore Group, LLC | 11/1/2012 |

As of  7/27/17  Orinoco

## Schedule 1.4(b)

### Assumed M&M Lien Claims

All statutory lien claims on the Assets that are determined in a final order from a court of competent jurisdiction to be "Senior Statutory Liens" as defined in paragraph 6(a) of the Final Order (I) Approving Post petition Financing, (II) Granting Liens and Providing Super priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Modifying Automatic Stay entered by the Bankruptcy Court in the Bankruptcy Case at Docket number 326.

**Schedule 2.2**
**Allocated Values**

| Area/Block | Allocated Value (M$) |
|---|---|
| HI A-443 | $ 5,024,790 |
| HI A-571 | $ 8,248,240 |
| MP 64 | $ 1,127,400 |
| MP 256/VK 697 | $ 142,000 |
| SP 89 | $ 95,530 |
| SS 252 | $ 526,940 |
| EI 183/184 | $ (674,450) |
| SM 41 | $ (367,430) |
| SP 86 | $ 109,870 |
| WC 20 | $ (333,620) |
| WC 21 | $ (194,040) |
| WC 44 | $ (39,260) |
| WC 57 | $ 143,970 |
| HI A-442 | $ (223,160) |
| SM 8 | $ (30,070) |
| SS 202 | $ (121,380) |
| WC 269 | $ (136,510) |
| WD 36 | $ (73,820) |
| Other Causes of Action - D&O | $ 25,000 |
| | $ 13,250,000 |

As of 7-11-17 Orinoco

**Schedule 4.7**
**Litigation**

None.

As of 7-11-17  Orinoco

## Schedule 4.8
### Taxes and Assessments

None.

As of 7-14-17 Orinoco

## Schedule 4.10
Contracts

None.

**Schedule 4.11**
**Hydrocarbon Production Payments**

None.

As of 7-11-17  Orinoco

**Schedule 4.12**
**Governmental Authorizations**

None.

## Schedule 4.13
## Outstanding Capital Commitments

**NON-OPERATED**

| Area | Block | Facility or Well | AFE # | Description of AFE | Gross AFE Amount | Northstar WI (%) | Net AFE Amount |
|------|-------|-----------------|-------|--------------------|------------------|------------------|----------------|
| SP/WD | Pipeline | 6013-3 | 17MTP0511 | Cut and Clear Pipe | $88,900.00 | 27% | $23,647.40 |

**OPERATED**

| Area | Block | Facility or Well | AFE # | Description of AFE | Gross AFE Amount | Northstar WI (%) | Net AFE Amount |
|------|-------|-----------------|-------|--------------------|------------------|------------------|----------------|
| South Pass | 86 | C | 400F130 | Corrosion Repair | $167,800.00 | 75.00% | $125,850.00 |
| High Island | A-571 | A | 400F136 | Sump Deck Installation | $298,500.00 | 79.17% | $236,307.53 |

**2017 ANNUAL RENTAL:**

Main Pass 256  OCS-G 34386   Annual Rental in the amount of $34,965.00 due no later than July 31, 2017.

## Schedule 4.14
### Imbalances

None.

## Schedule 4.17
## Violation of Laws

None.

## Schedule 4.18
## Environmental

None.

As of 7/7/17  Orinoco

**Schedule 4.19**
**Suspended Funds**

None.

<u>Schedule 4.20</u>
**BOEM or BSEE Incidents or Non-Compliance and Suspensions**

OCS-G 33092  Eugene Island 133
1. Failure to decommission EI 133 Caisson #1 within one year of lease termination

OCS-G 02391  High Island A-571
1. Repair or replace gratings and supports on platform "A" - Sumpdeck

OCS-G 31393  Ship Shoal 201
1. Failure to decommission of SS 201 Well #A-6 within one year of lease termination

OCS-G 31394  Ship Shoal 202
1. Primary and secondary escape routes identified as unsafe for use. Lessee must repair the primary escape route to a safe water level.

OCS-G 28972  Ship Shoal 202/198  (ROW)
1. Failure to decommission  PSN 17999 associated with RUE within the 180 day timeframe specified in application letter

OCS-G 28971  Ship Shoal 202/198  (ROW)
1. Failure to timely decommission PSN 17998 associated with RUE

OCS-G 30241  Ship Shoal 202 (RUE)
1. Failure to decommission RUE, OCS-G 30241 SS 202 Platform A, within one year of RUE termination

OCS-G 32155  South Marsh Island 8
1. Failure to decommission Well #1 within one year of lease termination

OCS-G 01192  South Marsh Island 41
1. Repair corrosion on platform "A"

OCS - 0680  West Cameron 20
1. Caisson 10 - Ink #G111 - Well corrosion, grating, and sign.
2. Caisson 14, Gas Lift Line, Access to Casing Bay Area, Light
3. Platform A
4. Auxillary 1 Platform
5. Caisson 2

OCS-G 23956  West Delta 36
1. Failure to decommission WD 36 Platform "G" and Well #G-1 within one year of lease termination

As of 7/27/17 Orinoco

OCS-G 30303  West Delta 39 (RUE)

1.  Failure to decommission RUE WD 39 Platform "A" and "A-Aux" within one year of RUE termination

Schedule 4.23
Bonds, Letters of Credit, Escrows, Guarantees and Other Securities

| SUPPLEMENTAL BONDS | Coverage | Bond Number |
|---|---|---|
| Eugene Island 133   OCS-G 33092  (Lease) | $ 200,000.00 | 1138600 |
| Eugene Island 183   OCS-G 17981  (Lease) | $ 600,000.00 | 1138597 |
| Eugene Island 184   OCS-G 15015  (ROW) | $ 90,000.00 | 1138549 |
| High Island A-442   OCS-G 11383  (Lease) General Purpose Rider | $ 4,710,000.00 | 1142619 |
| High Island A-442   OCS-G 15676  (ROW) | $ 250,000.00 | 1138550 |
| High Island A-442   OCS-G 15677  (ROW) | $ 250,000.00 | 1138551 |
| High Island A-443   OCS-G 29187  (ROW) | $ 290,000.00 | 1138558 |
| High Island A-443   OCS-G 3241  (Lease) | $ 3,255,000.00 | 1142622 |
| High Island A-571   OCS-G 4356  (ROW) | $ 290,000.00 | 1138548 |
| Main Pass 256   OCS-G 34386  (Lease) | $ 300,000.00 | 1138510 |
| Ship Shoal 201   OCS-G 31393  (Lease) | $ 150,000.00 | 1138599 |
| Ship Shoal 202   OCS-G 31394   Maintain Platform "A" | $ 720,000.00 | 1138509 |
| Ship Shoal 202   OCS-G 28971  (ROW) | $ 110,000.00 | 1138556 |
| Ship Shoal 202   OCS-G 28972  (ROW) | $ 145,000.00 | 1138557 |
| South Marsh Island 8   OCS-G 32155  (Lease) | $ 300,000.00 | 1138471 |
| South Marsh Island 41   OCS-G 1192  (Lease) General Purpose Rider | $ 6,205,000.00 | 1142623 |
| South Marsh Island 41   OCS-G 25396  (ROW) | $ 110,000.00 | 1138552 |
| South Pass 89   OCS-G 28557   ROW | $ 250,000.00 | 1138555 |
| Viosca Knoll 697   OCS-G 34870  (Lease) | $ 450,000.00 | 1138511 |
| West Cameron 20   OCS-G 0680  (Lease) | $ 2,640,000.00 | 1142624 |
| West Cameron 20   OCS 0877  (ROW) | $ 125,000.00 | 1138547 |
| West Cameron 20   OCS-G 25492  (ROW) | $ 145,000.00 | 1138553 |
| West Cameron 21   OCS-G 26859  (ROW) | $ 110,000.00 | 1138554 |
| West Cameron 44   OCS-G 21532  (Lease) | $ 1,320,000.00 | 1138598 |
| West Cameron 269   OCS-G 13563  (Lease) General Purpose Rider | $ 2,125,000.00 | 1142620 |
| West Delta 36   OCS-G 23956  (Lease) | $ 355,000.00 | 1138545 |
| West Delta 36   OCS-G 29323 (ROW)  WD 36 Platform G | $ 85,000.00 | 1138508 |
| West Delta 39   OCS-G 30303  (RUE) | $ 455,000.00 | SUR0035101 |

| Performance Bond with State of Louisiana Office of Conservation | Coverage | Bond Number |
|---|---|---|
| Performance Bond (+Bond Ride 3) with the State of LA Office of Conservation. Covers the **WC 20 Ivan Fisk SWD Well #1** (also currently covers the Creole, WC 2 Wells) | $1,250,000 * | 1138467 |
| * Future Bond coverage will reduce to cover only the WC 20 Ivan Fisk SWD Well #1 | | |

| Performance Bond for Platform Removal by and between Northstar Offshore Group, LLC, RLI Insurance Company, W&T Offshore Inc., Apache Corporation & Mariner Energy Resources dated effective October 16, 2012 | Coverage | Bond Number |
|---|---|---|

| | Coverage | Bond Number |
|---|---|---|
| Performance Bond - Platform Removal - SS 202 Platform Removal "A" with W&T Offshore; Well #A-1, A-2, A-3 & A-4; and ROW's OCS-G 28971 and OCS-G 28972. | $ 2,000,000.00 | RLB0014815 |
| Performance Bond - P&A Obligations - SP 86/89 Platform "C", Pipeline Segment #9550, #9597 and #10458 and Wells #C-1, #C-4 ST-1 BP01,# C-6, & #C-10. | $ 3,200,000.00 | SUR60000759 |
| *Performance Bond by and among Northstar Offshore Group, LLC, Lexon Insurance Company and W&T Offshore, Inc. as Obligee dated effective February 2, 2015* | Coverage | Bond Number |
| Performance Bond covering South Pass 86, OCS-G 5687 & ROW Segment 10458, OCS-G 28557 | $ 3,000,000.00 | 1118851 |
| Performance Bond covering High Island A-571, OCS-G 2391 & ROW Segment 5913, OCS-G 4356 | $ 3,900,000.00 | 1118854 |
| Performance Bond covering High Island A-443, OCS-G 3241 & ROW Segment 10773, OCS-G 15676 | $ 3,255,000.00 | 1118855 |
| *Settlement Agreement & Release by and among Fieldwood Energy Offshore LLC, Black Elk Energy Offshore Operations, LLC, and Northstar Offshore Group, LLC, dated effective April 30, 2015* | Coverage | Bond Number |
| Performance Bond with Bond Rider, Effective October 31, 2016 whereby the bond was changed from $8,848,633.60 to the current amount of $7,760,805.10 covering the following leases: PL 8, PL 13, SM 38, SM 39, **SM 41\***, SM 142/143, VR 196, **HI A-442\***, **WC 20\***, **WC 269\*** & **SP 89\*** *Bolded leases are the only Leases to be conveyed.* | $ 7,760,805.10 | SUR0030275 |
| *Assumption Agreement by and among JX Nippon Oil Exploration, Black Elk Energy Offshore Operations LLC and Northstar Offshore Group, LLC dated effective April 21, 2015* | Coverage | Bond Number |
| Performance Bond covering South Marsh Island 41, OCS-G 1192 | $ 6,131,417.00 | SUR0030276 |
| Performance Bond covering West Cameron Block 20, OCS-G 0680 in West Cameron 45 Field. | $ 7,824,394.00 | SUR0030280 |

**Schedule 4.25**
**Payout Status**

| Area / Block | Well | Non-Consenting Party(s) | BPO WI | APO WI |
|---|---|---|---|---|
| HI A-443 | #A-5[GA4] | GS E&R America Offshore, LLC | 0% | 1.44000% |
| HI A-571 | #A-15 | McMoRan Oil & Gas LLC | 0% | 20.83500% |
| SP 86 | #C-2 | Energy Resource Technology GOM, Inc. | 0% | 25% |

**Schedule 4.26**
**Non-Consent Operations**

None.

As of 7-7-17 Orinoco

## Schedule 4.27
## Wells - P&A Liability

| Area / Block | Lease # | Status | Operator | P&A Liability | API | P&A Liability Interests |
|---|---|---|---|---|---|---|
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | A001 ST-1 | 42-709-40961-01 | 45.45452% |
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | A002/A002D | 42-709-40975-00 | 45.45452% |
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | A003 ST-1 BP00 | 42-709-40981-01 | 45.45452% |
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | A004 | 42-709-40990-00 | 45.45452% |
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | A005 | 42-709-41081-00 | 45.45452% |
| HI A-442 | 11383 | Terminated 3/27/17 | Northstar | B001/B001D | 42-709-41089-00 | 45.45452% |
| SM 8 | 32155 | Terminated 6/27/14 | Northstar | 001 BP03 | 17-709-41514-00 | 100.00000% |
| SS 201 | 31393 | Relinquished 1/30/15 | Northstar | A006 | 17-711-41540-00 | 100.00000% |
| WD 36 | 23956 | Terminated 10/31/15 | Northstar | G-1 | 17-719-40832-00 | 88.75000% |

1 of 1

**Schedule 6.5**
**Preference Rights and Transfer Requirements**

| Consents to Assign | | | | | | |
|---|---|---|---|---|---|---|
| Area | Block | Lease | Contract | Dated | CTA? | CTA Article |
| EI | 184 | G 5498 | Amended and Restated Offshore Operating Agreement effective 7/18/2008 between McMoRan Oil & Gas LLC, Leed Petroleum LLC and Byron Energy Inc. covering N/2 of EI 184. | 7/18/2008 | NOT APPLICABLE | Article 27.3<br>A Party may not sell, farmout, assign without prior written consent of other party. |
| EI | 184 | G 5498 | Offshore Operating Agreement effective 6/1/07 between Newfield Exploration Company and Darcy Energy, LLC covering N/2 of EI 184. | 7/18/2008 | NOT APPLICABLE | Article 27.3<br>A Party may not sell, farm out,  assign without prior written consent of other party |
| MP | 64<br>65 | G 4909<br>G 5692 | Unit Agreement No. 7543900004 effective 3/1/90, 7300' Sand Unit, Blocks 64 and 65, Main Pass Area, Offshore Plaquemines Parish, Louisiana signed by Howell Petroleum Corporation, Oil Acquisitions, Inc., Woods Petroleum Corporation, BHP Petroleum (Americas) Inc. and Challenger Minerals, Inc. | 3/1/1990 | NOT APPLICABLE | Article 19.2<br>No assignment or transfer of any working interest shall be binding upon Unit Operator until 1st day of calendar month after the Unit Operator is furnished with the original, photostatic or certified copy of instrument of transfer. |
| MP | 64<br>65 | G 4909<br>G 5692 | First Amended and Restated Offshore Operating Agreement dated effective April 1, 2008, between Medco Energi US LLC and Leed Petroleum, LLC. (as to the 7300' Sand Unit, Blocks 64 and 65, Main Pass Area). | 4/1/2008 | NOT APPLICABLE | Article 26.3<br>No party shall assign lease without the prior written consent of the other parties. |
| SM | 41 | G 01192 | Operating Agreement dated effective June 1, 2003 by and between Hunt Petroleum (AEC), Inc., LLOG Exploration Offshore, Inc. and Devon Energy Production Company. | 6/1/2003 | NOT APPLICABLE | Article 26.3<br>The interest of any Party in the Lease shall not be assigned in whole or in part to a third party without the prior written consent of all other Parties. |
| SM | 41 | G 01192 | Production Handling Agreement dated effective September 1, 2004 by and between Hunt Petroleum (AEC), Inc. and Devon Energy Production Company. | 9/1/2004 | NOT APPLICABLE | Article 15.1<br>PRODUCER, nor their successors or assigns shall assign, convey, transfer, or hypothecate any of their rights, privileges, duties and/or obligations, in whole or in part, under this Agreement without the prior written consent of Platform Owners. |

1 of 4

| | | | Consents to Assign | | | |
|---|---|---|---|---|---|---|
| Area | Block | Lease | Contract | Dated | CTA? | CTA Article |
| SS | 252 | G 1529 | Participating Agreement effective 3/30/09 among Helis Oil & Gas Company, L.L.C.; Houston Energy, L.P.; CL&F Resources LP; Challenger Minerals Inc.; Marlin Coastal, L.L.C and Badger Oil Corporation. | 3/30/2009 | NOT APPLICABLE | Article IX.3<br>No assignment without prior written consent which consent shall not be unreasonably withheld. |
| SS | 252 | G 1529 | Farmout Agreement dated 2/15/09 between SPN Resources, LLC and Moreno Offshore Resources, LLC, Farmors, and Houston Energy, L.P., as Farmee (Exhibit A to Participation Agreement). | 2/15/2009 | NOT APPLICABLE | Sec 22<br>No assignment without prior written consent from Farmors which consent shall not be Unreasonably withheld. |
| SS | 252 | G 1529 | Production Handling Agreement dated 8/1/09 between SPN Resources, LLC and Moreno Offshore Resources, L.L.C., as Owner of SS 253 'F' and 'C' Platforms, Lease OCS-G 01031 ('Owner') AND Helis Oil & Gas Company, L.L.C.; Houston Energy, L.P.; CL&F Resources LP; Badger Oil Corporation, Challenger Minerals Inc. and Marlin Coastal, L.L.C., as Producer of the OCS-G 01529 F-4 Well, Ship Shoal 252 Producing Well, Lease OCS-G 01529 ('Producer'). | 8/1/2009 | NOT APPLICABLE | Article 10.14<br>Neither party will assign any or all of its interest without the express prior written consent of the other Part which consent will not be unreasonably withheld. |
| SS | 252 | G 1529 | Offshore Operating Agreement effective 3/30/09 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., et al as Non-Operators, covering Block 252, Ship Shoal Area, South Addition, OCS-G 01529 insofar as said lease covers the NE/4 and the N/2SE/4 and further limited to operating rights from the stratigraphic equivalent of 100' below the base of the LP15 Sand (with said base being identified at a depth of 14,668'MD and 11,934'TVD in the SS252 C12st2 well log), down to and including the stratigraphic equivalent of the total depth drilling the Initial Test Well. | 3/30/2009 | NOT APPLICABLE | Article 26.2.1<br>Must give other parties written notice of sale, transfer or assignment at least 30 days prior to executing any instrument. |
| WC | 21 | G 23730 | Joint Operating Agreement dated July 1, 2002 between The William G. Helis Company, LLC, as Operator and Houston Energy, LP et al, as Non-Operators. | 7/1/2002 | NOT APPLICABLE | Article 26.2.1<br>A Party may sell, transfer or assign all or any part of its interest in the property or this Agreement without the consent of any other Party hereto.<br>b. Such Party shall give the other Parties written notice of such sale, transfer or assignment...prior to executing any instrument(s). |

As of 7/22/17

| | | | Consents to Assign | | | |
|---|---|---|---|---|---|---|
| Area | Block | Lease | Contract | Dated | CTA? | CTA Article |
| WC | 44 | G 21532 | Joint Operating Agreement dated 7/1/00 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators, as amended. Prospect Payout Occurred 6/7/04. | 7/1/2000 | **NOT APPLICABLE** | Article 26.2.1<br>A Party may sell, transfer or assign all or any part of its interest in the property or this Agreement without the consent of any other Party hereto.<br>b. Such Party shall give the other Parties written notice of such sale, transfer or assignment. |
| WC | 44 | G 21532 | Participation Agreement, West Cameron 44 Z-28 Prospect, Offshore, Louisiana effective March 1, 2009 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., HE&D Offshore, L.P., Marlin Coastal, L.L.C., and Manti Godzilla, Ltd. and BTA Oil Producers, LLC. | 3/1/2009 | **NOT APPLICABLE** | Article XI.3<br>No Party shall assign any rights without obtaining prior written consent of the other Parties, which consent shall not be unreasonably withheld. |
| WC | 44 | G 21532 | Production Handling Agreement dated 4/1/08 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P. and Marlin Coastal, L.L.C. as Owner of at the WC Block 21 'G' Facility, Lease OCS-G 23730 ('Owner') and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP, Ridgewood energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534, Lease OCS-G 21532. | 4/1/2008 | **NOT APPLICABLE** | Paragraph 10.14<br>No assignment without prior written consent; shall not be unreasonably withheld. |
| WC | 57 | G 21534 | Joint Operating Agreement dated 7/1/00 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators, as amended. Prospect Payout Occurred 6/7/04. | 7/1/2000 | **NOT APPLICABLE** | Article 26.2.1<br>A Party may sell, transfer or assign all or any part of its interest in the property or this Agreement without the consent of any other Party hereto.<br>b. Such Party shall give the other Parties written notice of such sale, transfer or assignment. |

As of 7/22/17

| | | | Consents to Assign | | | |
|---|---|---|---|---|---|---|
| **Area** | **Block** | **Lease** | **Contract** | **Dated** | **CTA?** | **CTA Article** |
| WC | 57 | G 21534 | Participation Agreement dated 9/5/07 between Chevron Midcontinent, L.P. (formerly Pure Resources, L.P.), Marlin Coastal, L.L.C., Helis Oil and Gas Company, LLC, Houston Energy, L.P., 'Co-Owners' and Ridgewood Energy Corporation. | 9/5/2007 | **NOT APPLICABLE** | Paragraph 25<br>Ridgewood shall not assign their rights without prior written consent of Co-Owners.<br>. |
| WC | 57 | G 21534 | Production Handling Agreement dated 4/1/08 between Helis Oil & Gas Company, L.L.C., Houston Energy, L.P. and Marlin Coastal, L.L.C. as Owner of at the WC Block 21 'G' Facility, Lease OCS-G 23730 ('Owner') and Helis Oil & Gas Company, L.L.C., Houston Energy, L.P., Marlin Coastal, L.L.C., HE&D Offshore, LP, Ridgewood energy Corporation, Louisiana Offshore Ventures II and Hilcorp Energy, LLC, as Producer of West Cameron Blocks 57 and 44 Producing Wells, Lease OCS-G 21534, Lease OCS-G 21532. | 4/1/2008 | **NOT APPLICABLE** | Paragraph 10.14<br>No assignment without prior written consent; shall not be unreasonably withheld. |
| WC | 269 | G 13563 | Offshore Operating Agreement dated 12-1-11 by and between BEE, Peregrine, Apache, Castex. | 12/1/2011 | **NOT APPLICABLE** | Article 26.3<br>A Party may not sell, transfer, farm out, assign or otherwise dispose of all or part of its interest in the Lease without the prior written consent of the other Parties… |

As of 7/22/17

**Schedule 6.5**
**Preference Rights and Transfer Requirements**

| Preferential Right to Purchase | | | | | | | |
|---|---|---|---|---|---|---|---|
| Area | Block | Lease | Contract | Dated | Pref Right? | Preferential Article | Preferential Rights Exception Language |
| HI | A-443 | G 03241 | Operating Agreement dated effective September 1, 1975 by and between Union Oil Company of California, Mobil Oil Corporation, and Diamond Shamrock Corporation. | 9/1/1975 | **NOT APPLICABLE** | Article XX.1 It is agreed that each party hereto shall have a preferential right to purchase… the interest of any party hereto who desires to sell all or part of its interest in the Joint Lease. | [(1)] Sale of all its assets... |
| HI | A-571 | G 02391 | Offshore Operating Agreement dated effective February 13, 1974 by and between CNG Producing Company, El Paso Natural Gas Company, and American Pertofina Company of Texas. | 2/13/1974 | **NOT APPLICABLE** | Article 21.1 The other parties shall then have an optional prior right…to purchase on the same terms and conditions the interest which the other party hereto proposes to sell. | [(1)] Sale of all or substantially all of its assets... |
| HI | A-571 | G 02391 | Operating Agreement, 5-27-97, between Texaco, CNG, Fina, Sun, Burlington, Domain, Union Pacific, American Exploration. Exhibit "B" to Co-Development Agreement. | 5/27/1997 | **NOT APPLICABLE** | Article 26.2 The other Parties shall have the optional prior right..to acquire the interest which the Party proposes to sell, farmout or dispose of on the same terms and conditions. | [(1)] Sale of all or substantially all of its domestic E&P property or sale of all assets… |
| SM | 41 | G 01192 | Operating Agreement dated effective June 1, 2003 by and between Hunt Petroleum (AEC), Inc., LLOG Exploration Offshore, Inc. and Devon Energy Production Company. | 6/1/2003 | **NOT APPLICABLE** | Article 26.2 The other Parties shall have the optional prior right… to exercise such right to acquire the interest which the Party proposes to sell, farmout or dispose of on the same terms and conditions. | [(1)] Sale of all or substantially all of its Offshore E&P Properties, or Sale of all of its assets |

As of 7/22/17

| Area | Block | Lease | Contract | Dated | Pref Right? | Preferential Article | Preferential Rights Exception Language |
|------|-------|-------|----------|-------|-------------|----------------------|----------------------------------------|
| SP | 86 | G05687 | Joint Operating Agreement dated effective January 1, 1972 by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company. | 1/1/1972 | **NOT APPLICABLE** | Article 21 The other parties hereto shall then have an optional prior right … to purchase on the same terms and conditions the interest which the other party hereto proposes to sell. | (1) Sale of all or substantially all of its assets… |
| SP | 89 | G 01618 | Joint Operating Agreement dated effective January 1, 1972 by and between Signal Oil and Gas Company, The Louisiana Land and Exploration Company, Amerada Hess Corporation and Marathon Oil Company. | 1/1/1972 | **NOT APPLICABLE** | Article 21 The other parties hereto shall then have an optional prior right … to purchase on the same terms and conditions the interest which the other party hereto proposes to sell. | (1) Sale of all or substantially all of its assets… |

2 of 4

As of 7/22/17

| Area | Block | Lease | Contract | Dated | Pref Right? | Preferential Article | Preferential Rights Exception Language |
|------|-------|-------|----------|-------|-------------|----------------------|----------------------------------------|
| SS | 252 | G 1529 | Offshore Operating Agreement effective 3/30/09 between Helis Oil & Gas Company, L.L.C., as Operator, and Houston Energy, L.P., et al as Non-Operators, covering Block 252, Ship Shoal Area, South Addition, OCS-G 01529 insofar as said lease covers the NE/4 and the N/2SE/4 and further limited to operating rights from the stratigraphic equivalent of 100' below the base of the LP15 Sand (with said base being identified at a depth of 14,668'MD and 11,934'TVD in the SS252 C12st2 well log), down to and including the stratigraphic equivalent of the total depth drilling the Initial Test Well. | 3/30/2009 | **NOT APPLICABLE** | Article 26.2 The other PARTIES shall have the right… to purchase the interest which the PARTY proposes to sell, farmout, or otherwise dispose of on the same terms and conditions. | (1) Sale of all or substantially all of its assets… |
| WC | 21 | G 23730 | Joint Operating Agreement dated July 1, 2002 between The William G. Helis Company, LLC, as Operator and Houston Energy, LP et al, as Non-Operators. | 7/1/2002 | **NOT APPLICABLE** | Article 26.2 The other Parties shall have the right… to purchase the interest which the Party proposes to sell, farmout, or otherwise dispose of on the same terms and conditions. | (1) Sale of all or substantially all of its assets… |

As of 7/22/17

| Area | Block | Lease | Contract | Dated | Pref Right? | Preferential Article | Preferential Rights Exception Language |
|------|-------|-------|----------|-------|-------------|----------------------|----------------------------------------|
| WC | 44 | G 21532 | Joint Operating Agreement dated 7/1/00 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators, as amended. Prospect Payout Occurred 6/7/04. | 7/1/2000 | **NOT APPLICABLE** | Article 26.2 The other Parties shall have the right… to purchase the interest which the Party proposes to sell, farmout, or otherwise dispose of on the same terms and conditions. | [1] Sale of sales of substantially all of its Oil and Gas Properties |
| WC | 57 | G 21534 | Joint Operating Agreement dated 7/1/00 between IP Petroleum Company, Inc., as Operator, and The William G. Helis Company, L.L.C., et al, as Non-Operators, as amended. Prospect Payout Occurred 6/7/04. | 7/1/2000 | **NOT APPLICABLE** | Article 26.2 The other Parties shall have the right… to purchase the interest which the Party proposes to sell, farmout, or otherwise dispose of on the same terms and conditions. | [1] Sale of all or substantially all of its assets… |

[1] Language relating to where there shall be no Preferential Right to Purchase

4 of 4

As of 7/22/17

**Schedule 6.8**
**Insurance Coverage**

**General Liability**

Carrier:  Gemini Insurance Company
Policy:  JGH2002678
Term:  4/1/16 – 4/1/17

Declarations Endorsement No. 1 – Extending General Liability Policy term through 4/1/17 – 6/1/17 [1]

Coverage Limits:

| | |
|---|---|
| $ 2,000,000 | General Aggregate Limit |
| $ 2,000,000 | Products/Completed Operations Aggregate Limit |
| $ 1,000,000 | Personal & Advertising Injury Each Person Limit |
| $ 1,000,000 | Each Occurrence Limit |
| $ 100,000 | Damages to Premises Limit |
| $ 5,000 | Medical Expenses Limit |
| $ 1,000,000 | Hired/Non-Owned Auto Liability, Each Accident |

Self-Insured Retention:

| | |
|---|---|
| $ 50,000 | All Coverage's Combined, Per Occurrence |

**Worker's Compensation/Employer's Liability (through Insperity)**

Carrier:  ACE/Indemnity Insurance Co. of America
Policy:  C4 91 88 94 8
Term:  10/1/16 – 10/1/17

Coverage Limits:

Statutory

Employer's Liability

| | |
|---|---|
| $ 1,000,000 | BI by Accident, Each Accident |
| $ 1,000,000 | BI by Disease, Each Employee |
| $ 1,000,000 | BI by Disease, Policy Limit |

Maritime Employer's Liability

| | |
|---|---|
| $ 1,000,000 | BI by Accident, Each Accident |
| $ 1,000,000 | BI by Disease, Aggregate |

**Umbrella Liability**

Carrier:  Gemini Insurance Company
Policy:  JUH2002403
Term:  4/1/16 – 4/1/17 [1]

General Change Endorsement – Effective/Expiration Date changed to read as follows due to an extension: From April 1, 2016 to June 1, 2017

Coverage Limits:

$ 25,000,000   Each Occurrence Limit
$ 25,000,000   Personal & Advertising Injury Limit
$ 25,000,000   Other Aggregate (Except Covered Autos and Products/Completed
                Operations)
$ 25,000,000   Products/Completed Operations Aggregate

Underlying Limits:

*General Liability*

$ 2,000,000   General Aggregate Limit
$ 2,000,000   Products/Completed Operations Aggregate Limit
$ 1,000,000   Personal & Advertising Injury Each Person Limit
$ 1,000,000   Each Occurrence Limit

*Hired/Non-Owned Auto Liability*

$ 1,000,000   Hired/Non-Owned Auto Liability, Each Accident

*Employer's Liability*

$ 1,000,000   BI by Accident, Each Accident
$ 1,000,000   BI by Disease, Each Employee
$ 1,000,000   BI by Disease, Policy Limit

$ 1,000,000   Maritime Employer's Liability
$ 5,000,000   Non-Owned Aircraft Liability
$ 1,000,000   Charterer's Legal Liability

Self-Insured Retention:

$ 50,000

**Excess Liability ($50M x $25M)**

Carrier:     Certain Underwriters at Lloyd's London
Policy:      JHB-CIP-2136
Term:        4/1/16 – 4/1/17
             Declarations Endorsement No. 1– Extending Policy JHB-CIP-2136 Term Dates
             through 4/1/17 – 6/1/17 [1]

Coverage Limits:

$ 50,000,000   Each Occurrence Limit
$ 50,000,000   Personal & Advertising Injury Limit
$ 50,000,000   Other Aggregate (Except Covered Autos and Products/Completed
                Operations)
$ 50,000,000   Products/Completed Operations Aggregate

Underlying Limits:

$ 25,000,000   Each Occurrence Limit
$ 25,000,000   Personal & Advertising Injury Limit

$ 25,000,000  Other Aggregate (Except Covered Autos and Products/Completed Operations)

$ 25,000,000  Products/Completed Operations Aggregate

Excess of Basic Schedule Underlying

**Non-Owned Aircraft Liability**

| | |
|---|---|
| Carrier: | StarNet Insurance Company |
| Policy: | BA-16-04-00057 |
| Term: | 4/1/16 – 4/1/17 |

Endorsement 15 – Extending Policy BA-16-04-00057 Non-Owned Aviation Term Date through 4/1/17 – 6/1/17 [(2)]

Coverage Limits:

$  5,000,000  Combined Single Limit bodily injury and property damage (including passengers)

$     100,000  Physical Damage Liability, each occurrence

$       25,000  Medical Payments, each passenger

$       10,000  Personal Effects Liability, each passenger

$  5,000,000  Aviation Premises Liability, each occurrence

$  5,000,000  Personal Injury Liability, each offense and in the aggregate

**Pollution Legal Liability**

| | |
|---|---|
| Carrier: | Chartis Specialty Insurance Company |
| Policy: | PLS 13574515 |
| Term: | 10/11/12 – 10/11/17 |

Coverage Limits:

$ 10,000,000  Aggregate

**Oil Pollution Act (OPA)**

| | |
|---|---|
| Carrier: | Hartford Lloyd's Insurance Company |
| Policy: | JHB2M100612 |
| Term: | 4/1/16 – 4/1/17 |

Declarations Endorsement No. 2 – Extending Policy JHB2M100612 Term Dates through 4/1/17 – 6/1/17 [(1)]

Coverage Limits:

$ 35,000,000  each incident All covered offshore facilities combined as per 30 CFR Part 553 Final Rule for Oil Spill Financial Responsibility as required by the Minerals Management Services

Deductible:

$             NIL  Subject to letter of indemnity for first $100,000 each incident,

which must be received prior to binding

**Property (Office Contents)**
Carrier:    Hartford Lloyd's Insurance Company
Policy:     61 SBA IH2168 DX
Term:       4/1/17 – 4/1/18

Coverage Limit:

$           0   Building coverage
$     550,700   Business personal property – replace
$      10,000   Money & securities – inside premises
$       5,000   Money & securities – outside premises
$     250,000   Computers & media coverage
$      50,000   Limited fungi, bacteria, or virus coverage 30 days business income
                & extra expense

Retention:
$500    Per Occurrence
$           250   Computers and Media Coverage

**Energy Package**
Carrier:    Certain Insurance Cos. And Certain Underwriters at Lloyd's London
Policy:     JHB-CIP2137
Term:       4/1/16 – 4/1/17 [1]

Coverage Limits:

$  75,000,000   (100%) any one Occurrence, combined singled limit in respect of
                all High Island A-571 Producing, etc. wells except;
$  50,000,000   (100%) any one Occurrence, combined single limit in respect of all
                drilling/deepening/workover/re-entry wells except;
$   5,000,000   (100%) any one Occurrence, combined single limit in respect of
                Onshore Salt Water Disposal wells

*Option to increase $50,000,000 Limit as below to be elected by the Assured and
advised to Slip Leader only prior to spud:*
*$75,000,000   (100%) any one Occurrence, combined single limit in respect of all
                drilling/deepening/workover/re-entry rates.*

In no event shall Underwriter's Liability exceed the single highest applicable
Limit of Liability shown above in any one Occurrence

$   5,000,000   (100%) separate additional limit any once Occurrence in respect of
                Care, Custody, and Control Endorsement
$   2,000,000   (100%) separate additional limit any one Occurrence in respect of
                Drilling Materials and Supplies Endorsement

As of 7-13-17  Orinoco

## Section II "All Risks" Offshore Property (Platforms/Pipelines)

Agreed Values as per below and Northstar Offshore Group, LLC – PLATFORMS and PIPELINES schedule as presented, plus additional coverages as detailed in Conditions

### Platforms

Total Insured Value at inception in respect of:

| | | |
|---|---|---|
| $ | 52,864,375 | Platforms (for Assureds' interest) |
| $213,053,310 | | Removal of Wreck/Debris only (for Assureds' interest) |
| $ | NIL | Excess Removal of Wreck/Debris |

### Pipelines

Total Insured Value at inception in respect of:

| | | |
|---|---|---|
| $ | 30,277,575 | Pipelines (for Assureds' interest) |
| $ | 943,750 | Removal of Wreck/Debris only (for Assureds' interest) |

### Section III: Offshore Construction

To automatically cover individual projects with an estimated Final Completed Value of up to $20,000,000 (100%) or as may be agreed by Slip Leased and Agreement Parties plus amounts payable in addition as per wording.

### Section IV: Oil and Gas Well Lease Onshore Property

| | | |
|---|---|---|
| $ | 8,050,000 | (100%) Agreed Valued (for Assureds' interests) in respect of onshore gas plant |
| $ | 2,500,000 | (100%) Agreed Value (for Assureds' interests) in respect of onshore pipeline |

### Section V: Charterer's Liability

| | | |
|---|---|---|
| $ | 1,000,000 | any one loss or series of losses |

Retentions:

### Section I: Control of Well

| | | |
|---|---|---|
| $ | 25,000 | (100%) any one Occurrence in respect of Onshore Salt Water Disposal wells |
| $ | 250,000 | (100%) any one Occurrence in respect of all wells, except; |
| $ | 1,000,000 | (100%) any one Occurrence in respect of Drilling/Workover wells, except; |
| $ | 2,000,000 | (100%) any one Occurrence in respect of Drilling/Workover wells deeper than 15,000 feet True Vertical Depth (TVD) |
| $ | 100,000 | (100%) any one Occurrence in respect of Care Custody and Control except; |
| $ | 250,000 | (100%) any one Occurrence in respect of Unsound Location |
| $ | 50,000 | (100%) any one accident or Occurrence in respect of Drilling Materials and Supplies Endorsement. |

## Section II: "All Risks" Offshore Property (Platforms/Pipelines)

Deductible of:

$      250,000   any one Occurrence but NIL in respect of Total and/or Constructive Total Loss

## Section III: Offshore Construction

$      375,000   (100%) any one occurrence in respect of pipelines, umbilicals, flowlines, and cables in water depths up to 500 feet;

$      275,000   (100%) any one occurrence in respect of onshore fabrication, load out, transit and installation of jackets and decks and/or all other operations and/or activities in water depths of up to 500 feet

Deductible in respect of Declarations in water depths greater than 500 feet to be agreed by Slip Leader only prior to attachment hereon.

## Section IV: Oil and Gas Well Lease Onshore Property

$      25,000   any one Occurrence

## Section V: Charterer's Liability

$      25,000   any one loss or series of losses

(1)   Extended to 9-1-17
(2)   Extended to 12-1-17

**Schedule 6.10**
**Bonds, Letters of Credit, Escrows, Guarantees and Other Securities**

| SUPPLEMENTAL BONDS | Coverage | Bond Number |
|---|---|---|
| Eugene Island 133  OCS-G 33092  (Lease) | $    200,000.00 | 1138600 |
| Eugene Island 183   OCS-G 17981  (Lease) | $    600,000.00 | 1138597 |
| Eugene Island 184   OCS-G 15015  (ROW) | $      90,000.00 | 1138549 |
| High Island A-442   OCS-G 11383  (Lease) General Purpose Rider | $ 4,710,000.00 | 1142619 |
| High Island A-442   OCS-G 15676  (ROW) | $    250,000.00 | 1138550 |
| High Island A-442   OCS-G 15677  (ROW) | $    250,000.00 | 1138551 |
| High Island A-443   OCS-G 29187  (ROW) | $    290,000.00 | 1138558 |
| High Island A-443   OCS-G 3241  (Lease) | $ 3,255,000.00 | 1142622 |
| High Island A-571   OCS-G 4356  (ROW) | $    290,000.00 | 1138548 |
| Main Pass 256   OCS-G 34386  (Lease) | $    300,000.00 | 1138510 |
| Ship Shoal 201   OCS-G 31393  (Lease) | $    150,000.00 | 1138599 |
| Ship Shoal 202   OCS-G 31394    Maintain Platform "A" | $    720,000.00 | 1138509 |
| Ship Shoal 202   OCS-G 28971  (ROW) | $    110,000.00 | 1138556 |
| Ship Shoal 202   OCS-G 28972  (ROW) | $    145,000.00 | 1138557 |
| South Marsh Island 8 OCS-G 32155  (Lease) | $    300,000.00 | 1138471 |
| South Marsh Island 41   OCS-G 1192   (Lease) General Purpose Rider | $ 6,205,000.00 | 1142623 |
| South Marsh Island 41   OCS-G 25396  (ROW) | $    110,000.00 | 1138552 |
| South Pass 89 OCS-G 28557   ROW | $    250,000.00 | 1138555 |
| Viosca Knoll 697  OCS-G 34870  (Lease) | $    450,000.00 | 1138511 |
| West Cameron 20   OCS 0680  (Lease) | $ 2,640,000.00 | 1142624 |
| West Cameron 20   OCS 0877  (ROW) | $    125,000.00 | 1138547 |
| West Cameron 20   OCS-G 25492  (ROW) | $    145,000.00 | 1138553 |
| West Cameron 21   OCS-G 26859  (ROW) | $    110,000.00 | 1138554 |
| West Cameron 44   OCS-G 21532  (Lease) | $ 1,320,000.00 | 1138598 |
| West Cameron 269   OCS-G 13563  (Lease) General Purpose Rider | $ 2,125,000.00 | 1142620 |
| West Delta 36   OCS-G 23956  (Lease) | $    355,000.00 | 1138545 |
| West Delta 36 OCS-G 29323 (ROW)  WD 36 Platform G | $      85,000.00 | 1138508 |

As of 7/12/17 Orinoco

**Schedule 9.3 (m)**
**Permitted Encumbrances**

**None.**