IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **NORTHSTAR OFFSHORE** | § | **Case No. 16-34028** |
| **GROUP, LLC,** | § | |
| | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN OF LIQUIDATION UNDER
<u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

**WINSTON & STRAWN LLP**

Lydia T. Protopapas
Texas Bar No. 00797267
Southern Dist. of Texas Bar No. 21378
Jason W. Billeck
Texas Bar No. 24001740
Southern Dist. of Texas Bar No. 23802
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile:  (713) 651-2700

*Counsel for Northstar Offshore Group, LLC*

Dated: November 21, 2017

> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 11 PLAN DESCRIBED HEREIN.  ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR BANKRUPTCY COURT APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER APPROVAL OF THIS DISCLOSURE STATEMENT.**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[1]

**The Debtor is providing the information in this Disclosure Statement to holders of Claims and Interests for purposes of soliciting votes to accept or reject the plan of liquidation of Northstar Offshore Group, LLC pursuant to chapter 11 of the Bankruptcy Code.  Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose. Before deciding whether to vote for or against the Plan, each holder entitled to vote should consider carefully all of the information in this Disclosure Statement.**

**The Debtor urges each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement and the Plan.  This Disclosure Statement does not provide any legal, financial, securities, tax, or business advice.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan or the Bankruptcy Court's approval of the Plan.**

**This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and financial information in the Debtor's Chapter 11 Case. Although the Debtor believes that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents, statutory provisions, and financial information or every detail of such documents, provisions, and events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure Statement has been provided by the Debtor's management except where otherwise specifically noted.  No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations, or the value of its assets, except as explicitly set forth in this Disclosure Statement. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.**

**This Disclosure Statement was prepared to provide parties in interest in this case with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that creditors**

---

[1] Capitalized terms used but not defined in this disclaimer have the meanings ascribed to them elsewhere in this Disclosure Statement or in the Plan (as defined below), as applicable.

who are entitled to vote to accept or reject the Plan can make an informed judgment regarding such votes.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records and on various assumptions regarding its business. The Debtor believes that such financial information fairly reflects the financial condition of the Debtor as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments; however, the Debtor makes no representations or warranties as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtor or any other authorized party may seek to investigate, file, and prosecute Causes of Action and may object to Claims after the Confirmation Date or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Causes of Action or objections to Claims.

Unless otherwise specifically noted, the Debtor is making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so, and expressly disclaims any duty to update publicly any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Interests should not infer that the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Person to give any information concerning the Plan other than that which is contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of its Property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims and Interests (including those holders of Claims and Interests who do not submit Ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Section 10 of the Plan. There is no assurance that the Plan will be confirmed, or that if the Plan is confirmed, the conditions required to be satisfied for the Plan to become effective will be satisfied or waived.

As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any

fact, liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

The Debtor reserves the right to argue that this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party.  The Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against and Interests in the Debtor.

NOTE: THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE, ITS CREDITORS, INTEREST HOLDERS, AND ALL OTHER PARTIES IN INTEREST.  ACCORDINGLY, THE DEBTOR RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN.

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

    A.     Purpose of the Disclosure Statement ...........................................................1

    B.     Commencement of the Chapter 11 Case.......................................................1

    C.     Brief Overview of the Plan ...........................................................................2

    D.     Summary of Voting Procedures.....................................................................2

    E.     Confirmation Hearing ...................................................................................3

II.     OVERVIEW OF THE DEBTOR'S HISTORY, CORPORATE STRUCTURE, AND OPERATIONS.......................................................................................................... 4

    A.     History and Corporate Structure ...................................................................4

    B.     Operations and Properties .............................................................................5

    C.     Prepetition Indebtedness and Capital Structure ...........................................6

III.     THE CHAPTER 11 CASE ..................................................................................... 12

    A.     Events Leading to the Commencement of the Chapter 11 Case...........................12

    B.     The First Day Motions ...............................................................................12

    C.     The Appointment of the Official Creditors' Committee.......................................14

    D.     The Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs .......................................................................................................14

    E.     The Debtor's Retention of Professionals ....................................................14

    F.     The Sale of Substantially All of the Debtor's Assets .................................15

    G.     The Excluded Assets ...................................................................................16

    H.     Post-Sale Developments .............................................................................18

IV.     THE PLAN ............................................................................................................ 20

    A.     Classification and Treatment of Claims and Interests Under the Bankruptcy Code.............................................................................................................20

    B.     Treatment of Unclassified Claims ..............................................................21

    C.     Treatment of Claims and Interests ..............................................................23

    D.     Means of Implementation ...........................................................................26

    E.     Corporate Governance ................................................................................29

    F.     Distributions................................................................................................30

    G.     Procedures for Disputed Claims .................................................................32

    H.     Executory Contracts and Unexpired Leases ...............................................33

    I.     Conditions Precedent to the Effective Date ................................................35

    J.     Effect of Confirmation ...............................................................................36

    K.     Retention of Jurisdiction .............................................................................40

L.      Miscellaneous Provisions.................................................................42

V.     CERTAIN RISK FACTORS TO BE CONSIDERED ...................................................... 45

    A.      Certain Bankruptcy Law Considerations ...................................................45

    B.      Risks Associated with the Debtor's Business and Industry..................47

    C.      Unforeseen Events .........................................................................47

VI.    SOLICITATION AND VOTING PROCEDURES AND REQUIREMENTS ............... 47

VII.   CONFIRMATION OF THE PLAN.............................................................................. 48

    A.      Confirmation Hearing .....................................................................48

    B.      Objections to Confirmation............................................................48

    C.      Requirements for Confirmation of the Plan..................................49

VIII.  ALTERNATIVES TO CONFIRMATION OF THE PLAN ........................................... 53

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. 53

    A.      Certain United States Federal Income Tax Consequences to the Debtor..............54

    B.      Consequences to Holders of Certain Claims ................................54

X.     CONCLUSION AND RECOMMENDATION.................................................................. 57

## <u>EXHIBITS</u>

Exhibit A            The Plan

Exhibit B            Voting Instructions

Exhibit C            Schedule of Claims and Causes of Action to be Transferred and
                     Retained by the Litigation Trust

## I.     INTRODUCTION

### A.     Purpose of the Disclosure Statement[1]

Northstar Offshore Group, LLC (the "Debtor") submits this second amended disclosure statement (as modified, amended, or supplemented from time to time, including all exhibits and supplements, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances of the *Debtor's Second Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan"), attached hereto as **Exhibit A**, filed by the Debtor November 21, 2017 (ECF No. [__]).  This solicitation is being conducted to obtain sufficient acceptances of the Plan.

Accompanying this Disclosure Statement is a ballot (the "Ballot") and return envelope for voting to accept or reject the Plan.  Holders of Claims entitled to vote (collectively, the "Voting Claims") must return a Ballot to Prime Clerk, LLC (the "Solicitation Agent") prior to 12:00 p.m. (prevailing Central Time) on [December 19], 2017 (the "Voting Deadline") for their Ballots to be counted.  See Section VI of this Disclosure Statement and **Exhibit B** hereto for a more detailed description of the voting procedures and deadline.

This Disclosure Statement contains important information, and holders of Voting Claims are advised and encouraged to read it and the attached Plan in their entirety, including, without limitation, the risk factors set forth in Section V herein, before voting to accept or reject the Plan.

The exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

### B.     Commencement of the Chapter 11 Case

On August 12, 2016 (the "Involuntary Petition Date"), Alliance Offshore, LLC, Alliance Energy Services, LLC, and Montco Oilfield Contractors, LLC filed an involuntary chapter 11 petition for relief against the Debtor (ECF No. 1) (the "Involuntary Petition") under section 303 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  On September 29, 2016, the Debtor responded to the Involuntary Petition by filing a Motion for Abstention Under 11 U.S.C. § 305(A), and, in the Alternative, Answer, Affirmative Defenses, and Request for Discovery (ECF No. 38) (the "Abstention Motion").  The Abstention Motion requested, *inter alia*, that the Bankruptcy Court suspend proceedings on the Involuntary Petition while the Debtor attempted to achieve an out-of-court restructuring of its debts.  *See id.* at ¶ 2.  The Bankruptcy Court set trial on the Involuntary Petition for November 30, 2016 and denied the Abstention Motion as moot.  ECF No. 45.  The trial date was subsequently continued until December 9, 2016.  ECF No. 82.

During the Gap Period, the Debtor continued to operate its business in the ordinary course under section 303(f) of the Bankruptcy Code.  During that period, the Debtor retained Imperial

---

[1]  Capitalized terms used in this Disclosure Statement but not defined herein shall have the meanings ascribed to them in the Plan unless otherwise noted.

Capital, LLC to assist it with an out of court restructuring process.  The Debtor's efforts to undertake a workout outside of chapter 11 were ultimately unsuccessful.  As a result, on December 2, 2016 (the "Voluntary Petition Date"), the Debtor agreed to convert the involuntary case to a voluntary case by filing a voluntary petition for relief (ECF No. 88) (the "Voluntary Petition") under chapter 11 of the Bankruptcy Code.  The Debtor's chapter 11 case, styled *In re Northstar Offshore Group, LLC*, Case No. 16-34028 (the "Chapter 11 Case"), is currently pending before the Bankruptcy Court.

### C.      Brief Overview of the Plan

The Plan contemplates a liquidation of the Debtor and its Estate, and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to all holders of Allowed Claims and Interests, and to distribute all property of the Estate that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that the Plan accomplishes this objective and is in the best interests of the Estate.

Under the Plan, the Debtor will, among other things, resolve Disputed Claims, investigate and pursue (as appropriate) certain Claims and Causes of Action possessed by the Estate, make distributions to holders of Allowed Claims, and close the Chapter 11 Case.  In addition, as further detailed in the Plan, certain of the Debtor's "Causes of Action" will be transferred to a Litigation Trust in order to maximize the recovery of holders of Allowed Claims in the Chapter 11 Case.  After all distributions have been made and the Chapter 11 Case has been closed, the Debtor will be dissolved.

Section IV of this Disclosure Statement provides a detailed description of the Plan.

### D.      Summary of Voting Procedures

As set forth in more detail herein, Classes 1, 2, and 4 are Impaired (as such term is defined in section 1124 of the Bankruptcy Code and the Plan), and holders of Claims in such classes which are not Disputed Claims and are Allowed Claims are entitled to vote to accept or reject the Plan (collectively, the "Voting Claims").

Pursuant to section 1126 of the Bankruptcy Code, only holders of Voting Claims are entitled to vote to accept or reject the Plan.  Holders of Allowed Claims in Unimpaired Classes are deemed to accept the Plan and are not entitled to vote.  Holders of Claims in Impaired Classes who will not receive a distribution under the Plan are deemed to reject the Plan and are not entitled to vote.  As no holder of any Interest will receive a distribution under the Plan, the holders of Interests in Class 5 of the Plan are deemed to reject the Plan and are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, see Sections IV.A–D of this Disclosure Statement.

The Debtor intends to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by Class 5 and any other class or classes of Claims or Interests which vote to reject the Plan.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under section 1129(b), a plan may be

-2-

confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VII.C of this Disclosure Statement.

Your Claims may be classified in multiple classes, in which case you will receive a separate Ballot for each class of Claim that is entitled to vote on the Plan.  Please complete the information requested on each Ballot you receive; sign, date, and indicate your vote on the Ballot; and return the completed Ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the Solicitation Agent before the Voting Deadline.  For detailed voting instructions, please refer to the voting instructions described in Section VI of this Disclosure Statement and attached hereto as **Exhibit B**.

The deadline to submit Ballots is [December 19], 2017 at 12:00 p.m. (Central Time). For a Ballot to be counted, the Solicitation Agent must receive the Ballot by the Voting Deadline. The following do not constitute a vote to accept or reject the Plan: (i) the failure to submit a Ballot, (ii) the submission of a Ballot voting both for and against the Plan, or (iii) the submission of a Ballot voting neither for nor against the Plan.

If you are a holder of a Voting Claim and you did not receive a Ballot, received a damaged Ballot, lost your Ballot, or have any questions concerning the procedures for voting on the Plan, please contact the Solicitation Agent, Prime Clerk, LLC at (844) 794-3480.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE HOLDERS OF VOTING CLAIMS.  THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGES ALL HOLDERS OF VOTING CLAIMS TO VOTE TO ACCEPT THE PLAN.

### E.      Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "Confirmation Hearing").  The Confirmation Hearing will take place at [1:30 p.m. on December 22, 2017].  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The deadline to object to the confirmation of the Plan is [December 19, 2017] at 12:00 p.m. (Central Time).  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections and responses to the Plan, if any, must be served and filed as to be received on or before the above deadline in the manner described in Section VII.B of this Disclosure Statement.  An objection to the Plan filed with the Bankruptcy Court will not be considered a vote to reject the Plan.

II.   **OVERVIEW OF THE DEBTOR'S HISTORY, CORPORATE STRUCTURE, AND OPERATIONS**

A.   **History and Corporate Structure**

The Debtor is a Delaware limited liability company headquartered in Houston, Texas.  The Debtor's predecessor entity was formed in 1994 to acquire out-of-favor, non-operated shelf properties, but in 2000, its strategy became focused on operated properties.  In 2008, after acquiring several assets for approximately $75 million, the Debtor's predecessor sold those assets for approximately $265 million and was then re-capitalized with $102 million of private equity.  With this capital, the Debtor's predecessor acquired additional assets, which were divested in 2011 for approximately $215 million.

The current iteration of the Debtor began in 2012, with a larger equity commitment and a change in strategy to focus on exploration rather than acquisitions.  During this period, the Debtor drilled a large number of exploratory wells with mixed results.  In September 2014, the Debtor was purchased by Northstar GOM Holdings Group LLC ("Holdings"), an entity formed via conversion from a Delaware corporation known as LaFitte Energy Corporation.  Holdings is a wholly owned subsidiary of PPVA Oil and Gas LLC, which in turn is wholly owned by Platinum Partners Value Arbitrage Fund LP ("PPVA").  PPVA is controlled by Platinum Partners ("Platinum"), a New York-based investment management group that manages multiple funds in a variety of sectors.  As further detailed in Section II.C.4 of this Disclosure Statement, two other Platinum entities, Platinum Partners Credit Opportunities Master Fund LP ("PPCO") and Platinum Partners Liquid Opportunity Master Fund LP ("PPLO"), also hold ownership interests in the Debtor.

Following Platinum's acquisition of the Debtor in late 2014, the Debtor acquired several properties (the "Black Elk Assets") from Black Elk Energy Offshore Operations, LLC ("Black Elk"), another entity controlled by Platinum.  The Debtor began operating the Black Elk Properties in January 2015 and accordingly changed the focus of its business from exploration to production optimization and development.   From early 2015 until the recent sale of substantially all of the Debtor's assets described in Sections II.B and III.G of this Disclosure Statement, the Debtor operated both the Black Elk Assets and the "Legacy Assets" that it owned before January 2015, in addition to holding working interests in certain other properties.

Several ongoing proceedings involving PPVA, PPCO, and PPLO have impacted the Debtor.  First, on July 28, 2016, an involuntary winding up petition was filed against Platinum Partners Value Arbitrage Fund (International) Limited ("PPVA International") in the Grand Court of the Cayman Islands (the "Cayman Islands Court").  PPVA International invests its investable capital in Platinum Partners Arbitrage Intermediate Fund, Limited, which, in turn, invests its investable capital in PPVA.  Next, on August 23, 2016, PPVA filed a voluntary winding up petition with the Cayman Islands Court.  Following the filing of these petitions, the Cayman Islands Court appointed Matthew James Wright and Christopher Barnett Kennedy of RHSW (Caribbean) Limited as joint official liquidators for both PPVA International and PPVA.  On October 18, 2016, Mr. Wright and Mr. Kennedy filed petitions on behalf of PPVA and PPVA International under chapter 15 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.  *See In re Platinum Partners Value Arbitrage Fund L.P.*, No. 16-12925-scc, ECF No. 1

(Bankr. S.D.N.Y. Oct. 18, 2016); *In re Platinum Partners Value Arbitrage Fund (Int'l) Ltd.*, No. 16-12934-scc, ECF No. 1 (Bankr. S.D.N.Y. Oct. 18, 2016).  On November 23, 2016, the U.S. Bankruptcy Court for the Southern District of New York issued an *Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding Pursuant to Sections 1504, 1509, 1515, 1520 and 1521 of the Bankruptcy Code* in both proceedings.  *In re Platinum Partners Value Arbitrage Fund L.P., et al.*, No. 16-12925-scc, ECF No. 27 (Bankr. S.D.N.Y. Nov. 23, 2016).

Furthermore, in December 2016, a receiver was appointed for certain Platinum entities, including PPCO, in connection with charges brought by the S.E.C. against PPCO and several other defendants.  *See S.E.C. v. Platinum Mgmt. (NY) LLC, et al.*, No. 1:16-cv-06848-DLI-VMS, ECF No. 6 (E.D.N.Y. Dec. 19, 2016).  Additionally, the Litigation Trustee in Black Elk's bankruptcy proceedings has brought various claims against PPVA, PPCO, PPLO, and other entities affiliated with Platinum.  *See Schmidt v. Platinum Partners Black Elk Opportunities Fund LLC, et al.*, Case No. 15-34287, ECF No. 1672 (S.D. Tex. Aug. 31, 2017); *Schmidt v. B Asset Manager LP, et al.*, Case No. 15-34287, ECF No. 1631 (S.D. Tex. Aug. 3, 2017); *Schmidt v. Platinum Partners Value Arbitrage Fund LP, et al.*, Adv. No. 16-03237, ECF No. 1 (S.D. Tex. Oct. 26, 2016).  In connection with certain of these claims, the Litigation Trustee obtained a temporary restraining order freezing certain Platinum assets and subsequently recovered up to $29.6 million.  *See Schmidt v. Platinum Partners Value Arbitrage Fund LP, et al.*, Adv. No. 16-03237, ECF No. 7 (Oct. 26, 2016); Melissa Daniels, *Black Elk Trustee Gets $29M In Platinum Partners Claims*, Law360 (May 18, 2017).

## B.    Operations and Properties

Until recently, the Debtor operated as an independent oil and gas exploration and production company, as described in Section II.A of this Disclosure Statement.  However, on August 3, 2017, the Debtor completed the sale of substantially all of its assets (the "Transferred Assets") to Northstar Offshore Ventures LLC ("NOV"), as described in further detail in section III.G of this Disclosure Statement.  *See* ECF Nos. 792, 800; *see also* ECF No. 791-1, Ex. A (listing properties acquired by NOV).  Accordingly, the Debtor's sole remaining purpose relates to the winding down of its affairs pursuant to the Bankruptcy Code.  The Debtor's former employees are now employed by NOV and provide services to the Debtor under a Transition Services Agreement between the Debtor and NOV.

Several of the Debtor's properties (the "Excluded Assets") were excluded from the sale to NOV.  *See* ECF No. 792-1, Schedule 1.3(n).  The Debtor serves as operator on only one of the Excluded Assets, the West Cameron 2 or "Creole" property, which it leases from the State of Louisiana.  All other Excluded Assets are non-operated properties in which the Debtor holds only a working interest.  The Excluded Assets (including Creole) result in negative cash flow to the estate due to various obligations that encumber them, including tax and plugging and abandonment ("P&A") obligations.  As a result, the Debtor has recently rejected and abandoned various agreements and interests associated with them, including the Creole property.  *See* ECF Nos. 828, 891, 948.

### C.      Prepetition Indebtedness and Capital Structure

1.      <u>Secured Debt</u>

a.      *Secured Claims Owed to Taxing Authorities*

The Debtor has operated in various parts of the Gulf of Mexico abutting mainland Louisiana.  As a result, the Debtor is obligated to certain state and local authorities for taxes associated with such operations.  Due to, among other things, the Debtor's inability to obtain sufficient cash from its operations to pay such taxes, various state and local taxing authorities may have claims, some of which may be secured by liens arising by operation of law, against the assets of the Debtor.  In the Debtor's view, any such taxes that arose prior to the Voluntary Petition Date are prepetition claims, which may be secured and may have priority over other secured creditors of the Debtor.  However, the Debtor disputes the amount of claims asserted by certain state and local taxing authorities.

The Debtor also disputes the amount and characterization of the $514,902.79 secured claim filed by the Department of the Interior/Office of Natural Resources Revenue ("<u>DOI</u>").  This claim is comprised of, *inter alia*, a civil penalty, inspection fees, royalties, and late fees.  DOI asserts a secured claim for any setoff or recoupment against any claims owed by the government to the Debtor.

Moreover, to the extent that any tax liabilities arise in connection with the Excluded Assets, it is not clear whether the value of the underlying properties is sufficient to secure any liens associated with such claims.  While the Cameron Parish Sheriff & Tax Collector filed 12 claims totaling $1,321,129.00 for unsecured property tax liabilities related to the Excluded Assets, the Debtor believes that none of these liabilities is entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.  Each is a property tax liability filed after the Voluntary Petition Date, all are for the year of 2016 and all were assessed on December 12, 2016 or later.  As such, the Debtor does not believe that the taxes are entitled to priority status under section 507(a)(8)(B).

The Debtor does not believe there were any outstanding taxes or associated liens that arose in connection with the Transferred Assets before the sale; however, to the extent that any such liabilities did exist, they were not assumed by NOV, and any liens arising in connection therewith may attach to the proceeds of the sale.

b.      *Letter of Credit Loan Agreement—FNBCT*

On April 2, 2015, Holdings, as obligor, and the Debtor, as guarantor of payment and performance, entered into that certain Loan Agreement, dated as of April 2, 2015, by and between Northstar GOM Holdings Group LLC, as Borrower, Northstar Offshore Group, LLC, as Guarantor, and the First National Bank of Central Texas, as Bank (the "<u>Letter of Credit Loan Agreement</u>").  Under the Letter of Credit Loan Agreement, the First National Bank of Central Texas ("<u>FNBCT</u>") agreed to cause other financial institutions to issue letters of credit for the benefit of Holdings and/or the Debtor.  The principal balance under the Letter of Credit Loan Agreement was not to exceed $30 million.

The Letter of Credit Loan Agreement is evidenced by a promissory note (the "Letter of Credit Note") issued primarily for and by Holdings in favor of FNBCT in the principal amount of $30 million, with an interest rate of 6% per annum and a maturity date of March 31, 2017. The purpose of the Letter of Credit Loan Agreement was to provide collateral in favor of surety bonds relating to the Debtor's acquisition of the Black Elk Assets. The Letter of Credit Note and the obligations under the Letter of Credit Loan Agreement are secured by a first lien and security interest in favor of FNBCT on all assets of Holdings and the Debtor (the "First Lien").

On April 2, 2015, FNBCT entered into that certain Master Participation Agreement between the First National Bank of Central Texas, Platinum Partners Value Arbitrage Fund LP, and Platinum Partners Credit Opportunities Master Fund LP (the "Master Participation Agreement"). Under the Master Participation Agreement, PPVA and PPCO each purchased an undivided interest in the letters of credit issued under the Letter of Credit Loan Agreement (and the obligation to fund such letters of credit) up to the amount of $15 million.

Pursuant to the *Interim Order (I) Approving Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, and (V) Scheduling a Final Hearing* (ECF No. 129) (the "First Interim DIP Order") and the *Final Order (I) Approving Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Modifying Automatic Stay* (ECF No. 326, *as amended by* ECF Nos. 410, 650) (the "Final DIP Order"), the Debtor has been making certain adequate protection payments to FNBCT during the pendency of the Chapter 11 Case, including (i) payment of FNBCT's professional fees, costs, expenses, and charges up to $30,000 per month (plus up to an additional $20,000 incurred in fees, costs, and expenses from the Voluntary Petition Date through the first hearing on the Interim DIP Order); (ii) payment of interest on amounts advanced under the Letter of Credit Loan Agreement, with such interest commencing from the Voluntary Petition Date at the non-default rate; and (iii) payment of one-third (1/3) of the monthly contractual fee for Letter of Credit commitments (approximately $47,700 per month) with the accrual of such amount commencing on the Voluntary Petition Date. The Final DIP Order further provides that to the extent that it is held by final non-appealable order that FNBCT is an undersecured creditor pursuant to section 506(b) of the Bankruptcy Code, such payments of interest, fees, and expenses may be reapplied to reduce the principal amount of the obligations outstanding under the Letter of Credit Loan Agreement. Since the commencement of the Chapter 11 Case, the Debtor has paid FNBCT a total of (i) $194,624.35 in professional fees, costs, expenses, and charges, and (ii) $317,777.44 in (A) interest on amounts advanced under the Letter of Credit Loan Agreement and (B) monthly contractual fees for Letter of Credit Commitments in accordance with the Final DIP Order.

Draws under the Letter of Credit Loan Agreement have resulted in FNBCT holding a claim against the Debtor of approximately $1.3 million. The Debtor does not anticipate further draws under the Letter of Credit Loan Agreement. If, however, there are further draws under the Letter of Credit Loan Agreement they will be treated as Class 1 – First Lien Claims.

c. *Letter of Credit Loan Agreement—Argonaut*

Argonaut Insurance Company ("Argonaut") has asserted a secured claim for $23,479,855.10 based on five bonds it issued to the Debtor as a principal or indemnitor, which

bonds are supported by two letters of credit obtained by the Debtor on April 6, 2015 from BBVA Compass and Comerica Bank for the benefit of Argonaut. FNBCT has issued security to BBVA Compass and Comerica Bank in support of these letters of credit. At or around the time that the letters of credit were issued, Argonaut entered into two indemnification agreements, only one of which was with the Debtor.

Argonaut objected to the sale of the Debtor's assets in the Chapter 11 Case. ECF Nos. 437, 471, 477, 615, 744. Although not clear on the face of its objections, Argonaut has since argued that it objected to the sale because the Debtor's letters of credit stand as collateral for (i) bonds issued by Argonaut for the benefit of Black Elk (a different debtor that liquidated under Chapter 11 pursuant to a separate bankruptcy case in the Southern District of Texas) and/or (ii) indemnification obligations of PPVA related to the Black Elk bonds. That is, Argonaut asserts that the Debtor's letters of credit are cross-collateralized with other bond agreements and may serve as collateral for any losses it incurs under the Black Elk bonds and related indemnities executed by one of its parent companies. The language of each of the applicable agreements plainly contradicts Argonaut's position, which the Debtor believes is entirely without merit.

### d.      Second Priority Notes

On September 18, 2014, in order to fund its purchase of the Debtor, Holdings issued $80 million in 12% Second Priority Senior Secured Notes due September 18, 2019 (the "Second Priority Notes") pursuant to that certain Indenture, dated as of September 18, 2014, between Northstar GOM Holdings Group, LLC, as Issuer, U.S. Bank National Association, as Trustee and Collateral Agent, and each of the guarantors party thereto (the "Indenture"). The Indenture was replaced by that certain Amended and Restated Fiscal Agency Agreement, dated as of September 18, 2014, among Northstar GOM Holdings Group, LLC, as the Company, P Administrative Services, LLC, as Fiscal Agent and Collateral Agent, and each of the guarantors party thereto (the "Fiscal Agency Agreement"). Eleanor Fiduciary Services, LLC (together with any successors or assigns, "Eleanor") subsequently replaced P Administrative Services, LLC as Fiscal Agent and Collateral Agent under the Fiscal Agency Agreement pursuant to a notice dated June 22, 2016. The Debtor is a guarantor under both the Indenture and the Fiscal Agency Agreement. The current holders of the Second Priority Notes are New Mountain Finance Corporation, PPVA, and PPCO.

The obligations under the Second Priority Notes were to be secured by a lien on the collateral described in the security agreements executed in connection with the Second Priority Notes, which includes various property of the Debtor (the "Second Lien"). The Second Lien was to be junior to the First Lien pursuant to that certain Intercreditor Agreement, dated as of April 2, 2015, by and among the First National Bank of Central Texas, as First Lien Lender, P Administrative Services LLC, as Fiscal Agent, Northstar GOM Holdings Group, LLC, as Borrower, Northstar Offshore Group, LLC, as Guarantor, and each of the other Loan Parties from time to time party thereto. However, the Debtor disputes both the validity of Eleanor's secured claim in connection with the Second Priority Notes and the validity of the Second Lien as to certain of the Debtor's assets. ECF No. 341, Schedule D. Additionally, the statutory committee of unsecured creditors in the Chapter 11 Case (the "Committee") has filed a *Motion for Leave, Standing and Authority to Prosecute Claims on Behalf of the Debtor's Estate and for Related Relief* (ECF No. 695) (the "Standing Motion") in which it seeks standing to challenge, on behalf of the Estate, the extent, validity, and/or amount of Eleanor's claim under the Second Priority

Notes and to recharacterize such claim as equity. Both Eleanor and the Debtor have filed responses in opposition to the Standing Motion. ECF Nos. 811, 814. The Committee, the Debtor, and Eleanor believe they have resolved the issues raised in the Standing Motion. This resolution is addressed by the agreed treatment of the Second Priority Notes as set forth in the Plan. At a hearing on the Standing Motion on October 3, 2017, the Court abated the Standing Motion, pending further motion or order by the Court.

On August 1, 2016, Eleanor sent a letter to Holdings and the Debtor alleging that Holdings had defaulted on the Fiscal Agency Agreement by failing to make a required interest payment of $4.8 million that was due on April 1, 2016. Eleanor alleged that pursuant to the Fiscal Agency Agreement, the entire principal of, and accrued interest on, the Second Priority Notes was immediately due and payable, and demanded that the Debtor make such payment as guarantor. On the same date, Eleanor filed a complaint against Holdings and the Debtor in the Supreme Court of the State of New York, County of New York, alleging that Holdings had breached the Second Priority Notes and the Fiscal Agency Agreement, and that the Debtor had breached the Fiscal Agency Agreement and its obligations as guarantor. *See Eleanor Fiduciary Servs., LLC v. Northstar GOM Holdings Grp., LLC et al.*, No. 654014/2016 (N.Y. Sup. Ct. Aug. 1, 2016). The case is currently stayed with respect to the Debtor but is proceeding with respect to Holdings.

Pursuant to the First Interim DIP Order and the Final DIP Order, the Debtor has been making certain adequate protection payments to Eleanor during the pendency of the Chapter 11 Case, including payment of Eleanor's professional fees, costs, expenses, and charges up to $30,000 per month (plus up to an additional $20,000 incurred in fees, costs, and expenses from the Voluntary Petition Date through the first hearing on the First Interim DIP Order). The Final DIP Order further provides that to the extent that it is held by final non-appealable order that Eleanor is an undersecured creditor pursuant to section 506(b) of the Bankruptcy Code, such payments of fees and expenses may be reapplied to reduce the principal amount of the obligations outstanding under the Second Priority Notes. Since the commencement of the Chapter 11 Case, the Debtor has paid Eleanor a total of $170,000.00 pursuant to such obligations.

2.   Senior Statutory Liens

Prior to the Voluntary Petition Date, the Debtor incurred trade debt which it was not able to pay. As a result, many of the Debtor's trade creditors exercised their rights to file statutory mechanics and materialman's liens against the Debtor's current and former assets, including both the Transferred Assets and the Excluded Assets. To the extent that these liens (i) are valid, enforceable, and non-avoidable as of the Voluntary Petition Date, (ii) were timely perfected before the Voluntary Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (iii) are senior in priority to the First Lien and the Second Lien, they may be considered "Senior Statutory Liens" as defined by paragraph 6(a) of the Final DIP Order.

As authorized by the Bankruptcy Court, the Debtor has commenced a consolidated adversary proceeding (the "M&M Lien Proceeding") seeking a declaration as to whether claimants asserting secured claims based on statutory Liens on the Transferred Assets are holders of Senior Statutory Liens. ECF Nos. 791 at ¶ 2 & 865. To the extent that the parties agree or the Bankruptcy Court determines that any claimant holds a Senior Statutory Lien on the Transferred Assets, NOV has assumed such Senior Statutory Liens pursuant to the *Order (I) Approving the Sale of*

*Substantially All of the Debtor's Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (ECF No. 792) (the "Sale Order") and the Asset Purchase Agreement between the Debtor and the Buyer (ECF No. 792-1) (the "APA"). *See* ECF No. 792 at ¶ 23; ECF No. 792-1 at ¶ 1.4(b), Schedule 1.4(b).  To the extent that any claimant asserts a Senior Statutory Lien on the Excluded Assets, such claims were not assumed by NOV, and the Estate will treat such claims in accordance with the terms of the Plan.

The Debtor initiated the M&M Lien Proceeding against 26 claimants asserting approximately 60 secured claims based on alleged statutory Liens on the Transferred Assets.  ECF No. 865.  As further explained in the pleadings filed in the adversary proceeding, none of the M&M Liens qualifies as a Senior Statutory Lien because each is junior to large mortgages filed by the holders of the First Lien Claims which have a priority date of September 18, 2014.  *Id.* Moreover, because the pre-existing mortgages likely will not be fully satisfied by the proceeds from the sale to NOV, the Debtor believes that the M&M Liens are unsecured deficiency claims which will be treated as Class 4 – General Unsecured Claims under the Plan.  *Id.*  This conclusion is further supported by the fact that 52 of the M&M Lien Claims arise from Liens on Transferred Assets that were assigned a value zero in Schedule 2.2 of the APA (the "Negative Value M&M Lien Claims").  *Id.*  As a result, the Debtor believes that the Liens associated with the Negative Value M&M Lien Claims have no value, and that such Claims will ultimately be considered deficiency Claims and treated as General Unsecured Claims under the Plan.  *Id.*  As a result, the Debtor believes that the Liens associated with the Negative Value M&M Lien Claims have no value, and that such Claims will ultimately be considered deficiency Claims and treated as General Unsecured Claims under the Plan.  *Id.*  The Debtor anticipates that there will not be any claimants in Class 3 – M&M Lien Claims.  If, however, there is an Allowed M&M Lien Claim, the Claim will be treated in accordance with the terms of the Plan.

The Debtor is conducting early negotiations with several of the M&M Lienholders to determine if their Claims against the Estate can be resolved consensually.  To date, the Debtor has reached agreements with several M&M Lienholders whereby the parties will stipulate that the lienholders have Class 4 – General Unsecured Claims.  The Debtor is also in active discussions with other M&M Lienholders.

### 3.    Unsecured Debt

#### a.    Unsecured Notes

On December 28, 2015, the Debtor issued a delayed draw term note (the "Holdings Note") promising to pay Holdings the sum of $25 million, together with accrued and unpaid interest, on December 28, 2016.  Holdings agreed to fund $1 million of the total amount under the Holdings Note on December 28, 2015, and thereafter, subject to certain conditions, the Debtor was entitled to request that Holdings loan it additional amounts up to the maximum principal amount of $25 million.  The outstanding principal under the Holdings Note accrues interest at a rate of 12% per annum.  On August 4, 2016, the Debtor and Holdings entered into that certain Letter Agreement and Amendment to the Delayed Draw Term Note, pursuant to which the parties agreed to include all sums owed by PPVA under any surety bonds securing the Debtor's P&A obligations as a debt

of the Debtor, provided that Holdings actually funded such amounts, and to make such debt subject to the terms of the Holdings Note.

On the same date, the Debtor also issued a delayed draw term note (the "PPCO Note") promising to pay PPCO the sum of $25 million, along with any accrued and unpaid interest, on August 4, 2017.  PPCO agreed to fund $520,000 on the dates set forth in the PPCO Note, and thereafter, subject to certain conditions, the Debtor was entitled to request that PPCO loan it additional amounts up to the maximum principal amount of $25 million.  The outstanding principal under the PPCO Note accrues interest at a rate of 12% per annum.

> b.      Trade Debt

As noted above, prior to the Voluntary Petition Date, the Debtor accumulated significant trade debt which was not paid.  As of the Voluntary Petition Date, this included approximately $25.8 million incurred prior to the Involuntary Petition Date and approximately $3.29 million incurred during the Gap Period.  *See* ECF No. 341, Am. Schedule E/F.  However, subsequent and ongoing developments in the Chapter 11 Case, such as the sale of substantially all of the Debtor's assets and the payment of certain cure amounts in connection therewith, may impact the amounts of such trade debt that currently remain outstanding.  The Debtor and NOV are disputing the cure amounts relating to contracts for High Island Offshore System, LLC and Panther Operating Company, LLC.  These contracts will be assumed by NOV if and when the cure disputes are resolved.  At present, the disputed cure amount equals approximately $366,118.10.

> 4.      Preferred and Common Equity

> a.      Class A Preferred Units

In February 2015, PPVA, PPCO, PPLO, and the Debtor entered into a "Note Purchase Agreement" under which the Debtor purchased senior secured notes issued by Black Elk and Black Elk Energy Finance Corporation from PPVA, PPCO, and PPLO in exchange for promissory notes issued by the Debtor (the "Northstar Notes").  In addition, PPVA, PPCO, and PPLO each obtained the right to receive accrued interest on the Northstar Notes.  Also in February 2015, the parties to the Note Purchase Agreement entered into an "Exchange Agreement" under which the Debtor purchased the Northstar Notes from PPVA, PPCO, and PPLO in exchange for Class A Preferred Units in the Debtor.  In connection with the Exchange Agreement, the Debtor's limited liability company agreement was also amended to provide that the holders of Class A Preferred Units would be entitled to receive an amount equal to a 12% per annum return on the amount of capital contributed in exchange for the issuance of the Class A Preferred Units, to be reduced by any distributions made in connection with such units.

As a result of the transactions under the Note Purchase Agreement and Exchange Agreement, PPVA received 30,636,357.14 Class A Preferred Units, PPCO received 27,469,000 Class A Preferred Units, and PPLO received 6,894,642.86 Class A Preferred Units.  Subsequently, the Debtor issued an additional 4,050,000 Class A Preferred Units to PPVA.  Thus, a total of 69,050,000 Class A Preferred Units are issued and outstanding at this time.

b.      *Class B Preferred Units and Common Units*

The Debtor has a total of 8,889,012.33 shares of its Class B Preferred Units and 110,987.67 shares of its Common Units issued and outstanding at this time, all of which are owned by Holdings.

## III.      THE CHAPTER 11 CASE[2]

### A.      Events Leading to the Commencement of the Chapter 11 Case

Like many other oil and gas exploration and production companies, the Debtor was affected by the dramatic decline in commodity prices that began in late 2014.  The magnitude of this price decline, along with the ongoing uncertainty in the energy markets, adversely affected the Debtor's operations.  Although the Debtor's management implemented cost-saving measures that significantly reduced operating expenses while maintaining relatively stable production levels, such efforts were not sufficient to permit the Debtor to satisfy its ongoing obligations.

The Debtor was also affected by several crises involving Platinum, including Platinum's actions in causing the Debtor to incur and assume certain liabilities.  As detailed in Section II.A of this Disclosure Statement, PPVA and another Platinum entity are currently in liquidation proceedings in the Cayman Islands Court, and a receiver has been appointed for PPCO and other Platinum entities in connection with charges brought against such entities by the S.E.C.  Additionally, the Litigation Trustee in Black Elk's bankruptcy proceedings has brought various claims against PPVA, PPCO, PPLO, and other Platinum entities, leading to a temporary restraining order freezing certain Platinum assets.  All of these events contributed to the Debtor's inability to obtain sufficient funding for its business.

### B.      The First Day Motions

On the Voluntary Petition Date, the Debtor filed several "first day" motions with the Bankruptcy Court requesting permission to continue operating its business in the ordinary course.  After notice and a hearing on December 6, 2016, the Bankruptcy Court entered orders granting the Debtor authority to, among other things:

- Pay certain royalties and severance taxes that accrued during the Gap Period (ECF No. 124);

- Honor its obligations to its employees (ECF No. 125);

- Pay premiums in connection with certain surety bonds (ECF No. 162);

---

[2]  Additional information regarding the Chapter 11 Case and the associated pleadings filed with the Bankruptcy Court can be found on the case website maintained by the Solicitation Agent at http://cases.primeclerk.com/northstar.  The Debtor recommends that holders of Claims and Interests and other parties in interest visit the case website for up-to-date information regarding the Chapter 11 Case.

- Establish procedures for providing adequate assurance of payment to its utility providers (ECF No. 172); and

- Continue operating its existing cash management system in the ordinary course (ECF No. 173).

In addition, the Bankruptcy Court entered several procedural orders, which: (i) authorized the Debtor to employ Prime Clerk, LLC as Claims, Noticing and Solicitation Agent (ECF No. 126); (ii) granted an extension of time to file the Debtor's schedule of assets and liabilities and statement of financial affairs (ECF No. 127); and (iii) clarified that the Voluntary Petition manifested the Debtor's consent to relief under chapter 11 of the Bankruptcy Code, designated the Chapter 11 Case as complex, and set a bar date for filing proofs of claim (ECF No. 131). Subsequently, the Bankruptcy Court also entered orders which (a) authorized the Debtor to retain and compensate professionals retained in the ordinary course of the Debtor's business (ECF No. 216) and (b) established procedures for monthly and interim compensation of professionals retained in the Chapter 11 Case (ECF No. 217).

Simultaneously with its other "first day" motions, the Debtor filed an *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Priming and Superpriority Postpetition Financing Pursuant to 11 U.S.C §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (IV) Granting Related Relief* (ECF No. 105) (the "DIP Motion"). Pursuant to the DIP Motion, the Debtor sought, *inter alia*, to obtain debtor-in-possession financing from Arena Limited DIP I, LLC (the "DIP Agent") under a $16 million facility (the "DIP Facility"). *Id.* at ¶ 1. On December 6, 2016, the Bankruptcy Court issued the First Interim Order, which, *inter alia*, granted the DIP Motion on an interim basis, authorized the Debtor to enter into the DIP Facility and borrow an initial $3 million, granted the DIP Agent an allowed senior administrative expense claim in connection therewith, and provided for adequate protection for FNBCT and Eleanor (including the adequate protection payments detailed in Sections II.C.1.b and II.C.1.c of this Disclosure Statement). ECF No. 129. On December 29, 2016 and January 16, 2017, the Bankruptcy Court issued additional interim orders on the DIP Motion, which, *inter alia*, provided that the First Interim DIP Order remained in full force and effect, scheduled final hearings on the DIP Motion, and authorized the Debtor to borrow up to $4 million under the DIP Facility. ECF Nos. 215, 282. Following multiple hearings, the Bankruptcy Court issued the Final DIP Order on February 2, 2017. ECF No. 326. The Final DIP Order, *inter alia*, granted the DIP Motion on a final basis, authorized the Debtor to borrow up to the principal amount of $16 million under the DIP Facility, and continued to provide for the DIP Agent to be granted an allowed senior administrative expense claim and for FNBCT and Eleanor to receive adequate protection payments. *Id.*

On March 15, 2017, the DIP Agent filed a Notice of Limited Termination Declaration stating that a default had occurred under the terms of the agreement associated with the DIP Facility (the "DIP Credit Agreement"). On March 22, 2017, the Debtor filed a motion to amend the Final DIP Order in order to resolve the alleged default, including by amending certain terms of the DIP Credit Agreement. ECF No. 396. In addition, because the Debtor had since determined that a sale of its assets would be the best way to maximize the value of the Estate (as further

detailed in Section III.F of this Disclosure Statement), the Debtor sought to amend certain milestones under the DIP Credit Agreement and extend its maturity date in order to permit a sale process to occur.  *Id.*  The Bankruptcy Court issued an order amending the Final DIP Order and granting the requested relief on March 27, 2017.  ECF No. 410.  In addition, on June 30, 2017, the Bankruptcy Court issued a second order amending the Final DIP Order in order to authorize the Debtor to enter into a further amendment to the DIP Credit Agreement under which both the sale-related milestones and the maturity date of the DIP Facility would be extended as set forth therein.  ECF No. 650.

### C.     The Appointment of the Official Creditors' Committee

The United States Trustee appointed the Committee on December 19, 2016 and then filed an amended notice of appointment on December 22, 2016.  ECF Nos. 186, 192.  The members of the Committee are Montco Oilfield Contractors, B & J Martin, Inc., Alliance Energy Services, LLC, Fieldwood Energy LLC, R & R Energy Services LLC, Wood Group PSN, Inc., and Offshore Contract Services, LLC.  The Committee retained FTI Consulting, Inc. as its financial advisor and DLA Piper LLP as its counsel.  ECF Nos. 344, 345.

### D.     The Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs

On January 4, 2017, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs.  ECF Nos. 236, 237.  The Debtor amended its Schedules of Assets and Liabilities on February 9, 2017.  ECF No. 341.  Based on an initial analysis of the Debtor's financial affairs undertaken in connection with the creation of such documents, the Debtor believes there are causes of action pursuant to chapter 5 of the Bankruptcy Code available to benefit creditors of the Estate.  The Debtor made payments to approximately 70 creditors within 90 days of the Involuntary Petition Date.  ECF No. 237, at 15-16.  The Debtor believes that it paid approximately $4,826,944.18 for services received during that time period and approximately $859,551.48 on account of antecedent debt.  Some of these payments may be avoidable as preferential transfers and therefore available for distribution under the Plan.

### E.     The Debtor's Retention of Professionals

Prior to the Involuntary Petition Date, Winston & Strawn LLP ("Winston") advised the Debtor regarding its ongoing financial difficulties and the possible restructuring of its financial obligations.  Winston continued to represent the Debtor during the Gap Period; however, simultaneously with the filing of the Voluntary Petition, the Debtor moved to substitute Diamond McCarthy LLP ("Diamond") as its bankruptcy counsel.  ECF No. 104.  The Bankruptcy Court granted the motion and ultimately approved the Debtor's application to employ Diamond.  ECF Nos. 128, 219.  Later in the Chapter 11 Case, however, certain developments necessitated the re-engagement of Winston as the Debtor's bankruptcy counsel.  Accordingly, on July 26, 2017, the Court issued orders granting the Debtor's application to retain Winston as its general bankruptcy counsel and authorizing Diamond's withdrawal from the case.  ECF Nos. 723, 724.

On December 29, 2016, the Bankruptcy Court issued an order authorizing the Debtor to retain CR3 Partners, LLC to provide restructuring services and to designate Donald R. Martin as

its Chief Restructuring Officer.  ECF No. 218.  Additionally, on January 4, 2017, the Bankruptcy Court issued an order authorizing the retention of M1 Energy Capital Management Services, LLC ("M1") as the Debtor's investment banker.  ECF No. 238.  Subsequently, however, as further described in Section III.F of this Disclosure Statement, the Debtor decided to pursue a sale of substantially all of its assets, and its advisory needs changed accordingly.  Thus, on April 18, 2017, the Bankruptcy Court granted the Debtor's request to engage Parkman Whaling LLC as its investment banker, and the Debtor's engagement of M1 Energy Capital Management Services, LLC was terminated.  ECF No. 448.

Following its termination, M1 claimed that it was owed monthly work fees of $40,000 for the months of December 2016 through March 2017 as well as a 3.5% success fee on DIP financing, which the Bankruptcy Court calculated as $250,000.  ECF No. 440 at 7-8.  At the time the Debtor ended its engagement of M1, it had paid it $219,350.  The Debtor thereafter filed an Emergency Motion Under Rule 9019 for Authority to Enter Into a Settlement Agreement and Mutual Release with M1 Energy Capital Management, LLC and an Amended Proposed Settlement Agreement Between the Debtor and M1 in order to settle open compensation issues (the "M1 Motion").  ECF Nos. 421, 431.  The settlement agreement provided for payment to M1 in the amount of $294,000, which represented the difference between the amount M1 had received ($219,350) and the monthly fees and a compromised success fee (($40,000 x 4)+(.035 x 10,000,000) = $510,000, plus expenses).  ECF No. 421.  Eleanor objected to the M1 Motion on the ground that the settlement misrepresented the amounts properly payable to M1.  ECF No. 429.  At the hearing on the M1 Motion, the Bankruptcy Court questioned what provision of the pertinent engagement agreement entitled M1 to a 3.5% success fee.  ECF No. 440 at 7–8.  Unsatisfied with the response, the Bankruptcy Court scheduled another hearing on the matter.  Thereafter, the Debtor withdrew the M1 Motion and the continued hearing was cancelled.  ECF No. 454.  M1 continues to seek payment for monthly work fees for the months of December 2016 through March 2017 and a 3.5% success fee associated with funds drawn under the DIP Orders.  The Debtor believes that its prior payment of $291,350 represents full and final satisfaction of all amounts owed to M1 and that no further amounts are payable.

**F.     The Sale of Substantially All of the Debtor's Assets**

As the Chapter 11 Case progressed, the Debtor determined that a sale of assets would be the best way to maximize the value of the Estate.  On May 11, 2017, the Bankruptcy Court issued an order approving proposed bidding procedures for the sale of substantially all of the Debtor's assets, scheduling an auction and sale hearing, and granting other relief (ECF No. 504, *as amended by* ECF No. 650) (the "Bidding Procedures Order").  The Bidding Procedures Order set forth a deadline by which the Debtor would be required to identify a stalking horse purchaser, followed by a deadline for any other interested parties to submit bids on the Debtor's assets.  The Bidding Procedures Order further stated that, if necessary, following the receipt of such bids, an auction would be held.  Additionally, the Bidding Procedures Order set forth procedures under which the Debtor could serve notices on the counterparties to the executory contracts and unexpired leases that it wished to assume and assign in connection with the sale.

The Debtor and its professionals marketed the Debtor's assets pursuant to the procedures approved by the Bidding Procedures Order.  On June 29, 2017, the Debtor filed a notice indicating that it had entered into a stalking horse asset purchase agreement with the DIP Agent.  ECF No.

648.  Following the designation of the DIP Agent as the stalking horse bidder, the Debtor received bids from various parties, including "Qualified Bids" (as defined by the Bidding Procedures Order) from NOV and Acadia Energy Holdings, LLC ("Acadia").  The bid submitted by NOV was determined to be the highest and best bid.  Furthermore, after engaging in discussions with the Debtor, both the DIP Agent and Acadia informed the Debtor that they did not intend to amend or improve their respective bids.  Accordingly, the Debtor determined that it should proceed with NOV's bid and cancelled the auction.  ECF No. 703.  Shortly thereafter, the Debtor also issued a final notice listing the executory contracts and unexpired leases that it sought to assume and assign in connection with the sale, as well as proposed cure amounts for such contracts and leases.  ECF No. 725.

On August 1 and 2, 2017, the Bankruptcy Court held a hearing on the proposed sale.  On August 2, after resolving multiple objections, the Bankruptcy Court issued the Sale Order, which approved the sale to NOV and the assumption and assignment of certain executory contracts and unexpired leases in connection therewith.  ECF No. 792.  The sale closed on August 3.  ECF No. 800.  As provided in the APA, the aggregate consideration that the Debtor received for the sale included:

- $13,250,000.00 in cash;

- the assumption by NOV of the Assumed Liabilities, which were comprised of (i) significant P&A obligations, (ii) payment of cure amounts on the executory contracts and unexpired leases that the Debtor assumed and assigned to NOV, and (iii) payment of the Senior Statutory Liens;

- the funding of a $19,000,000.00 working capital facility to be used, in part, for the satisfaction of the Assumed Liabilities;

- the obligation by NOV to maintain, replace, and/or satisfy certain of the Debtor's outstanding bonds to the extent required by the Bureau of Ocean & Energy Management, and a commitment by NOV to obtain further bonds as required by applicable law to operate the Transferred Assets; and

- NOV's written and binding commitment to assist the Debtor in settling its Estate pursuant to a plan acceptable to the Bankruptcy Court, in part, with the funding of a litigation trust in an amount not to exceed $150,000.

ECF No. 792-1 at ¶ 2.1.  NOV has also entered into a Transition Services Agreement with the Debtor, pursuant to which NOV agreed to provide the Debtor with the services of certain of its former employees to assist the Debtor in winding down the Estate.  *See id.* at ¶ 6.13.

### G.    The Excluded Assets

As provided in the APA, the Debtor did not transfer the Excluded Assets to NOV in connection with the sale.  *See* ECF No. 792-1, Schedule 1.3(n).  The Excluded Assets included one property—West Cameron 2, or "Creole"—on which the Debtor served as operator, and which the Debtor leased from the State of Louisiana.  The remainder of the Excluded Assets were

-16-

properties as to which the Debtor held only a working interest and did not serve as operator. These non-operated Excluded Assets are: East Cameron 317 and 318; South Marsh Island 39, 142, and 143; South Pelto 8 and 13; Vermilion 196 and 207; and West Cameron 60, 61, 62, 75, 76, and 77.

Due to various tax and P&A obligations associated with the Excluded Assets, they have resulted in negative cash flow to the Estate, and the Debtor believes they have a value of, at most, zero. Accordingly, following the closing of the sale, the Debtor filed a motion to reject various operating agreements and other executory contracts associated with the Excluded Assets, which the Bankruptcy Court granted on September 11, 2017. ECF Nos. 828, 846. In addition, due to the significant tax liability that burdens the Creole property, the Debtor engaged in several discussions with Louisiana State and parish tax officials in an attempt to come to a mutually agreeable resolution that would permit the Debtor to continue to operate the property without sustaining further financial losses. Unable to reach a favorable resolution, the Debtor moved to reject and abandon its interest in the Creole property. ECF No. 891. Louisiana State and RLI Insurance Company objected. ECF Nos. 913, 918. Following negotiations with the Debtor, Louisiana State withdrew its objection, and the Bankruptcy Court approved the rejection and abandonment of the Creole property—overruling RLI Insurance Company's objection to the extent not withdrawn. ECF No. 948. As memorialized in the Bankruptcy Court's order, Louisiana State agreed to an unsecured claim in the amount of $8.75 million, which is the amount of its claim for all decommissioning liabilities associated with the Creole property.

The Debtor is not the operator under any remaining federal or state oil and gas leases. In response to the United States' Department of Interior's ("DOI") November 16, 2017 request for clarification concerning the Debtor's intentions with respect to any Excluded Assets involving federal leases, the Debtor's counsel agreed to participate in a telephone conference with DOI. That telephone conference with DOI and other regulators took place on November 17, 2017. As explained during the call, the Debtor is not the operator under any outer continental shelf ("OCS") leases. To the extent the Debtor has an interest in any OCS lease which may be rejected under applicable law, the Debtor intends to rely on the lease rejection provisions set forth in Section 9.1 of the Plan. To reiterate what was explained during the November 17, 2019 conference call with DOI and others, the Debtor has no intention of assuming any interest in any OCS lease and to the extent any such lease has not already been rejected, it will be rejected pursuant to section 9.1 of the Plan. The Debtor expects that any and all costs associated with the decommissioning of OCS properties in which it holds or held an interest will be borne by the respective operator (and/or co-lessee) and that it will not be called upon to satisfy such liabilities given the existence of ongoing, viable and solvent entities in the chain of title.

Many of the decommissioning liabilities to which the Debtor would otherwise be subject were assumed by NOV in connection with the Sale. NOV's obligation to perform decommissioning activities is conditioned, in part, on its receipt of regulatory approval of the assignments of the Debtor's leases to NOV. NOV and the regional director of the Bureau of Ocean Energy Management ("BOEM") have met in person on two separate occasions (August 2, 2017 and November 20, 2017) to discuss this approval. Thus far, the assignment of 11 leases to NOV has been approved by BOEM and the Debtor has no reason to believe that the remaining approvals will not be forthcoming. As such, the Debtor does not believe that it will be required to satisfy any of the decommissioning liabilities assumed by NOV pursuant to the Sale Order.

### H.    Post-Sale Developments

Following the closing of the sale, and as further detailed in Section V.A.4 of this Disclosure Statement, the Debtor used a portion of the sale proceeds to satisfy its obligations to the DIP Agent in connection with the DIP Facility.

The Debtor has addressed, and is addressing, many of the following post-sale tasks in the Chapter 11 Case:

- Prosecuting the M&M Lien Proceeding (discussed in further detail in Section II.C.2);

- Resolving outstanding disputes with creditors, including cure and collection disputes (discussed in further detail in Section II.3.C.b);

- Winding down the Debtor's remaining assets and operations, including by preparing and filing rejection and abandonment motions (discussed in further detail in Sections II.B & III.G);

- Performing analysis and reconciliation of Claims;

- Resolving disputes with certain of its creditors, the favorable resolution of which could result in the collection of additional funds for distribution under the Plan;

- Reviewing and pursuing claims and causes of action possessed by the Estate, including actions under chapter 5 of the Bankruptcy Code (a schedule identifying and describing the claims and causes of action to be transferred and retained by the Litigation Trust for the benefit of the creditors is attached hereto as **Exhibit C[3]**); and

- Preparing the Disclosure Statement and Plan in anticipation of a confirmation hearing.

On May 3, 2017, the Debtor commenced an adversary proceeding against Fieldwood Energy, LLC ("Fieldwood") seeking to avoid an $8.8 million performance bond (the "Fieldwood Bond") under 11 U.S.C. § 548(a)(1)(B) and the Texas Uniform Fraudulent Transfer Act. The Debtor has alleged that it did not receive reasonably equivalent value in exchange for incurring its obligation to procure and maintain the Fieldwood Bond. The Debtor has also brought claims for unjust enrichment and a turnover action against Fieldwood. While the parties have not finalized a written settlement, the parties have reached an agreement in principle resolving their disputes.

On September 20, 2017, the Debtor met with the Committee, the First Lien Holders and Second Lien Holders regarding a proposed plan of liquidation. The parties reached an agreement in principal, the terms of which are now reflected in the Plan. FNBCT and Eleanor agreed,

---

[3] This exhibit may be updated and modified at any time up to and including the date on which any confirmation order is entered.

respectively, to the FNBCT Gift Distribution and the Eleanor Gift Distribution in exchange for releases and, in the case of FNBCT, the Debtor's agreement to seek the disallowance of, and/or to support the disallowance of Argonaut's claim. These agreements also have the Committee's support for confirmation.

In addition, as noted above in Section II.C.1.c of this Disclosure Statement, the Committee has filed the Standing Motion, in which it seeks standing to challenge, on behalf of the Estate, the extent, validity, and/or amount of Eleanor's claim in connection with the Second Priority Notes and to recharacterize such claim as equity. In the Standing Motion, the Committee alleges, *inter alia*, that the interest rate and payments under the Second Priority Notes were "illusory" and that certain payments to New Mountain Finance Corporation were "designed . . . to appear as though they came from the Debtor," even though they actually came from Platinum. ECF No. 695 at ¶¶ 32, 33. The Committee further alleges that the Debtor was "severely undercapitalized" at the time that the Second Priority Notes were issued, meaning that "Platinum's risk was equivalent to [that of] an equity investor, not a lender." *Id.* ¶ 34. The Standing Motion attaches a draft adversary proceeding complaint for recharacterization of the debt. ECF No. 695-2. Both Eleanor and the Debtor have filed responses in opposition to the Standing Motion. ECF Nos. 811, 814. At a hearing on the motion held on October 3, 2017, the Committee and the Debtor reported that they were working on a resolution to the issues presented in the Standing Motion and that they planned to incorporate such resolution in an updated Plan. Such resolution is included in the Plan filed subsequent to the October 3, 2017 hearing.

Pursuant to the schedule proposed by the Debtor's Motion For Entry of Order (I) Approving Disclosure Statement, (II) Determining Dates, Procedures, and Forms Applicable to Solicitation Process, (III) Establishing Vote Tabulation Procedures, and (IV) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of Plan (the "Solicitation Procedures Motion") [ECF No. 894], the Debtor intends to file the Litigation Trust Agreement on or before December 17, 2017 (i.e., at least five days before the proposed Confirmation Hearing and two days before the voting deadline and the deadline to file objections to the Plan). The Debtor believes that the proposed timeline will allow all parties-in-interest sufficient time to review and, if appropriate, object to the Litigation Trust Agreement. The Debtor has communicated to the United States Trustee ("UST") its willingness to endeavor to file the Litigation Trust Agreement earlier than the deadline set forth in the Solicitation Procedures Motion, however, it has not agreed to file such agreement prior to the hearing on the Disclosure Statement, as requested by the UST. The Debtor, however, believes that filing the Litigation Trust Agreement at least 5 days prior to the Confirmation Hearing provides both a sufficient and customary timeframe for review of such Plan-related document.

Since the consummation of the Sale, the Debtor filed its Monthly Operating Reports ("MOR") for the periods April-June 2017. ECF Nos. 829, 871, 889. The Debtor has been unable to meet the prescribed deadlines for filing its remaining MORs because it does not employ its own accounting staff and must instead rely on an outside vendor to provide the financial information necessary for the preparation of such reports. The Debtor believes that it will be able to file its July 2017 MOR (the last month during which it had ongoing operations) before the proposed December 19, 2017 at 12:00 p.m. (Central Time) voting deadline. Although the UST asserts that the Debtor's failure to file current MORs has resulted in creditors not having critical information necessary to evaluate the Plan, the Debtor disputes this position as all MORs relating to the period

-19-

after July 2017 will contain limited information pertaining only to the Debtor's status after it ceased functioning as an operating entity on August 3, 2017.

## IV.   THE PLAN

THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTOR'S PLAN.  ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ PARTICULARLY CAREFULLY THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS SET FORTH IN SECTIONS 11.6, 11.7, 11.8, AND 11.9 OF THE PLAN BECAUSE SUCH PROVISIONS AFFECT NOT ONLY SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST THE DEBTOR BUT ALSO AGAINST CERTAIN NON-DEBTOR PERSONS IDENTIFIED IN SUCH SECTIONS.

### A.   Classification and Treatment of Claims and Interests Under the Bankruptcy Code

#### 1.   Classification in General.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided, however,* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, discharged, or otherwise settled prior to the Effective Date.

#### 2.   Summary of Classification.

The following table designates the Classes of Claims against and Interests in the Debtor, and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Gap Period Claims, Priority Tax Claims, and Other Priority Claims have not been classified and are therefore excluded from the Classes of Claims and Interests set forth in Section 3 of the Plan.  All of the potential Classes for the Debtor are set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | First Lien Claims | Impaired | Yes |
| 2 | Second Lien Claims | Impaired | Yes |

| 3 | M&M Lien Claims | Unimpaired | No (deemed to accept) |
|---|---|---|---|
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3. Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 4. Elimination of Vacant Classes.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 5. Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

### 6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the Plan in accordance with Section 13.1 of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 7. Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## B. Treatment of Unclassified Claims

### 1. Administrative Expense Claims.

Except to the extent that the holder of an Allowed Administrative Expense Claim and the Debtor agree to a different treatment, the Debtor shall pay to each holder of an Allowed

Administrative Expense Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court or as provided by Section 2.2 of the Plan, requests for payment of Administrative Expense Claims must be filed and served on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve requests for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or its Estate, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.

The Debtor must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

## 2. Professional Fee Claims.

All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date. Except to the extent that a holder of an Allowed Professional Fee Claim and the Debtor agree to a different treatment, the Debtor shall pay to each holder of a Professional Fee Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, Cash in such amounts as are Allowed by the Bankruptcy Court upon the later of (a) the Effective Date and (b) within five (5) days of the date upon which the Order relating to any such Allowed Professional Fee Claim is entered.

## 3. Gap Period Claims.

Except to the extent that a holder of an Allowed Gap Period Claim and the Debtor agree to a different treatment, each holder of an Allowed Gap Period Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Gap Period Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Gap Period Claim becomes an Allowed Gap Period Claim; or (b) such lesser amount as to which the holder of an Allowed Gap Period Claim may agree, in writing.

4.       Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; *provided, however*, that the Debtor may elect to provide the holder of an Allowed Priority Tax Claim with regular installment payments pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (b) such lesser amount as to which the holder of an Allowed Priority Tax Claim may agree, in writing.

5.       Other Priority Claims.

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtor agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Other Priority Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Other Priority Claim becomes an Allowed Other Priority Claim; or (b) such lesser amount as to which the holder of an Allowed Other Priority Claim may agree, in writing.

**C.       Treatment of Claims and Interests**

1.       First Lien Claims (Class 1).

(a)       Classification:  Class 1 consists of the First Lien Claims.

(b)       Allowance:  Notwithstanding any other provision of this Plan to the contrary, on the Effective Date, the First Lien Claims shall be Allowed as Secured Claims pursuant to section 506(b) of the Bankruptcy Code having first lien priority on account of unpaid principal, accrued and unpaid interest, letters of credit obligations, plus additional amounts for unpaid Additional Obligations (as defined below) on account of any fees, costs, expenses, disbursements, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to the Letter of Credit Loan Agreement, the Letter of Credit Note, and/or the Final DIP Order (the foregoing, collectively, the "Additional Obligations"), in each case, not subject either in whole or in part to offset, disallowance, or avoidance under chapter 5 of the Bankruptcy Code or otherwise, or any legal, contractual, or equitable theory for Claims or Causes of Action (including, without limitation, subordination, recharacterization, recoupment, or unjust enrichment) that any Person, including, but not limited to, the Debtor and its Estate, may be entitled to assert against FNBCT or the First Lien Claim.

(c)       Treatment:  Except to the extent that the holder of an Allowed First Lien Claim agrees to a less favorable treatment, the holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed

-23-

First Lien Claim and any Additional Obligations, one of the following treatments, at the discretion of the Debtor: (i) payment of such Allowed First Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed First Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a rate to be determined by the Bankruptcy Court; (iii) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code; or (iv) such other treatment as may be agreed to by the holder of an Allowed First Lien Claim; *provided, however,* that any Cash or other distribution to which the holder of an Allowed First Lien Claim is entitled pursuant to this paragraph shall be distributed as an FNBCT Gift Distribution.

(d)     Voting:  Class 1 is Impaired, and the holder of the First Lien Claim is entitled to vote to accept or reject the Plan.

2.     Second Lien Claims (Class 2).

(a)     Classification:  Class 2 consists of the Second Lien Claims.

(b)     Treatment:  To the extent that a Second Lien Claim is determined to be an Allowed Second Lien Claim, the holder of such Allowed Second Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Second Lien Claim, one of the following treatments, at the discretion of the Debtor: (i) payment of such Allowed Second Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed Second Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a rate to be determined by the Bankruptcy Court; (iii) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code; or (iv) such other treatment as may be agreed to by the holder of an Allowed Second Lien Claim; *provided, however,* that any Cash or other distribution to which the holder of an Allowed Second Lien Claim is entitled pursuant to this paragraph shall be distributed as an Eleanor Gift Distribution.  To the extent that all or any portion of a Second Lien Claim is determined to be an Allowed General Unsecured Claim, the holder of such Second Lien Claim shall be entitled to the treatment accorded to Class 4.

(c)     Voting:  Class 2 is Impaired, and the holders of the Second Lien Claims are entitled to vote to accept or reject the Plan.

3.     M&M Lien Claims (Class 3).

(a)     Classification:  Class 3 consists of the M&M Lien Claims.

(b)     Treatment:  Except to the extent that the holder of an Allowed M&M Lien Claim agrees to a less favorable treatment, the holder of an Allowed M&M Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed M&M Lien Claim, at the discretion of the Debtor: (i) payment of such Allowed M&M Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed M&M Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a

rate to be determined by the Bankruptcy Court; or (iii) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code.

(c)    Voting:  Class 3 is Unimpaired, and the holders of the M&M Lien Claims are deemed to accept the Plan.

4.    General Unsecured Claims (Class 4).

(a)    Classification:  Class 4 consists of the General Unsecured Claims.

(b)    Treatment:  Provided that there are no holders of Allowed Professional Fee Claims or Allowed Administrative Expense and Priority Claims or Allowed Secured Claims whose claims have not been settled, satisfied, discharged, and/or released, the holders of Allowed General Unsecured Claims will receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claims, their Pro Rata share of  the FNBCT Gift Distribution, if any, the Eleanor Gift Distribution, if any, and/or Available Cash, if any.

(c)    Voting:  Class 4 is Impaired, and the holders of the General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    Equity Interests (Class 5).

(a)    Classification:  Class 5 consists of the Equity Interests.

(b)    Treatment:  On the Effective Date, all Equity Interests shall be deemed cancelled, and the holders of the Equity Interests shall not receive or retain any property under the Plan on account of such Interests.

(c)    Voting:  Class 5 is Impaired, and the holders of the Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. The holders of the Equity Interests are not entitled to vote to accept or reject the Plan.

6.    Distribution Analysis.

Although the Debtor is still assessing the characterization and amount of its liabilities, it believes that the Distribution set forth in the Plan will satisfy the Debtor's liabilities as follows:

| Class | Designation | Amount of Liability | Estimated Recovery |
|---|---|---|---|
|  | Administrative Expense Claims | $0 to $98,081,586 | 100% (or as agreed) |
|  | Professional Fee Claims | $2,332, 138.78 to $2,812,798.98 | 100% (or as agreed) |
|  | Gap Period Claims | $613,587 to $3,290,435 | 100% (or as agreed) |
|  | Priority Tax Claims | $514,903 to $2,144,143 | 100% (or as agreed) |

| 1 | First Lien Claims | $0 to $48,244,673 | 0% due to gift distribution |
|---|---|---|---|
| 2 | Second Lien Claims | $0 to $91,900,948 | 0% due to gift distribution |
| 3 | M&M Lien Claims | $0 to $25,692,253 | 100% (or as agreed) |
| 4 | General Unsecured Claims | $0 to $62,711,869 | 0-100%, depending on the outcome of post-confirmation litigation |
| 5 | Equity Interests | $0 to $34,826,003 | 0% |

## D.  Means of Implementation

### 1.  Authority.

The Debtor shall have the authority and right, without the need for Bankruptcy Court approval (unless otherwise expressly indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(a)    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Claims against the Debtor (except to the extent Claims have been previously Allowed);

(b)    make distributions to holders of Allowed Claims in accordance with the Plan;

(c)    exercise its reasonable business judgment to direct and control the wind-down, liquidation, sale, and/or abandonment of the remaining Property of the Debtor under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(d)    prosecute all Causes of Action on behalf of the Debtor, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Debtor may determine is in the best interests of the Debtor and the holders of Allowed Claims; *provided, however,* that the Debtor shall transfer all Causes of Action to the Litigation Trust pursuant to Section 5.2 of the Plan;

(e)    make payments to professionals who will continue to perform in their current capacities;

(f)    retain professionals to assist in performing duties under the Plan;

(g)    maintain books, records, and accounts;

(h)    obtain any prudent or necessary insurance;

(i)        invest its Cash and any income earned thereon;

(j)        incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals;

(k)        administer tax obligations, including (i) filing tax returns and paying tax obligations; (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of the Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of the Debtor ending after the Voluntary Petition Date through the Liquidation, as determined under applicable tax laws; and (iii) representing the interest and account of the Debtor or its Estate before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit;

(l)        prepare and file any and all informational returns, reports, statements, returns, or disclosures relating to the Debtor that are required hereunder by any Governmental Unit or applicable law;

(m)       pay statutory fees in accordance with Section 13.3 of the Plan; and

(n)        perform such other duties and functions as are necessary and/or advisable.

2.        Litigation Trust.

(a)        Transfer of Causes of Action. A schedule identifying and describing the claims and causes of action to be transferred and retained by the Litigation Trust is attached hereto as **Exhibit C.**  On the Effective Date, the Debtor and the Estate shall preserve, irrevocably transfer, and assign all Causes of Action to the Litigation Trust, with good, clean title to such property, free and clear of all Liens, charges, Claims, claims, encumbrances, Interests, and interests.  On the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all Causes of Action, as well as the rights and powers of the Estate applicable to the Causes of Action, shall automatically vest in the Litigation Trust.  The Litigation Trust shall be established for the sole purpose of prosecuting the Causes of Action and distributing the proceeds thereof in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business.

(b)        Management and Oversight. The Litigation Trust shall be administered by the Litigation Trustee and overseen by the Litigation Trust Committee, the latter of which shall be identified prior to the conclusion of the Confirmation Hearing.

(c)        Beneficiaries and Distributions.  Upon the creation of the Litigation Trust, holders of Allowed Claims shall become the beneficiaries of the Litigation Trust pursuant to the Litigation Trust Agreement, as their respective interests may appear in accordance with the terms of the Plan.  The Litigation Trustee may, pursuant to the Litigation Trust Agreement and the Plan, make interim distributions to holders of Allowed Claims in the exercise of reasonable business judgment.  Upon the settlement, conclusion of litigation, and collection of all of the Causes of Action in the Litigation Trust, after the payment of all costs and expenses of collection, the Litigation Trustee must distribute the corpus of the Litigation Trust Pro Rata to the holders of Allowed Claims in accordance with the Plan and the Litigation Trust Agreement.

(d)      Authority.   The Litigation Trustee shall, subject to the terms of the Litigation Trust Agreement and the Litigation Trust Committee, have full power, authority, and standing to prosecute, compromise, or otherwise resolve the Causes of Action.   The Litigation Trust, acting by and through the Litigation Trustee pursuant to the Litigation Trust Agreement, shall be authorized to exercise and perform all rights and powers held by the Debtor and the Estate with respect to the Litigation Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee, representative appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, or any similar official who has been appointed to take control of, supervise, manage, or liquidate the Estate, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Causes of Action.   Neither the Debtor nor the Estate shall be subject to any counterclaims with respect to the Causes of Action.

(e)      Retention of Professionals.   The Litigation Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties on such terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval.   The Litigation Trustee may retain any Professional who represented any Party in Interest in the Chapter 11 Case if he deems it an appropriate exercise of his business judgment.

(f)      Funding.   In no event later than ten (10) days after the Effective Date, pursuant to Paragraph 2.1(iv) of the APA, the Buyer shall transfer $150,000.00 in Cash to the Debtor or the Litigation Trust to pay the expenses of the Litigation Trustee and his professionals for administering the Litigation Trust and prosecuting the Causes of Action in accordance with the Plan and the Litigation Trust Agreement.   The Litigation Trustee may be able to supplement this initial funding through settlement payments and the collection of judgments, by borrowing funds to finance litigation, or by retaining contingent fee counsel.

(g)      Party in Interest.   For the avoidance of doubt, the Litigation Trust is a Party in Interest with respect to all objections to any Claim relating to a Cause of Action and all compromises of such objections.

(h)      Binding Effect of Litigation Trust Agreement.   For the avoidance of doubt, the Debtor, the Litigation Trustee, and the Litigation Trust Committee shall be bound by the terms of the Litigation Trust Agreement.

3.      Corporate Action.

On the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Litigation Trust) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtor, or any other Person.   All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection therewith, shall be deemed to have occurred and shall be in effect without any requirement of further action by the Debtor or the Estate.

Upon the Effective Date or as soon as reasonably practicable thereafter, the existing board of managers of the Debtor shall be dissolved without any further action required on the part of such entities, their members, their managers, or their officers, and any and all remaining officers, members or managers of the Debtor shall be dismissed without any further action required on their part.  The members, managers, and officers of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of the Plan.

The authorizations and approvals contemplated by Section 5.3 of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

4.      Withholding and Reporting Requirements.

(a)      Withholding Rights.  In connection with the Plan, any party making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any Taxes, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)      Forms.  Any Person entitled to receive a distribution under the Plan shall, upon request, deliver to the Debtor an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt and so notifies the Debtor.  If such request is made by the Debtor and such Person fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtor, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor and its Property.

5.      Closing of the Chapter 11 Case.

When (a) all Disputed Claims have become Allowed Claims or Disallowed Claims, (b) the Litigation Trust has been dissolved pursuant to the Litigation Trust Agreement, (c) all remaining Available Cash has been distributed in accordance with the Plan, and (d) the Chapter 11 Case has been fully administered, the Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**E.      Corporate Governance**

1.      Board of Directors and Officers.

On the Effective Date, James Katchadurian of CR3 Partners, LLC shall be appointed as the sole officer and manager of the Debtor.  The Debtor shall elect such additional manager(s) and officer(s) as it deems necessary to implement the Plan and the actions contemplated in the Plan.

2.      Wind Down.

After the Effective Date, pursuant to the Plan, the Debtor shall, in an expeditious but orderly manner, wind down, sell, and otherwise liquidate and convert its Property to Cash, with no objective to continue or conduct a trade or business except to the extent reasonably necessary to and consistent with the Liquidation and orderly wind down of the Debtor, and shall not unduly prolong the duration of the Liquidation and the wind down.

Upon a certification to be filed with the Bankruptcy Court by the Debtor of (a) all distributions having been made, (b) completion of all duties of the Debtor and the Litigation Trust under the Plan, and (c) entry of a final decree closing the Chapter 11 Case, the Debtor shall be deemed to be dissolved without any further action, including the filing of any documents with the secretary of state for the state in which the Debtor is formed or any other jurisdiction.

3.      LLC Agreement.

As of the Effective Date, the LLC Agreement shall be amended to the extent necessary to carry out the provisions of the Plan.  The amended LLC Agreement and any other necessary corporate documents shall be contained in the Plan Supplement.

**F.      Distributions**

1.      Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its respective agents shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests.  The Debtor shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

2.      Date of Distributions.

Except as otherwise provided in the Plan, the Debtor shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  Thereafter, the Debtor shall from time to time determine the subsequent Distribution Dates, subject to the provisions of the Plan; *provided, that,* other than as discussed below, the Debtor is required to distribute to the holders of Allowed Claims, at least annually, all Available Cash on hand.  The amount of Available Cash shall be reviewed quarterly.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Notwithstanding the foregoing, the Debtor shall retain Available Cash sufficient to pay (i) reasonable and necessary professional fees and administrative costs and (ii) holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims; *provided, however,* that to the extent the holder of a Disputed Claim has filed duplicative claims (in the judgment of the Debtor), the Debtor shall be required to retain an amount equal to only one of the Disputed Claims.  In the event the holders of Allowed Claims

-30-

have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Debtor shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.

3.      Delivery of Distributions.

In the event that any distribution to any holder of a Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtor has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Distribution Date. After such date, all unclaimed property or interests in property shall be redistributed (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to holders of Allowed Claims pursuant to the Plan without the need for a further order by the Bankruptcy Court, and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.      Manner of Payment Under the Plan.

At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer.

5.      Minimum Cash Distributions.

The Debtor shall have no obligation to make a distribution that is less than Fifty Dollars ($50.00) in Cash.

6.      Setoffs and Recoupment.

Except for Claims that are expressly Allowed hereunder, the Debtor may, but shall not be required to, setoff or recoup against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made) any claims of any nature whatsoever that the Debtor may have against the holder of such Claim or Interest; *provided, that* neither the Debtor's failure to enforce such a setoff or recoupment nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtor of any setoff or recoupment right the Debtor may have against the holder of such Claim or Interest.

7.      Payment of Disputed Claims.

As Disputed Claims are resolved pursuant to Section 8 of the Plan, the Debtor shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Debtor in the Debtor's sole discretion.

8.     Allocation of Distributions Between Principal and Interest.

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan comprises both indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim, and then to accrued but unpaid interest.

## G.     Procedures for Disputed Claims

### 1.     Allowance of Claims.

After the Effective Date, the Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until (a) such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or (b) the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

### 2.     Objections to Claims.

As of the Effective Date, only the Debtor may interpose and prosecute objections to Claims.  The Debtor must serve and file such objections on or before (a) the Claims Objection Bar Date or (b) such later date as ordered by the Bankruptcy Court.

### 3.     Estimation of Claims.

On or before the Claims Objection Bar Date or such later date as ordered by the Bankruptcy Court, the Debtor may request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor may pursue supplementary proceedings to object to the allowance of such Claim.

All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.        No Distributions Pending Allowance.

If the Debtor files an objection to a Claim as set forth in Section 8.2 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.        Preservation of Claims and Right to Settle Claims.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims and Disputed Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 8.2 of the Plan, the Confirmation Order, the Litigation Trust Agreement, and any other contract, instrument, release, indenture, or other agreement entered into in connection herewith.

**H.      Executory Contracts and Unexpired Leases**

1.        Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan or Plan Supplement, including Section 9.5 of the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) is subject to a pending motion to assume as of the Effective Date; (b) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Case, including, but not limited to, the Executory Contracts and Unexpired Leases assumed and assigned to the Buyer in connection with the Sale; (c) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (d) is a D&O Policy or an insurance policy; or (e) is the APA.

2.        Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless an Order of the Bankruptcy Court otherwise provides for an earlier date, any proofs of Claim based on the rejection of the Debtor's Executory Contracts or Unexpired Leases, pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Clerk of the Court and the Debtor no later than thirty (30) days after the Confirmation Date.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtor no later than the deadline to file objections to the Plan pursuant to the Bankruptcy Code and Bankruptcy Rules.

Any holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease for which a proof of Claim is not timely filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim or (b) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claim arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will

-33-

be automatically disallowed, forever barred from assertion, and unenforceable against the Debtor, the Estate, or the Property, and shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by Order of the Bankruptcy Court.

3.    <u>APA.</u>

The Debtor's assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Buyer's rights and obligations, including any cure obligations assumed by the Buyer pursuant to the APA, with respect to any Executory Contract or Unexpired Lease assigned to the Buyer pursuant to the terms of the APA and the Sale Order. For the avoidance of doubt, the APA is being assumed and ratified by the Debtor and will remain enforceable by the parties thereto.

4.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements.</u>

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.    <u>Insurance Policies.</u>

To the extent any insurance policy of the Debtor is an Executory Contract, the Debtor shall assume each such insurance policy, including any D&O Policy, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless (a) the Debtor previously rejected such insurance policy pursuant to an Order of the Bankruptcy Court or (b) such insurance policy is the subject of a motion to reject pending on the Effective Date. Coverage for defense and indemnity under any D&O Policy shall remain available to all Persons falling within the definition of "Insured" in any such D&O Policy.

6.    <u>Reservation of Rights.</u>

Neither the exclusion nor the inclusion of any contract or lease in the APA or the Sale Order, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtor or the Estate has any liability thereunder. In the event of a dispute regarding

whether a contract or lease is or was executory or unexpired at the time of assumption, assignment, or rejection, the Debtor shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## I.    Conditions Precedent to the Effective Date

1.    Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and the Confirmation Order shall not be subject to any stay;

(b)    all ancillary documents necessary to implement and confirm the Plan shall have been approved by the Debtor or waived in writing;

(c)    all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effected or executed and delivered; and

(d)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

2.    Waiver of Conditions Precedent.

Each of the conditions precedent in Section 10.1 of the Plan, other than the condition set forth in Section 10.1(a) of the Plan, may be waived in writing by the Debtor.

3.    Effect of Failure of Conditions to Effective Date.

Unless otherwise extended by the Debtor, if the Effective Date does not occur within thirty (30) days of the Confirmation Date, or if the Confirmation Order is vacated, (a) no distributions shall be made, (b) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all of the Debtor's obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other entity, or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

**J.    Effect of Confirmation**

1.    Vesting of Assets.

On the Effective Date, except as provided pursuant to the Plan and the Confirmation Order, and pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtor's Estate shall vest in the Debtor and/or the Litigation Trust, as applicable, for the purpose of liquidating the Estate and consummating the Plan.

2.    Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or documents created pursuant to the Plan or the Sale, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any Property of the Debtor or the Estate shall be fully released, settled, and compromised in exchange for any right to a distribution from the Debtor as provided in the Plan, and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any Property of the Debtor or the Estate shall revert to the Debtor.

3.    Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise; *provided, however,* that pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination right relating thereto.

4.    Binding Effect.

(a)    Subject to Section 11.4(b) of the Plan, confirmation of the Plan does not provide the Debtor with a discharge under section 1141 of the Bankruptcy Code because the Plan is a liquidating chapter 11 plan.

(b)    Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

5.    Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case, under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the date indicated in the order providing for such injunction or stay and the date the Chapter 11 Case is closed.

6.     <u>Injunction Against Interference with the Plan.</u>

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order.

7.     <u>Releases by the Debtor.</u>

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties in facilitating and implementing the Liquidation, and the waiver and/or subordination of certain Claims by certain of the Released Parties as memorialized by the Eleanor Gift Distribution and the FNBCT Gift Distribution, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtor and the Estate from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), remedies, losses, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtor or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtor; (b) the Chapter 11 Case; (c) the purchase, sale, or rescission of the purchase or sale of any security of the Debtor; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; (e) the business or contractual arrangements between any Debtor and any Released Party; (f) the Liquidation; (g) the restructuring of any Claim or Interest before or during the Chapter 11 Case; (h) the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof; (i) the solicitation of votes with respect to the Plan; or (j) any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.**

8.     <u>Releases by Holders of Claims and Interests.</u>

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate and implement the Liquidation, and the waiver and/or subordination of certain Claims by certain of the Released Parties against the Debtor, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law and approved by the Bankruptcy Court, by (a) the holders of all Claims or Interests who elect to "opt-in" to a release in favor of such Released Parties on their respective Ballots, (b) the holders of all**

Claims or Interests that are Unimpaired under the Plan, (c) the holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, and (d) the holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, in each case from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), remedies, losses, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtor; (b) its Estate; (c) the Chapter 11 Case; (d) the purchase, sale, or rescission of the purchase or sale of any security of the Debtor; (e) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; (f) the business or contractual arrangements between the Debtor and any Released Party; (g) the Liquidation; (h) the restructuring of any Claim or Interest before or during the Chapter 11 Case; (i) the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof; (j) the solicitation of votes with respect to the Plan; or (k) any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes fraud, gross negligence, or willful misconduct.

9.      Exculpation.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action (including Avoidance Actions), remedy, loss, and liability for any claim in connection with or arising out of (a) the administration of the Chapter 11 Case; (b) the negotiation and pursuit of the Disclosure Statement, the Liquidation, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (c) the funding of the Plan; (d) the occurrence of the Effective Date; (e) the administration of the Plan or the property to be distributed under the Plan; or (f) the transactions in furtherance of any of the foregoing; *provided, however,* that the exculpation provided in this paragraph shall not apply to an Exculpated Party's fraud, gross negligence, or willful misconduct.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

10.      Retention of Causes of Action/Reservation of Rights.

(a)      Except as otherwise provided in the Plan, including Sections 11.6, 11.7, 11.8, and 11.9 of the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Debtor or the Litigation Trust, as applicable, shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person without the approval of the Bankruptcy Court, including, without limitation,

(i) any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim, and/or Claim for setoff seeking affirmative relief against the Debtor, or its officers, directors, or representatives; and (ii) the turnover of any Property of the Debtor or the Estate; *provided, however,* that the Debtor and the Litigation Trust shall not retain any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence, or willful misconduct, which Claims or Causes of Action are hereby preserved). The Debtor or the Litigation Trust, as applicable, may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Debtor, the Estate, and the Parties in Interest.

(b)     Except as otherwise provided in the Plan, including Sections 11.6, 11.7, 11.8, and 11.9 of the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately before the Voluntary Petition Date, against or with respect to any Claim left Unimpaired by the Plan; *provided, however,* that the Debtor and the Litigation Trust shall not retain any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence, or willful misconduct, which Claims or Causes of Action are hereby preserved).  The Debtor or the Litigation Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately before the Voluntary Petition Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date by the Debtor or the Litigation Trust, as applicable, to the same extent as if the Chapter 11 Case had not been commenced.

11.     Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

12.     Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court no less than five (5) days before the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours and will also be posted at http://cases.primeclerk.com/northstar.

13.     Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects.  All matters provided for in the Plan involving the corporate or limited

liability company structure of the Debtor and any corporate or limited liability company action required by the Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, directors, officers, members, or partners of the Debtor.  The authorizations and approvals contemplated by Section 11.13 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### K.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation, or payment of Claims or Interests resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided in the Plan;

(d)    to consider Claims or Interests and the allowance, classification, priority, compromise, estimation, or payment of Claims or Interests;

(e)    to enter, implement, or enforce such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other Orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other Order;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Plan Supplement, or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the APA, the Sale Order, the Plan, the Confirmation Order, or any other agreement, instrument, or other document governing or relating to any of the foregoing;

(j)       to take any action and issue any Order as may be necessary to construe, interpret, enforce, implement, execute, or consummate the Plan or to maintain the integrity of the Plan following consummation;

(k)       to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, or similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(l)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)       to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)       to adjudicate, decide, or resolve any Causes of Action (including Avoidance Actions);

(o)       to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)       to resolve any cases, controversies, suits, disputes, or Causes of Action (including Avoidance Actions) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid;

(q)       to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(r)       to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to the amount of a payment to cure a monetary default to permit the Debtor to assume or assign an Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)       to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)       to enter a final decree closing the Chapter 11 Case;

(u)       to enforce all Orders previously entered by the Bankruptcy Court;

(v)       to recover all Property of the Debtor and the Estate, wherever located; and

(w)     to hear and determine any rights, Claims, or Causes of Action (including Avoidance Actions) held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

**L.     Miscellaneous Provisions**

1.     Modification of the Plan.

This Plan may be altered, amended, modified, or supplemented by the Debtor before or after the Confirmation Date in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided, however, that the Committee shall have the right to be consulted on any proposed modifications of the Confirmation Order and the Plan.  A holder of an Allowed Claim or Allowed Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

2.     Revocation or Withdrawal of the Plan.

The Debtor, in consultation with the Committee, reserves the right to withdraw this Plan at any time before entry of the Confirmation Order.  If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, or (iv) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

3.     Payment of Statutory Fees.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtor.  Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law, and the Debtor shall continue to file reports to show the calculation of such fees for the Debtor's Estate until confirmation of the Plan according to section 1129 of the Bankruptcy Code.  Post-confirmation, quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law by the Debtor or the Litigation Trustee, and such entities shall continue to file reports to show the calculation of such fees for the Debtor's Estate until the Chapter 11 Case is closed under section 350(a) of the Bankruptcy Code.

4.     Post-Confirmation Reports

The Debtor or the Litigation Trustee shall file the post-confirmation report with the U.S. Trustee in accordance with applicable law.

5.     Dissolution of the Committee.

On the Effective Date, the Committee shall dissolve automatically, and the members of the Committee shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Committee and any professionals and/or advisors to the Committee.

6.      Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

7.      Severability of Plan Provisions.

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

8.      Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof.

9.      Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

10.      Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable, and deemed binding upon, and inure to the benefit of, the Debtor, the Litigation Trust, the holders of Claims and Interests (irrespective of whether holders of such Claims and Interests are deemed to have accepted the Plan), the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

11.      Successors and Assigns.

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each Person.

12.     Exhibits/Schedules

All exhibits and schedules to the Plan, the Plan Supplement, and the Exhibits to the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

13.     Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.     Notices

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission or e-mail) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Northstar Offshore Group, LLC
> 11 Greenway Plaza, Suite 2800
> Houston, Texas 77046
> Telephone: (713) 626-9696
> Attn:   Avery C. Alcorn
>         James Katchadurian
> Email:  AAlcorn@nstaroffshore.com
>         James.Katchadurian@cr3partners.com
>
> with a copy to:
>
> Winston & Strawn LLP
> 1111 Louisiana, 25th Floor
> Houston, TX 77002
> Telephone: (713) 651-2600
> Facsimile:  (713) 651-2700
> Attn:   Lydia T. Protopapas, Esq.
>         Jason W. Billeck, Esq.
> Email:  LProtopapas@winston.com
>         JBilleck@winston.com

After the Effective Date, the Debtor is authorized to send notice to Persons informing them of the need to file a renewed request for service if they wish to continue to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

## V.      CERTAIN RISK FACTORS TO BE CONSIDERED

### A.      Certain Bankruptcy Law Considerations

#### 1.      Objection to Claims

Although holders of certain Claims may not be required to file proofs of claim in the Chapter 11 Case, the Debtor may object to a proof of Claim filed by or on behalf of a holder of a Claim, except where otherwise indicated in the Plan.  The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim or Interest whose Claim or Interest is or may be subject to an objection.  Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

#### 2.      Conversion to Chapter 7 Case

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of creditors and/or the Debtor, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to the Debtor's creditors than those provided for in the Plan, as further detailed in Section VII.C below.

#### 3.      Non-Confirmation of Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.  Finally, there can be no assurances that the Plan will receive sufficient votes for confirmation.

The Bankruptcy Code requires that a plan comply with certain requirements (including, but not limited to, the requirements of section 1129 of the Bankruptcy Code) in order to be confirmed.  The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan.  If the Bankruptcy Court makes such a determination, the Debtor could be required to restart the solicitation process and to (i) seek approval of a new disclosure statement, (ii) solicit or re-solicit votes from holders of Claims or Interests, and/or (iii) seek confirmation of the newly proposed plan.  Additionally, should the Plan fail to be approved, confirmed, or consummated, non-Debtor parties-in-interest may be in a position to file alternative plans pursuant to section 1121 of the Bankruptcy Code.  As such, non-confirmation of the Plan would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtor and the Estate.

#### 4.      Administrative Insolvency

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for the Plan to be confirmed, it must provide that each holder of an Allowed Claim brought under section 507(a)(2)

or 507(a)(3) of the Bankruptcy Code—*i.e.*, Allowed Administrative Expense Claims and Gap Period Claims—receive cash equal to the full Allowed amount of such Claim, unless such holder agrees to a different treatment.  Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for the Plan to be confirmed, it must provide that each holder of an Allowed Claim entitled to priority under section 507(a) of the Bankruptcy Code—*i.e.*, Allowed Priority Tax Claims—receive regular installment payments in cash of a total value equal to the Allowed amount of such claim over a period ending not later than five (5) years after the Voluntary Petition Date, and in a manner that is not less favorable than the most favored non-priority unsecured claim under the Plan.  Finally, while the Debtor does not currently believe that any Other Priority Claims exist, to the extent that such claims do exist, they may similarly be required to receive certain treatment (such as cash equal to the full Allowed amount of such Claim) under section 1129(a)(9) of the Bankruptcy Code.

The Debtor presently believes that it has sufficient cash to pay the Administrative Expense Claims, Gap Period Claims, Priority Tax Claims, and Other Priority Claims that it anticipates will be Allowed by the Bankruptcy Court, and/or that it can reach agreements with holders of such Claims as to different treatments of such Claims.  While the Debtor received $13.25 million in Cash from the sale as detailed in Section III.F of this Disclosure Statement, approximately $10.9 million of such proceeds were used to satisfy the Debtor's obligations to the DIP Agent.  As discussed in Section III.H, there are potentially other sources of Cash which may be used to satisfy Administrative Expense Claims, Gap Period Claims, Priority Tax Claims, and Other Priority Claims.  The Debtor does not know if these sources of Cash will materialize and/or if they will be sufficient to cover the Allowed Claims, which must be paid in full or compromised in order to confirm the Plan.

If the Debtor is administratively insolvent, the Bankruptcy Court may not confirm the Plan, and the Bankruptcy Court may convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, either or both of which would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtor and the Estate as noted above in Sections V.A.2 and V.A.3 of this Disclosure Statement.

### 5.       Non-Occurrence or Delayed Occurrence of the Effective Date

Although the Debtor believes that the Effective Date will occur within thirty (30) days after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date described in Section IV.I of this Disclosure Statement have not occurred or otherwise been waived by the date that is thirty (30) days after the Confirmation Order, then the Confirmation Order will be vacated.  Under such circumstances, no distributions would be made under the Plan, the Debtor and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

### 6.       Amendment, Waiver, Modification, or Withdrawal of Plan

Under certain circumstances, the Debtor may, prior to confirmation or substantial consummation of the Plan and subject to the provisions of section 1127 of the Bankruptcy Code,

Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Plan, amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the classes or a change in the relative rights of such classes.

      **B.**      **Risks Associated with the Debtor's Business and Industry**

The value of the Excluded Assets and the Estate depends substantially upon the prices and demand for oil and gas. The markets for these commodities are volatile, and even relatively modest changes in prices can significantly affect financial results and impede growth. Prices for oil and gas fluctuate in response to relatively minor changes in the supply and demand for oil and gas, market uncertainty, and a variety of additional factors beyond the Debtor's control. Lower oil and gas prices could decrease the value of the Estate.

      **C.**      **Unforeseen Events**

The future value of the Excluded Assets and the Estate are, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond the Debtor's control.

**VI.**      <u>**SOLICITATION AND VOTING PROCEDURES AND REQUIREMENTS**</u>

Ballots have been provided for holders of Voting Claims as of [November 21], 2017 (the "<u>Voting Record Date</u>") to vote to accept or reject the Plan. Because all other classes are either (a) unimpaired and deemed to accept or (b) impaired and deemed to reject, only Classes 1, 2, and 4 are entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan; the Voting Record Date for voting purposes; and the applicable standards for tabulating Ballots. Additional details regarding voting instructions are attached hereto as **<u>Exhibit B</u>**.

The Debtor has engaged Prime Clerk, LLC as its Solicitation Agent to assist in the transmission of voting materials and in the tabulation of votes. It is important that holders of Voting Claims timely exercise their right to vote to accept or reject the Plan.

Ballots must be returned by the Voting Deadline by "E-Ballot" platform at https://cases.primeclerk.com/northstar with your Unique E-Ballot ID# or with an original signed copy by First Class Mail, Overnight Courier, or Personal Delivery to:

      Northstar Ballot Processing
      Prime Clerk, LLC
      830 Third Avenue, 3rd Floor
      New York, NY 10022

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT <u>NO LATER THAN [DECEMBER 19], 2017 AT 12:00 PM (CENTRAL TIME).</u>**

**ANY BALLOT THAT IS EXECUTED AND RETURNED BUT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE COUNTED AS AN ACCEPTANCE. A FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.**

## VII. <u>CONFIRMATION OF THE PLAN</u>

### A. **Confirmation Hearing**

The Confirmation Hearing will take place on [December 22, 2017 at 1:30 p.m. at 515 Rusk, Courtroom 404]. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any subsequent adjournment of that hearing.

### B. **Objections to Confirmation**

Any objection to the confirmation of the Plan must (i) be written in English, (ii) conform to the Bankruptcy Rules and the local rules for the Bankruptcy Court for the Southern District of Texas (the "<u>Local Rules</u>"), (iii) set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector, the basis for the objection, and the specific grounds therefor, (iv) be filed with the Bankruptcy Court, together with proof of service thereof, no later than [December 19, 2017 at 12:00 p.m. (Central Time)], and (v) be served upon and received by the following parties, no later than the date and time set by the Bankruptcy Court:

*Counsel to the Debtor:*

Winston & Strawn LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile:  (713) 651-2700
Attn:  Lydia T. Protopapas, Esq.
          Jason W. Billeck, Esq.
Email: LProtopapas@winston.com
          JBilleck@winston.com

*Counsel to the First National Bank of Central Texas:*

Dykema Cox Smith
112 E. Pecan St., Suite 1800
San Antonio, TX 78205

Telephone: (210) 554-5500
Facsimile: (210) 226-8395
Attn:   Deborah D. Williamson, Esq.
Email: dwilliamson@dykema.com

*Counsel to Eleanor Fiduciary Services, LLC:*

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Attn:   Mitchell A. Seider, Esq.
             Christopher Harris, Esq.
             Jeffrey T. Mispagel, Esq.
Email: mitchell.seider@lw.com
             christopher.harris@lw.com
             jeffrey.mispagel@lw.com

*Counsel to the Committee:*

DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, TX 75204
Telephone: (214) 743-4500
Attn:   Vincent P. Slusher, Esq.
Email: vincent.slusher@dlapiper.com

DLA Piper LLP (US)
444 W. Lake Street, Suite 900
Chicago, IL 60606
Telephone: (312) 368-4000
Attn:   Daniel M. Simon, Esq.
             David E. Avraham, Esq.
Email: daniel.simon@dlapiper.com
             david.avraham@dlapiper.com

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Objections to confirmation of a plan are governed by Bankruptcy Rule 9014 and Local Rule 9013-1. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of the Plan

The Plan will not constitute a valid, binding contract between the Debtor and its creditors and Interest holders unless and until the Bankruptcy Court has entered a Final Order confirming

the Plan.  Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court must hold the Confirmation Hearing before deciding whether to confirm the Plan.

        1.      <u>Section 1129(a) of the Bankruptcy Code</u>

        *a.*      *Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements specified in section 1129 of the Bankruptcy Code for confirmation of a plan.  If the Bankruptcy Court determines that those requirements are satisfied, it will enter an order confirming the Plan.

The Debtor believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of the Bankruptcy Code, and that the Plan is proposed in good faith.

        *b.*      *Acceptance*

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired Claims or Interests are conclusively deemed to have accepted a plan.  Accordingly, their votes are not solicited.  Class 3 of the Plan is unimpaired.  As a result, holders of Claims in Class 3 are conclusively deemed to have accepted the Plan and are not entitled to vote.

Holders of Impaired Claims and Interests that receive or retain any property under the Plan on account of such Claims or Interests are entitled to vote on the Plan, and therefore, must accept the Plan as a class in order for it to be confirmed without the application of the "unfair discrimination" and "fair and equitable" requirements.  A class of Claims is deemed to have accepted the Plan if the Plan is accepted by (i) holders of at least two-thirds (⅔) in amount of each such class (other than any Claims designated under section 1126(e) of the Bankruptcy Code), and (ii) a majority of the number of holders of Allowed Claims that have voted to accept or reject the plan.  The Voting Claims are Impaired and thus entitled to vote to accept or reject the Plan.

A class of Claims or Interests is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code if such class does not receive or retain any property on account of such Claims or Interests.  Class 5 is not receiving or retaining any property under the Plan on account of their Claims or Interests, and thus, are deemed to have rejected the Plan.

        *c.*      *Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, with respect to each Impaired class of Claims and Interests, confirmation of the Plan requires that each such holder either (i) have accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."  Application of the best interests test requires the Bankruptcy Court to consider what the holders of Allowed Claims and Interests in each Impaired Class would receive from a liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  The Debtor believes that Allowed Claim holders in Impaired Classes will receive or retain property under the

Plan that is not less than they would receive or retain in a chapter 7 case and that the Plan therefore satisfies the "best interests test." The basis for this conclusion is that in a chapter 7 case: (i) the Debtor would incur additional administrative costs and professional fees that would not otherwise be incurred in the Chapter 11 Case; (ii) fewer accounts receivable are likely to be collected by a chapter 7 trustee than are likely to be collected by the Debtor with the assistance of NOV in a Chapter 11 Case; and (iii) neither the Eleanor Gift Distribution nor the FNBCT Gift Distribution would be distributed to General Unsecured Creditors.

First, the Debtor's cost of liquidating under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee and new attorneys and other professionals engaged by such trustee. These new professionals would not only be required to expend time and resources familiarizing themselves with the issues relevant to the case, but they would also be deprived of the institutional knowledge and assistance of NOV's employees which are provided to the Debtor under the terms of the Transition Services Agreement. This knowledge and assistance is instrumental to the Debtor's ability to efficiently and effectively marshal Estate assets in a coordinated and streamlined manner. Thus, the Debtor believes that the obligation to pay the fees of a chapter 7 trustee and the professionals engaged by such trustee, combined with their inability to freely access NOV's knowledgeable employees, would both significantly increase the administrative burden borne by creditors in a chapter 7 case, and hamper the trustee's ability to efficiently marshal assets.

Second, the Debtor believes that its ability to effectively collect its unpaid receivables will be undermined if the case is liquidated under chapter 7 of the Bankruptcy Code. This is because NOV, the purchaser of substantially all the Debtor's assets, has an ongoing relationship with entities owing funds to the Debtor. In the Chapter 11 Case, NOV has assisted the Debtor in recovering outstanding accounts receivables based, in part, on its ability to encourage such payments as the quid pro quo for continuing to do business with NOV. A chapter 7 trustee will not have the same ability to encourage such payments, and consequently, the ability to successfully collect the Debtor's receivables would likely diminish.

Third, because the Debtor has negotiated the terms of the FNBCT Gift Distribution and the Eleanor Gift Distribution—agreements under which the First Lien Claim holder and the Second Lien Claim holders have agreed to distribute to General Unsecured Creditors any recoveries to which they would otherwise be entitled—the Debtor believes that Impaired Class 4 creditors will fare better under the Plan than they would if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

Based on the foregoing, and on the financial analysis attached hereto as **Exhibit D**, the Debtor believes that the Plan satisfies the best interests test.

> ### *d.* *Feasibility*

The Bankruptcy Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization unless contemplated by the plan. Under the Plan, which provides for the liquidation of the Debtor and its Estate, the Debtor presently believes that it will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations

to pay for the costs of administering and fully consummating the Plan.  Accordingly, the Debtor believes the Plan satisfies the feasibility requirement.

2.    <u>Section 1129(b) of the Bankruptcy Code</u>

Under certain circumstances, the Bankruptcy Court may confirm the Plan over a rejecting class of Claims or Interests in a process referred to as "cramdown."  To meet the requirements for cramdown, the Debtor must demonstrate that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to all such rejecting Impaired classes.  The Plan does not "discriminate unfairly" if (i) the legal rights of a dissenting class are treated no worse than those of any class holding Claims of equal priority, and (ii) no class junior to such dissenting class receives a distribution of greater value.  The Debtor believes that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for secured Claims, unsecured Claims, and Interests.

- <u>Secured Claims</u>: To be "fair and equitable," the Plan must provide: (i) that the holders of Secured Claims retain the liens securing such Claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the Allowed amount of such Claims, and that each holder of such Claim receives deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the Estate's interest in such property; (ii) for the sale of any property that is subject to the liens securing such Claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the "indubitable equivalent" of such Claims.

- <u>Unsecured Claims</u>:  To be "fair and equitable," the Plan must provide: (i) that each holder of an Impaired unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim, or (ii) that the holders of Claims and Interests that are junior to the Claims of the dissenting class do not receive any property under the Plan.

- <u>Equity Interests</u>:  To be "fair and equitable," the Plan must provide: (i) that each Interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such Interest or (b) the value of the Interest, or (ii) that the holders of junior Interests will not receive any property under the Plan.

The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over a rejecting class of Claims or Interests as long as the standards in section 1129(b) are met.  This power to confirm and cramdown a plan over dissenting classes is an important part of the chapter 11 process. It assures that no single group of Claims or Interests can block a restructuring or liquidation that is otherwise acceptable to the Debtor's creditors and that meets the stringent confirmation requirements of the Bankruptcy Code.

The Debtor asserts that the Plan meets the above requirements and will seek confirmation of the Plan, notwithstanding the deemed rejection of the Plan by Class 5 or any Class that votes to reject the Plan.

## VIII.   ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the most likely alternative is that the Chapter 11 Case would be converted to a case under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to liquidate the assets of the Debtor.  Any cash realized from such a liquidation, after accounting for the fees and expenses of the trustee and other professionals, would be distributed strictly in accordance with the priorities established by the Bankruptcy Code and applicable non-bankruptcy law.

The Debtor believes that liquidation under chapter 7 would result in smaller distributions to holders of Claims than those provided for in the Plan because of the additional administrative expenses attendant to the appointment of a chapter 7 trustee, including the trustee's employment of attorneys and other professionals.

## IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtor and certain holders of Allowed Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtor does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the United States federal income tax consequences of the Plan described below.

This summary does not apply to holders of Allowed Claims that are not United States persons, as such term is defined in the Internal Revenue Code, or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, foreign (*i.e.*, non-United States) persons, brokers and dealers in securities, mutual funds, small business investment companies, persons holding Allowed Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction, and regulated investment companies).  Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtor and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL**

**PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### A.  Certain United States Federal Income Tax Consequences to the Debtor

Under the Internal Revenue Code, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtor is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided.  In this case, the Debtor expects that it may recognize significant CODI from the implementation of the Plan.  As a result, the Debtor expects that its tax attributes may be reduced on account of such CODI.  However, because the Debtor intends to liquidate, any remaining net operating losses or other tax attributes will have no ongoing value to the Debtor or to the holders of Allowed Claims.

### B.  Consequences to Holders of Certain Claims

#### 1.  Distributions by the Debtor

As previously described, the Debtor will resolve Disputed Claims and also investigate and pursue (as appropriate) certain Claims possessed by the Debtor and/or the Estate.  The Causes of Action will be transferred by the Debtor to the Litigation Trust.  Thereafter, the Debtor will make distributions to holders of Allowed Claims of Available Cash, and holders will obtain the rights to receive any additional amounts recovered by the Litigation Trust with respect to the Causes of Action, and the Debtor will dissolve.  Each holder of an Allowed Claim generally will recognize income, gain, or loss for United States federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and, if the Litigation Trust is classified as a "grantor trust" for United States federal income tax purposes (as discussed in Section IX.B.2 of this Disclosure Statement), the fair market value of such holder's rights to distributions from the Litigation Trust that such holder is deemed to receive in exchange for its Claim, and (b) such holder's adjusted United States federal income tax basis in its Claim.  The character of such income, gain, or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, whether the Claim is extinguished as a result of the distribution, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.  A holder's ability to deduct any loss recognized on a deemed exchange of its Claim will depend on such holder's own circumstances and may be restricted under the Internal Revenue Code.

2.      Treatment of the Litigation Trust

Pursuant to the Plan, on the Effective Date, the Debtor will establish the Litigation Trust (to be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement) and transfer the Causes of Action to the Litigation Trust.  The Debtor currently expects that the Litigation Trust could be eligible to be treated as a qualified settlement fund ("QSF") for United States federal income tax purposes, but it may be beneficial for the Debtor to elect to treat the Litigation Trust as a grantor trust.

a.      *QSF Treatment*

If the Litigation Trust is treated as a QSF, such trust would be subject to a separate entity-level tax on its income at the maximum rate applicable to trusts.  In determining the taxable income of the Litigation Trust, if treated as a QSF, (a) the Debtor's contributions to the Litigation Trust would not be treated as taxable income; (b) any sale, exchange, or distribution of property by the Litigation Trust would result in the recognition of gain or loss in an amount equal to the difference between (i) the fair market value of the property on the date of the sale, exchange, or distribution and (ii) the adjusted United States federal income tax basis of such property; (c) interest income and dividend income would be treated as taxable income, and (d) administrative costs (including state and local taxes) would be deductible.  In general, the adjusted United States federal income tax basis of property received by the Litigation Trust, if treated as a QSF, would be its fair market value at the time of contribution by the Debtor.

If the Litigation Trust is treated as a QSF for United States federal income tax purposes, holders of Allowed Claims will not be taxed on the value of their rights to receive distributions from the Litigation Trust (to the extent there are recoveries with respect to the Causes of Action) at the time the Litigation Trust is created and the Debtor dissolves.  Rather, a holder is only subject to tax upon actual receipt of distributions from the Litigation Trust.  The determination of whether a distribution by the Litigation Trust to a holder of a Claim is includible in such holder's gross income for United States federal income tax purposes is made in the same manner as if the distribution were made directly by the Debtor to the holder as described in Section IX.B.1 of this Disclosure Statement.

b.      *Grantor Trust Treatment*

If the Litigation Trust were treated as a grantor trust, then it would not be subject to United States federal income tax as a separate entity.  Instead, each holder of an Allowed Claim would be treated as the beneficial owner of that portion of the assets of the Litigation Trust corresponding to the portion of any distributions from the Litigation Trust (from recoveries with respect to Causes of Action) which such holder would be entitled to receive (commonly referred to for United States federal income tax purposes as such holder's "beneficial ownership percentage" in the Litigation Trust).

Subject to various limitations and special rules, the taxable income of the Litigation Trust each year would be allocated among the holders of Allowed Claims in accordance with their respective beneficial ownership percentages in the Litigation Trust.  Until there has been a final determination of the amount of any distributions from the Litigation Trust to which each holder of

an Allowed Claim would be entitled, each such holder's allocable share of the Litigation Trust's taxable income may be unclear.  Cash distributions by the Litigation Trust to holders of Allowed Claims would not be treated as additional taxable income.  However, there would be no assurance that Cash distributions by the Litigation Trust to the holders of Allowed Claims would correspond to the allowed taxable income in any particular year.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OF ALLOWED CLAIMS FOR DISTRIBUTIONS FROM THE DEBTOR AND THE POSSIBLE ALLOCATION OF TAXABLE INCOME FROM THE LITIGATION TRUST.**

3.      Accrued Interest

A portion of the consideration received by holders of Allowed Claims may be attributable to accrued interest on such Claims.  Such amounts should be taxable to that holder as interest income if such accrued interest has not been previously included in such holder's gross income for United States federal income tax purposes.  Conversely, holders of Allowed Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in such holder's gross income but was not paid in full by the Debtor.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal.  The Internal Revenue Service could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE UNITED STATES FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

4.      Market Discount

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a holder of a Claim on the taxable exchange of such Claim as described above may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired by the holder other than on original issue and if such holder's adjusted United States federal income tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the

debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable exchange of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by such holder (unless such holder elected to include market discount in income as it accrued).

5.     Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless such holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding (generally on Form W-9). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the holder to the extent it results in an overpayment of tax; *provided, that* the required information is timely provided to the Internal Revenue Service.

The Debtor, the Litigation Trust, or the applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest. The Debtor and the Litigation Trust will comply with all applicable reporting requirements of the Internal Revenue Service.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE LIQUIDATION, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## X.     CONCLUSION AND RECOMMENDATION

All holders of Voting Claims are urged to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received by [**December 19], 2017 at 12:00 p.m. (Central Time).**

Dated:  November 21, 2017            Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ Lydia T. Protopapas*
Lydia T. Protopapas
Texas Bar No. 00797267
Southern Dist. of Texas Bar No. 21378
Jason W. Billeck
Texas Bar No. 24001740
Southern Dist. of Texas Bar No. 23802
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile:  (713) 651-2700

*Counsel for Northstar Offshore Group, LLC*

**<u>Exhibit A</u>**

**The Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **NORTHSTAR OFFSHORE** | § | **Case No. 16-34028** |
| **GROUP, LLC,** | § | |
| | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

**DEBTOR'S SECOND AMENDED PLAN OF LIQUIDATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**WINSTON & STRAWN LLP**

Lydia T. Protopapas
Texas Bar No. 00797267
Southern Dist. of Texas Bar No. 21378
Jason W. Billeck
Texas Bar No. 24001740
Southern Dist. of Texas Bar No. 23802
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile:  (713) 651-2700

*Counsel for Northstar Offshore Group, LLC*

Dated: November 21, 2017

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS AND INTERPRETATION .............................................................. 1

    A.     Definitions. ........................................................................................... 1

    B.     Interpretation; Application of Definitions and Rules of Construction .................. 10

    C.     Controlling Document. ........................................................................... 11

SECTION 2. PROFESSIONAL FEE CLAIMS AND ADMINISTRATIVE EXPENSE
AND PRIORITY CLAIMS ........................................................................... 11

    2.1. Administrative Expense Claims. ............................................................... 11

    2.2. Professional Fee Claims. ....................................................................... 11

    2.3. Gap Period Claims. .............................................................................. 12

    2.4. Priority Tax Claims. ............................................................................. 12

    2.5. Other Priority Claims. .......................................................................... 12

SECTION 3. CLASSIFICATION OF CLAIMS AND INTERESTS ....................................... 12

    3.1. Classification in General. ....................................................................... 12

    3.2. Summary of Classification. ..................................................................... 13

    3.3. Special Provision Governing Unimpaired Claims. ........................................ 13

    3.4. Elimination of Vacant Classes. ............................................................... 13

    3.5. Voting Classes; Presumed Acceptance by Non-Voting Classes ........................ 13

    3.6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
Bankruptcy Code. ................................................................................ 14

    3.7. Controversy Concerning Impairment. ....................................................... 14

SECTION 4. TREATMENT OF CLAIMS AND INTERESTS ............................................... 14

    4.1. First Lien Claims (Class 1). ................................................................... 14

    4.2. Second Lien Claims (Class 2). ................................................................. 15

    4.3. M&M Lien Claims (Class 3). .................................................................. 15

    4.4. General Unsecured Claims (Class 4). ........................................................ 16

    4.5. Equity Interests (Class 5). ..................................................................... 16

SECTION 5. MEANS OF IMPLEMENTATION .................................................................. 16

    5.1. Authority. .......................................................................................... 16

    5.2. Litigation Trust. .................................................................................. 17

    5.3. Corporate Action. ................................................................................ 19

5.4. Withholding and Reporting Requirements. ................................................................... 19

5.5. Closing of the Chapter 11 Case. .................................................................................... 20

SECTION 6. CORPORATE GOVERNANCE ............................................................................. 20

6.1. Board of Directors and Officers. .................................................................................... 20

6.2. Wind Down. .................................................................................................................... 20

6.3. LLC Agreement. ............................................................................................................. 21

SECTION 7. DISTRIBUTIONS .................................................................................................. 21

7.1. Distribution Record Date. ............................................................................................... 21

7.2. Date of Distributions. ..................................................................................................... 21

7.3. Delivery of Distributions. ............................................................................................... 21

7.4. Manner of Payment Under the Plan. ............................................................................... 22

7.5. Minimum Cash Distributions. ........................................................................................ 22

7.6. Setoffs and Recoupment. ................................................................................................ 22

7.7. Payment of Disputed Claims. ......................................................................................... 22

7.8. Allocation of Distributions Between Principal and Interest. .......................................... 22

SECTION 8. PROCEDURES FOR DISPUTED CLAIMS ......................................................... 22

8.1. Allowance of Claims ....................................................................................................... 22

8.2. Objections to Claims. ...................................................................................................... 23

8.3. Estimation of Claims. ...................................................................................................... 23

8.4. No Distributions Pending Allowance. ............................................................................ 23

8.5. Preservation of Claims and Right to Settle Claims. ....................................................... 23

SECTION 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................... 24

9.1. Rejection of Executory Contracts and Unexpired Leases. ............................................. 24

9.2. Claims Based on Rejection of Executory Contracts and Unexpired Leases. ............. 24

9.3. APA. ................................................................................................................................. 24

9.4. Modifications, Amendments, Supplements, Restatements, or Other
     Agreements. ................................................................................................................... 25

9.5. Insurance Policies. .......................................................................................................... 25

9.6. Reservation of Rights. ..................................................................................................... 25

SECTION 10. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .............................. 25

10.1. Conditions Precedent to the Effective Date. ................................................................. 25

10.2. Waiver of Conditions Precedent. ................................................................................... 26

10.3. Effect of Failure of Conditions to Effective Date. ........................................................ 26

SECTION 11. EFFECT OF CONFIRMATION ........................................................ 26

    11.1. Vesting of Assets. ................................................................................ 26

    11.2. Release of Liens. .................................................................................. 26

    11.3. Subordinated Claims. ........................................................................... 27

    11.4. Binding Effect. ..................................................................................... 27

    11.5. Term of Injunctions or Stays ............................................................... 27

    11.6. Injunction Against Interference with the Plan. ..................................... 27

    11.7. Releases by the Debtor ......................................................................... 27

    11.8. Releases by Holders of Claims and Interests. ....................................... 28

    11.9. Exculpation. ......................................................................................... 29

    11.10. Retention of Causes of Action/Reservation of Rights. ........................ 29

    11.11. Solicitation of the Plan. ...................................................................... 30

    11.12. Plan Supplement. ................................................................................ 30

    11.13. Corporate Action. ............................................................................... 30

SECTION 12. RETENTION OF JURISDICTION ...................................................... 30

SECTION 13. MISCELLANEOUS PROVISIONS ...................................................... 32

    13.1. Modification of the Plan. ...................................................................... 32

    13.2. Revocation or Withdrawal of the Plan. ................................................ 33

    13.3. Payment of Statutory Fees. .................................................................. 33

    13.4. Post Confirmation Report. .................................................................... 33

    13.5. Dissolution of the Committee. .............................................................. 33

    13.6. Substantial Consummation. .................................................................. 33

    13.7. Severability of Plan Provisions. ............................................................ 33

    13.8. Governing Law. .................................................................................... 34

    13.9. Time. .................................................................................................... 34

    13.10. Immediate Binding Effect. ................................................................... 34

    13.11. Successors and Assigns ........................................................................ 34

    13.12. Exhibits/Schedules .............................................................................. 34

    13.13. Entire Agreement ................................................................................ 34

    13.14. Notices ................................................................................................ 35

## SECTION 1. DEFINITIONS AND INTERPRETATION

**A.**   Definitions.

1.1.   ***Administrative Expense Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred from and after the Voluntary Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises); and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.2.   ***Administrative Expense Claims Bar Date*** means the first Business Day that is thirty (30) days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.3.   ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 90 days following the Effective Date, except as otherwise specifically set forth in the Plan; *provided, however,* that the Administrative Claims Objection Bar Date may be extended pursuant to an Order of the Bankruptcy Court upon a motion filed by the Debtor after notice and a hearing.

1.4.   ***Allowed*** means, with respect to any Claim, (a) any Claim against the Debtor that has been listed in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and for which no contrary proof of Claim has been filed; (b) any Claim listed on the Schedules or included in a timely filed proof of Claim as to which no objection to allowance has been, or subsequently is, interposed prior to the expiration of any applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court; (c) any Claim listed on the Schedules or included in a timely filed proof of Claim as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder; or (d) any Claim expressly allowed by a Final Order or pursuant to the terms of the Plan.

1.5.   ***Allowed Administrative Expense and Priority Claims*** means Allowed Administrative Expense Claims, Allowed Gap Period Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims.

1.6.   ***APA*** means that certain Asset Purchase Agreement by and between the Debtor and the Buyer, which provides for the sale of substantially all of the Debtor's Property to the Buyer pursuant to the Sale Order.

1.7.   ***Argonaut Claim*** means any Claim asserted directly or indirectly by Argonaut Insurance Company or any related entity against the Debtor and/or the Estate with the exception of claims relating to bonds issued in favor of JX Nippon Oil Exploration (U.S.A.) Limited and/or Fieldwood Energy, LLC.

1.8.   ***Available Cash*** means (i) all Cash of the Debtor realized from its business operations, the Sale, any other sale or disposition of any of its Property, the interest earned on invested funds, or from any other source or otherwise, and (ii) all Cash recovered by the Litigation

Trustee on Causes of Action and available for distribution, less (iii) the amount of Cash (a) necessary to satisfy or discharge Allowed Professional Fee Claims, Allowed Administrative Expense and Priority Claims and Allowed Secured Claims, to the extent such Claims have not been settled, released, or otherwise discharged, and (b) estimated and retained by the Debtor to (I) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, and (II) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code. Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with Section 8 of the Plan or (ii) amounts represented by undeliverable distributions in accordance with Section 7.3 of the Plan.

1.9. ***Avoidance Actions*** means all Causes of Action commenced, or that may be commenced, by the Debtor pursuant to chapter 5 of the Bankruptcy Code, including without limitation, sections 544, 545, 547, 548, 549, 550, and/or 551 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.10. ***Bankruptcy Code*** means title 11 of the United States Code.

1.11. ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Chapter 11 Case.

1.12. ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Case, and any Local Rules of the Bankruptcy Court.

1.13. ***Business Day*** means any day other than a Saturday, Sunday, or "legal holiday" as defined by Bankruptcy Rule 9006(a).

1.14. ***Buyer*** means Northstar Offshore Ventures LLC.

1.15. ***Cash*** means legal tender of the United States of America.

1.16. ***Cause of Action*** means any action, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Voluntary Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law, including, without limitation: (a) any right of setoff, counterclaim, or recoupment, and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including Avoidance Actions); (c) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (d) any state law fraudulent transfer claim; and (e) any claim against the Debtor's current or former managers, officers, or directors for damage to the Debtor or the Estate, including for breach of any duty owed to the Debtor or the Estate by any of its current or former managers, officers, or

directors; *provided, however,* that Causes of Action shall not include the right to object to Claims and Interests.

1.17.   **Chapter 11 Case** means the case under chapter 11 of the Bankruptcy Code which was initially commenced in the Bankruptcy Court as an involuntary proceeding on August 12, 2016 and styled *In re Northstar Offshore Group, LLC*, Case No. 16-34028.

1.18.   **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.19.   **Claims Objection Bar Date** means, with respect to a Claim, the first Business Day that is 90 days after the later of (a) the Effective Date or (b) the date that a proof of Claim is filed or amended, or a Claim is otherwise asserted or amended in writing, by or on behalf of a holder of such Claim; *provided, however,* that the Claims Objection Bar Date may be extended pursuant to an Order of the Bankruptcy Court upon a motion filed by the Debtor.

1.20.   **Class** means any group of Claims or Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

1.21.   **Committee** means the statutory committee of unsecured creditors appointed in the Chapter 11 Case.

1.22.   **Confirmation** means the approval of the Confirmation Order by the Bankruptcy Court.

1.23.   **Confirmation Date** means the date on which the Bankruptcy Court approves the Confirmation Order.

1.24.   **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.25.   **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be consistent in all respects with this Plan.

1.26.   **D&O Policy** means any and all primary and excess insurance policies of the Debtor, the Estate or any other Person currently or formerly affiliated with, or a shareholder of, the Debtor as of the Effective Date, that provides for, among other things, coverage for liability related to the actions or omissions of the Debtor's directors, members, trustees, or officers including, but not limited to, the ACE Express Private Company Management Indemnity Package issued to the Debtor by Westchester Fire Insurance Company.

1.27.   **Debtor** means Northstar Offshore Group, LLC, before, on, and after the Effective Date.

1.28.   **DIP Agent** means Arena Limited DIP I, LLC in its capacity as agent under the DIP Credit Agreement, and any predecessor or successor in interest thereto.

1.29. ***DIP Credit Agreement*** has the meaning set forth in the Final DIP Order.

1.30. ***Disallowed*** means, with respect to any Claim or Interest, disallowed by a Final Order.

1.31. ***Disclosure Statement*** means the disclosure statement for the Plan, which is prepared and distributed in accordance with sections 1125 and/or 1126(b) of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, and/or other applicable law.

1.32. ***Disputed Claim*** means, with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, on or before the Confirmation Date; or (b) for which a proof of Claim or Interest for payment has been made, to the extent the Debtor or any Party in Interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.33. ***Distribution Date*** means the date or dates, including the Initial Distribution Date, as determined by the Debtor in accordance with the terms of the Plan, on which the Debtor makes a distribution to holders of Allowed Claims.

1.34. ***Distribution Record Date*** means the Effective Date of the Plan.

1.35. ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 10 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.36. ***Eleanor*** means Eleanor Fiduciary Services, LLC in its capacity as Fiscal Agent and Collateral Agent under the Fiscal Agency Agreement, together with any of its successors or assigns.

1.37. ***Eleanor Gift Distribution*** means any Cash to which Eleanor and/or any holder of an Allowed Second Lien Claim is entitled, which Cash shall be distributed Pro Rata as follows: first to holders of Allowed Professional Fee Claims, if any, second to holders of Allowed Administrative Expense and Priority Claims (in accordance with the priority scheme of the Bankruptcy Code), if any, and third to holders of Allowed General Unsecured Claims; *provided, however*, that after all Allowed Professional Fee Claims, Allowed Administrative Expense and Priority Claims and Allowed General Unsecured Claims have otherwise been satisfied, settled, released, and/or discharged, any remaining Available Cash shall be distributed to Eleanor.

1.38. ***Equity Interests*** means Class A Preferred Units in the Debtor, Class B Preferred Units in the Debtor, and Common Units in the Debtor.

1.39. ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.40. ***Exculpated Parties*** means (a) the Debtor; (b) the Debtor's current and former officers, directors, and managers; (c) each of the foregoing Persons' respective predecessors,

4

successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, affiliates, and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, restructuring advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such; and (d) the Committee and each of the Committee's agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such; *provided, however*, that notwithstanding the foregoing, the Platinum Equity Holders and all of their current and former members, managers, equity holders, employees, agents, professionals, trustees, principals, partners, parents, directors, and/or officers and each of the foregoing's predecessors, successors and assigns, are expressly excluded from this definition notwithstanding the fact that such Persons may have also been shareholders, members, managers, directors, or officers of, or otherwise related to, the Debtor.

1.41.   ***Executory Contract*** means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

1.42.   ***Final DIP Order*** means that certain *Final Order (I) Approving Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Modifying Automatic Stay* (ECF No. 326) signed by the Bankruptcy Court on February 2, 2017.

1.43.   ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion has been or may be filed with respect to such order or judgment pursuant to sections 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024.

1.44.   ***First Lien Claim*** means a Secured Claim or any other Claim arising in connection with the Letter of Credit Loan Agreement and/or the Letter of Credit Note as well as any other Claim granted to the First Lien Claim holder under the Final DIP Order.

1.45.   ***Fiscal Agency Agreement*** means that certain Amended and Restated Fiscal Agency Agreement, dated as of September 18, 2014, among Holdings, as the Company, P Administrative Services, LLC (predecessor to Eleanor), as Fiscal Agent and Collateral Agent, and each of the guarantors party thereto (including the Debtor).

1.46.   ***FNBCT*** means the First National Bank of Central Texas.

1.47.   ***FNBCT Gift Distribution*** means any Cash to which FNBCT is entitled as the holder of an Allowed First Lien Claim, which Cash shall be distributed Pro Rata as follows:  first to holders of Allowed Professional Fee Claims, if any, second to holders of Allowed Administrative Expense and Priority Claims (in accordance with the priority scheme of the Bankruptcy Code), if any, and third to holders of Allowed General Unsecured Claims.

1.48.   ***Gap Period*** means the period of time beginning on the Involuntary Petition Date and concluding immediately before the Voluntary Petition Date.

1.49.   ***Gap Period Claim*** means a Claim arising in the ordinary course of the Debtor's business or financial affairs during the Gap Period and entitled to priority under section 507(a)(1)(3) of the Bankruptcy Code.

1.50.   ***General Unsecured Claim*** means any Claim against the Debtor which is not an Administrative Expense Claim, a Professional Fee Claim, a Gap Period Claim, a Priority Tax Claim, an Other Priority Claim, or a Secured Claim.  For the avoidance of doubt, General Unsecured Claims include deficiency Claims.

1.51.   ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code

1.52.   ***Holdings*** means Northstar GOM Holdings Group, LLC.

1.53.   ***Impaired***, with respect to a Claim, Interest, or Class of Claims or Interests, has the meaning set forth in sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.54.   ***Indenture*** means that certain Indenture, dated as of September 18, 2014, between Holdings, as Issuer, U.S. Bank National Association, as Trustee and Collateral Agent, and each of the guarantors party thereto (including the Debtor), which was subsequently replaced by the Fiscal Agency Agreement.

1.55.   ***Initial Distribution*** means the first distribution that the Debtor makes to holders of Allowed Claims.

1.56.   ***Initial Distribution Date*** means the date selected by the Debtor on or as soon as reasonably practicable after the Effective Date.

1.57.   ***Interest*** means any equity security in the Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock or units, preferred stock or units, or other instruments evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interests in the Debtor, that existed immediately before the Effective Date.

1.58.   ***Involuntary Petition Date*** means August 12, 2016.

1.59.   ***Letter of Credit Loan Agreement*** means that certain Loan Agreement, dated as of April 2, 2015, by and between Holdings, as Borrower, the Debtor, as Guarantor, and FNBCT, as

Bank, the obligations under which are secured by a first lien and security interest in favor of FNBCT on all assets of Holdings and the Debtor.

1.60.    **Letter of Credit Note** means the promissory note issued primarily for and by Holdings in favor of FNBCT in the principal amount of $30 million, with an interest rate of 6% per annum and a maturity date of March 31, 2017, and secured by a first lien and security interest in favor of FNBCT on all assets of Holdings and the Debtor.

1.61.    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.62.    **Litigation Trust** means a trust to be established on the Effective Date to hold and prosecute the Causes of Action pursuant to the Litigation Trust Agreement.

1.63.    **Litigation Trust Agreement** means the agreement in form and substance, reasonably acceptable to the Committee and substantially in the form included in the Plan Supplement governing the Litigation Trust, including the responsibilities of the Litigation Trustee pursuant to Section 5.2 of the Plan, which shall be approved in the Confirmation Order and entered into by the Litigation Trustee on behalf of the Litigation Trust beneficiaries on the Effective Date pursuant to the terms of the Plan.

1.64.    **Litigation Trust Committee** means the committee which, pursuant to the terms of the Litigation Trust Agreement, shall oversee the Litigation Trust and the Litigation Trustee.

1.65.    **Litigation Trustee** means James Katchadurian of CR3 Partners, LLC in his capacity as administrator of the Litigation Trust, or any of his successors in interest in such capacity, pursuant to the Litigation Trust Agreement.

1.66.    **Liquidation** means the proposed liquidation of the Debtor pursuant to and in accordance with this Plan.

1.67.    **LLC Agreement** means that certain Amended and Restated Limited Liability Company Agreement of the Debtor dated February 13, 2012, and all subsequent amendments thereto.

1.68.    **M&M Lien** means a mechanic's or materialman's lien and/or mineral lien on the Property that is not a Senior Statutory Lien but that is otherwise (a) valid, enforceable, and non-avoidable as of the Voluntary Petition Date and perfected under non-bankruptcy law; and (b) timely perfected as permitted by section 546(b) of the Bankruptcy Code.

1.69.    **M&M Lien Claim** means a Secured Claim arising in connection with an M&M Lien that is not payable by the Buyer pursuant to the Sale Order.

1.70.    **Order** means a determination, decree, adjudication, or judgment issued or entered by the Bankruptcy Court.

1.71.    **Other Priority Claim** means a Claim against the Debtor, other than an Administrative Expense Claim, Professional Fee Claim, Gap Period Claim, or Priority Tax Claim, which is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.72.   ***Party in Interest*** means a Person with a legal, equitable, or beneficial interest at issue in the Chapter 11 Case.

1.73.   ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other entity.

1.74.   ***Plan*** means this chapter 11 plan of liquidation, including the exhibits hereto (including the Plan Supplement), as may be amended or modified from time to time in accordance with the terms hereof.

1.75.   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, the Litigation Trust Agreement and the list of Causes of Action to be retained by the Debtor and/or the Litigation Trust; *provided, that* through the Effective Date, the Debtor shall have the right to amend the Plan Supplement as long as such amendment is consistent with the Plan in all respects.

1.76.   ***Platinum Equity Holders*** means Holdings; PPVA Oil and Gas, LLC; PPCO; Platinum Partners Liquid Opportunity Master Fund LP; and PPVA.

1.77.   ***Post-August 25, 2016 PPVA*** means PPVA on and after August 25, 2016, which is the date on which Matthew James Wright and Christopher Barnett Kennedy of RHSW (Caribbean) Limited were appointed as joint official liquidators for PPVA.

1.78.   ***Post-December 19, 2016 PPCO*** means PPCO on and after December 19, 2016, which is the date on which of Bart Schwartz was appointed as receiver for PPCO.

1.79.   ***PPVA*** means Platinum Partners Value Arbitrage Fund, LP.

1.80.   ***PPCO*** means Platinum Partners Credit Opportunities Master Fund LP.

1.81.   ***Priority Tax Claim*** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.82.   ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

1.83.   ***Professional*** means (a) any professional retained in the Chapter 11 Case pursuant to an Order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code, (b) any attorney or accountant seeking compensation or reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code, or (c) any Person whose fees and expenses are subject to approval by the Bankruptcy Court as reasonable pursuant to section 1129(a)(4) of the Bankruptcy Code.

1.84.   ***Professional Fee Claim*** means a Claim for services rendered or costs incurred by a Professional on or after the Voluntary Petition Date through the Effective Date.

1.85.    **Property** means all property of the Estate and the Debtor, whether tangible or intangible, and, without limitation, any and all real or personal property, including all Cash and cash equivalents, licenses, certifications, tax refunds, accounts receivable, inventory, Causes of Action, and equipment.

1.86.    **Released Parties** means collectively: (a) the Debtor; (b) the Committee; (c) the DIP Agent; (d) the Buyer; (e) Eleanor; (f) New Mountain Finance Corporation; (g) Post-August 25, 2016 PPVA; (h) Post-December 19, 2016 PPCO; and (i) with respect to each of the foregoing entities in clauses (a) through (h), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts, or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, restructuring advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees in their capacity as such; *provided, however,* that, notwithstanding the foregoing, and except as set forth in (a), (g) and (h), the Platinum Equity Holders and all of their current and former members, managers, equity holders, employees, agents, professionals, trustees, principals, partners, parents, directors, and/or officers, and each of the foregoing's predecessors, successors, assigns, heirs, executors, estates, agents, servants, and professionals, are expressly excluded from this definition notwithstanding the fact that such Persons may have also been shareholders, members, managers, directors, officers or predecessors of, or otherwise related to, the Debtor, Post-August 25, 2016 PPVA and/or Post-December 19, 2016 PPCO.

1.87.    **Sale** means the sale of substantially all of the Debtor's Property to the Buyer pursuant to the Sale Order.

1.88.    **Sale Order** means that certain *Order (I) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (ECF No. 792) signed by the Bankruptcy Court on August 2, 2017.

1.89.    **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.90.    **Second Lien Claim** means any Secured Claim or other Claim arising in connection with the Indenture, the Fiscal Agency Agreement, and/or the Second Priority Notes as well as any other Claim granted to the Second Lien Claim holders under the Final DIP Order.

1.91.    **Second Priority Notes** means the 12% Second Priority Senior Secured Notes due September 18, 2019 issued by Holdings in the principal amount of $80 million pursuant to the Indenture and the Fiscal Agency Agreement.

1.92.    **Secured Claim** means a Claim to the extent (a) secured by property of the Debtor or the Estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtor, or (iii) as determined by

a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.93.   **Senior Statutory Lien** shall have the meaning assigned to it in Paragraph 6(a) of the Final DIP Order.

1.94.   **Tax** means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under § 59A of the Internal Revenue Code of 1986, as amended), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and including any liability under Treasury Regulation § 1.1502-6 or any analogous or similar state, local, or non-U.S. law or regulation.

1.95.   **Unexpired Lease** means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.96.   **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.97.   **U.S. Trustee** means the office of the United States Trustee for Region 7 located at 515 Rusk, Houston, Texas 77002.

1.98.   **Voluntary Petition Date** means December 2, 2016.

**B.**   Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or on those terms and conditions, and in each case shall include any amendment, restatement, or other modification made in accordance herewith; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**C.**     Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however,* that if there is any inconsistency between a Plan provision and a provision of the Confirmation Order, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## SECTION 2. PROFESSIONAL FEE CLAIMS AND ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

2.1.     ***Administrative Expense Claims.***

Except to the extent that the holder of an Allowed Administrative Expense Claim and the Debtor agree to a different treatment, the Debtor shall pay to each holder of an Allowed Administrative Expense Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court or as provided by Section 2.2 hereof, requests for payment of Administrative Expense Claims must be filed and served on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve requests for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or its Estate, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.

The Debtor must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

2.2.     ***Professional Fee Claims.***

All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date.  Except to the extent that a holder of an Allowed Professional Fee Claim and the Debtor agree to a different treatment, the Debtor shall pay to each holder of a Professional Fee Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim,

Cash in such amounts as are Allowed by the Bankruptcy Court upon the later of (a) the Effective Date and (b) within five (5) days of the date upon which the Order relating to any such Allowed Professional Fee Claim is entered.

    2.3.    ***Gap Period Claims.***

Except to the extent that a holder of an Allowed Gap Period Claim and the Debtor agree to a different treatment, each holder of an Allowed Gap Period Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Gap Period Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Gap Period Claim becomes an Allowed Gap Period Claim; or (b) such lesser amount as to which the holder of an Allowed Gap Period Claim may agree, in writing.

    2.4.    ***Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; *provided, however*, that the Debtor may elect to provide the holder of Allowed Priority Tax Claim with regular installment payments pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (b) such lesser amount as to which the holder of an Allowed Priority Tax Claim may agree, in writing.

    2.5.    ***Other Priority Claims.***

Except to the extent that a holder of an Allowed Other Priority Claim and the Debtor agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Debtor, (a) Cash in an amount equal to such Allowed Other Priority Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Other Priority Claim becomes an Allowed Other Priority Claim; or (b) such lesser amount as to which the holder of an Allowed Other Priority Claim may agree, in writing.

## SECTION 3. <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

    3.1.    ***Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided, however,* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest

is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, discharged, or otherwise settled prior to the Effective Date.

### 3.2. *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in the Debtor, and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Gap Period Claims, Priority Tax Claims, and Other Priority Claims have not been classified and are therefore excluded from the Classes of Claims and Interests set forth in this Section 3. All of the potential Classes for the Debtor are set forth herein.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | First Lien Claims | Impaired | Yes |
| 2 | Second Lien Claims | Impaired | Yes |
| 3 | M&M Lien Claims | Unimpaired | No (deemed to accept) |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.3. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided herein, nothing under the Plan shall affect the rights of the Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 3.5. *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.6.    ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.***

The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the Plan in accordance with Section 13.1 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

3.7.    ***Controversy Concerning Impairment.***

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## SECTION 4.  <u>TREATMENT OF CLAIMS AND INTERESTS</u>

4.1.    ***First Lien Claims (Class 1).***

(a)    <u>Classification</u>:  Class 1 consists of the First Lien Claims.

(b)    <u>Allowance</u>:  Notwithstanding any other provision of this Plan to the contrary, on the Effective Date, the First Lien Claims shall be Allowed as Secured Claims pursuant to section 506(b) of the Bankruptcy Code having first lien priority on account of unpaid principal, accrued and unpaid interest, letters of credit obligations, plus additional amounts for unpaid Additional Obligations (as defined below) on account of any fees, costs, expenses, disbursements, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to the Letter of Credit Loan Agreement, the Letter of Credit Note, and/or the Final DIP Order (the foregoing, collectively, the "<u>Additional Obligations</u>"), in each case, not subject either in whole or in part to offset, disallowance, or avoidance under chapter 5 of the Bankruptcy Code or otherwise, or any legal, contractual, or equitable theory for Claims or Causes of Action (including, without limitation, subordination, recharacterization, recoupment, or unjust enrichment) that any Person, including, but not limited to, the Debtor and its Estate, may be entitled to assert against FNBCT or the First Lien Claim.

(c)    <u>Treatment</u>:  Except to the extent that the holder of an Allowed First Lien Claim agrees to a less favorable treatment, the holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed First Lien Claim and any Additional Obligations, one of the following treatments, at the discretion of the Debtor: (i) payment of such Allowed First Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed First Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a rate to be determined by the Bankruptcy Court; (iii) such other treatment necessary to satisfy

14

section 1129(b)(2)(A) of the Bankruptcy Code; or (iv) such other treatment as may be agreed to by the holder of an Allowed First Lien Claim; *provided, however,* that any Cash or other distribution to which the holder of an Allowed First Lien Claim is entitled pursuant to this paragraph shall be distributed as an FNBCT Gift Distribution.

(d)    Voting:  Class 1 is Impaired, and the holder of the First Lien Claim is entitled to vote to accept or reject the Plan.

**4.2.    *Second Lien Claims (Class 2).***

(a)    Classification:  Class 2 consists of the Second Lien Claims.

(b)    Treatment:  To the extent that a Second Lien Claim is determined to be an Allowed Second Lien Claim, the holder of such Allowed Second Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Second Lien Claim, one of the following treatments, at the discretion of the Debtor: (i) payment of such Allowed Second Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed Second Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a rate to be determined by the Bankruptcy Court; (iii) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code; or (iv) such other treatment as may be agreed to by the holder of an Allowed Second Lien Claim; *provided, however,* that any Cash or other distribution to which the holder of an Allowed Second Lien Claim is entitled pursuant to this paragraph shall be distributed as an Eleanor Gift Distribution.  To the extent that all or any portion of a Second Lien Claim is determined to be an Allowed General Unsecured Claim, the holder of such Second Lien Claim shall be entitled to the treatment accorded to Class 4.

(c)    Voting:  Class 2 is Impaired, and the holders of the Second Lien Claims are entitled to vote to accept or reject the Plan.

**4.3.    *M&M Lien Claims (Class 3).***

(a)    Classification:  Class 3 consists of the M&M Lien Claims.

(b)    Treatment:  Except to the extent that the holder of an Allowed M&M Lien Claim agrees to a less favorable treatment, the holder of an Allowed M&M Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed M&M Lien Claim, at the discretion of the Debtor: (i) payment of such Allowed M&M Lien Claim in full in Cash, including the payment of any interest required under section 506(b) of the Bankruptcy Code; (ii) payment of such Allowed M&M Lien Claim in full in equal installments over a period not to exceed five (5) years after the Effective Date, with interest (if applicable) at a rate to be determined by the Bankruptcy Court; or (iii) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code.

(c)    <u>Voting</u>:  Class 3 is Unimpaired, and the holders of the M&M Lien Claims are deemed to accept the Plan.

4.4.    ***General Unsecured Claims (Class 4).***

(a)    <u>Classification</u>:  Class 4 consists of the General Unsecured Claims.

(b)    <u>Treatment</u>:  Provided that there are no holders of Allowed Professional Fee Claims or Allowed Administrative Expense and Priority Claims or Allowed Secured Claims whose claims have not been settled, satisfied, discharged, and/or released, the holders of Allowed General Unsecured Claims will receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claims, their Pro Rata share of the FNBCT Gift Distribution, if any, the Eleanor Gift Distribution, if any, and/or Available Cash, if any.

(c)    <u>Voting</u>:  Class 4 is Impaired, and the holders of the General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.5.    ***Equity Interests (Class 5).***

(a)    <u>Classification</u>:  Class 5 consists of the Equity Interests.

(b)    <u>Treatment</u>:  On the Effective Date, all Equity Interests shall be deemed cancelled, and the holders of the Equity Interests shall not receive or retain any property under the Plan on account of such Interests.

(c)    <u>Voting</u>:  Class 5 is Impaired, and the holders of the Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The holders of the Equity Interests are not entitled to vote to accept or reject the Plan.

## SECTION 5. <u>MEANS OF IMPLEMENTATION</u>

5.1.    ***Authority.***

The Debtor shall have the authority and right, without the need for Bankruptcy Court approval (unless otherwise expressly indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(a)    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Claims against the Debtor (except to the extent Claims have been previously Allowed);

(b)    make distributions to holders of Allowed Claims in accordance with the Plan;

(c)    exercise its reasonable business judgment to direct and control the wind-down, liquidation, sale, and/or abandonment of the remaining Property of the Debtor

under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(d)     prosecute all Causes of Action on behalf of the Debtor, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Debtor may determine is in the best interests of the Debtor and the holders of Allowed Claims; *provided, however,* that the Debtor shall transfer all Causes of Action to the Litigation Trust pursuant to Section 5.2 herein and, as further provided therein, the Litigation Trust shall govern the ultimate disposition of the Causes of Action;

(e)     make payments to any professionals who may continue to perform in their current capacities;

(f)     retain professionals to assist in performing duties under the Plan;

(g)     maintain books, records, and accounts;

(h)     obtain any prudent or necessary insurance;

(i)     invest its Cash and any income earned thereon;

(j)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals;

(k)     administer tax obligations, including (i) filing tax returns and paying tax obligations; (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of the Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of the Debtor ending after the Voluntary Petition Date through the Liquidation, as determined under applicable tax laws; and (iii) representing the interest and account of the Debtor or its Estate before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, or audit;

(l)     prepare and file any and all informational returns, reports, statements, returns, or disclosures relating to the Debtor that are required hereunder by any Governmental Unit or applicable law;

(m)     pay statutory fees in accordance with Section 13.3 of the Plan; and

(n)     perform such other duties and functions as are necessary and/or advisable.

5.2.     ***Litigation Trust.***

(a)     <u>Transfer of Causes of Action</u>. On the Effective Date, the Debtor and the Estate shall preserve, irrevocably transfer, and assign all Causes of Action to the Litigation Trust, with good, clean title to such property, free and clear of all Liens, charges, Claims, claims, encumbrances, Interests, and interests.  On the Effective Date, in

17

accordance with section 1141 of the Bankruptcy Code, all Causes of Action, as well as the rights and powers of the Estate applicable to the Causes of Action, shall automatically vest in the Litigation Trust. The Litigation Trust shall be established for the sole purpose of prosecuting the Causes of Action and distributing the proceeds thereof in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business.

(b)     <u>Management and Oversight</u>. The Litigation Trust shall be administered by the Litigation Trustee and overseen by the Litigation Trust Committee, the latter of which shall be identified prior to the conclusion of the Confirmation Hearing.

(c)     <u>Beneficiaries and Distributions</u>. Upon the creation of the Litigation Trust, holders of Allowed Claims shall become the beneficiaries of the Litigation Trust pursuant to the Litigation Trust Agreement, as their respective interests may appear in accordance with the terms of the Plan. The Litigation Trustee may, pursuant to the Litigation Trust Agreement and the Plan, make interim distributions to holders of Allowed Claims in the exercise of reasonable business judgment. Upon the settlement, conclusion of litigation, and collection of all of the Causes of Action in the Litigation Trust, after the payment of all costs and expenses of collection, the Litigation Trustee must distribute the corpus of the Litigation Trust Pro Rata to the holders of Allowed Claims in accordance with the Plan and the Litigation Trust Agreement.

(d)     <u>Authority</u>. The Litigation Trustee shall, subject to the terms of the Litigation Trust Agreement and the Litigation Trust Committee, have full power, authority, and standing to prosecute, compromise, or otherwise resolve the Causes of Action. The Litigation Trust, acting by and through the Litigation Trustee pursuant to the Litigation Trust Agreement, shall be authorized to exercise and perform all rights and powers held by the Debtor and the Estate with respect to the Litigation Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee, representative appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, or any similar official who has been appointed to take control of, supervise, manage, or liquidate the Estate, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Causes of Action. Neither the Debtor nor the Estate shall be subject to any counterclaims with respect to the Causes of Action.

(e)     <u>Retention of Professionals</u>. The Litigation Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties on such terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval. The Litigation Trustee may retain any Professional who represented any Party in Interest in the Chapter 11 Case if he deems it an appropriate exercise of his business judgment.

(f)     Funding.  In no event later than ten (10) days after the Effective Date, pursuant to Paragraph 2.1(iv) of the APA, the Buyer shall transfer $150,000.00 in Cash to the Debtor or the Litigation Trust to pay the expenses of the Litigation Trustee and his professionals for administering the Litigation Trust and prosecuting the Causes of Action in accordance with the Plan and the Litigation Trust Agreement.  The Litigation Trustee may be able to supplement this initial funding through settlement payments and the collection of judgments, by borrowing funds to finance litigation, or by retaining contingent fee counsel.

(g)     Party in Interest.  For the avoidance of doubt, the Litigation Trust is a Party in Interest with respect to all objections to any Claim relating to a Cause of Action and all compromises of such objections.

(h)     Binding Effect of Litigation Trust Agreement.  For the avoidance of doubt, the Debtor, the Litigation Trustee, and the Litigation Trust Committee shall be bound by the terms of the Litigation Trust Agreement.

### 5.3.     *Corporate Action.*

On the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Litigation Trust) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtor, or any other Person.  All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection therewith, shall be deemed to have occurred and shall be in effect without any requirement of further action by the Debtor or the Estate.

Upon the Effective Date or as soon as reasonably practicable thereafter, the existing board of managers of the Debtor shall be dissolved without any further action required on the part of such entities, their members, their managers, or their officers, and any and all remaining officers, members or managers of the Debtor shall be dismissed without any further action required on their part.  The members, managers, and officers of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of the Plan.

The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

### 5.4.     *Withholding and Reporting Requirements.*

(a)     Withholding Rights.  In connection with the Plan, any party making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant

to the Plan shall have responsibility for any Taxes, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)     Forms. Any Person entitled to receive a distribution under the Plan shall, upon request, deliver to the Debtor an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt and so notifies the Debtor. If such request is made by the Debtor and such Person fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtor, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor and its Property.

5.5.     ***Closing of the Chapter 11 Case.***

When (a) all Disputed Claims have become Allowed Claims or Disallowed Claims, (b) the Litigation Trust has been dissolved pursuant to the Litigation Trust Agreement, (c) all remaining Available Cash has been distributed in accordance with the Plan, and (d) the Chapter 11 Case has been fully administered, the Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

# SECTION 6. **CORPORATE GOVERNANCE**

6.1.     ***Board of Directors and Officers.***

On the Effective Date, James Katchadurian of CR3 Partners, LLC shall be appointed as the sole officer and manager of the Debtor. The Debtor shall elect such additional manager(s) and officer(s) as it deems necessary to implement the Plan and the actions contemplated herein.

6.2.     ***Wind Down.***

After the Effective Date, pursuant to the Plan, the Debtor shall, in an expeditious but orderly manner, wind down, sell, and otherwise liquidate and convert its Property to Cash, with no objective to continue or conduct a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation and orderly wind down of the Debtor, and shall not unduly prolong the duration of the Liquidation and the wind down.

Upon the Debtor's filing with the Bankruptcy Court of a certification stating that all duties of the Debtor under the Plan have been completed (save and except for those assigned to the Litigation Trustee under the Litigation Trust), the Debtor shall be dissolved without any further action or filing, including the filing of any documents with the secretary of state for the state in which the Debtor is formed or any other jurisdiction.

6.3.    *LLC Agreement.*

As of the Effective Date, the LLC Agreement shall be amended to the extent necessary to carry out the provisions of the Plan.  The amended LLC Agreement and any other necessary corporate documents shall be contained in the Plan Supplement.

# SECTION 7. <u>DISTRIBUTIONS</u>

7.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its respective agents shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests.  The Debtor shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

7.2.    *Date of Distributions.*

Except as otherwise provided herein, the Debtor shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  Thereafter, the Debtor shall from time to time determine the subsequent Distribution Dates, subject to the provisions of this Plan; *provided, that,* other than as discussed below, the Debtor is required to distribute to the holders of Allowed Claims, at least annually, all Available Cash on hand.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Notwithstanding the foregoing, the Debtor shall retain Available Cash sufficient to pay (i) reasonable and necessary professional fees and administrative costs and (ii) holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims; *provided, however*, that to the extent the holder of a Disputed Claim has filed duplicative claims (in the judgment of the Debtor), the Debtor shall be required to retain an amount equal to only one of the Disputed Claims.  In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Debtor shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.

7.3.    *Delivery of Distributions.*

In the event that any distribution to any holder of a Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtor has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Distribution Date.

After such date, all unclaimed property or interests in property shall be redistributed (notwithstanding any applicable federal or state escheat, abandonment, or unclaimed property laws to the contrary) to holders of Allowed Claims pursuant to the Plan without the need for a further order by the Bankruptcy Court, and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### 7.4.   *Manner of Payment Under the Plan.*

At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer.

### 7.5.   *Minimum Cash Distributions.*

The Debtor shall have no obligation to make a distribution that is less than Fifty Dollars ($50.00) in Cash.

### 7.6.   *Setoffs and Recoupment.*

Except for Claims that are expressly Allowed hereunder, the Debtor may, but shall not be required to, setoff or recoup against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made) any claims of any nature whatsoever that the Debtor may have against the holder of such Claim or Interest; *provided, that* neither the Debtor's failure to enforce such a setoff or recoupment nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtor of any setoff or recoupment right the Debtor may have against the holder of such Claim or Interest.

### 7.7.   *Payment of Disputed Claims.*

As Disputed Claims are resolved pursuant to Section 8 hereof, the Debtor shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Debtor in the Debtor's sole discretion.

### 7.8.   *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan comprises both indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim, and then to accrued but unpaid interest.

## SECTION 8. <u>PROCEDURES FOR DISPUTED CLAIMS</u>

### 8.1.   *Allowance of Claims.*

After the Effective Date, the Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without

limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until (a) such Claim is deemed Allowed under this Plan or the Bankruptcy Code, or (b) the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

### 8.2.   *Objections to Claims.*

As of the Effective Date, only the Debtor may interpose and prosecute objections to Claims.  The Debtor must serve and file such objections on or before (a) the Claims Objection Bar Date or (b) such later date as ordered by the Bankruptcy Court.

### 8.3.   *Estimation of Claims.*

On or before the Claims Objection Bar Date or such later date as ordered by the Bankruptcy Court, the Debtor may request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor may pursue supplementary proceedings to object to the allowance of such Claim.

All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 8.4.   *No Distributions Pending Allowance.*

If the Debtor files an objection to a Claim as set forth in Section 8.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 8.5.   *Preservation of Claims and Right to Settle Claims.*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims and Disputed Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 8.2 hereof, the Confirmation Order, the Litigation Trust Agreement, and any other contract, instrument, release, indenture, or other agreement entered into in connection herewith.

23

## SECTION 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1.     *Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan or Plan Supplement, including Section 9.5 herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) is subject to a pending motion to assume as of the Effective Date; (b) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Case, including, but not limited to, the Executory Contracts and Unexpired Leases assumed and assigned to the Buyer in connection with the Sale; (c) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (d) is a D&O Policy or an insurance policy; or (e) is the APA.

9.2.     *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless an Order of the Bankruptcy Court otherwise provides for an earlier date, any proofs of Claim based on the rejection of the Debtor's Executory Contracts or Unexpired Leases, pursuant to the Plan or otherwise, must be filed with the Bankruptcy Court and served on the Clerk of the Court and the Debtor no later than thirty (30) days after the Confirmation Date. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtor no later than the deadline to file objections to the Plan pursuant to the Bankruptcy Code and Bankruptcy Rules.

Any holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease for which a proof of Claim is not timely filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim or (b) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claim arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and unenforceable against the Debtor, the Estate, or the Property, and shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by Order of the Bankruptcy Court.

9.3.     *APA.*

The Debtor's assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Buyer's rights and obligations, including any cure obligations assumed by the Buyer pursuant to the APA, with respect to any Executory Contract or Unexpired Lease assigned to the Buyer pursuant to the terms of the APA and the Sale Order. For the avoidance of doubt, the APA is being assumed and ratified by the Debtor and will remain enforceable by the parties thereto.

9.4.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.5.    ***Insurance Policies.***

To the extent any insurance policy of the Debtor is an Executory Contract, the Debtor shall assume each such insurance policy, including any D&O Policy, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless (a) the Debtor previously rejected such insurance policy pursuant to an Order of the Bankruptcy Court or (b) such insurance policy is the subject of a motion to reject pending on the Effective Date.  Coverage for defense and indemnity under any D&O Policy shall remain available to all Persons falling within the definition of "Insured" in any such D&O Policy.

9.6.    ***Reservation of Rights.***

Neither the exclusion nor the inclusion of any contract or lease in the APA or the Sale Order, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtor or the Estate has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assignment, or rejection, the Debtor shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## SECTION 10. <u>CONDITIONS PRECEDENT TO THE EFFECTIVE DATE</u>

10.1.    ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and the Confirmation Order shall not be subject to any stay;

(b)    all ancillary documents necessary to implement and confirm the Plan shall have been approved by the Debtor or waived in writing;

25

(c)     all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effected or executed and delivered; and

(d)     all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

### 10.2.   *Waiver of Conditions Precedent.*

Each of the conditions precedent in Section 10.1, other than the condition set forth in Section 10.1(a), may be waived in writing by the Debtor.

### 10.3.   *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Debtor, if the Effective Date does not occur within thirty (30) days of the Confirmation Date, or if the Confirmation Order is vacated, (a) no distributions shall be made, (b) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all of the Debtor's obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other entity, or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

## SECTION 11. <u>EFFECT OF CONFIRMATION</u>

### 11.1.   *Vesting of Assets.*

On the Effective Date, except as provided pursuant to this Plan and the Confirmation Order, and pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtor's Estate shall vest in the Debtor and/or the Litigation Trust, as applicable, for the purpose of liquidating the Estate and consummating the Plan.

### 11.2.   *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or documents created pursuant to the Plan or the Sale, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any Property of the Debtor or the Estate shall be fully released, settled, and compromised in exchange for any right to a distribution from the Debtor as provided in this Plan, and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any Property of the Debtor or the Estate shall revert to the Debtor.

11.3.    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise; *provided, however,* that pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination right relating thereto.

11.4.    ***Binding Effect.***

(a)    Subject to Section 11.4(b) below, confirmation of the Plan does not provide the Debtor with a discharge under section 1141 of the Bankruptcy Code because the Plan is a liquidating chapter 11 plan.

(b)    Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

11.5.    ***Term of Injunctions or Stays.***

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case, under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the date indicated in the order providing for such injunction or stay and the date the Chapter 11 Case is closed.

11.6.    ***Injunction Against Interference with the Plan.***

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order.

11.7.    ***Releases by the Debtor.***

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties in facilitating and implementing the Liquidation, and the waiver and/or subordination of certain Claims by certain of the Released Parties as memorialized by the Eleanor Gift Distribution and the FNBCT Gift Distribution, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtor and the Estate from any**

27

and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), remedies, losses, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtor or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtor; (b) the Chapter 11 Case; (c) the purchase, sale, or rescission of the purchase or sale of any security of the Debtor; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; (e) the business or contractual arrangements between any Debtor and any Released Party; (f) the Liquidation; (g) the restructuring of any Claim or Interest before or during the Chapter 11 Case; (h) the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof; (i) the solicitation of votes with respect to the Plan; or (j) any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.

      11.8.   *Releases by Holders of Claims and Interests.*

        As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate and implement the Liquidation, and the waiver and/or subordination of certain Claims by certain of the Released Parties against the Debtor, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law and approved by the Bankruptcy Court, by (a) the holders of all Claims or Interests who elect to "opt-in" to provide a release in favor of such Released Parties on their respective Ballots, (b) the holders of all Claims or Interests that are Unimpaired under the Plan, (c) the holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, and (d) the holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, in each case from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), remedies, losses, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtor; (b) its Estate; (c) the Chapter 11 Case; (d) the purchase, sale, or rescission of the purchase or sale of any security of the Debtor; (e) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; (f) the business or contractual arrangements between the Debtor and any Released Party; (g) the Liquidation; (h) the restructuring of any Claim or Interest before or during the Chapter 11

Case; (i) the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof; (j) the solicitation of votes with respect to the Plan; or (k) any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes fraud, gross negligence, or willful misconduct.

11.9.   *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action (including Avoidance Actions), remedy, loss, and liability for any claim in connection with or arising out of (a) the administration of the Chapter 11 Case; (b) the negotiation and pursuit of the Disclosure Statement, the Liquidation, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (c) the funding of the Plan; (d) the occurrence of the Effective Date; (e) the administration of the Plan or the property to be distributed under the Plan; or (f) the transactions in furtherance of any of the foregoing; *provided, however,* that the exculpation provided in this paragraph shall not apply to an Exculpated Party's fraud, gross negligence, or willful misconduct.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

11.10.   *Retention of Causes of Action/Reservation of Rights.*

(a)     Except as otherwise provided herein, including Sections 11.6, 11.7, 11.8 and 11.9, pursuant to section 1123(b) of the Bankruptcy Code, the Debtor or the Litigation Trust, as applicable, shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person without the approval of the Bankruptcy Court, including, without limitation, (i) any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim, and/or Claim for setoff seeking affirmative relief against the Debtor, or its officers, directors, or representatives; and (ii) the turnover of any Property of the Debtor or the Estate; *provided, however,* that the Debtor and the Litigation Trust shall not retain any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence, or willful misconduct, which Claims or Causes of Action are hereby preserved).  The Debtor or the Litigation Trust, as applicable, may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Debtor, the Estate, and the Parties in Interest.

(b)     Except as otherwise provided herein, including Sections 11.6, 11.7, 11.8 and 11.9, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately before the Voluntary

Petition Date against or with respect to any Claim left Unimpaired by the Plan; *provided, however,* that the Debtor and the Litigation Trust shall not retain any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence, or willful misconduct, which Claims or Causes of Action are hereby preserved). The Debtor or the Litigation Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately before the Voluntary Petition Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date by the Debtor or the Litigation Trust, as applicable, to the same extent as if the Chapter 11 Case had not been commenced.

11.11. ***Solicitation of the Plan.***

As of and subject to the occurrence of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

11.12. ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court no less than five (5) days before the Confirmation Hearing. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours and will also be posted at http://cases.primeclerk.com/northstar.

11.13. ***Corporate Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtor and any corporate or limited liability company action required by the Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, directors, officers, members, or partners of the Debtor. The authorizations and approvals contemplated by this Section 11.13 shall be effective notwithstanding any requirements under non-bankruptcy law.

## SECTION 12. <u>RETENTION OF JURISDICTION</u>

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification,

priority, compromise, estimation, or payment of Claims or Interests resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

(d)    to consider Claims or Interests and the allowance, classification, priority, compromise, estimation, or payment of Claims or Interests;

(e)    to enter, implement, or enforce such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other Orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other Order;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Plan Supplement, or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the APA, the Sale Order, the Plan, the Confirmation Order, or any other agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue any Order as may be necessary to construe, interpret, enforce, implement, execute, or consummate the Plan or to maintain the integrity of the Plan following consummation;

(k)    to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, or similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)      to adjudicate, decide, or resolve any Causes of Action (including Avoidance Actions);

(o)      to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)      to resolve any cases, controversies, suits, disputes, or Causes of Action (including Avoidance Actions) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid;

(q)      to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(r)      to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to the amount of a payment to cure a monetary default to permit the Debtor to assume or assign an Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)      to enter a final decree closing the Chapter 11 Case;

(u)      to enforce all Orders previously entered by the Bankruptcy Court;

(v)      to recover all Property of the Debtor and the Estate, wherever located; and

(w)      to hear and determine any rights, Claims, or Causes of Action (including Avoidance Actions) held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 13. <u>MISCELLANEOUS PROVISIONS</u>

13.1.    ***Modification of the Plan.***

This Plan may be altered, amended, modified, or supplemented by the Debtor before or after the Confirmation Date in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the

Bankruptcy Code; provided, however, that the Committee shall have the right to be consulted on any proposed modifications of the Confirmation Order and the Plan. A holder of an Allowed Claim or Allowed Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

13.2. ***Revocation or Withdrawal of the Plan.***

The Debtor, in consultation with the Committee, reserves the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, or (iv) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

13.3. ***Payment of Statutory Fees.***

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtor. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law, and the Debtor shall continue to file reports to show the calculation of such fees for the Debtor's Estate until confirmation of the Plan according to section 1129 of the Bankruptcy Code. Post-confirmation, quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law, and the Debtor or liquidating trustee shall continue to file reports to show the calculation of such fees for the Debtor's Estate until the Chapter 11 Case is closed under section 350(a) of the Bankruptcy Code.

13.4. ***Post Confirmation Report.***

The Debtor or the liquidating trustee shall file the post-confirmation report with the U.S. Trustee in accordance with applicable law until the Chapter 11 Case is closed under section 350(a) of the Bankruptcy Code.

13.5. ***Dissolution of the Committee.***

On the Effective Date, the Committee shall dissolve automatically, and the members of the Committee shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Committee and any professionals and/or advisors to the Committee.

13.6. ***Substantial Consummation.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

13.7. ***Severability of Plan Provisions.***

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter

33

and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.8.  ***Governing Law.***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof.

13.9.  ***Time.***

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.10.  ***Immediate Binding Effect.***

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable, and deemed binding upon, and inure to the benefit of, the Debtor, the Litigation Trust, the holders of Claims and Interests (irrespective of whether holders of such Claims and Interests are deemed to have accepted the Plan), the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

13.11.  ***Successors and Assigns.***

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each Person.

13.12.  ***Exhibits/Schedules***

All exhibits and schedules to the Plan, the Plan Supplement, and the Exhibits to the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

13.13.  ***Entire Agreement***

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.14. **_Notices_**

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission or e-mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Northstar Offshore Group, LLC
> 11 Greenway Plaza, Suite 2800
> Houston, Texas 77046
> Telephone: (713) 626-9696
> Attn:   Avery C. Alcorn
>             James Katchadurian
> Email:  AAlcorn@nstaroffshore.com
>             James.Katchadurian@cr3partners.com

> with a copy to:

> Winston & Strawn LLP
> 1111 Louisiana, 25th Floor
> Houston, TX 77002
> Telephone: (713) 651-2600
> Facsimile:  (713) 651-2700
> Attn:   Lydia T. Protopapas, Esq.
>             Jason W. Billeck, Esq.
> Email:  LProtopapas@winston.com
>             JBilleck@winston.com

After the Effective Date, the Debtor is authorized to send notice to Persons informing them of the need to file a renewed request for service if they wish to continue to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

Dated: November 21, 2017

Respectfully submitted,

Northstar Offshore Group, LLC

By: _/s/ Avery C. Alcorn_
Name: Avery C. Alcorn
Title: Chief Financial Officer and Senior Vice President

**Exhibit B**

**Voting Instructions**

**VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT
FOR HOLDERS OF CLASS [ ] CLAIMS**

1. The Debtor is soliciting votes of holders of Claims and Equity Interests with respect to the Plan that accompanies the Ballot.  Capitalized terms used but not otherwise defined in the Ballot or these instructions shall have the meanings ascribed to them in the Plan, the Disclosure Statement, or the order approving the Disclosure Statement, copies of which also accompany the Ballot.

2. This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  The Court may confirm the Plan and thereby bind you to the terms of the Plan.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THE BALLOT.**

3. Please review the information contained in Item 1 for accuracy.

4. In the boxes provided in Item 2 of the Ballot, please cast ONE vote to either accept or reject the Plan.

5. You must vote your entire Class [ ] Claims to accept or reject the Plan.  You may not split your vote.  A Ballot that partially rejects and partially accepts the Plan will not be counted.

6. Pursuant to the Plan, you are deemed to have given the releases in Section 11.8 of the Plan if you (a) vote to accept the Plan (whether or not you check the box in Item 3) or are deemed to accept the Plan, (b) abstain from voting to accept or reject the Plan without checking the box in Item 3 of the Ballot, or (c) submit the ballot and vote to reject the Plan without checking the box in Item 3.  You may check the box in Item 3 only if you are entitled to opt out of the Releases in Section 11.8 of the Plan.

7. Complete the Ballot by providing all the information requested and sign, date, and return the Ballot by "E-Ballot" platform at https://cases.primeclerk.com/northstar with your Unique E-Ballot ID# or by mail, overnight courier, or hand delivery to Prime Clerk, LLC (the "Solicitation Agent") at the applicable following address:

> Northstar Ballot Processing
> c/o Prime Clerk, LLC
> 830 Third Avenue, 3rd Floor
> New York, NY 10022

**To be counted, Ballots must be *received* by the Solicitation Agent by [December 19], 2017 at 12:00 p.m. (Central Time) (the "Voting Deadline"), unless such time is extended by the Debtor.**

If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Solicitation Agent is enclosed for your convenience.

**Ballots will <u>not</u> be accepted by telecopy, facsimile, e-mail, or other electronic means of transmission (unless otherwise noted).  Ballots should not be sent to the Debtor or the Bankruptcy Court.**

8. If you hold Claims in more than one voting Class under the Plan, you may receive more than one Ballot.  Each Ballot you receive is for voting only those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class [ ] Claims.  You must vote all of your Claims in a particular class under the Plan either to accept or reject the Plan.

9. If you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and, if requested, submit satisfactory evidence of your authority to do so (i.e., a power of attorney).

10. Your Claim has been **temporarily allowed solely for purposes of voting** to accept or reject the Plan in accordance with certain tabulation rules approved by the Bankruptcy Court (the "<u>Tabulation Rules</u>").  The Tabulation Rules are set forth in the Disclosure Statement Order which is enclosed with the solicitation materials you received along with this Ballot.  The temporary allowance of your Claim for voting purposes does not constitute an allowance of your Claim for purposes of distribution under the Plan and is without prejudice to the rights of the Debtor in any other context (i.e., the right of the Debtor to contest the amount or validity of any Claim for purposes of allowance under the Plan).  If you wish to have your Claim allowed for purposes of voting on the Plan in a manner that is inconsistent with the Ballot you received, you must file with the Court, on or before [December 4], 2017, a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for purposes of voting (a "<u>Rule 3018 Motion</u>").  With respect to any such motion filed, the Ballot shall be counted (a) in the amount established by the Court, or (b) if such an order has not been entered by the Voting Deadline and unless you and the Debtor have reached an agreement with respect to the Rule 3018 Motion, in an amount equal to the preprinted amount on the Ballot.

11. The Ballot does not constitute and shall not be deemed a proof of Claim or Equity Interest or an assertion of a Claim or Equity Interest.

**PLEASE RETURN YOUR BALLOT PROMPTLY.**

**THE SOLICITATION AGENT WILL *NOT* ACCEPT BALLOTS BY E-MAIL OR FACSIMILE TRANSMISSION.  BALLOTS SHOULD NOT BE SENT TO THE DEBTOR OR THE BANKRUPTCY COURT.**

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE SOLICITATION AGENT, PRIME CLERK, LLC AT (844) 596-2260 (OR OUTSIDE OF THE U.S. AT (929) 333-8976) OR VIA EMAIL AT**

**NORTHSTARBALLOTS@PRIMECLERK.COM.   PLEASE NOTE THAT THE SOLICITATION AGENT CANNOT PROVIDE YOU WITH LEGAL ADVICE.**

**Exhibit C**

**Schedule of Claims and Causes of Action to be
Transferred and Retained by the Litigation Trust**

Exhibit C-1

## SCHEDULE OF CLAIMS AND CAUSES OF ACTION TO BE
## TRANSFERRED AND RETAINED BY THE LITIGATION TRUST

The Debtor operated as an oil and gas company with substantially all of its producing assets located offshore in U.S. federal and Louisiana and Texas waters in the Gulf of Mexico. The Debtor's financial condition resulted at least in part due to acts and omissions of its equity holders and entities related to them. The Litigation Trust may pursue claims against Platinum Equity Holders, and all persons and entities related to them (collectively, "Platinum")[1] based on their domination and negligent operation of the Debtor's business, their use of the Debtor as a vehicle to promote their own self-interests, undercapitalization of the Debtor, and their failure to observe fundamental corporate formalities, such as constituting a Board of Directors, and their resulting unfettered control and domination of the Debtor. Other acts and omissions may give rise to claims for self-dealing, misappropriation of assets, diversion, usurpation and theft of corporate opportunities and assets, breach of fiduciary duty, breach of contract, embezzlement, conspiracy, fraud, negligent misrepresentation, misuse of collateral, conflicts of interest, securities violations, misuse of insider information, fraudulently structuring security interests and thus fraudulently obtaining interest payments, causing the Debtor to purchase poor-quality assets from other entities wholly-owned by Platinum, such as Black Elk, and seeking to use the Debtor as a means to avert Black Elk's bankruptcy. In connection with the Black Elk transaction, Platinum was advised by Chardan Capital Markets Inc. ("Chardan"), which does not appear to have been an impartial or "independent" advisor, and, as such, the Litigation Trust may seek to pursue claims against such entity.

The Debtor believes that the following additional claims and causes of action may exist:

a.      Claims and causes of action for avoidance and recovery under §§ 541, 542, 543, 544, 545, 547, 548, 549, 550, 553(b) of the Bankruptcy Code and all applicable state law counterparts, including claims against all parties who received payments within the ninety (90) days prior to the Petition Date, including but not limited to those parties identified in the Debtor's Statement of Financial Affairs (ECF No. 237) and Section IV.A.4, and all insiders who received payments within one (1) year of the Petition Date, including but not limited to those parties identified in the Debtor's Statement of Financial Affairs (ECF No. 237) and Platinum.

---

[1] Platinum Equity Holders means Holdings; PPVA Oil and Gas, LLC; PPCO; Platinum Partners Liquid Opportunity Master Fund LP; and PPVA. Platinum Partners, LP is "a Manhattan-based hedge fund," that was founded in part by, among others, Mark Nordlicht ("Nordlicht") and Murray Huberfeld ("Huberfeld"), both of whom are currently under criminal indictment. PPVA, the core Platinum fund, was founded in 2003 by Nordlicht, with investors that also included Huberfeld. Nordlicht has been the Chief Investment Officer ("CIO") and the person primarily directing Platinum's day-to-day operations. A number of other Platinum executives have played key roles in the Platinum companies, like Black Elk and Northstar, in which Platinum invested, and then dominated and controlled. Other Platinum related persons relevant to this case are: (i) David Levy ("Levy"), Huberfeld's nephew, a Managing Director and Portfolio Manager at Platinum, whom Platinum placed as CIO of the "friendly" Beechwood entities, and as the President of B Asset Manager, which was both the Administrative Agent for Black Elk's credit facility and also the investment arm of the Beechwood entities; and (ii) Daniel Small ("Small"), a Managing Director and Portfolio Manager at Platinum, an executive at Beechwood, and a member of Black Elk's Board of Managers. Levy and Small are under criminal indictment along with Nordlicht and other Platinum operatives, for, among other things, their role in the fraudulent transfer of Black Elk's assets, including the transfers to the Debtor.

b.      Any and all claims and causes of action against Platinum and former officers, directors, managers, control persons of the Debtor and employees of the Debtor put in place by Platinum (other than Brian Macmillan, Michaael Rauch, and Avery Alcorn) (the "Former D&Os"), including, but not limited to claims for breach of fiduciary duty, fraud, negligent misrepresentation, self-dealing, breach of contract, misuse of collateral, negligence, conversion, embezzlement, conflicts of interest, and misuse of insider information related to their acts and omissions or the transfers referred to herein.  Specifically, and without waiving the generality of the foregoing, any such claims and causes of action against Platinum and the Former D&Os arising out of the sale of assets to Holdings, the purchase of the Black Elk assets, the transfer of any collateral underlying any surety bonds of the Debtor, and the allegations in *Eleanor Fiduciary Servs., LLC v. Northstar GOM Holdings Grp., LLC et al.*, No. 654014/2016 (N.Y. Sup. Ct. Aug. 1, 2016), among others.

c.      Claims and causes of action against any former auditors of the Debtor and their respective insurers, including Chardan and Kerry Propper, for negligence, negligent misrepresentation, gross negligence, failure to abide by the standard of care for auditors and/or failure to institute appropriate controls and for malpractice related to false and misleading financial reporting associated with work performed from 2014 to 2016.

d.      Claims and causes of action against any of the following persons or entities: Platinum, Dan Small, Stephen Silver, Zach Weiner, John Hoffman, Jeff Shulse, Jed Latkin, Dov Weiner, Chaim Nordlicht, Mark Nordlicht, David Levy, Daniel Sakes, Jamie Hartman, Ehtan Benovitz, Beechwood Asset Management, Beechwood International Bermuda, LTD, Chardan, Kerry Propper, and any affiliates or related persons of the aforementioned entities for claims for the avoidance of preferential or fraudulent transfers, conspiracy, breach of contract or warranty, civil theft, conversion, fraud, negligent misrepresentation, breach of fiduciary duty, usurpation of corporate opportunity, self-dealing, breach of contract, misuse of collateral, negligence, embezzlement, equitable subordination, conflicts of interest associated with their control of/or dealings with the Debtor and/or the transfer and receipt of the Debtor's assets;

e.      Claims and causes of action against Platinum, its members, officers, directors, and affiliates, including but not limited to claims for the avoidance of preferential or fraudulent transfers, conspiracy, civil theft, conversion, fraud, negligent misrepresentation, breach of fiduciary duty, usurpation of corporate opportunity, self-dealing, breach of contract, misuse of collateral, negligence, embezzlement, equitable subordination, conflicts of interest associated with the purchase of the Debtor in September 2014;

f.      Claims and causes of action against Platinum, their officers directors, employees and affiliates, including but not limited to, claims for the avoidance of preferential or fraudulent transfers, conspiracy, civil theft, conversion, fraud, negligent misrepresentation, breach of fiduciary duty, self-dealing, breach of contract, negligence, embezzlement, equitable subordination, conflicts of interest associated with the $30 million transferred to New Mountain Finance and interest payments made on such notes;

g.      Claims and causes of action against Platinum and Chardan their officers directors, employees and affiliates, including but not limited to, claims for the avoidance of preferential or fraudulent transfers, conspiracy, civil theft, conversion, fraud, negligent misrepresentation, breach

of fiduciary duty, self-dealing, breach of contract, negligence, embezzlement, equitable subordination, conflicts of interest associated with purchase of Black Elk assets in 2014;

h.     Claims and causes of action against the Debtor's direct and indirect equity interest holders and their respective insurers for breach of fiduciary duty, fraudulent transfers, preferences, civil theft, conspiracy, embezzlement, self-dealing, conflicts of interest, successor liability, fraud, misrepresentation, piercing of the corporate veil associated with their role in the insolvency of the Debtor and the transfers referred to herein;

i.     Any and all claims and causes of action against any present or former joint interest partner or joint venture partners, including breach of contract, breach of the duty of good faith, commercial torts, tortious interference, setoff, recoupment, fraud, fraudulent inducement, misrepresentation, fraudulent or negligent misrepresentation, fraudulent or preferential transfers arising under the Bankruptcy Code, conversion, equitable subordination, negligence, conspiracy, aiding and abetting, self-dealing, and un-commercial transactions;

j.     Any and all claims and causes of action against all predecessors in interest (i.e., prior owners of properties sold to the Debtor), including breach of contract, breach of the duty of good faith, commercial torts, tortious interference, setoff, recoupment, fraud, fraudulent inducement, misrepresentation, fraudulent or negligent misrepresentation, fraudulent or preferential transfers arising under the Bankruptcy Code, conversion, equitable subordination, negligence, conspiracy, aiding and abetting, self-dealing, and un-commercial transactions;

k.     Any and all claims and causes of action against the Debtor's members and former senior management related to fraud, negligence, usurpation of corporate opportunity, self-dealing, breach of confidential relationship, mismanagement, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duty;

l.     Any and all claims and causes of action against all creditors that initiated an involuntary petition against the Debtor, any entities that served or serve as sureties for the Debtor, including commercial torts, tortious interference, unfair competition, breach of contract, loss of income, setoff, recoupment, fraud, fraudulent inducement, misrepresentation, fraudulent or negligent misrepresentation, fraudulent or preferential transfers arising under the Bankruptcy Code, conversion, lender liability, equitable subordination, negligence, conspiracy, aiding and abetting, self-dealing, and un-commercial transactions, and breach of duty of good faith; and

m.     Any and all claims and causes of action against any party that received a payment within the 90 day period prior to the filing of the Involuntary Petition or for statutory insiders within the one year period prior to the filing of the Involuntary Petition, including those parties set forth on the Debtor's Schedules and Statement of Financial Affairs.

The Committee has asserted that it has standing to assert independent causes of action as to some of the claims herein.  The Debtor disputes that the Committee has standing to assert such claims.

In addition, there may be additional state or federal law causes of action which currently exist or may arise that are not set forth in this Disclosure Statement because the facts that form the

basis of such causes of action are not currently known by the Debtor (the "<u>Unknown Causes of Action</u>").  The Debtor has just begun its initial investigation of potential causes of action and the Plan is premised on the Litigation Trust continuing the investigation of these causes.  The failure to list Unknown Causes of Action in this Disclosure Statement or the Plan is not in any way intended to waive such Unknown Causes of Action or to limit the rights of the Litigation Trust to pursue them.

Due to the preliminary nature of the Debtor's investigation of the Causes of Action, it is currently unknown whether there will be a recovery, and if so, the likely amount of such recovery. Until further progress has been made in the investigation, and sufficient discovery undertaken, the Debtor will be unable to offer an informed and credible estimate of the likely recovery on the Causes of Action.

**<u>Exhibit D</u>**
**Liquidation Analysis**

**SOURCES OF FUNDS**

| $ in USD/ Actuals | Unaudited Book Value | % | Orderly Liquidation Gross Recovery | % | Forced Liquidation Gross Recovery | Variance (W/-B) Estimate |
|---|---|---|---|---|---|---|
| **CURRENT ASSETS:** | | | | | | |
| Cash and cash equivalents | $885,744 | 100% | $885,744 | 100% | $885,744 | $0 |
| Restricted cash | - | 0% | - | 0% | - | - |
| *Accounts Receivable JIB's* | $1,000,000 | 100% | $1,000,000 | 50% | $500,000 | ($500,000) |
| Accounts receivable | - | 0% | - | 0% | - | - |
| Accrued oil and gas sales | - | 0% | - | 0% | - | - |
| Joint interest billings | - | 0% | - | 0% | - | - |
| Accrued sale, oil & gas properties | - | 0% | - | 0% | - | - |
| Other, net of allowance for doubtful accounts | - | 0% | - | 0% | - | - |
| Prepaid expenses | - | 0% | - | 0% | - | - |
| Derivative instruments, current | - | 0% | - | 0% | - | - |
| Related party receivable | - | 0% | - | 0% | - | - |
| Total current assets | $1,885,744 | | $1,885,744 | | $1,385,744 | ($500,000) |
| **OIL AND GAS PROPERTIES, SUCCESSFUL EFFORTS METHOD, NET OF DEPRECIATION:** | | | | | | |
| Proved properties | - | 0% | | 0% | - | - |
| Unproved properties | - | 0% | | 0% | - | - |
| Less accumulated depletion, depreciation, and amortization | - | 0% | - | 0% | - | - |
| Net oil and gas properties | - | | $0 | | $0 | $0 |
| **Total Assets** | $1,885,744 | | $1,885,744 | 0% | $1,385,744 | ($500,000) |

| $ in USD/ Actuals | Unaudited Book Value | % | Orderly Liquidation Gross Recovery | % | Forced Liquidation Gross Recovery | Variance (W/-B) Estimate |
|---|---|---|---|---|---|---|
| **Costs of Chapter 7 Trustee & Other** | | | | | | |
| Chapter 7 Trustee Fees | $113,145 | 0% | - | 100% | $113,145 | $113,145 |
| Legal and Professional | $100,000 | 0% | - | 100% | $100,000 | $100,000 |
| FNBCT Gift Distribution | $100,000 | 0% | - | 100% | $1,300,000 | $1,300,000 |
| **Total Liquidation Administrative Costs/ Income** | $313,145 | | - | | $1,513,145 | $199,000 |
| **Net Funds Available for Distribution** | | | $ 1,885,744 | | ($127,400) | $ (699,000) |