IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **NORTHSTAR OFFSHORE GROUP,** | § | |
| **LLC,** | § | |
| | § | **Case No. 16-34028** |
| **Debtor.** | § | |

**FIRST AND FINAL FEE APPLICATION OF M1 ENERGY CAPITAL MANAGEMENT, LLC, AS FINANCIAL ADVISOR FOR THE DEBTOR, FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FROM NOVEMBER 16, 2016 THROUGH AND INCLUDING MARCH 1, 2018**

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

| Name of applicant | M1 Energy Capital Management, LLC |
|---|---|
| Applicant's professional role in this case | Investment Banker and Financial Advisor to the Debtor |
| Indicate whether this is an interim or a final application | Final Application |
| Effective date of order approving retention | January 4, 2017, *nunc pro tunc* |
| Time period covered in application | November 16, 2016 – March 1, 2018 |
| Time period covered in all prior applications | N/A |
| Total amounts awarded in all prior applications | N/A |
| Time period covered by this final application | November 16, 2016 – March 1, 2018 |
| Amount of retainer received in case | $0.0 |
| Total fees requested in this application and all prior applications (including any retainer amounts applied or to be applied) | $1,073,850.00 |
| Total additional fees requested in this application (including any retainer amounts to be applied) | SAME |
| Total professional fees requested in this final application | $1,073,850.00 |
| Total professional hours covered by this final application | N/A[1] |
| Average hourly rate for professionals | N/A[2] |
| Reimbursable expenses sought in this application | $35,733.15 |
| Expected amount of dividend to be paid to unsecured creditors | Unknown |
| Expected percentage dividend to be paid to unsecured creditors | Unknown |
| Expected amount to be paid to all pre-petition creditors | Unknown |

---

[1] The Court's order authorizing the retention of M1 Energy Capital Management Service, LLC ("M1") states that "M1 and its professionals shall be excused from: (a) the requirement to maintain or provide detailed time records for services rendered postpetition and (b) providing or conforming to any schedule of hourly rates." [D.I. 238 at ¶ 7.]

[2] Although M1 was not required to keep or submit time records in this case, M1 estimates that the two professionals who worked on the Northstar engagement expended more than 1,443 hours on behalf of the Debtor, for an imputed hourly rate computed from the total fees of $744.18 ($1,073,850 / 1,443).

2

**TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:**

M1 Energy Capital Management, LLC ("M1"), which served as investment banker and financial advisor to Northstar Offshore Group, LLC, the debtors in the above-captioned case (the "Debtor" or the "Company"), submits this first and final application (this "Application") requesting allowance and approval of compensation for professional services rendered to the Debtor and reimbursement of actual and necessary expenses incurred in connection with such services on a final basis, for the period from November 16, 2016 through and including March 1, 2018 (the "Application Period")[3], pursuant to sections 327, 328 and 330 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Bankruptcy Local Rules for the Southern District of Texas (the Bankruptcy Local Rules") and the Court's Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Chapter 11 Procedures"). M1 represents as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The legal predicates for the relief requested herein are Bankruptcy Code sections 327, 328 and 330, Bankruptcy Rule 2016 and Bankruptcy Local Rule 2016-1.

3. M1 consents to this Court's authority to enter final orders on this matter.

---

[3] Although M1's retention was terminated as of April 2017, the Application Period extends through the end of the case given its entitlement to compensation under its Engagement Letter and the Retention Order.

3

**BACKGROUND**

4. On August 12, 2016 ("Involuntary Petition Date"), Montco Oilfield Contractors, LLC, Alliance Offshore, LLC and Alliance Energy Services, LLC ("Petitioning Creditors") filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code against the Debtor thereby commencing the above-captioned bankruptcy case.

5. On December 2, 2016 ("Voluntary Petition Date"), the Debtor agreed to convert the involuntary case to a voluntary case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("Voluntary Petition") (Dkt. No. 88).

6. Between the Involuntary Petition Date and the Voluntary Petition Date (the "Gap Period") the Debtor continued to operate its business under § 303(f).

7. On September 13, 2017, the Debtor filed its Plan of Liquidation (as subsequently amended, the "Plan") and the Disclosure Statement related thereto (Dkts. 851-852. 893, 895-897).

8. On December 22, 2017 (the "Confirmation Date"), the Court entered its Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Plan of Liquidation of Northstar Offshore Group, LLC (the "Confirmation Order") (Docket No. 1078), whereby the Court confirmed the Debtors' Second Amended Joint Plan of Liquidation of Northstar Offshore Group, LLC Under Chapter 11 of the Bankruptcy Code (the "Plan") (Docket No. 1078, Ex. A).

9. On January 19, 2018 (the "Effective Date"), the Plan became effective in accordance with its terms, and the Debtors filed notice thereof (Docket No. 1092).

**RETENTION OF M1**

10. On December 8, 2016, the Debtor applied to the Court for an order authorizing it to retain M1 pursuant to an engagement letter, dated November 16, 2016 (the "Engagement

4

Letter"), as their financial advisor, effective *nunc pro tunc* to the November 16, 2016 (the "Retention Application") (Docket No. 135) (A true and correct copy of the Engagement Letter is attached as Exhibit A). As summarized in the Retention Application, the Debtors sought to retain M1 to provide the following professional services, to the extent requested by the Debtor and Diamond McCarthy LLP, then-attorneys for the Debtor, as applicable:

<u>*General Financial Advisory, Investment Banking. Restructuring and Financing Services*</u>:

    (a)    Assist the Debtor in the assessment of risks and the development of commercial terms and conditions for contracts with external entities relating to the Debtor's reorganization;

    (b)    Assist the Debtor in the evaluation of ownership structures to ensure and Maximize capitalization;

    (c)    Review and evaluate potential sources of capital and assist the Debtor in the development of a capitalization plan;

    (d)    Assist the Debtor in preparing necessary transaction and solicitation materials in order to raise capital and coordinate any presentations to potential investors, lenders, and other parties, including assisting with due diligence;

    (e)    Advise and assist the Debtor in discussions and negotiations with investors, industry partners, banks, and other financial institutions regarding terms and conditions relating to the Debtor's reorganization;

    (f)    Solicit a wide spectrum of appropriate potential sources of capital for the Debtor, including private equity, mezzanine debt providers, and selected qualified buyers;

    (g)    Provide testimony and render financial services as necessary and mandated by the Court during this chapter 11 case, including, without limitation, the preparation and presentation of cash flow budgeting;

    (h)    Review and analyze the Debtor's business, operations, and financial projections;

    (i)    Assist in the determination of a range of values for the Debtor on a going-concern basis;

(j)        Advise the Debtor on tactics and strategies for negotiating with the parties in interest in this chapter 11 case;

(k)        Render financial advice to the Debtor and participate in meetings or negotiations with the parties in interest in connection with reorganization of the Debtor;

(l)        Advise the Debtor on the timing, nature, and terms of new securities, other considerations, or other inducements that might be offered pursuant to the reorganization of the Debtor;

(m)        Assist the Debtor in preparing documentation within M1's area of expertise that is required in connection with the reorganization of the Debtor;

(n)        Attend meetings of the Debtor's Board of Managers with respect to matters relating to M1's engagement; and

(o)        Provide the Debtor with other financial restructuring advice.

11.      As noted in its Retention Application, financial advisory firms such as M1 do not customarily charge for their services on an hourly basis. Instead, they charge a monthly advisory fee plus additional fees contingent on the occurrence of specified transactions. Accordingly, pursuant to the terms of the Engagement Letter, M1 is entitled to be compensated for its services as follows:[4]

> (a)      Upon the Effective Date of this Letter Agreement, Company agrees to pay to M1 a nonrefundable work fee (the "Work Fee") of forty thousand dollars (USD $40,000) per each calendar month for the Term of this Letter Agreement. The Work Fee will be due and payable on the Effective Date of this Letter Agreement and the first day (1st) of each calendar month thereafter for the Term of the Letter Agreement. Partial months shall be pro-rated based on a 30-day period. In the event of termination under Section 3, the Work Fee shall be payable for the full calendar month notwithstanding termination prior to the end date thereof.

Plus,

---

[4] In the case of any conflict between this Application and the Retention Order (as defined below), the Retention Order controls.

       (b)    For any Capital Raise in which Advisor provides Services to Company hereunder, the compensation to be paid to Advisor by Company for such Services will be calculated inclusive of the cash and non-cash consideration received by Company, its successors and assigns, and/or its subsidiaries in connection with the capital commitments (the "Success Fee"), and any Success Fees payable to Advisor will be paid to M1, and will be as follows:

(i) For an Equity Financing,[5] which includes issuance by the Company of common or preferred stock, or similar capital that provides ownership interests to the investor as follows: (x) a cash fee in the amount of 3.5% of the first $50,000,000 of funds committed to Company, and such cash fee to be reduced to 2.0% for all funds above $50,000,000 of the total funds committed to the Company from such Capital Raise, such fee to be paid as the committed funds are received by or paid to the Company during the later of (x) the commitment period defined by the investors or (y) the twenty-four month period following a Capital Raise closing, as a result of the services provided to the Company by Advisor pursuant to <u>Section 1</u>.

. . . . . . .

(iv) A Transaction Fee ("***Transaction Fee***") **of $500,000** shall be payable in cash upon the closing of a Restructuring that is completed outside or inside a Chapter 11 Filing, A Transaction shall be deemed to have been consummated upon the earliest of any of the following events to occur: (a) a Restructuring, (b) the acquisition of a majority of the outstanding common stock of the Company by a Buyer; (c) a merger or consolidation of the Company with or into a Buyer; (d) the acquisition by a Buyer of substantially all of the Company's assets; or (e) in the case of any other Transaction, the consummation thereof.

---

[5]     The Engagement Letter, Exhibit A, Section 5) provides the relevant definition:

5.   **Definitions:**  The term "<u>Equity Financing</u>" as used in this Letter Agreement includes:

   (a)    Any corporate, partnership or limited liability company equity financing or sale of other interests in the Company where the funding either is not restricted to one or more specifically identified projects or properties or allows reinvestment of cash flows (including the sale of preferred stock with or without warrants, common stock, convertible securities, joint venture or partnership interests or limited liability company equity),

   (b)    Corporate debt with equity warrants or other equity participation,

   (c)    the sale of overriding royalty, net profits interests, promoted working interests, or any other portion of interests held by or acquired by the Company (other than sales of working interests to industry partners in the ordinary course of the Company's business).

12. In Section 4(d), the Engagement Letter also provides that, in addition to M1's fees for professional services, the Debtors will promptly reimburse M1 for its reasonable and documented out-of-pocket expenses approved in advance by Company and incurred in connection with M1's services under the Engagement Letter, including, but not limited to, reasonable and necessary due diligence, travel, printing and any legal, consultants or other professional fees to be incurred by Advisor on the Company's behalf.

13. On January 4, 2017, the Court entered an order (the "Retention Order") (Docket No. 238) authorizing the Debtors to employ M1 as their financial advisor, effective as of November 16, 2016, in accordance with the provisions of the Retention Order and the Engagement Letter. A copy of the Retention Order is attached hereto as Exhibit B. The Retention Order authorized the Debtors to compensate and reimburse M1 in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders or procedures of this Court, except that (i) M1's fees shall be subject to review only pursuant to Bankruptcy Code section 328(a) and not section 330, except by the U.S. Trustee, and (ii) M1 and its professionals shall be excused from keeping time records for services rendered in one-tenth of an hour increments, and instead shall only be required to maintain time records in half-hour increments, and shall not be required to provide or conform to any schedule of hourly rates.

## COMPLIANCE WITH GUIDELINES

14. In compliance with the procedure outlined in the Plan and Confirmation Order, M1 is filing this Application for compensation for professional services rendered and reimbursement of disbursements made in these cases during the Application Period.

8

15. This Application was prepared in accordance with (i) the Retention Order; (ii) the Bankruptcy Rules; (iii) the Bankruptcy Local Rules; (iv) the Complex Chapter 11 Procedures; and (v) the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 (the "UST Guidelines" and, collectively with the Retention Order, the Bankruptcy Rules, the Bankruptcy Local Rules and the Complex Chapter 11 Procedures, the "Guidelines").

16. Annexed hereto as Exhibit E is the Certification of Richard Bernardy regarding M1's compliance with the Complex Chapter 11 Procedures. To the extent the Application is not in compliance with the Guidelines, M1 respectfully submits that such noncompliance is immaterial and requests a waiver of the applicable requirements.

**COMPENSATION REQUESTED**

17. M1 commenced efforts to locate a source of financing for Debtors and, after much effort, identified and commenced preliminary discussions with Arena Limited DIP 1, LLC, together with any additional parties or lenders thereto, (collectively, "Arena" or "DIP Lender") to provide such financing. Shortly thereafter, Debtor, through its CFO, engaged in detail negotiations with Arena to structure a DIP facility and provide the required protections for Arena to provide such funding, in consultation with M1 and its legal professionals. On December 2, 2016, Debtor filed an emergency motion seeking interim and final orders for post-petition financing from Arena (Docket 105). The final terms of that financing were approved by the Court in a Final Order dated February 2, 2017 (Docket 326).

18. Informing M1 that, at the request of its DIP Lender, Debtor would seek to retain a larger firm to conduct further marketing of the Debtor's assets with a goal towards selling all of its oil and gas assets, Debtor approached M1 and asked it to work cooperatively towards a wrap

9

up of the Debtor's retention for M1 so that Debtor could move forward with an alternative firm. Upon notifying Debtor and its counsel it would retain counsel to work cooperatively on that unwinding to allow Debtor to transition that work to another oil and gas marketing firm, M1 retained the undersigned counsel to work with Debtor on wrapping up these issues. During that process, Debtor notified M1 that as of April, M1 would be officially terminated. Although at the April 11, 2017 hearing before the Court to approve the settlement agreement requested by Debtor to quickly transition from the M1 engagement to the new broker, who was Parkman Whaling LLC, the Court noted that discharge of any estate professional required Court approval, for purposes of this Fee Application, M1 uses that April 11, 2017 date as the termination date for purposes of computing the compensation herein.

19. On August 2, 2017, the Court approved the sale of substantially all of the assets of Debtor to the highest bidder, Northstar Offshore Ventures LLC ("NOV"), and entered an order approving the sale (Docket 792). On August 4, 2017, Debtor submitted notice of the closing of its sale to NOV (Docket 800). The sale to NOG constitutes a Transaction under the M1 Engagement Letter and Retention.

20. On January 19, 2018, the Debtor's Plan of liquidation went effective. Based on the consummation of the Restructuring (as defined in the Engagement Letter), M1 is seeking, on a final basis, compensation equal to $1,073,850 in fees, which includes $220,000 for the monthly Work Fees, $353,850 for the Capital Raise, and $500,000 for the Success Fee, and $35,733.15 in reimbursement of related expenses.

21. **Monthly Fee**. M1's earned a monthly fee of $40,000/month from November 16, 2016 through April 2017. Although M1's retention is being treated as terminated as of April 11, 2017, the fee for the month of April was earned under the Letter Agreement (Ex. A, Section 4(a))

entitling M1 to 5 ½ months (i.e., November 16, 2016 through April 30, 2017) of the monthly fee. Consequently, M1 has earned and is entitled to monthly fees totaling $220,000. As required under the Retention Order, although M1 is compensated on a flat monthly fee, M1 has attached as Exhibit C a report of the hours spent by its personnel on this engagement to the ½ hour increments by day and task.

22. **DIP Financing**. M1's locating and obtaining a DIP financer, who, upon subsequent detailed negotiation with the Debtor, led to an acceptable and approved DIP loan by the Court, was a critical success early in this case for Debtor. That DIP financing ultimately led to the successful sale process and, following M1's termination, the plan of liquidation to complete the Chapter 11 Case. Obtaining DIP financing for Debtor under its then-present condition was a significant and substantial accomplishment of M1. Debtor's prior advisor in the four months preceding its determination to proceed under Chapter 11 had not been able to locate even one (1) possible source of financing, while M1 was able to promptly locate a lender, Arena. As a result of that financing, the Debtor's management, upon consultation with M1, concluded the negotiation of the term sheet and ultimately borrowed $10,110,000 in funds from Arena.

23. During the negotiations, Arena requested and Debtor's management, led by its then-CFO, agreed to award warrants to Arena. The DIP constitutes an Equity Financing under the Engagement Letter and Retention Order, for a fee payable to M1 of 3.5% of total funds actually advanced under the Equity Financing ($10.11 million), not on the $19 million commitment given by Arena, resulting in an Equity Financing fee to M1 of $353,850.

24. **Success Fee**. Similarly, the marketing process was commenced through the distribution of the teaser and sales materials by M1 and its initial conversations with the responding parties regarding non-disclosure agreements, although the work was ultimately

11

transitioned to the larger investment banker, Parkman Whaling, as requested by Arena and Debtor. In addition, the sale process was led by the stalking-horse credit bid of Arena, the financing party that M1 was instrumental in locating for Debtors. The Debtor ultimately achieved a confirmed liquidating plan, largely as a result of that sale process, that M1 commenced.

25. The sale of substantially all of the assets of Debtor to NOV constitutes a Transaction under the Engagement Letter and Retention Order. Although the Engagement Letter was terminated as of April 2017, the Transaction Fee of $500,000 is nonetheless earned under Sections 3(b) and 4 of the Engagement Letter.

26. **Payments to Date**. M1 has received payments to date totaling $216,000. As a result, the net compensation requested by M1 hereunder for fees and disbursements, after deducting for monies received, is $893,583.15

27. In accordance with Bankruptcy Code section 504, M1 has no agreement or understanding between M1 and any other entity, other than employees of M1, for the sharing of compensation received or to be received for services rendered in connection with these Chapter 11 Cases.

## DESCRIPTION OF SERVICES RENDERED

28. M1's strategic and financial expertise, as well as its knowledge of oil and gas valuation and operation knowledge, financing skills, and restructuring capabilities, played a critical role in the performing the work for Debtor that it accomplished. Among other things, M1 advised the Debtors in the following key areas during the Application Period:

> (a) M1 participated in weekly, and at times daily, planning sessions and other periodic meetings with the Debtor's management and

CRO, together with its legal counsel concerning process and strategy issues related to the bankruptcy;

(b) M1 participated in numerous meetings with the Debtor's management and presented materials regarding bankruptcy process and strategic issues;

(c) M1 professionals assisted the Debtor's management in locating, negotiating and completing a structure for obtaining the critical DIP post-petition financing, and M1 responded to requests from Debtor's CFO who completed the final negotiations of that equity financing;

(d) M1 professionals also worked with the Debtor to prepare Court filings and attended Court hearings;

(e) M1 professionals provided expert financial analysis and valuation work for the Debtor as well as assisted in preparing for testimony and hearings for Debtor in connection with the restructuring process;

(f) M1 prepared materials and solicited, conducted and performed a process to seek to raise capital from investors to restructure the Debtor in the bankruptcy; and

(g) M1 prepared sales materials and a draft, and ultimately assisted in the completion, of a teaser for the marketing process for the sale of Debtor's assets, and M1 distributed the teaser to over 500 potential purchasers of Debtor's oil and gas assets, and distributed sales materials to all parties who had executed non-disclosure agreements.

29. Senior level professionals with extensive experience in the area of investment banking and bankruptcy services directed M1's team. The financial advisory and investment banking services set forth above were performed primarily by Richard Bernardy (Partner/Senior Banker) and Hayden Munsell (Senior Analyst). The senior banker was also responsible for day-to-day coordination of the case and the review of all financial analyses and strategies for M1. The experienced senior analyst managed the budget, monthly operating reports, compliance

reporting under the DIP loan agreement, and prepared management reports during the case while M1 provided such services.

30. As noted above, M1 does not generally bill its clients based on the number of hours expended by its professionals. Accordingly, M1 does not have hourly rates for its professionals, and M1 professionals generally do not maintain time records for the work performed for its clients. Consistent with the terms of the Retention Order, however, M1 has attached hereto as Exhibit C a log setting forth the activities and services performed by M1 on behalf of the Debtors, in half-hour increments, during the period of its retention.

### ACTUAL AND NECESSARY EXPENSES INCURRED BY M1

31. As noted above, Debtor requested M1 engage in discussions to assist in the orderly and cooperative transition and negotiation of the "settlement agreement" to allow for a quick transition from M1 to Parkman Whaling, LLC, and agreed to M1's retention of counsel to expedite that process. As set forth in Exhibit D attached hereto, M1 has incurred a total of $35,733.15 in reimbursable expenses during the Application Period (but only up through the April 11, 2017 date of the hearing to approve Debtor's proposed settlement agreement with M1), including those expenses associated with the legal fees incurred in the effort, as requested by Debtor, to move for a quick transition from M1 to ultimately, Parkman Whaling LLC. None of the expenses or disbursements (in legal expenses) being sought by M1 relate to time periods after the April 11, 2017 hearing date nor for the preparation of M1's Fee Application. Those expenses are attached hereto as Exhibit D, and they are recorded in accordance with the requirements of the Retention Order.

32. M1's charges for expenses to the Debtors are determined in the same manner as for clients in non-bankruptcy matters. Out-of-pocket expenses incurred by M1 are charged to a

client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. M1 does not factor general overhead expenses into disbursements charged to clients in connection with chapter 11 cases. M1 has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtors.

**M1'S REQUESTED COMPENSATION AND
REIMBURSEMENT SHOULD BE ALLOWED**

33. Pursuant and subject to the Retention Order, M1's fees and expenses are subject to the standard of review provided for in section 328(a) of the Bankruptcy Code.

34. Section 328(a) of the Bankruptcy Code permits, with the Court's approval, the employment of a professional person "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Section 328 represents a departure from the practice that prevailed before the enactment of the Bankruptcy Code in 1978. The purpose of section 328 is to permit the pre-approval of compensation arrangements as a method of insuring that the most competent professionals will be available to provide services in bankruptcy cases.

35. Once the terms of a professional's retention have been approved under section 328(a) of the Bankruptcy Code, the approved compensation structure cannot be altered unless the agreed terms "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Id.

36. In the instant case, M1 respectfully submits that the services for which it seeks compensation in the Application were necessary for and beneficial to the Debtors and their estates and were rendered to protect and preserve the Debtors' estates. These expenses are also consistent with its Engagement Letter approved by this Court through its Retention Order.

15

Accordingly, M1 respectfully submits that fees and expense reimbursement sought herein should be allowed and approved by this Court pursuant to sections 328(a) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

37. M1 does not waive, and expressly reserves, its right to respond to any objections regarding this Application and the amounts sought for M1's work in the Chapter 11 Case.

38. Although every effort has been made to include all fees and expenses incurred in the Application Period, some fees and expenses might not be included in this Application due to delays caused by accounting and processing during the Application Period and M1 understands that if not included, they will not be within the scope of this Final Fee Application. Moreover, M1 lost computer back-up for materials during a period of time that includes some of the Application Period and where such information in regards to the time records of M1 were lost or incapable of being retrieved, M1 has attempted in good faith to recreate such records to the best of its ability.

## NO PRIOR REQUEST

39. No previous request for the relief sought herein has been made to this or any other court.[6]

## CERTIFICATION

40. Attached as Exhibit E is the Certification provided by M1.

---

[6] Although no other requests were made for these fees, Debtor requested M1 work with it towards an agreement to rapidly transition from M1 to Petrie Parkman in March and April 2017, a request with which M1 complied. While this Court was unwilling to approve that proposed settlement on an expedited basis, it was not in fact a request for these same fees as it included concessions associated with that agreement.

# NOTICE

41. Notice of this Application has been provided to (i) the Office of the United States Trustee in accordance with Local Rule 9003-1; (ii) in accordance with Procedure II.A.4 of the Administrative Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts; and (iii) in accordance with the Order Granting Complex Chapter 11 Bankruptcy Case Treatment.

# CONCLUSION

WHEREFORE, M1 respectfully requests that the Court enter an order substantially in the form filed herewith, granting final allowance and approval of compensation of $1,073,850 to M1 for professional services rendered as financial advisor for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $35,733.15, less such amounts advanced to date of $216,000, and such other and further relief as may be just and proper.

Dated: March 5, 2018                    Respectfully submitted,

**MAYER BROWN LLP**

By:/s/ Charles S. Kelley
Charles S. Kelley
State Bar No. 11199580
Southern District of Texas Bar No. 15344
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone: 713 238-3000
Facsimile: 713 238-4888

**ATTORNEYS FOR M1 ENERGY CAPITAL MANAGEMENT, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2018, the foregoing document has been served on all parties of record via the Court's ECF system, and copies of the same have been mailed to others in accordance with the Notice provisions herein.

/s/ Charles S. Kelley _____