**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
07/10/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **NORTHSTAR OFFSHORE GROUP, LLC** | § | **CASE NO: 16-34028** |
| **Debtor(s)** | § | |
| | § | **CHAPTER 11** |

**<u>MEMORANDUM OPINION</u>**

On May 1, 2019, Medco Energi US LLC filed an amended application seeking allowance and payment of an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) in the amount of $1,512,305.00. The $1,512,305 represents Northstar's pro rata liability for decommissioning work provided on two leases—the EC 317 Lease and the EC 318 Lease—it co-owned with Northstar Offshore Group, LLC. As set forth below, there is no dispute that Northstar owes this amount to Medco Energi. The sole issue is whether the claim has priority over other general unsecured claims. It does not.

Medco Energi argues that its claim is entitled to administrative priority either in the form of: (i) reimbursement by virtue of Northstar and Medco Energi's co-ownership of the EC 317/318 Leases in accordance with federal and state law; or, (ii) alternatively through subrogation of its claim to that of a state agency pursuant to 11 U.S.C. § 503(a).

On May 22, 2019, Northstar filed an objection to Medco Energi's amended application for allowance and payment of an administrative expense, arguing that Medco Energi's claim does not qualify for administrative priority pursuant to 11 U.S.C. § 503(b)(1)(A) because: (i) the leases were no longer property of the estate at the time the decommissioning costs were incurred; (ii) the costs were not actual or necessary and they did not benefit the bankruptcy estate; (iii) costs incurred as part of decommissioning the EC 318 Lease are prepetition obligations; and

(iv) there exists no administrative claim, in light Northstar's rejection of the leases, to which Medco Energi can subrogate its claim.

On July 16, 2019, Northstar filed a supplemental objection to Medco Energi's amended application, setting forth additional arguments.   Northstar maintained that, in addition to the reasons set forth in its original objection, Medco Energi is further not entitled to an administrative expense pursuant to 28 U.S.C. § 959(b) because: (i) once rejected, the EC 317/318 Leases were no longer a part of the estate and therefore no longer subject to § 959(b), which requires that a debtor-in-possession or trustee to manage and operate the property *in his possession*; and (ii) Northstar had sold substantially all of its assets at the time the decommissioning costs were incurred and therefore had ceased all business operations.   In essence, there was no property to manage.

On July 17, 2019, the Court held a hearing on Medco Energi's amended application.   The Court noted that in light of the fact that the parties did not contest the existence of a claim nor the contractual responsibilities of each party as to the EC 317/318 Leases, the only issue remaining was whether Medco Energi's claim was entitled to administrative priority.   At the conclusion of the hearing, the Court requested that the parties file further briefing on the issue of whether Medco Energi was entitled to subrogation under 11 U.S.C. § 509.

For the reasons set forth below, the Court finds that Medco Energi is not entitled to subrogation pursuant to § 509(a).

## Background[1]

Northstar Offshore Group, LLC ("Northstar") was an oil and gas company headquartered in Houston, Texas, focused on offshore oil and gas exploration.   (ECF No. 106 at 6–7).   In 2012,

---

[1] A substantial portion of this background section was written in reliance on the parties' briefing.   It is included solely for background.   The statements in this background section do not constitute findings by the Court.

Northstar shifted the focus of its business from actively producing oil and gas wells to the discovery of new oil fields and began leveraging debt to finance its exploration and test drilling. (ECF No. 106 at 25).

By the second half of 2014, oil prices began to drop, which also coincided with a criminal fraud investigation into the Platinum Partner entities that formed Northstar's parent organization. (ECF No. 106 at 25). These events caused Northstar to experience a liquidity crisis and made it difficult to continue operating in the Gulf of Mexico. (ECF No. 106 at 25).

Northstar's financial situation came to head on August 12, 2016, when Alliance Offshore, LLC, Alliance Energy Services, LLC, and Montco Oilfield Contractors, LLC—three of Northstar's creditors—filed an involuntarily bankruptcy petition for Northstar pursuant to 11 U.S.C. § 303. (ECF Nos. 106 at 25; 1346 at 1). At Northstar's request, the Court granted relief and converted Northstar's case to a voluntary case under Chapter 11 on December 2, 2016. (ECF No. 1346 at 1 (citing ECF No. 88)).

On December 6, 2016, the Court entered an order setting the bar date for proofs of claim. (*See* ECF No. 131). The order established March 1, 2017, as the deadline by which proofs of claim were required to be filed by holders of claims other than governmental units, and May 31, 2017, as the deadline by which proofs of claim were required to be filed by governmental units. (ECF Nos. 131; 1346 at 2).

On August 2, 2017, the Court entered an order, which approved the sale of substantially all of Northstar's assets and the assumption and assignment of certain executory contracts, and further granted other related relief ("Sale Order"). (*See* ECF No. 792). Pursuant to the Sale Order, Northstar sold substantially all of its assets free and clear to Northstar Offshore Ventures, LLC ("NOV") on August 3, 2017. (*See* ECF Nos. 792; 800; 1346 at 2).

Thereafter, on August 18, 2017, Northstar filed its first omnibus motion to reject executory contracts and unexpired leases. (*See* ECF No. 828). Among the contracts and leases which Northstar wished to reject were the "EC 317 and EC 318 Agreements":

i. Offshore Operating Agreement effective August 27, 2004, between Novus Louisiana LLC and Darcy Energy, Ltd.;

ii. First Amended and Restated Offshore Operating Agreement between Medco Energi US LLC and Leed Petroleum LLC dated effective April 1, 2008, whereby parties "amended and restated the Original Agreement" (Offshore Operating dated August 27, 2004) and to reflect further amendments as well; and

iii. First Amendment to and Ratification of Memorandum Operating Agreement and Financing Statement dated effective May 17, 2011 by and between Medco Energi US LLC and Marlin GOM I, L.L.C. recorded in Cameron Parish under File No. 322020 in the Conveyance and Mortgage Books.

(ECF No. 828 at 5). All three agreements related to the operation of the Leases in question between Northstar and Medco Energi US LLC (the "Operating Agreements"). (ECF No. 828 at 5). The Court entered an order granting Northstar's motion to reject certain agreements and unexpired leases on September 11, 2017. (ECF No 846 at 13). The agreements' rejections became effective on August 18, 2017 (the "Rejection Date"). (*See* ECF Nos. 1342 at 5; 1346 at 3 ("[T]he Debtor rejected the EC Leases because the costs associated with the leases were greater than the profits attributable to those properties, and therefore, did not benefit the estate.")).

The Court confirmed Northstar's Second Amended Plan of Liquidation on December 22, 2017. (*See* ECF No. 1078). The terms of the Second Amended Plan created the Northstar Litigation Trust (the "Trust"), which received all of Northstar's causes of action on the effective date of the Plan—January 19, 2018. (ECF Nos. 969 at 17–18; 1342 at 3). The terms of the Plan also established James Katchadurian as the administrator of the Trust. (ECF No. 969 at 11). In

his role as Litigation Trustee, James Katchadurian was approved to "oversee the implementation of the Plan and the Liquidation of" Northstar's estate, "including the filing of claim objections." (ECF No. 1346 at 3).

The plan established February 18, 2018, as the administrative expense claims bar date and April 19, 2018, as the bar date for administrative claim objections.  (ECF No. 1346 at 3).  On April 2, 2018, Northstar moved to extend the objection deadline, which the Court approved on April 10, 2018.  (ECF No. 1185).  The order extended the objection deadline through July 18, 2018.  (ECF No. 1185 at 1).  Thereafter, Northstar requested and obtained further orders extending its claim objection deadline until September 30, 2019.  (*See* ECF Nos. 1239; 1300; 1340).

### *Relationship between Northstar and Medco Energi*

On July 1, 1983, the United States Department of the Interior through the Minerals Management Service ("MMS") granted a mineral lease to Mobil Oil Exploration & Production Southeast Inc. and Sohio Petroleum Company covering EC Block 317.  (ECF No. 1342 at 3). The lease bears Serial No. OCS-G 5392.  (ECF No. 1342 at 3).  On the same date, the United States Department of the Interior through the MMS also granted a mineral lease to Mobil Oil Exploration & Production Company and Sohio Petroleum Company covering EC Block 318. (ECF No. 1342 at 3).  The lease bears Serial No. OCS-G 5393.  (ECF No. 1342).  The eventual decommissioning of these two leases are at the center of the dispute before the Court.

Prior to Northstar's bankruptcy filing, Northstar and Medco Energi US LLC ("Medco Energi") co-owned operating rights in certain oil and gas leases located on the Gulf of Mexico Outer Continental Shelf (the "OCS"), adjacent to the state of Louisiana.[2]  (ECF Nos. 1342 at 4;

---

[2] "In federal waters, the federal government—specifically the Secretary of the Interior—has the authority to issue leases and permits for the extraction of oil and natural gas, pursuant to the Outer Continental

1346 at 3). Those leases are the East Cameron Block 317 (the "EC 317 Lease") and the East Cameron Block 318 (the "EC 318 Lease").[3] (ECF Nos. 1342 at 3–4; 1346 at 3). The parties' rights and interest in the EC 317/318 Leases were conveyed by the United States Bureau of Ocean Energy Management ("BOEM"). (ECF No. 1346 at 3). "[T]he United States Bureau of Safety and Environmental Enforcement ("BSEE") regulates the decommissioning activities required" under the EC 317/318 Leases pursuant to Title 30 of the Code of Federal Regulations. (ECF No. 1346 at 3–4).

Although Northstar and Medco Energi co-owned operating rights to both of the EC 317/318 Leases, Medco Energi was designated as the operator of the EC 317/318 Leases—a designation it received with Northstar's consent. (ECF Nos. 1342 at 4; 1346 at 4). In connection with the EC 317/318 Leases, Northstar and Medco Energi were parties to the following Operating Agreements:

    i. Offshore Operating Agreement effective August 27, 2004, between Novus Louisiana LLC and Darcy Energy, Ltd.;

    ii. First Amended and Restated Offshore Operating Agreement between Medco Energi US LLC and Leed Petroleum LLC dated effective April 1, 2008, whereby parties "amended and restated the Original Agreement" (Offshore Operating dated August 27, 2004) and to reflect further amendments as well; and

    iii. First Amendment to and Ratification of Memorandum Operating Agreement and Financing Statement dated effective May 17, 2011 by and

---

Shelf Lands Act (OSCLA)." *Review of U.S. Ocean and Coastal Law*, U.S. COMM'M. ON OCEAN POLICY (2004). Louisiana is extended 3 nautical miles—or the equivalent of 5.560 kilometers/3.455 miles— seaward of the baseline from which the breadth of the territorial sea is measured. Petroleum Dynamite, *Tulanian*, Ryan Rivet (June 2008). These measurements were defined under pre-1954 standards, which measured each nautical mile as the equivalent of 6,080.2 feet. *Id.*

[3] "The United States Department of the Interior, Minerals Management Service ("MMS"), is the agency within the Federal Government tasked with the responsibility for managing the Federal Government's offshore leasing program under 43 U.S.C. § 1344." U.S. Dep't of Interior, Boundary Development on the Outer Continental Shelf, *OSC Report MMS 99-0006,* https://www.boem.gov/sites/default/files/boem-newsroom/Library/Publications/1999/99-0006.pdf.

> between Medco Energi US LLC and Marlin GOM I, L.L.C. recorded in
> Cameron Parish under File No. 322020 in the Conveyance and Mortgage
> Books.

(ECF No. 1346 at 4).[4]  Pursuant to the Operating Agreements, Northstar owned a 25% working

interest in each of the EC 317/318 Leases and Medco Energi owned a 75% working interest in

each of the EC 317/318 Leases.  (ECF Nos. 1342 at 5; 1346 at 4).

On April 13, 2012, the EC 318 Lease terminated due to non-production.  (ECF Nos. 1342

at 5; 1380 at 2).  All wells located on the EC 318 Lease were then plugged and abandoned in

accordance with applicable regulations.  (ECF Nos. 1342 at 5; 1380 at 2).  Thereafter, by

correspondence dated March 12, 2014, BOEM approved an application for and granted Medco

Energi a Right of Use and Easement ("RUE") relative to the platform located on the EC 318

Lease.  (ECF Nos. 1346 at 4; 1380 at 2).  The RUE allowed access to the EC 318 Lease's

platform for the continued production and operation of the EC 317 Lease.  (*See* ECF No. 1375 at

10 ("The EC 318 platform, which was accessible through the RUE, 'was being used . . . in order

to produce the [EC] 317 [Lease's] field, which didn't have equipment sufficient to produce' its

---

[4] The notice of lien filed by Medco Energi relates to four leases: two leases covering "Main Pass Block 54/65" and two other leases covering "East Cameron Blacks 317/318."  Those leases are covered by the following agreements as set forth by Medco Energi:

1. Offshore Operating Agreement dated May 17, 1982 by and between Howell Petroleum Corporation, et al; Offshore Operating Agreement dated November 15, 1983 by and between Total Petroleum, Inc., et al; and Unit Operating Agreement, 7500' San Unit, Blocks 64 and 65, Main Pass Area, effective March 1, 1990 by and between Howell Petroleum Corporation, et al; all of which are amended, restated and replaced by that certain First Amended and Restated Offshore Operating Agreement effective April 1, 2008, by and between Medco Energi US LLC and Leed Petroleum LLC; and

2. First Amended to and Ratification of First Amended and Restated Offshore Operating Agreement dated Effective May 17, 2011, by and between Medco Energi US LLC and Marlin GOM I, L.L.C. recorded in Plaquemines Parish and under File Number 2011-00003275, Book 1252, Page 167 of the Conveyance Records.

(ECF No. 193 at 1–2).  An amendment to Medco's original proof of claim listing these agreements is explained below.

own field.")).  Medco Energi maintains that through the BOEM's approval of the RUE on the EC 318 Lease, the EC 318 Lease remained active, and therefore tolled the obligations to decommission the lease.  (ECF No. 1380 at 2).

The EC 317 Lease last recorded production on or about August 1, 2016.  (ECF Nos. 1342 at 6; 1346 at 4).  Thereafter, on February 27, 2017, the EC 317 Lease terminated due to non-production.  (ECF Nos. 1346 at 4; 1380 at 2).  Medco Energi claims that the "RUE relative to the EC 318 Lease expired on account of the termination of the EC 317 Lease"—on May 29, 2017—"(*i.e.* ninety days after the EC 317 Lease terminated)."  (ECF Nos. 1342 at 5;1380 at 2) (citation omitted).

On December 22, 2016, Medco Energi filed a notice of lien pursuant to 11 U.S.C. § 546, giving notice "of its perfected statutory liens" against Northstar "for material and services rendered to the wells and leases" pursuant to the agreements listed above.  (*See* ECF No. 193). The notice of lien listed the following leases: MP 64 OCS-G 04909, and MP 65 OCS-G 05692. (ECF No. 193 at 1).[5]  On February 2, 2017, Medco Energi filed another notice of lien, this time asserting perfected statutory lien against Northstar pursuant to:

> First Amended & Restated Offshore Operating Agreement between Medco Energi US, LLC and Leed Petroleum, LLC, effective April 1, 2008 and covering East Cameron Area, South Addition, Block 317 and East Cameron Area, South Addition, Block 318.

(the "Operating Agreement") (*See* ECF No. 319 at 1 (listing the leases at issue in this case: EC 317 OCS-G 05392, and EC 318 OCS-G 05393)).

*Medco Energi's Decommissioning Efforts*

Medco Energi's efforts to decommission the EC 317/318 Leases occurred in stages.  On March 7, 2017, April 6, 2017, and July 19, 2017, Medco Energi, as operator of the EC 317/318

---

[5] This notice of lien covers the "Main Pass Block 64/65" as described above in the footnote above.  (*See* ECF No. 193 at 1–2).

Leases, filed applications with the Bureau of Safety and Environmental Enforcement ("BSEE") for approval to decommission pipeline segments related to the EC 317/318 Leases.  (ECF Nos. 1342 at 7; *see* 1380 at 3).[6]  On July 19, 2017, Medco Energi filed applications with BSEE to decommission the EC 317 A platform and the EC 318 B platform.  (ECF No. 1342 at 7).  Thereafter, on August 21, 2017, Medco Energi filed applications with BSEE "to permanently abandon the EC 317, A001, A003, A004, and A005 wells, and the EC 318 A002 well."  (ECF No. 1342 at 7).

BSEE's approval of Medco Energi's applications to decommission various pipeline segments, wells, and platforms of the EC 317/318 Leases similarly occurred in stages.  On July 31, 2017, August 31, 2017, and January 24, 2018, BSEE approved Medco Energi's applications to decommission the various pipeline segments.  (ECF No. 1342 at 7–8).[7]  On October 6, 2017 and December 27, 2017, BSEE approved Medco Energi's application to decommission the EC 317 A platform and the EC 318 B platform, respectively.  (ECF No. 1342 at 7–8).  Moreover, approval of Medco Energi's applications to permanently abandon the EC 317 wells occurred over a series of months—from September 21, 2017 to August 10, 2017.  (ECF No. 1342 at 8).[8]  Approval to permanently abandon the EC 318 A002 well was granted on September 14, 2017.  (ECF No. 1342 at 8).

---

[6] The applications to decommission pipeline segments 8867 and 12251 were filed with the BSEE on March 7, 2017.  (ECF No. 1342 at 7).  The applications to decommission pipeline segments 15287 and 15288 were filed on April 6, 2017, and the application to decommission pipeline segment 17954 was filed on July 20, 2017.  (ECF No. 1342 at 7).

[7] The decommissioning of pipeline segments 8867 and 12251 was approved on July 31, 2017.  (ECF No. 1342 at 7).  Although filed last, the decommissioning of pipeline segment 17954 was approved on August 31, 2017.  (ECF No. 1342 at 7).  Finally, the BSEE approved the decommissioning of pipeline segments 15287 and 15288 on January 24, 2018.  (ECF No. 1342 at 8).

[8] The BSEE approved the abandonment of the EC 317 wells as follows: A005 was approved on August 10, 2017; A004 was approved on September 20, 2017; A001 was approved on September 21, 2017; and A003 was approved on October 12, 2017.  (ECF No. 1342 at 8).

Medco Energi claims that on or about August 9, 2017—in the midst of filing its applications with the BSEE to decommission the EC 317/318 Leases—it provided Northstar with an Authority for Expenditure ("AFE") in order to plug and abandon "the EC 317 A wells, decommission the five associated pipelines and decommission the EC 317 A and the EC 318 B [p]latforms."   (ECF No. 1342 at 7).   "The AFE estimated the projected cost of . . . decommissioning obligation at $6,600,00.00."  (ECF No. 1342 at 7).  Northstar did not sign the AFE.  (ECF No. 1342 at 7).

<em>Medco Energi's Administrative Expense Claim</em>

On March 1, 2017, approximately a week prior to the start of its decommissioning application filings with the BSEE, Medco Energi filed its original proof of claim in Northstar's bankruptcy—Claim No. 143.  (ECF Nos. 1342 at 3;1346 at 5).  Medco Energi's original proof of claim asserted a secured claim of $925,176.00 based primarily on three separate contracts.  (*See* Claim No. 143, Ex. A).  The contracts listed in Medco Energi's original proof of claim covered four leases—two leases on "Main Pass Block 64/65" and two leases on "East Cameron Blocks 317/318."  (*See* Claim No. 143, Ex. A).  Notably, Medco Energi's proof of claim indicated that the claim amount did "*not include the entirety of the decommissioning obligations of Northstar pursuant to the Operating Agreements and applicable law.*"  (*See* Claim No. 143, Ex. A) (emphasis added).

Thereafter, on January 31, 2018, Medco Energi filed "Claim No. 213, which amended and superseded Claim No. 143."  (ECF Nos. 1342 at 3; 1346 at 5).  "Accordingly, Claim No. 143 was disallowed and expunged as an amended and superseded claim, and Claim No. 213 remains as the surviving claim."  (ECF No. 1346 at 5 (citing ECF No. 1140)).  "Claim No. 213 asserted a priority claim for an estimated $1,650,000.00 or 25% of the actual decommissioning costs" for

the EC 318/317 Leases based on the estimate of the projected cost listed in the AFE, which was provided to Northstar on August 9, 2017.  (ECF No. 1346 at 5).

Medco Energi maintains that as of December 31, 2018, it had "completed the decommissioning of the EC 317/318 Leases" at a total cost of $6,049,221.00.  (ECF No. 1342 at 8; 1380).  Therefore, Medco Energi, under its amended proof of claim, alleges that Northstar's share of the decommissioning costs, in accordance with its working interest in the EC 317/318 Leases is $1,512,305.00 or 25% of the actual decommissioning costs.  (ECF No. 1342 at 8).

On January 7, 2019, Medco Energi "filed final site-clearance verification reports with the BSEE."  (ECF No. 1342 at 8).  BSEE thereafter authorized cancellation of the bonds securing the decommissioning obligations of Medco Energi and Northstar for the EC 317 Lease and the EC 318 Lease."  (ECF No. 1342 at 8).

On May 1, 2019, Medco Energi filed an amended application for allowance and payment of an administrative expenses claim against Northstar pursuant to 11 U.S.C. § 503(b)(1).  (*See* ECF No. 1342 at 1).  Under its amended application, Medco Energi seeks an administrative expense in the amount of $1,512,305.00, or the equivalent of 25% of the decommissioning costs of the EC 317 Lease and the EC 318 Lease, "plus interest at the statutory rate from the date that the obligation of Northstar came due."  (ECF No. 1342 at 12).  Medco Energi claims that it is entitled to an administrative expense in proportion of 25% of Northstar's share in the EC 317/318 Leases either in the form of: (i) *reimbursement* by virtue of Northstar and Medco Energi's co-ownership of the leases, making them joint and severally liable, in accordance with Title 30 of the Code of Federal Regulations and Louisiana law;[9] or (ii) through *subrogation* also

---

[9] "As owners of operating rights in the EC 317/318 Leases, Medco and Northstar are jointly and severally liable to the United States for decommissioning."  (ECF No. 1342 at 6 (citing 30 C.F.R. §§ 250.146, 250.1701)).  Moreover, under the Louisiana Civil Code, "expenses paid to a third person is entitled to

in accordance with Louisiana law and 28 U.S.C. § 959(b).[10]  (ECF No. 1342 at 9–11) (emphasis

added).  In support for its proposition that it is entitled to subrogation of its claim to that of

BSEE, a federal agency, Medco Energi maintains that paragraph 62 of the Confirmation Order

explicitly preserves Northstar's decommissioning obligations, without regard to any contractual

rejection Northstar may have made.  (ECF No. 1342 at 11 ("Paragraph 62 provides that rejection

did not discharge or release Northstar from its decommissioning obligations under the Outer

Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq*. ("OCSLA") and its implementing

regulations . . . and any other laws reasonably designed to protect the public health or safety from

identified hazards.")).  The text of paragraph 62 reads:

> 62.  Notwithstanding anything to the contrary elsewhere in this Confirmation Order, and/or any other Confirmation Document, nothing shall constitute a discharge, waiver, or release of any regulatory or compliance obligations that the Estate, Northstar Offshore Group, LLC and/or the Litigation Trust, as successor to Northstar Offshore Group LLC's nondischargeable regulatory obligations, have associated with maintenance, monitoring, decommissioning or any similar regulatory obligations (collectively, but without limitation, the "Regulatory Obligations") related to their Rejected OCS Leases and Grants (and, to the extent applicable, any related platforms, wells, pipelines, or equipment located on the Rejected OCS Leases and Grants), pursuant to applicable laws and regulations including, without limitation, those found in The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. ("OCSLA") and its implementing regulations found in, among other places, 30 C.F.R. Part 250, and any and all other laws reasonably designed to protect the public health or safety from identified hazards.  For the avoidance of any doubt, these Regulatory Obligations are, and shall remain, nondischargeable and survive Northstar Offshore Group LLC's bankruptcy.

(*See* ECF No. 1078).

---

reimbursement from the other co-owners in proportion to their shares."  (ECF No. 1342 at 10 (citing La. Civ. Code art. 806)).

[10] "A party paying for decommissioning work is subrogated to the claim and priority granted to a governmental agency to the extent the co-debtor has paid the creditor."  (ECF No. 1342 at 10–11 (citing La. Civ. Code art. 1898(3)).  Medco Energi further notes that "the trustee may not abandon property in contravention of a state law reasonably designed to protect public health or safety."  (ECF No. 1342 at 11 (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envt. Protection*, 474 U.S. 494, 507 (1986)).

The language of paragraph 62 matters. Paragraph 62 did not create any obligations that did not exist before the entry of the Confirmation Order, and it did not alter the priority of any obligation. It did not convert a non-regulatory obligation into a regulatory obligation. It did not elevate the status of any claim. In this Memorandum Opinion, the Court will examine the priority of the Estate's obligations without regard to the Confirmation Order.

On May 22, 2019, Northstar filed an objection to Medco Energi's amended application for allowance and payment of an administrative expense. (*See* ECF No. 1346). Northstar argues that Medco Energi's claim does not qualify for administrative priority pursuant to 11 U.S.C. § 503(b)(1)(A) because: (i) the EC 317/318 Leases were no longer property of the estate at the time Medco Energi incurred the decommissioning costs; therefore, the costs incurred are neither actual or necessary nor did they benefit the bankruptcy estate; (ii) the RUE on EC 318 platform did not toll the EC 318 Lease's decommissioning obligations; therefore, any costs incurred as part of decommissioning the EC 318 Lease were prepetition obligations; and (iii) there exists no administrative claim, in light Northstar's rejection of the Operating Agreement, to which Medco Energi can subrogate its claim. (ECF No. 1346 at 7–14).

On July 16, 2019, Northstar filed a supplemental objection to Medco Energi's amended application. (*See* ECF No. 1370). In its supplemental objection, Northstar maintained that in addition to the reasons set forth in its original objection, Medco Energi is further not entitled to an administrative expense given that 28 U.S.C. § 959(b) "requires a debtor-in-possession or trustee to manage and operate the property *in his possession.*" (ECF No. 1370 at 2) (emphasis in original) (internal quotations omitted). Northstar argued, as it did in its original objection, that once rejected, the EC 317 Lease and the EC 318 Lease were no longer a part of the estate and therefore no longer subject to § 959(b). (ECF No. 1370 at 2 ("Where property is not part of the

bankruptcy 'estate' as defined in 11 U.S.C. § 541, the debtor cannot violate the prescriptions of section 959(b) with respect to such property." (citation omitted))).   In support of its proposition that § 959(b) is inapplicable, Northstar highlights that at the time decommissioning costs were incurred, Northstar had ceased all operations.  (ECF No. 1370 at 2 (arguing that § 959(b) "does not apply when a business has ceased operations and its assets are being liquidated," because the statute requires that the debtor "*manage and operate the property in his possession*" (emphasis added) (citations omitted)).   In sum, given that that Northstar was no longer operating its business and had additionally sold substantially all of its assets to NOV at the time the decommissioning costs were incurred, § 959(b) does not apply and therefore cannot be used to grant Medco Energi an administrative priority on its claim.  (ECF No. 1370 at 3–4 (adding that all decommissioning costs "were incurred after the Effective date, at a time when the bankruptcy estate had ceased to exist and therefore the 'estate' could not have derived a benefit from such expenditures")).  Rather, Medco Energi is only entitled to an unsecured claim.

On July 17, 2019, the Court held a hearing on Medco Energi's amended application.  (*See* ECF No. 1375).  At the hearing, the Court noted that the only issue remaining was whether Medco Energi's claim was entitled to administrative priority on its claim.  (ECF No. 1375 at 20 ("I think that what we really have now is the legal question of whether the decommissioning work creates as an administrative claim not whether it existed and not whether they were contractual responsibilities . . . .")).  Moreover, Medco Energi made clear that its argument was based on paragraph 62 of the Confirmation Order, rather than the rejected Operating Agreement.  (ECF No. 1375 at 23 ("[I]n fact, paragraph 62 specifically [states] that notwithstanding the rejection or any other order entered that the decommissioning obligations are neither discharged, waived, nor released.")).  At the conclusion of the hearing, the Court requested that the parties

file further briefing on the issue of whether Medco Energi is entitled to subrogation under 11 U.S.C. § 509.

In its supplemental brief, Medco Energi argues that it "is subrogated to the rights of the Bureau of Safety and Environmental Enforcement ('BSEE') against Northstar" by virtue of 11 U.S.C § 509(a) and, alternatively by virtue of Louisiana law, which is made applicable through the Outer Continental Shelf Lands Acts ("OCSLA").  (*See* ECF No. 1380).

Northstar filed two supplemental briefs in response to the Court's question.  (*See* ECF Nos. 1081; 1082).  Northstar first challenges the availability of a claim to which Medco Energi can subrogate but makes its argument assuming *arguendo* that the United States could have a claim against Northstar, entitling it to administrative priority.  (ECF No. 1381 at 1).  Northstar maintains that 11 U.S.C. § 509(b)—which acts as an exception to § 509(a)—precludes subrogation because Medco Energi, as the operator under the EC 317/318 Leases, "was primarily liable on the decommissioning obligations" and received consideration "in the form of a release from its obligation" to the United States.  (ECF No. 1381 at 10).  Moreover, Northstar argues that Louisiana law does not apply to this case given that: (i) Medco Energi "is not proceeding under an agreement governed by OSCLA" and therefore "Louisiana law does not act as the applicable law"; and (ii) even if Medco Energi was proceeding under the Operating Agreement, state law only applies on the Outer Continental Shelf ("OCS") "where there is a 'gap' in federal law on the subject matter at issue—*notwithstanding whether the adjacent state's laws are inconsistent with federal law or not.*"  (ECF Nos. 1381 at 11–13; 1382 at 2) (emphasis in original) (citations omitted).

**Jurisdiction**

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

**Analysis**

## I.  Administrative Claim pursuant to 11 U.S.C. § 503(b)(1)(A) & 28 U.S.C. § 959(b)

Medco Energi claims it is entitled to the allowance and payment of an administrative expense claim against Northstar pursuant to 11 U.S.C. § 503(b)(1)(A).  (*See* ECF No. 1342 at 1). Specifically, Medco Energi claims that it is entitled to reimbursement in proportion of Northstar's 25% share in the EC 317 Lease and the EC 318 Lease by virtue of Northstar and Medco Energi's post-petition co-ownership of the leases in accordance with Louisiana law, and that such is elevated to an administrative expense by virtue of 28 U.S.C. § 959(b).  (*See* ECF No. 1342 at 10 ("Medco is, thus entitled to reimbursement from Northstar as a result of the co-ownership of the EC Lease and the EC 318 Lease post-petition.") (citing La. Civ. Code art. 806)).

However, at the hearing on Medco Energi's application, Medco Energi made it clear that it no longer sought administrative priority by virtue of the EC 317 Lease and EC 318 Lease, which were rejected by Northstar; rather Medco Energi maintains that Paragraph 62 of the Confirmation Order explicitly preserves Northstar's decommissioning obligations, without regard to any contractual rejection Northstar may have made.  (ECF No. 1342 at 11 ("Paragraph 62 provides that rejection did not discharge or release Northstar from its decommissioning obligations under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq*. ("OCSLA")

and its implementing regulations . . . and any other laws reasonably designed to protect the public health or safety from identified hazards.")).  In essence, Medco Energi argues that it is entitled to administrative priority through subrogation of its claim to that of BSEE.  (*See* ECF No. 1342 at 10–11 ("A party paying for decommissioning work is subrogated to the claim and priority granted [to] a governmental agency to the extent the co-debtor has paid the creditor." (citations omitted)).

Northstar maintains that Medco Energi is not entitled to administrative status as to its claim pursuant to 11 U.S.C. § 503(b)(1)(A), in light of the fact that 28 U.S.C. § 959(b) is inapplicable where: (i) once rejected, the EC 317 Lease and the EC 318 Lease were no longer a part of the bankruptcy estate as defined by 11 U.S.C. § 541; and (ii) at the time decommissioning costs were incurred, Northstar had ceased all operations and its assets were liquidated, which precludes the statute's application given that the statute "requires a debtor-in-possession or trustee to manage and operate the property *in his possession*."  (*See* ECF No. 1370 at 2–4 (noting that all decommissioning costs "were incurred after the Effective date, at a time when the bankruptcy estate had ceased to exist and therefore the 'estate' could not have derived a benefit from such expenditures")).  Moreover, Northstar highlights that the argument above furthers the notion that there is no longer an estate to which Medco Energi could provide a benefit pursuant to § 503(b)(1)(A).

Finally, Northstar claims that Medco Energi may not avail itself of the Confirmation Order to subrogate its claim to that of the BSEE's.  (*See* ECF No. 1375 at 42 ("[F]irst of all, Medco makes much of the . . . language in the Plan.  That language was specifically crafted by the Government.  We reviewed it.  We put it in the Plan and it was an agreement that we would continue to be bound to the Government.  Medco nor any other party in this case is a third-party

beneficiary of that language.")).   Therefore, Northstar argues that Medco Energi is only entitled to general, unsecured priority on its claim.

*11 U.S.C. 503(b)(1)*

"The Bankruptcy Code provides that 'actual, necessary costs and expenses of preserving the estate' are characterized as administrative expenses [under] 11 U.S.C. § 503(b)(1)(A) [], entitled to priority over the claims of other secured creditors." *In re H.L.S. Energy Co. Inc.,* 151 F.3d 434, 437 (5th Cir. 1998) (citing 11 U.S.C. § 507(a)(1)); *see* 4 COLLIER ON BANKRUPTCY ¶ 503.06 (Richard Levin & Henry J. Sommers eds., 16th ed.) ("The first of the specified types of claims allowable as administrative expenses are those described by section 503(b)(1)(A) as the 'actual, necessary costs and expenses of preserving the estate.'")   Moreover, an "actual and necessary cost" must have been of benefit to the estate and its creditors.   *In re H.L.S. Energy Co. Inc.,* 151 F.3d at 437 (citing *In re TransAmerican Nat. Gas Corp.,* 978 F.2d 1409, 1416 (5th Cir. 1992)); *cf.* 4 COLLIER ON BANKRUPTCY ¶ 503.06[1] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added) ("Although the trustee has an implicit duty to preserve and safeguard the estate and its assets for the benefit of all creditors, preservation may also include and be means to other ends in the administration of an estate, such as *the continuation of the business or an orderly liquidation*." (emphasis added)).   "This requirement is in keeping with the conceptual justification for administrative expense priority: that creditors must pay for those expenses necessary to produce distribution to which they are entitled." *In re H.L.S. Energy Co. Inc.,* 151 F.3d at 437 (citation omitted).   "That is, the costs of salvage are to be paid." *Id.*   "The 'benefit' requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'" *Id.*

"Generally, section 503(b) priorities should be narrowly construed to maximize the value of the estate for all creditors."  4 COLLIER ON BANKRUPTCY ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.).  Moreover, "allowing administrative expense priority under section 503(b)(1) is important to provide an *incentive* for creditors to continue doing business with a debtor and an incentive for others to engage in business transactions with the debtor:

> Administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization.

4 COLLIER ON BANKRUPTCY ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.) (citing *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir. 1984)).

In general, "[f]or a claim to be allowed as an administrative expense, goods or services must be delivered or provided pursuant to a *postpetition transaction*; it is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor prepetition.  4 COLLIER ON BANKRUPTCY ¶ 503.06[3][a] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added) (citing *Pension Benefit Guar. Corp. v. Skeen (In re Bayly Corp.*), 163 F.3d 1205 (10th Cir. 1998)).  Moreover, although § 503 "is silent as to when expenses of a debtor in a reorganization case cease to be accorded administrative priority, courts generally recognize that plan confirmation cuts off the accrual of further administrative expenses." *Id.*  "This is true because the 'estate' usually no longer exists after plan confirmation or, at the latest, after the effective date of the plan or reorganization." *Id.*  Such notion is highlighted in Northstar's objection to Medco Energi's claim:

> In short, Medco's efforts to procure an administrative claim by relying on section 959(b) are misplaced because the provision has no application where[:] (i) the property which was purportedly benefited by Medco's expenditure was not in the possession of the trustee and was no longer property of the estate due to the proper rejection of the related agreements; (ii) the decommissioning costs were incurred after the debtor had ceased operations—at a time when most authorities

> find that section 959(b) is inapplicable; and (iii) the decommissioning expenses were incurred after the Effective Date—*a time when the bankruptcy estate had ceased to exist and therefore could not have been benefitted thereby.*

(ECF No. 1370 at 5) (emphasis added).  Medco Energi, however, challenges this assertion—that Northstar's plan confirmation cut of its rights with regard to administrative priority of its decommissioning costs' claim—in light of Paragraph 62 of the Confirmation Order:

> In this case, the Debtor did reject the lease and while I might not agree that you can reject an oil and gas lease . . . for these purposes, I'm not going down that road . . . the Confirmation Order makes clear at paragraphs 61, *et seq.,* makes clear, in fact, paragraph 62 specifically, that notwithstanding the rejection or any other order entered that the decommissioning obligations are neither discharged, waived, nor released.

(ECF No. 1375 at 23).  Thus, Medco Energi seeks administrative priority of its decommissioning claim through a state agency's—the BSEE's—right to priority of a potential environmental claim.

> While this court affirmed Northstar's rejection of its contractual interests in the EC 317 Lease and the EC 318 Lease in paragraph 61 of the Confirmation Order, it did so expressly subject to paragraph 62 thereof.  Paragraph 62 provides that rejection did not discharge or release Northstar from its decommissioning obligations under the Outer Continental Shelf Lands Act, 43 U.S.C. § 133, *et seq.* ("OCSLA") and its implementing regulations, including CFR Part 250, and any other laws reasonably designated to protect the public health or safety from identified hazards.

(ECF No. 1342 at 11).

In addition to Paragraph 62 of the Confirmation Order, Medco Energi primarily relies on the Supreme Court's decision in *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494 (1986), the Fifth Circuit's decision in *In re H.L.S. Energy Co. Inc.,* 151 F.3d 434, 437 (5th Cir. 1998), and this Court's decision in *In re American Coastal Energy, Inc.* 399 B.R. 805 (Bankr. S.D. Tex. 2009) for its proposition that an estimated $1,512,305.00 or Northstar's 25% share of the actual decommissioning costs for the EC 318 Lease and the EC 317 Lease—although

considered a prepetition claim—should be granted post-petition status under 28 U.S.C. § 959(b),

and thus administrative priority pursuant to § 503(b)(1)(A).  (*See generally* ECF No. 1375 at 22

(answering the Court's question: "So it's a prepetition claim which made them have post-petition

administrative status based on *Midlantic,* right?" in the affirmative); *see also* at 23 ("We submit,

Your Honor, that this Court's Order made clear that the *Midlantic* principle applies to theses

leases.  The Debtor's obligation, a creature of leases and federal law, was neither affected by the

Plan, the rejection or the Confirmation Order.  It persists.  And those obligations became due and

enforceable post-petition.")).

"In *Midlantic,* the Supreme Court ruled that a bankruptcy trustee could not abandon

property contaminated with hazardous waste in contravention of state or local laws designed to

protect public health or safety."  4 COLLIER ON BANKRUPTCY ¶ 503.06[4] (Richard Levin &

Henry J. Sommers eds., 16th ed.).  The Supreme Court stated, in pertinent part:

> Title 28 U.S.C. § 959(b) provides additional evidence that Congress did not
> intend for the Bankruptcy Code to pre-empt all state laws.   Section 959(b)
> commands the trustee to "manage and operate the property in his possession . . .
> according to the requirements of the valid laws of the state."  Petitioners have
> contended that § 959(b) is relevant only when the trustee is actually operating the
> business of the debtor, and not when he is liquidating it.  Even though § 959(b)
> does not directly apply to an abandonment under § 554 of the Bankruptcy Code—
> and therefore does not de-limit the precise conditions of an abandonment—the
> section nevertheless supports our conclusion that Congress did not intend for the
> Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise
> of a trustee's powers.

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494, 505 (1986).  The Supreme

Court, however, expressly left open the question of the priority accorded to governmental costs if

the trustee fails to respond to a cleanup order.

In *American Coastal,* this Court discussed the determinations of both *H.L.S. Energy* and

*Midlantic* and their subsequent effects.  399 B.R. 805 at 808–17.  This Court first noted that in

*H.L.S. Energy,* the "Fifth Circuit held that an expense incurred post-petition to remedy a post-petition environmental liability" qualifies as an administrative expense under § 503(b)(1)(A):

> H.L.S Energy, like American Coastal, had oil and gas wells that were inactive for more than one year and thus subject to the Texas Administrative and Natural Resources Codes' plugging requirement.  Post-petition, the Commission incurred plugging expenses.  However, the one-year period of inactivity did not conclude until *after* H.L.S. Energy filed a bankruptcy petition.  Accordingly, although H.L.S Energy's plugging liability was attributable to H.L.S Energy's pre-petition conduct, the timing of the obligation meant that the first day on which Texas could enforce the obligation arose during the pendency of the case.  The Fifth Circuit held that the plugging expense was an actual and necessary cost of the estate.  The Fifth Circuit reasoned that debtors must operate a bankruptcy estate in accordance with state law.  Additionally, the Court noted that continued non-compliance with the plugging requirement subjected the estate to daily fines.  Accordingly, expenses incurred to bring a debtor in compliance with state law were actual and necessary.

*American Coastal,* 399 B.R. at 809 (citing *H.L.S. Energy.,* 151 F.3d at 436–38).

This Court, however, highlighted that the "Fifth Circuit ha[d] not considered whether a well-plugging expense incurred by a state agency *post-petition to remedy a pre-petition environmental obligation* [was] also an actual and necessary expense that benefits the estate. *Id.* In determining whether such claim fell within the preview of § 503(b)(1)(A), such that the claim could be granted administrative priority, this Court looked to both 28 U.S.C. § 959(b) and *Midlantic. Id.* at 810–11.  Section 959(b) of Title 28 of the United States Code provides:

> Except as provided in section 1166 of title 11, a trustee, receiver, or manager appointed in any cause pending in any court of the United States, including a debtor in possession, *shall manage and operate the property in his possession* as such trustee, receiver, or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b) (emphasis added); *see American Coastal,* 399 B.R. at 810–11 (citations omitted).  As noted above, under the holding in *Midlantic,* pursuant to § 959(b), "a trustee cannot

abandon contaminated estate property if state health or safety law prohibits such abandonment."

*American Coastal,* 399 B.R. at 810 (citing *Midlantic,* 474 U.S. at 507).

This Court then turned to the distinction between a liability that arose post-petition versus one that arose pre-petition.  Again, highlighting the Supreme Court's decision in *Midlantic,* this Court determined that:

> The facts that the debtor does not intend to operate the property does not diminish its duty under § 959 to manage the property in accordance with state law.
>
> A debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law is not contingent upon whether the obligation arose before or after the bankruptcy filing. . . . .  [W]ith respect to environmental liabilities, whether the liability arose pre-petition or post-petition produces an analysis that is superficial.  The analysis must focus not on just when the obligation arose, *but whether the obligation continues to arise anew with the passage of each day*.

*American Coastal,* 399 B.R. at 809–10 (emphasis added).  Accordingly, this Court held that under "§ 959 and *Midlantic,* American Coastal's obligation to plug the wells in accordance with Texas law [was] a continuing post-petition obligation."  *Id.*  "American Coastal's continuing post-petition duty to conform with Texas law renders expenditure necessary to conformity with that law actual and necessary costs of preserving the estate entitled to § 503(b)(1)(a) administrative priority."  *Id.* at 812.

Under the applicable Federal Regulations governing Northstar and Medco Energi's decommissioning obligations as to the EC 317 Lease and the EC 318 Lease, the parties are jointly and severally liable for decommissioning obligations:

> (a) Lessees and owners of operating rights are *jointly and severally responsible for meeting decommissioning obligation for facilities on leases*, including obligations related to least-term pipelines, as the obligations accrue and until each obligation is met.

(b) All holders of a right-of-way *are jointly and severally liable for meeting decommissioning obligations for facilities on their right-of-way*, including right-of-way pipelines, as the obligations accrue and until each obligation is met.

(c) In this subpart, the terms "you" or "I" refer to lessees and owners of operating rights, as to facilities installed under the authority of a lease, and to right-of-way holders as to facilities installed under the authority of a right-of-way.

30 C.F.R. § 250.1701 (2011) (emphasis added).  Moreover, if lessees and owners of operating rights do not comply with their decommissioning obligations, BSEE may send such parties "a Notice of Noncompliance informing [them] what the violation is and what [the parties] need to do to correct it avoid civil penalties under 30 U.S.C. 1719(a) and (b)."  30 C.F.R. § 250.1451(a) (2011).  If violations "identified in the Notice of Noncompliance" are not corrected "within 20 days after" the Notice of Noncompliance is received, the BSEE will issue a "Notice of Civil Penalty," notifying parties the amount that must be paid.  30 C.F.R. § 250.1453(a) (2011).  "The penalty may be up to $500.00 per day, beginning with the date of Notice of Noncompliance, for each violation identified in the Notice of Noncompliance for as long" as the parties "do not correct the violations."  *Id.*  If the parties fail to correct violations within 40 days from receipt of the Notice of Noncompliance, penalties may increase to up to $5,000.00 a day.  § 250.1453(b).

Accordingly, Northstar's obligation as to the EC 317 Lease and the EC 318 Lease is of the type of "continuing post-petition duty" that this Court identified in *American Coastal,* which could render "expenditures necessary to conform with th[e] law actual and necessary costs of preserving the estate entitled to § 503(b)(1)(a) administrative priority."  *American Coastal,* 399 B.R. at 811–12.  However, unlike in *American Coastal,* the party asserting administrative priority is not a state agency, nor, as Northstar argues, was the trustee operating a business in light of Northstar's sale of substantially all of its assets to NOV, nor did 28 U.S.C. § 959 apply because the Northstar was not in possession of the property.

Medco was the operator.  Northstar was not.  As between Medco and Northstar, Medco had the operating obligation to perform the decommissioning.

In light of Medco Energi's argument that its claim survives and is entitled to administrative priority pursuant to Paragraph 62 of Confirmation Order, the Court must first address whether Medco Energi may subrogate its claim to that of the BSEE pursuant to Louisiana Law and/or 11 U.S.C. § 509(a).  (*See* ECF No. 1342 at 10 ("The Louisiana rules of solidary liability also lead to the conclusion that Medco is entitled to recover Northstar's share of the decommissioning expenses.")).

## II. Subrogation

### *Louisiana Law*

Northstar argues that Louisiana law does not apply because Medco Energi is no longer basing its claim for subrogation pursuant to the Operating Agreement, and even if it was, there is no gap in federal law on the question of subrogation that would allow Louisiana law to govern the subject matter at issue.  (ECF Nos. 1381 at 11–13; 1382 at 2)

"The purpose of the Outer Continental Shelf Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the Outer Continental Shelf." *Cont'l Oil Co. v. London S.S. Owner's Mut. Ins. Assoc.*, 417 F.2d 1030, 1034 (5th Cir. 1969), *cert. denied,* 397 U.S. 911 (1970).  "*Continental Oil* involved the allision of a vessel with a fixed platform located on the outer continental shelf off the coast of Louisiana."  *In re Tidewater Inc.,* 883 F. Supp. 105, 106 (W.D. La. 1994).  The Fifth Circuit found "that under the Outer Continental Shelf Lands Act (OCSLA) Congress did not intend for Louisiana's" Direct Action Statute ("DAS") "to become federal law on the outer continental shelf, as there were no voids or

gaps in the federal law which would necessitate its adoption." *Id.* Notably, the Fifth Circuit, in analyzing the application and use of OSCLA, stated:

> That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the act. . . . Since Federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented gaps in federal law with state law through the adoption of state law as the law of the United States. Under [section] 4 [of the Constitution], the adjacent State's laws were made the law of the United States for (the relevant subsoil and seabed) and artificial lands and fixed structures erected thereon, but only to the extent that they are applicable and not inconsistent with other federal laws.

> It is evident from this that federal law is exclusive in its regulation of this area, and that state law is adopted only as surrogate federal law.

*Cont'l Oil Co.*, 417 F.2d at 1034–35 (internal quotations omitted).

The Supreme Court recently analyzed and discussed the notion of a void or gap, which would necessitate the application of surrogate state law. *Parker Drilling Mgmt. Svc. Ltd. v. Newton,* 139 S. Ct. 1881 (2019). In analyzing various provisions of OCSLA, the Supreme Court held that "[t]aken together, these provisions convince us that state laws can be 'applicable and not inconsistent with federal law under § 1333(a)(2)(A) only if federal law does not address the relevant issue.'" *Parker Drilling,* 139 S. Ct. at 1889. Moreover, in distinguishing the issue from an ordinary preemption question, the Supreme Court noted:

> Because federal law is the only law on the OCS, and there has never been overlapping state and federal jurisdiction there, the statute's reference to 'not inconsistent' state laws does not present the ordinary question in pre-emption cases—*i.e.*, whether a conflict exists between federal and state law. *Instead, the question is whether federal law has already addressed the relevant issue;* if so, state law addressing the same issue would necessarily be inconsistent with existing federal law and cannot be adopted as surrogate federal law. Put another away, to the extent federal law applies to particular issue, state law is inapplicable.

*Parker Drilling,* 139 S. Ct. at 1890 (emphasis added) (citing *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617–18 (2011)).

Medco Energi does not claim that Louisiana law is the only applicable law, rather it contends that "Louisiana law is the applicable non-bankruptcy law" on the issue of subrogation. (ECF Nos. 1380 at 6; 1375 at 26 ("But even if Louisiana law didn't apply, we also have federal law *on this point* because in the Code, under Section 509(a), an entity that is liable with the Debtor [] or that has a secured claim for a creditor against the debtor and [] pay[s] such claim is subrogated to the rights of such creditor to the extent of such payment.") (emphasis added)). Medco Energi asserts Louisiana law as an alternative to this Court's application of 11 U.S.C. § 509.  (ECF No. 1380 at 5 ("While Section 509 provides bankruptcy-based right of subrogation, [s]ection 509 is not the exclusive source of subrogation rights in bankruptcy.")).

Accordingly, in light of Medco Energi's own recognition that there exists applicable federal law in the form of § 509 regarding the issue of whether it is entitled to subrogation of its claim, Louisiana law cannot apply as surrogate federal law.  *Parker Drilling,* 139 S. Ct. at 1890.

### *11 U.S.C. § 509*

Medco Energi argues that it is entitled to subrogation of its claim pursuant to 11 U.S.C. § 509(a) in light of Northstar and Medco Energi's joint and several liability under to 30 C.F.R. § 250.1701 (2011).  (ECF No. 1380 at 7, 12 ("The applicable federal regulations make clear that the obligation of Medco and Northstar to decommission EC 317/318 Leases is joint and several *vis-à-vis* the lessor/regulator (*i.e.,* BSEE).")).  Medco Energi maintains that its payment for decommissioning costs allows it to subrogate its claim, notwithstanding the fact that it was the operator of the leases, or that "had its own obligation" to decommission the leases.  (ECF No. 1375 at 34 ("Whether we're looking at the Louisiana Civil Code, the common law, or Section

509, they all reject the argument that simply because *Medco had its own obligation*, that that makes it not entitled to subrogation.")(emphasis added)).

As noted earlier, Northstar challenges the availability of a claim to which Medco Energi could subrogate; however, assuming *arguendo* that such claim exists, Northstar maintains that § 509(b), an exception to § 509(a), precludes subrogation where Medco Energi was primarily liable on the decommissioning obligations and received consideration "in the form of a release from its obligation" to the United States.  (ECF Nos. 1381 at 10).  Northstar—highlighting the statute's exception in § 509(b)(2)—insists that Medco Energi's full payment of the decommissioning costs itself is what precludes Medco Energi from availing itself of subrogation under § 509(a).  (ECF No. 1381 at 6–7).  Specifically, Northstar claims that "a party who is jointly and severally liable with the debtor on a claim is not entitled to subrogation where it receives *consideration* in the form of a release from any further obligation on the claim it paid." (ECF No. 1381 at 6–7 (emphasis added) (citing *Fibreboard Corp. v. Celotex Corp. (In re Celotex Corp.),* 472 F.3d 1318 (11th Cir. 2006))).  Thus, Northstar contends that in light of Medco Energi's position as operator of the leases, it held primary liability for the claim, and in paying for decommissioning costs, it relieved itself of its own liability and therefore cannot seek subrogation for paying its own debt.  (ECF Nos. 1381 at 6–7, 10; 1375 at 48 ("I don't think 509 supplants the law which is that if you're paying your own liability, your [own] independent liability, that you're not subrogated.")).

Although the Court agrees that paying its own obligation would preclude Medco Energi from asserting a subrogation claim pursuant to § 509(a), it disagrees with Northstar's characterization of Medco Energi's responsibility—namely, that it is primarily liable on the claim in light of its position as operator on the EC 317/318 Leases.

Section 509 provides in pertinent part:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has a secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

 (1) a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is—

  (A) allowed under section 502 of this title;

  (B) disallowed other than under section 502(e) of this title; or

  (C) subordinated under section 510 of this title; or

 (2) as between the debtor and such entity, such entity received consideration for the claim held by such debtor.

11 U.S.C. § 509(a)–(b).   Accordingly, under § 509, which governs "claims of codebtors, to be subrogated to a claim, creditors must show that (1) they are an entity that is liable with the debtor on, or that has secured, a claim of a creditor against a debtor, (2) they have paid the claim secured, and (3) they have not received consideration for the claim held by such creditor."  Brian H. Redmond, Annotation, *Bankruptcy: Codebtor's Subrogation Rights under 11 U.S.C.A. § 509*, 86 A.L.R. Fed. 856 (1988) (citing *In re Flamingo 55, Inc.,* 378 B.R. 893 (Bankr. D. Nev. 2007)).

 "Section 509 of the Bankruptcy Code is one of a series of provisions found in subchapter I of Chapter 5 that seek to ensure a fair allocation of estate assets among the many types of claimants that exist in bankruptcy."  4 COLLIER ON BANKRUPTCY ¶ 509.01 (Richard Levin & Henry J. Sommers eds., 16th ed.).  "Section 509 allows a co-obligor who pays, after the petition date, a claim for which the debtor is primarily liable, to be subrogated to the rights of the creditor that the co-obligor has paid." *Id.*  "Section 509 operates as a narrow, equitable backstop to ensure that a co-obligor is entitled to whatever distribution would otherwise have gone to the

creditor whose claim the obligor paid postpetition." *Id.* (citations omitted); *see In re Flamingo 55, Inc.,* 378 B.R. at 906 (noting subrogation is to be flexibly applied given that "[i]t is a legal fiction and because it is a creature of equity it is enforced solely for the purpose of accomplishing the ends of substantial justice") (internal quotations omitted)).

"Under section 509(a), an entity is liable with the debtor when the entity is obligated to pay, by law or equity, on a claim of a creditor *against the debtor*."  4 COLLIER ON BANKRUPTCY ¶ 509.01[2] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added).   In other words, in "order for subrogation to be available to the co-obligor under section 509, [] the *debtor* must be the party that in the eyes of the law is *primarily liable* for the indebtedness paid by the obligor."  *Id.* (emphasis added) (citing *Benson v. Corbin (In re Corbin),* 506 B.R. 287, 295 (Bankr. W.D. Wash. 2014)); *see* Brian H. Redmond, Annotation, *Bankruptcy: Codebtor's Subrogation Rights under 11 U.S.C.A. § 509*, 86 A.L.R. Fed. 856 (1988) ("A right to subrogation exists . . . only when the subrogee pays or discharges a debt for which another is primarily liable.") (citing *Ridge v. Smothers (In re Smothers),* 60 B.R. 733, 735 (Bankr. W.D. Ky. 1986))). This is so because "[o]ne cannot seek subrogation for paying one's own debts."  *In re Smothers,* 60 B.R. at 735.  Notably, this notion or principle is reflected further in the exception set forth under § 509(b)(2).  Taking into consideration "[t]he legislative history, and generally recognized principles of law of equitable subrogation," as set forth in the exception under § 509(b), "courts refuse to extend section 509 to a party who itself is primarily liable on the creditors claim *or* has otherwise received the consideration for the claim of the creditor."  4 COLLIER ON BANKRUPTCY ¶ 509.01[2] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added) (citing *In re Flamingo 55 Inc.,* 378 B.R. at 920).

Although both entities had liability for the claim, Medco was the operator.  It was not a mere guarantor or surety of Northstar's primary liability.

To understand why the statute allows for subrogation only in certain instances, one must understand that "[s]ection 509 is chiefly aimed at claims of sureties, guarantors and co-makers . . . ."  4 COLLIER ON BANKRUPTCY ¶ 509.01[2] (Richard Levin & Henry J. Sommers eds., 16th ed.); *see In re Tygrett,* 72 B.R. 129, 130 (Bankr. C.D. Ill. 1987) (showing consensus in that § 509 "contemplates a third party who is liable with the bankrupt.  The classic examples would be a surety, a guarantor, or an endorser").  Therefore, in order to determine whether subrogation is applicable to the issue in question, § 509 "looks to the relationship between the debtor and the co-obligor in terms of which one received the *consideration* giving rise to the *joint obligation*." 4 COLLIER ON BANKRUPTCY ¶ 509.01[2] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added).  In light of the statute's focus, "subrogation is not permitted if *the co-obligor was primarily liable* for the obligation that it incurred with the debtor."  4 COLLIER ON BANKRUPTCY ¶ 509.01[4] (Richard Levin & Henry J. Sommers eds., 16th ed.) (emphasis added).

As noted above, "[s]ection 509(b)(2) furthers this policy by making it clear that where the co-obligor itself received consideration for which its payment was made, it will not be subrogated to the rights of the creditor that it paid."  *Id.* (citing *In re Flamingo 55 Inc.,* 378 B.R. at 920).  "This implements the public policy behind section 509, which is to permit subrogation of those *secondary liable* with the debtor but to deny subrogation where the paying co-obligor is merely paying its own debt."  4 COLLIER ON BANKRUPTCY ¶ 509.01[4] (Richard Levin & Henry J. Sommers eds., 16th ed.); *see In re Flamingo 55 Inc.,* 378 B.R. at 913 (noting that subrogation's "centrality derives from the basic fact that a party cannot subrogate to its own debt").  Notably, courts have "recognized that a party who pays a judgment on which it is *jointly*

*and severally liable* with the debtor does not have a right to subrogation, because the paying creditor receives consideration in the form of a release."   4 COLLIER ON BANKRUPTCY ¶ 509.01[4] (Richard Levin & Henry J. Sommers eds., 16th ed.) (citing *Fibreboard Corp. v. Celotex Corp. (In re Celotex Corp.),* 472 F.3d 1318 (11th Cir. 2006)).

The Federal Regulations governing Northstar and Medco Energi's decommissioning obligations as to the EC 317/318 Leases provide as follows:

> (a) Lessees and owners of operating rights are *jointly and severally responsible for meeting decommissioning obligation for facilities on leases*, including obligations related to least-term pipelines, as the obligations accrue and until each obligation is met.
>
> (b) All holders of a right-of-way *are jointly and severally liable for meeting decommissioning obligations for facilities on their right-of-way*, including right-of-way pipelines, as the obligations accrue and until each obligation is met.
>
> (c) In this subpart, the terms "you" or "I" refer to lessees and owners of operating rights, as to facilities installed under the authority of a lease, and to right-of-way holders as to facilities installed under the authority of a right-of-way.

30 C.F.R. § 250.1701 (emphasis added).   Therefore, the applicable Federal Regulations make Northstar and Medco Energi jointly and severally liable for the decommissioning obligations on the leases.

Northstar and Medco Energi agree that both parties are jointly and severally liable to meet the decommissioning obligations as to the EC 317/318 Leases, despite the contractual apportionment of interests under the Operating Agreement.   (*See* ECF Nos. 1380 at 7 ("The applicable federal regulations make clear that the obligation of Medco and Northstar to decommission EC 317/318 Leases is joint and several *vis-à-vis* the lessor/regulator (*i.e.,* BSEE)."); *see also* 1381 at 5 ("Under the governing regulations, the United States could have called upon either Debtor or Medco to decommission the leases.   In this regard, the Debtor and Medco were *equally liable* to the United States for the decommissioning obligations." (emphasis

added) (internal citation omitted))).  Therefore, here, neither party was primarily or secondarily

liable as to the decommissioning obligations under the applicable law governing their obligations

as to the EC 317/318 Leases—namely, under 30 C.F.R. § 250.1701.  As such, Medco Energi

may not avail itself of § 509 to claim subrogation of its claim:

> The full requirement is that the 'entity . . . is liable with the debtor on . . . a claim
> of a creditor *against a debtor."*  The italicized language at the end of section
> 509(a) makes apparent what Section 509(b)(2) makes clear: that Section 509
> effects subrogation only when nonbankruptcy law distinguishes between primary
> and secondary liability.  This can be seen from the common situation of a
> guaranty: there is but one debt, and the guarantor is liable with the debtor on that
> creditor's claim.  Here, however, BA was directly liable itself on the debt to
> Datacom . . . .  Its liability to Datacom was *joint and several,* and not derivative
> upon claims Datacom might have against Flamingo 55.  Thus, Section 509 does
> not apply when the liability of the person seeking subrogation is *direct and of
> equal status with the debtor's.*

*In re Flamingo 55 Inc.,* 378 B.R. at 920 (emphasis added).

Accordingly, in light of the fact that Medco Energi's liability as to the decommissioning

obligations under 30 C.F.R. § 250.1701 is of equal status as that of Northstar's obligation, it is

not entitled to subrogation pursuant to § 509(a).  (*See* ECF Nos. 1380 at 7; 1381 at 5).

Moreover, because Medco Energi's liability is of equal status as that of Northstar's, in

paying for the decommissioning costs on the EC 317/318 Leases, Medco Energi received

consideration in the form of a release.  (*See* ECF Nos. 1342 at 8 ("Medco received BSEE final

approval in January 2019 for the decommission.  BSEE thereafter authorized the cancellation of

the bonds securing the decommissioning obligations *of Medco and Northstar* for the EC 317

Lease and the EC 318 Lease." (emphasis added)); *see also* 1375 at 17 (testifying that Medco

Energi received "a letter from the Bureau of Ocean and Engineering Management authorizing

the cancellation of the bonds that are relative to the leases in this case . . . .")).  The release

obtained precluded the BOEM from assessing penalties against Medco Energi.  (*See* ECF No.

1342 at 9 ("If the decommissioning requirements are not satisfied, BSEE may issue and serve a notice of noncompliance upon the lessees identifying the violations.") (citing 30 C.F.R. § 250.1451)).  It makes no difference that the BOEM could have assessed those same penalties against Northstar, because their joint and several decommissioning responsibilities on the Leases placed them on equal footing.  Therefore, in receiving a release from the BOEM, Medco Energi obtained consideration for payment on its decommissioning obligations, and may not subrogate its claim under § 509.  *See* 4 COLLIER ON BANKRUPTCY ¶ 509.01[4] (Richard Levin & Henry J. Sommers eds., 16th ed.) (noting courts have "recognized that a party who pays a judgment on which it is *jointly and severally liable* with the debtor does not have a right to subrogation, because the paying creditor receives consideration in the form of a release." (emphasis added)).

   As noted above, Medco Energi made clear at the hearing on its amended application that it no longer sought administrative priority by virtue of the EC 317 Lease and EC 318 Lease, which were rejected by Northstar; rather Medco Energi maintains that Paragraph 62 of the Confirmation Order explicitly preserves Northstar's decommissioning obligations, without regard to any contractual rejection Northstar may have made.  (ECF No. 1342 at 11 ("Paragraph 62 provides that rejection did not discharge or release Northstar from its decommissioning obligations under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq*. ("OCSLA") and its implementing regulations . . . and any other laws reasonably designed to protect the public health or safety from identified hazards.")).  In essence, Medco Energi argues that it is entitled to administrative priority through subrogation of its claim to that of the BSEE.  (*See* ECF No. 1342 at 10–11 ("A party paying for decommissioning work is subrogated to the claim and priority granted [to] a governmental agency to the extent the co-debtor has paid the creditor." (citations omitted)).

In light of the fact that Medco Energi may not subrogate its claim to that of the BSEE, and therefore may not base its claim for administrative priority on Paragraph 62 of the Confirmation Order, the Court will not address Northstar's remaining arguments.

<u>**Conclusion**</u>

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **<u>July 10, 2020.</u>**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE